IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KB Toys, Inc., *et al.*, | ) | Case No. 04-10120 (DDS) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Objection Date:** February 21, 2005 at 4:00 p.m. |
| | ) | **Hearing Date:** February 28, 2005 at 10:00 a.m. |

**MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER AUTHORIZING AND APPOINTING THE COMMITTEE TO COMMENCE AND PROSECUTE ACTIONS AGAINST INSIDERS**

The Official Committee of Unsecured Creditors (the "Committee"), by its undersigned counsel, hereby moves (the "Motion") the Court pursuant to, among others, sections 105, 1103(c)(2) and (5) and 1109(b) of title 11 of the United States Code, §§ 101-1330 (the "Code"), for the entry of an order authorizing and appointing the Committee to commence and prosecute actions, including fraudulent conveyance actions, against, among others, the current Chief Executive Officer and Director (the "CEO") of the above-captioned debtors and debtors in posession (the "Debtors"), the current Chief Financial Officer and Director of the Debtors (the "CFO"), and Bain Capital, Inc. and other related investment funds, a current member of the Debtors' Board of Directors and majority shareholder (collectively, the "Bain Entities," and together with the CEO and the CFO, the "Potential Defendants"). In support of this Motion, the Committee respectfully represents as follows:

**JURISDICTION**

1.   The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of these cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because it concerns the administration of the Debtors' estates.

RLF1-2840883-2

2.   The statutory predicates for the relief sought herein are sections 105, 1103 and 1109 of the Code.

## INTRODUCTION

3.   Since the outset of these cases, the Committee, in furtherance of its fiduciary duties, has undertaken an investigation of certain transactions involving the Potential Defendants and has conducted detailed legal and financial analyses of these transactions. Significantly, this investigation has been made *with the consent of the Debtors*, who alone have produced thousands of pages of documents. In furtherance of its investigation, the Committee has reviewed in excess of 100,000 pages of documents produced by seven different parties and has obtained several orders pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure authorizing it to obtain documents from no less than three different parties.[1] After such exhaustive efforts, the Committee believes the Debtors' estates have valid causes of action against, among others, the Potential Defendants relating to the Transaction (as defined herein) (the "Actions") and the Committee is prepared to prosecute the Actions on behalf of the estates.[2]

4.   The Committee has requested that the Debtors consent to the Committee's appointment to prosecute the Actions. The Debtors have denied the Committee's request. Notwithstanding the Debtors' consent to the Committee's approximately 12 month investigation, it is no surprise that the Debtors' current Board of Directors made the decision to deny the

---

[1] Although a significant amount of documents have been produced, certain requests remain outstanding.

[2] The Debtors have suggested that it may be appropriate to appoint an examiner under section 1106 of the Code to prosecute the Actions. However, the Third Circuit has suggested that an examiner may only be authorized to investigate, not prosecute, actions. In discussing the applicable sections of the Code, the Third Circuit Court of Appeals stated "these sections permit only investigating and reporting on that investigation – they stop far short of authorizing examiners to litigate based on their findings." *Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 578 (3d Cir. 2003). As such and given that the Committee has already undertaken an exhaustive investigation, the appointment of an examiner would be unnecessary and inappropriate.

Committee's request for standing since certain members of the Board of Directors are also Potential Defendants in the Actions.

5. As the Court of Appeals for the Third Circuit so aptly stated, "[o]ne suspects that if managers can devise any opportunity to avoid bringing a claim that would amount to reputational self-immolation, they would seize it." *Cybergenics*, 330 F.3d at 573. As such, the Committee moves this Court for an order authorizing and appointing the Committee to prosecute the Actions against, among others, the Potential Defendants.

## BACKGROUND

6. The toy business operated by the Debtors started in 1922 as a family-owned business, and continued in that form until 1981 when the business was sold to Melville Corporation ("Melville"). Melville in turn sold the KB Toys business to Consolidated Stores Corporation ("Consolidated") in 1996. On December 7, 2000, management of the Debtors together with the Bain Entities, purchased the Debtors from Consolidated for a purchase price of approximately $281 million (the "KB Acquisition").[3] Each of KB Toys, Inc., KB Acquisition Corporation and Havens Corners Corporation is a holding company whose sole assets are the shares in its direct subsidiary. KB Toys (US), Inc., an Ohio corporation, and Southdale Kay-Bee Toy, Inc. ("Southdale"), a Minnesota corporation, are also holding companies whose sole assets are the shares in their respective direct subsidiaries (except for one store operated by Southdale).

7. Mall of America Kay-Bee Toy, Inc. ("Mall of America") is a Minnesota corporation, which owns the various corporations through which the Debtors' retail and wholesale businesses are conducted and owns and operates the leases and stores located in Minnesota. Mall of America also owns, through certain indirect bankruptcy remote subsidiaries

---

[3] There is conflicting information on the amount of the purchase price.

that are not debtors in these chapter 11 cases (nor are the entities which are the direct parents of such entities), distribution centers located in Arizona and Alabama.

8. KB Mass. is the principal operating company through which the Debtors' mall-based operations are conducted and which purchases substantially all of the merchandise which is sold by the Debtors. Merchandise purchased by KB Mass. is then distributed to the various retail and wholesale customers.

## POTENTIAL CAUSES OF ACTION

9. In December 2000, the Bain Entities and certain members of then existing management of KB Toys acquired the $1.6 billion toy business from Consolidated with a net equity investment of approximately $17.5 million. Within sixteen months thereafter, on or around April 23, 2002, the Debtors' Board of Directors (comprised, upon information and belief, entirely of interested parties) approved a stock redemption transaction, under which the Debtors paid out approximately $121 million to their closely held shareholders, officers, directors and senior executives (the "Transaction"). The Bain Entities received approximately $83 million in connection with the redemption of their shares. Approximately $34.4 million was paid predominantly to executives and other members of management.

10. To finance the Transaction, the Debtors used *nearly all of their cash on hand*, approximately $55 million, and also leveraged their assets by borrowing approximately $65.6 million in senior secured financing.

11. The Debtors' top four management personnel, currently the CEO, CFO and two other officers of the Debtors, in the aggregate received $28,472,115 in both share repurchase proceeds and cash bonuses. Moreover, as additional consideration, several insiders who had issued secured promissory notes to the Debtors in connection with such insiders' original

purchase of stock in connection with the KB Acquisition were released from liability under their respective outstanding notes (the "Forgiven Notes").

12. The CEO's gross bonus was in the approximate amount of $18.4 million and his Forgiven Note was in the approximate amount of $2 million.

13. The CFO's gross bonus was in the approximate amount of $4.8 million and his Forgiven Note was in the approximate amount of $0.5 million.

14. Another of the Debtors' officers gross bonus was in the approximate amount of $4.6 million and his Forgiven Note was in the approximate amount of $0.5 million.

15. The CEO and the CFO were the sole directors of KB Mass. By resolution dated April 21, 2002, the CEO and the CFO, as the sole directors of KB Mass., approved the bonus payments to themselves and others.

16. The Transaction was effectuated at a time when the Potential Defendants not only knew the that the economy was heading deeper into recession, generally, but that the toy industry and, more specifically, the Debtors' business, was in the midst of a downward trend. It appears that the Transaction was effectuated during the zone of insolvency or when the Debtors were insolvent, or, alternatively, the Transaction rendered the Debtors' insolvent.

17. Indeed, the Transaction had a devastating impact on the business. While the Debtors' core pro forma EBITDA for the fiscal year prior to 2002 was reportedly $89 million, for the fiscal year ended 2002 (the year of the Transaction) total pro forma EBITDA plunged to negative $21 million. The Debtors experienced cumulative net losses of approximately $109 million (excluding a write-off of the Debtors' "negative goodwill" and the $22.4 million the Debtors lost in the first quarter of 2002) from the time of the Transaction through the bankruptcy filing.

18. Moreover, the Debtors faced a severe liquidity shortfall following the Transaction, which required the Debtors to seek further secured financing in the approximate amount of $72 million within the one-year period immediately following the Transaction. During this same one year period after the Transaction, the Debtors were forced to stretch unsecured creditors' payment terms as a means to generate the liquidity they needed to operate.

19. As of the date of the Debtors' bankruptcy filing, while the Potential Defendants held onto their $121 million, unsecured creditors were left "holding the bag" with claims exceeding $200 million.

20. The Committee strongly believes that certain causes of action arising out of the Transaction exist against, among others, the Potential Defendants. In fact, Big Lots Stores, Inc (a Committee member) has recently commenced an action in Delaware state court (the "State Court Action") against certain members of the Debtors' Board of Directors, officers of the Debtors and other parties, for, *inter alia*, breach of fiduciary duty. Annexed hereto as Exhibit "A" is true copy of the complaint filed in the State Court Action.[4] The Committee must be permitted to protect, preserve and enforce any and all claims of the Debtors' estate, for the benefit of all unsecured creditors.

## BASIS FOR RELIEF REQUESTED

21. By this Motion, the Committee, pursuant to sections 105, 1103 and 1109 of the Code, seeks the entry of an order authorizing and appointing the Committee to commence and prosecute the Actions against, among others, the Potential Defendants, the recipients of the approximate $121 million dollars. The Committee requires the requested relief to fulfill its

---

[4] The Committee believes the breach of fiduciary duty action, and perhaps others, to be estate claims, and reserves all rights in connection therewith.

fiduciary responsibilities and duties as mandated by Congress pursuant to section s1103(c) and 1109 of the Code.

22. Section 1103(c)(2) states:

A committee appointed under section 1102 of this title may - investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan.

11 U.S.C. § 1103(c)(2).

23. The importance and breadth of the Committee's authority is described as follows:

The investigative authority granted to a committee is extremely broad and a committee may undertake whatever investigation is appropriate to enable it to fulfill its duty to monitor the operations of the debtor...

24. In order to fulfill the duties mandated by Congress in section 1103(c)(2) of the Code, the Committee requires standing to pursue the Actions against the Potential Defendants *See Walsh v Westmoreland Human Opportunities, Inc. (In re Life Service Systems, Inc.)*, 279 B.R. 504, 510 (Bankr. W.D.Pa. 2002) ("The primary purpose of the committee is to represent the interests of all general unsecured creditors and to maximize distribution to them."); *In re Nationwide Sports Distributors, Inc.*, 227 B.R 455, 463 (Bankr. E.D.Pa. 1998) ("In general, the purpose of such committees is to represent the interests of unsecured creditors and to strive to maximize the bankruptcy dividend paid to that class of creditors."). *See also Advisory Committee of Major Funding Corp. v. Sommers (Matter of Advisory Comm of Major Funding Corp)*, 109 F.3d 219, 224 (5th Cir. 1997) ("Section 1103 provides the tools with which the creditors' committee work.").

25. Evaluation of the Transaction and having the ability to commence actions based on the results of such evaluation furthers the Committee's charge to investigate the "acts,

conduct, assets, liabilities, and financial condition of the debtor, ..." as provided by Congress in Code section 1103(c)(2). Without the ability to act on the results of such investigations, the directives of Section 1103(c)(2) are meaningless.

26. Section 1103(c)(5) also mandates the granting of the relief requested herein Section 1103(c)(5) states: "A committee appointed under section 1102 of this title may -- perform such other services as are in the interest of those represented." 11 U.S.C. § 1103(c)(5). As explained in *Collier on Bankruptcy*:

> Section 1103(c) contains a catch-all provision that authorizes an official committee to perform such other services as are in the interest of those represented. This provision allows the committee to exercise such other rights and perform such other functions as may be appropriate to further the interest of its constituency.

7 *Collier on Bankruptcy* ¶ 1103.05[1][f] (Lawrence P. King ed., 15th ed. rev. 2001). As explained by the Third Circuit Court of Appeals,

> Like § 1109(b), however, § 1103(c)(5) suggests that Congress intended for creditors' committees to perform services on behalf of the estate, and that Congress consciously built a measure of flexibility into the scope of those services. As the question before us today is whether a bankruptcy court can authorize a creditors' committee to represent the estate when the usual representative is delinquent, the "flexible representation" role evidenced in § 1103(c)(5) militates in the affirmative.

*Cybergenics*, 330 F.3d at 562.

28. It is in the interest of those represented by the Committee that the Committee prosecute the Actions against the Potential Defendants. The Committee will seek to recover for the benefit of all creditors the funds wrongfully paid by the Potential Defendants to themselves

29. Clearly, any action against the Potential Defendants, to the extent it is successful, will benefit unsecured creditors. In this regard, the Committee has a great incentive to zealously

pursue the Actions. Conversely, the Debtors have none, as those at the helm of the Debtors will be defendants in the Actions.

30. The Court's denial of the relief requested herein would be inequitable and detrimental to all unsecured creditors since the Committee, as their representative, will be denied the opportunity to maximize unsecured creditors' recovery and fulfill its purpose, as Congress intended.

31. It is well settled within this Circuit that bankruptcy courts may allow a creditors committee to pursue the estate's litigation. *Cybergenics*, 330 F.3d at 548; *Official Committee of Unsecured Creditors of Polaroid Corp., et al v. Barron (In re Polaroid Corp., et al)*, 2004 WL 1397852 (Bankr. D.Del. 2004); *Official Committee of Unsecured Creditors of Valley Media, Inc. v. Cablevision Systems Corporation (In re Valley Media, Inc.)*, 2003 WL 21956410 (Bankr. D Del. 2003); *Official Committee of Unsecured Creditors of National Forge Company, et al v. Clark, et al. (In re National Forge Company, et al.)*, 304 B.R. 214 (Bankr. W.D. Pa. 2004). See also, e.g., *Liberty Mutual Ins. Co. v. Official Unsecured Creditors' Committee of Spaulding Composites Co. (In re Spaulding Composites Co.)*, 207 B.R. 899, 904 (B.A.P. 9th Cir. 1997); *Louisiana World Exposition v. Federal Insurance Company*, 858 F.2d 233, 253-45 (5th Cir. 1988); *Unsecured Creditors Committee of Debtor STN Enterprises, Inc v. Noyes (In re STN Enterprises)*, 779 F.2d 901, 904 (2d Cir. 1985); *Hansen v. Finn (In re Curry and Sorenson, Inc.)*, 57 B.R. 824, 827-29 (B.A.P. 9th Cir. 1986). The Third Circuit made it abundantly clear that this Court can authorize the Committee to pursue, among others, avoidance actions when it stated, "[i]t becomes unmistakably clear that Congress approved of creditors' committees suing derivatively to recover property for the benefit of the estate. Avoiding fraudulent transfers through § 544 (b) is a perfect application of that function." *Cybergenics*, 330 F.3d at 566. See

*also National Forge Company, et al.*, 304 B.R. at 222 (holding that the official committee of unsecured creditors was the "only appropriate party" to pursue an adversary proceeding against insiders asserting fraudulent transfer claims in connection with prepetition stock redemption transaction under section 544 of the Bankruptcy Code). Here too, the Committee is the only appropriate party to pursue an adversary proceeding against insiders in connection with a prepetition stock redemption transaction.

32. Although there is no set test for determining whether a creditors' committee may be granted standing to assert claims and causes of action, various courts have held that an official committee has standing to assert claims and causes of action where: (1) the debtor declines to act or is unable to act within the requisite time frames; (2) the claims and causes of action in question are colorable; and (3) good reason or other cause exists by virtue of the relevant circumstances to grant the official committee authority to bring such suits. *See, e.g., STN Enters.*, 779 F.2d at 904; *In re Nicolet, Inc.*, 80 B.R. 733, 737-39 (Bankr. E.D. Pa. 1988); *In re Philadelphia Light Supply Co.*, 39 B.R. 51, 52 (Bankr. E.D. Pa. 1984). Furthermore, the *Cybergenics* court also seemed to suggest that "a creditors' committee can be granted derivative standing when the trustee is 'delinquent' in pursuing action on behalf of the estate." *Valley Media, Inc.*, 2003 WL 21956410 at *2 (citing *Cybergenics*, 330 F.3d at 563, 568-69). Therefore, where "a debtor's counsel has a conflict of interest in pursuing an action which is otherwise a colorable claim, the debtor (or trustee) can be viewed as delinquent and the creditors' committee should be authorized to pursue the cause of action." *Id.*

33. These standards are plainly met here. The patent conflict of interest is clear. The Debtors are clearly unable to pursue the Actions against the Potential Defendants as the Potential

Defendants are members of the Debtors' management, who obviously would be in no position to vigorously sue themselves.

34. It is the Committee's position that the causes of action are more than colorable. The Debtors' opinion on this issue is weightless. They simply are in no position to determine whether the causes of action against themselves are meritorious. The Third Circuit Court of Appeals said it best: "[c]onflicts of interest can often cloud debtors' judgment. It is difficult objectively to determine whether a potential action is meritorious when one would be a defendant in that action." *Cybergenics*, 330 F.3d at 575.

35. After its exhaustive investigation, the Committee strongly believes that the Debtors' estates have colorable actions against the Potential Defendants arising out of the Transaction that, if successful, would benefit all creditors. Under all of these circumstances, it would be in the best interest of the estates if the Committee pursued the actions. Accordingly, this Court should authorize and appoint the Committee to commence and prosecute all actions that arise out of, or relate to, the Transaction against, among others, the Potential Defendants.

## CONCLUSION

36. It is patently clear that the Debtors cannot pursue their own current officers and directors and, therefore, that the Committee is the appropriate entity to pursue the Actions. The Committee has conducted an extensive investigation into the facts and circumstances surrounding the Transaction (with the consent of the Debtors) and is currently prepared to pursue all causes of action that relate to, or otherwise arise out of, the Transaction. As such, the Committee requests that this Court authorize the Committee to pursue the Actions against all parties, including the Potential Defendants.

## NO PRIOR REQUEST

37. No prior request for the relief sought in this Motion has been made to this or any other court.

## NOTICE

38. No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion has been given to (a) the United States Trustee, (b) counsel to the Debtors and (c) the other parties on the general service list being maintained in these cases. In light of the nature of the relief requested in this Motion, the Committee submits that no other or further notice is required.

**WHEREFORE,** the Committee respectfully request that this Court (i) enter the proposed Order attached hereto as Exhibit "B" authorizing and appointing the Committee to commence and prosecute Actions against, among others, the Potential Defendants and (ii) grant such other and further relief as is just and proper.

Dated: February 11, 2005         TRAUB, BONACQUIST & FOX LLP

/s/ Michael S. Fox
Paul Traub (PT 3752)
Michael S. Fox (MSF 2612)
Susan F. Balaschak (SFB 1901)
Adam Friedman (AHF 5125)
655 Third Avenue – 21st Floor
New York, NY  10017
212/476-4770

Counsel to the Official Committee
of Unsecured Creditors

RLF1-2840883-2                                   12