## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*<br><br>KB TOYS, INC., *et al.*,<br><br>       Debtors. | Chapter 11<br><br>Case No. 04-10120 (DDS)<br>(Jointly Administered) |
| KB TOYS, INC., *et al.*,<br><br>      Plaintiff(s),<br><br> v.<br><br>BIG LOTS STORES, INC.,<br><br>      Defendant. | Adv. Proc. No. 05-_50 475 (DDS) |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEBTORS FOR PRELIMINARY INJUNCTION STAYING PROSECUTION OF CERTAIN ACTION

KB Toys, Inc., and the other above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by their undersigned attorneys, submit this memorandum of law in support of their motion for a preliminary injunction pursuant to Sections 105(a) and 362(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 7065 of the Federal Rules of Bankruptcy Procedure, to enjoin Big Lots Stores, Inc. ("Big Lots" or "Defendant") from continuing to prosecute the complaint (the "Complaint") it filed on or about February 9, 2005 in the Court of Chancery of the State of Delaware, styled as *Big Lots Stores, Inc v Bain Capital Fund VII, LLC, et al.* (the "Big Lots Action"), against the Debtors' current and former directors and officers and certain shareholders, which action asserts claims which are property of the Debtors' estates and therefore is a willful violation of the automatic stay of Section 362 of the Bankruptcy Code, and which action if allowed to continue, will cause the Debtors irreparable

harm and threaten their reorganization efforts. The Debtors also rely on the *Affidavit of William McMahon In Support of Motion of Debtors For Preliminary Injunction Staying Prosecution of Certain Action* filed contemporaneously herewith.

## PRELIMINARY STATEMENT

Big Lots — in an effort to increase the distribution on its unsecured claim — filed the Big Lots Action in state court thereby improperly appropriating claims owned by the Debtors and their estates and violating the automatic stay. While Big Lots crafted its Complaint in an effort to disguise the claims as its own, they are not. Big Lots has asserted estate claims, which if successful, should benefit all creditors, not solely Big Lots.

Section 362(a)(3) of the Bankruptcy Code bars the appropriation of property of the estate, including claims owned by a debtor and its estate. In determining whether a claim is an estate claim or a claim that belongs to an individual plaintiff, courts look to the substance of a claim — not to how a claim is actually pled. At its core, Big Lots Action asserts claims that are, in substance, breach of fiduciary duty and fraudulent conveyance claims, both belonging to the Debtors' estates.

Further, since the Big Lots Action is against the Debtors' directors and officers, the Big Lots Action seeks to recover the proceeds of the Debtors' director and officer insurance policy. The proceeds of the Debtors' insurance policy also are property of the estate.

Thus, the Big Lots Action seeks to obtain property of the estate in violation of the automatic stay in at least two ways: (i) by usurping estate claims, and (ii) by depleting insurance proceeds belonging to the estate. The Debtors are entitled to a preliminary injunction prohibiting Big Lots from taking any actions in furtherance of the prosecution or litigation of the Complaint pending a final determination of the Debtors' request that the Court declare that the Big Lots

Action, other than Count VII (the "Estate Causes of Action"), asserts claims owned by the Debtors' estates and violates the automatic stay under 11 U.S.C. § 362.

Alternatively, the Big Lots Action should be stayed temporarily under Sections 105(a) and 362(a) of the Bankruptcy Code. Although the Big Lots Action does not name any Debtor as a defendant, courts have enjoined these types of actions against non-debtors: (i) to prevent distraction of the debtor during its reorganization; (ii) to prevent depletion of an asset that may otherwise be available to all creditors; and (iii) where the debtor is the real party in interest and will suffer harm if the proposed action is permitted to continue.

*Critical Time for the Debtors.* The Debtors are at a critical time in these chapter 11 cases (the "Chapter 11 Cases"). They have been in chapter 11 for one year and are in the midst of negotiations that are likely to resolve their chapter 11 reorganization cases and in the midst of implementation of a new store format and merchandising strategy. The Big Lots Action, which is directed against current officers and directors among others, will clearly distract the Debtors' leadership from accomplishing the Debtors' reorganization, maximizing the value of the Debtors' assets, and exiting or concluding these Chapter 11 Cases. Thus, a stay of the Big Lots Action is critical to the successful conclusion of the Chapter 11 Cases.

*Depletion of Assets of the Estate.* The Debtors' directors and officers insurance policy is an asset of the estate, particularly since the estate may have competing claims based on and derived from the same facts and circumstances on which the Big Lots Action is based. Allowing Big Lots to continue its action would deplete the proceeds of the Debtors' insurance policy to the detriment of all other creditors.

*The Debtors Are the Real Party In Interest.* While Big Lots does not name the Debtors, they are an indispensable party to the action, and the real party in interest in that action. If

3

allowed to continue, Big Lots and the Defendants will be required to distract the Debtors from their businesses and their reorganization efforts in order to proceed with expensive and protracted litigation. Also, allowing the Big Lots Action to go forward will create serious litigation risk to the Debtors including: (i) collaterally estopping the estate in any litigation that it commences involving these same issues; and (ii) creating indemnification and contribution claims back against the Debtors.

As demonstrated below, the Big Lots Action is either stayed or should be stayed to prevent irreparable harm to the Debtors and their reorganization efforts.

## STATEMENT OF FACTS

### Background

The Defendant in this action, Big Lots is the former owner of Havens Corners Corporation ("HCC"), through which Big Lots owned the "KB Toys" toy business. In December 2000, a number of investment funds managed by Bain Capital LLC and management of the KB Toys toy business organized KB Toys, Inc. ("KBI") and KB Acquisition Corporation ("KBAC") to purchase the shares of HCC from Big Lots. In connection with KBAC's purchase of the shares of HCC, HCC issued to Big Lots an unsecured promissory note (the "Note") in the principal amount of $45 million.

On or about April 23, 2002, KB Holdings Inc., Bain Capital Fund VIII, LLC, BCIP Associates II, BCIP Trust Associates II, BCIP Associates II-B, Sankaty High Yield Partners II, LP, Michael Glazer, Robert Feldman and others entered into a Redemption Repurchase and Equity Restructuring Agreement pursuant to which a total of approximately $88.4 million was paid to shareholders in redemption of shares and approximately $33.7 million was paid to approximately 25 senior managers of the Debtors (the "Recapitalization Transaction").

4

Due to unprecedented competition and very disappointing operating results during the 2003 holiday selling season, and in light of the uncertainty concerning their liquidity for 2004, on January 14, 2004, the Debtors filed for protection under Chapter 11 of the Bankruptcy Code.

On or about February 9, 2005, Big Lots filed a complaint[1] in the Delaware Chancery Court against certain shareholders of KBI and certain current and former officers and directors of the Debtors (collectively, the "Chancery Court Defendants") asserting claims for (i) breach of fiduciary duty by Glazer and Feldman; (ii) breach of fiduciary duty against the directors of KBI who are affiliated with Bain Capital LLC (the "Bain Directors"); (iii) aiding and abetting breach of fiduciary duty against the Bain Directors and the shareholders of KBI who are affiliated with Bain Capital LLC; (iv) fraud against Feldman; and (v) intentional interference with contractual relations against the Chancery Court Defendants. By the Complaint, Big Lots seeks to recover $52 million in damages, claimed to be due under the Note, on fraudulent conveyance and breach of fiduciary duty theories.

The Chancery Court Defendants include all of the current members of the Debtors' boards of directors and their current Chief Executive Officer and the Chief Financial Officer. These individuals are leading the Debtors' operations and restructuring efforts, and the prosecution of the Complaint at this time will divert their attention and energies from the Debtors' reorganizing efforts and from running the Debtors' business, thereby disrupting the Debtors' development of plans to bring these Chapter 11 Cases to conclusion. Given all of these demands, including operating a business with over $650 million in projected annual sales, the undivided attention and efforts of the Debtors' board and management is critical to these efforts in the coming days, weeks and months.

---

[1]  A copy of the Complaint filed by Big Lots is attached hereto as <u>Exhibit "A"</u>

## <u>Debtors' Efforts to Reorganize and Develop a Plan(s)</u>

During these Chapter 11 Cases, the Debtors have sold their online business, and closed approximately 600 stores, of which approximately 549 stores were closed by court approved going out of business sales and the balance were closures in the ordinary course of business.

As the Debtors consolidated their operations, the Debtors also substantially reduced their annual overhead expenses from approximately $53 million to approximately $36 million. The Chancery Court Defendants, other than Robert White, and other senior management have been extensively involved in the development and implementation of the Debtors' business plan during these Chapter 11 Cases. Their involvement has been critical to the Debtors' restructuring efforts.

During the summer of 2004 the Debtors extensively explored the possibility of selling their business as part of a plan. The Debtors, by and through their senior management, discussed terms for sale with various interested parties and responded to the due diligence requests, but unfortunately, the Debtors were unable to agree to terms with any purchaser or plan funder. As the Debtors entered into their busy holiday season in November and December 2004, the Debtors re-focused themselves on their operations, sales and customer retention efforts and on developing a new store format and merchandising strategy for 2005.

To assist the Debtors to develop a new store format and merchandise strategy, the Debtors and the Creditors' Committee retained Retail Forward, Inc., a strategic retail consulting firm ("RFI"). With RFI's assistance, the Debtors' senior management developed a new store format, merchandising strategy and operations plan which the Debtors are beginning to implement. Successful implementation of these new strategies requires the undivided attention of the Debtors' management.

The Debtors have also resumed plan negotiations with a potential purchaser of the Debtors through a plan of reorganization, continue to pursue and provide diligence to possible purchasers of some or all of the Debtors' assets, and are negotiating revised financing terms to improve the Debtors' liquidity outlook for 2005. All of these activities also require the substantial attention of the Chancery Court Defendants.

On February 9, 2005, however, the Defendant filed the Complaint. The Complaint alleges various claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, fraud and civil conspiracy based on actions taken by the Defendants in connection with the Recapitalization Transaction.

### Harm to Reorganization

The Debtors' board of directors and management (including the Chancery Court Defendants other than Mr. White), and in particular Messrs. Glazer and Feldman, are actively involved in the Debtors' restructuring initiatives described above as well as in operating the Debtors' business on a day to day basis. The Debtors' officers and directors are currently spending nearly all of their time and efforts developing business and financial plans, engaging in discussions with the Creditors' Committee and possible plan funders, and evaluating the possibility of a plan of reorganization or other bankruptcy alternatives which are in the best interests of the Debtors and the creditors. Achieving these goals is and will continue to consume substantially all of management's time and resources.

If the Complaint were to proceed, Messrs. Feldman and Glazer would be involved in defending the Complaint, and would not be able to focus their attentions on restructuring and operating the Debtors. Based on the allegations in the Complaint, the Debtors expect that substantially all of the discovery sought from the Defendants in connection with the Complaint will involve documents and information in the Debtors' possession, custody and control.

7

Accordingly, the Debtors' current officers, directors and in-house legal staff would likely have to devote significant time to Complaint-related matters, including such matters as possibly preparing for and appearing at depositions, answering interrogatories, and responding to voluminous document requests. Likewise, the Debtors believe that the majority of potential fact witnesses are likely to be current or former employees of the Debtors, including those who will be focused on and needed for the Debtors' reorganization. As a result of the very substantial overhead reductions, the Debtors are not able to respond to such substantial litigation demands without compromising the Debtors' reorganization efforts. Such diversion of their attention would irreparably harm the Debtors.

Even where depositions are taken of former employees, the Debtors' privileged and proprietary information would be at risk and current employees and professionals would have to become involved to protect such information. As a result, absent a stay of the Complaint, the Debtors' current officers, directors, and in-house legal personnel will be forced to shift much of their focus from the reorganization efforts to peripheral litigation.

Of the Defendants who are individuals, all but Mr. White have a significant role in the Debtors' reorganization. If forced to defend the Complaint against them, the individuals will not be able to devote adequate time and resources to the Debtors' reorganization.

All of these burdens on the Debtors would substantially interfere with the Debtors' reorganization, and would irreparably harm the Debtors.

### Threat to Debtors' Insurance – An Asset of the Estates

The Debtors and their officers and directors are insureds under a Directors, Officers and Private Company Liability Insurance Policy issued by AIG (the "D&O Policy"). The proceeds of the D&O Policy are an asset of the Debtors' estates. Upon information and belief, promptly following receipt of a copy of the Complaint, the Creditors' Committee sent a letter to the

8

Debtors asserting claim for damages arising out of the Recapitalization Transaction in an unliquidated amount equal to not less than $121 million. Such letter requested that the former and current officers and directors of the Debtors furnish notice of the claims to the insurance carrier for the Debtors' D&O Policy.

The Creditors' Committee also thereafter filed a *Motion for an Order Authorizing and Appointing the Committee to Commence and Prosecute Claims Against Insiders* [Docket No. 1984], that the Debtors' estates have claims against the Chancery Court Defendants and other former and current officers and directors, and further requests authorization for the Creditors' Committee to commence and prosecute such actions. If such claims are brought, there is no assurance that the proceeds of the D&O Policy would be sufficient to satisfy such claims as well as the claims asserted by Big Lots in the Complaint. Any depletion of the D&O Policy proceeds on account of the Complaint would diminish proceeds available to other creditors of the Debtors.

On information and belief, by virtue of applicable state statutes, common law, the Debtors' by-laws, and various employment agreements, the Debtors may be required to provide the individual Chancery Court Defendants with full indemnification for losses and/or defense costs in connection with the Complaint or any other action based on the Recapitalization Transaction. The prosecution of such claims could therefore, on information and belief, result in the assertion of substantial indemnification claims against the Debtors.

## ARGUMENT

### I.  The Automatic Stay Enjoins the Big Lots Action

Big Lots — through the filing of the Complaint — appropriated claims which are property of the Debtors' chapter 11 estates for its own benefit in violation of the automatic stay.

9

While Big Lots attempts to craft the Complaint in such a way as to disguise the claims as its

own, they are estate claims. Section 362(a)(3) of the Bankruptcy Code prohibits parties, like Big

Lots, from seeking to obtain the benefit of claims that belong to the chapter 11 estate no matter

how such claims are designated by a plaintiff.

> Section 362(a)(3) provides that:
>
> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of -
>
>     * * * *
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.
>
> 11 U.S.C. § 362(a).

"The automatic stay is one of the fundamental protections provided by the bankruptcy

laws. It gives the debtor a breathing spell from his creditors. . . . It permits the Debtor to attempt

a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove

him into bankruptcy." H.R. Rep. No. 95-595, at 340 (1977). "The purpose of [subsection (a)(3)]

is to prevent dismemberment of the estate. . . Any distribution of property must be by the trustee

after he has an opportunity to familiarize himself with the various rights and interests involved

and with the property available for distribution." *Id* at 341.

"The stay applies to attempts to obtain or exercise control over both tangible and

intangible property." 3 Collier on Bankruptcy, ¶ 362.03 (Lawrence P. King 15th ed. rev. 2005).

A creditor who seeks to assert a claim that is property of the estate violates the automatic stay.

*See, e.g., S.I. Acquisition, Inc. v. Fastway Delivery (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142,

1153 (5th Cir. 1987) (automatic stay protected alter ego claim belonging to the debtor). If the

cause of action belongs to the estate, the estate has exclusive standing to assert it. *See Goldin v.

Primavera Familienstiftung, TAG Assocs., Ltd. (In re Granite Partners, L.P.)*, 194 B.R. 318, 325

10

(Bankr. S.D.N.Y. 1996). Where the estate has standing to sue, the automatic stay prevents creditors from asserting the claim, notwithstanding that outside of bankruptcy, the creditor might otherwise have a right to do so. *St. Paul Fire & Marine Ins. Co. v. PepsiCo., Inc.*, 884 F.2d 688, 701 (2d Cir. 1989)

In determining whether a claim is property of the estate, "the court must look to the nature of the wrongs alleged in the complaint without regard to the plaintiff's designation" thereof. *See Granite Partners*, 194 B.R. at 325; *In re Swallen's, Inc.*, 205 B.R. 879, 883 (Bankr. S.D. Ohio 1997). Accordingly, it does not matter how a plaintiff pleads the claims, only the substance of the claims matters. Each of the claims asserted in the Complaint is premised on a common fact – the occurrence of the Recapitalization Transaction and the alleged consequences of that transaction. While Big Lots attempts to plead otherwise, the Estate Causes of Action seek damages for breach of fiduciary duty claims and fraudulent conveyance claims, which are claims that belong to, and if viable should be asserted by, the estates for the benefit of all creditors that may have been harmed, and not just for the benefit of Big Lots.[2]

A.    **The Complaint Seeks Recovery for Breach of Fiduciary Duty Claims Properly Belonging to the Estates**

Counts I through III of the Complaint seek recovery for the Defendants' breach of fiduciary duty to the Debtors, and Counts V and VIII, although couched in terms other than breach of fiduciary duty, assert in substance the same type of action.[3] While Big Lots thinly

---

[2] The Debtors do not concede that any of the claims asserted in the Complaint have any merit, and indeed vigorously contest the truth and accuracy of most of the allegations in the Complaint. For purposes hereof, however, the Court does not have to decide whether the Complaint or the Estate Causes of Action are meritorious or meritless. Rather the issue before the Court is simply who owns the Estate Causes of Action, regardless of their value or merit, and what effect the present prosecution of such claims will have on the Debtors and their estates.

[3] Specifically, in Counts I, II, III, V, and VIII, Big Lots pleads, respectively: (i) breach of fiduciary duty by Glazer and Feldman; (ii) breach of fiduciary duty against the Bain directors; (iii) aiding and abetting breach of fiduciary

11

disguises its claims to appear as though it is asserting its own claims, the substance of Big Lots' allegations are for breach of fiduciary duty claims that are properly asserted only by the Debtors.

Prepetition breach of fiduciary duty claims are property of the estate when, under state law, they are derivative claims. *See Kalb, Voorhis & Co. v. American Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) (trustee is proper party to assert claim that is property of the estate); *Solow v. Stone*, 994 F. Supp. 173, 178 (S.D.N.Y. 1998). Under Delaware law, courts "look to the nature of the wrong and to whom relief should go in distinguishing between direct and derivative claims." *Production Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 792 (Del. Ch. 2004); *see also Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004). Where a corporation or entity suffers the injury, and others only suffer by virtue of a diminution in the value of their rights or claims against the corporation or entity, such claims are derivative and belong to the corporation or entity. *See In re S.I. Acquisition, Inc.*, 817 F.2d at 1152-52. However, even if a plaintiff has a common claim with a corporation or entity, it may have to wait until the derivative claim is completed since it cannot measure its injury until then. *Cf. Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1106 (2d Cir. 1988) (corporate creditor asserting RICO claim against debtor's principals must await bankruptcy court's disposition of claim based on some wrongful conduct before creditor's claim will accrue). As discussed below, the derivative/direct claim analysis demonstrates that the Big Lots Action asserts a derivative claim for breach of fiduciary duty.

*Nature of the Wrong*: Under Delaware law, the nature of the harm will be considered derivative when the breach of fiduciary duty claim is based on self-dealing or negligence, and the

---

duty against all of the Bain defendants (directors and shareholder entities); (iv) fraud against Feldman; and (v) intentional interference with contractual relations against all the defendants.

wrong is done to the corporation as a whole. *NCT Group, Inc.*, 863 A.2d at 792. The nature of the wrong asserted in the Complaint, is that the Defendants caused the Debtors to enter into a transaction that they should not have, causing *the Debtors* harm. In other words, the Defendants allegedly breached their fiduciary duty to the Debtors by authorizing the Recapitalization Transaction, which Big Lots alleges economically harmed the Debtors. Assuming *arguendo* that the Defendants' alleged breach may have been detrimental to Big Lots, any harm to Big Lots is only indirect — through the diminution in the Debtors' assets thereby indirectly affecting the Debtors' ability to pay Big Lots under the Note. To the extent these claims are valid, creditors other than Big Lots would have been similarly effected. Big Lots has not asserted that the Defendants' actions caused Big Lots different harm than any other creditor. Thus, the wrong asserted by Big Lots is without doubt derivative in nature. *See id*; *Dieterich v. Harrer*, 857 A.2d 1017, 1027 (Del. Ch. 2004) (finding breach of fiduciary duty claim for authorizing a corporate action is a "wrong" that that is derivative in nature).

*Damages (if any) Should Be Paid to the Debtors*: When the payment complained of derives from the debtor, courts have found that the repayment should go back to the debtor. *See In re BCP Management, Inc*, 2005 WL 310410, *3 (Bankr. D. Del. Feb. 8, 2005). Here, Big Lots complains of payments that originated in the Debtors' operating subsidiaries. Accordingly, each of the payments should be returned to the Debtors' operating subsidiaries (if a court so awards them). *Id* Any other result would be inequitable.

Also, for each Count, Big Lots alleges that the "wrong" caused the reduction in the value in the Debtors' enterprise as a whole (or some harm caused thereby). (*See* Complaint ¶¶ 47, 53, 61, 69, 78, 83, 88, 94 and 95). In the event that the facts underlying the Complaint are true and merit a recovery, the appropriate result is that the Debtors' enterprise value should be increased

as a whole to the same extent. *NCT Group, Inc.*, 863 A.2d at 792. Since the harm was caused to all, the resulting recovery should be shared by all in the same way.[4]

In sum, while Big Lots thinly disguises its claims, they are derivative breach of fiduciary claims which are property of the estate. Big Lots' attempt to pursue these estate claims is a violation of Section 362(a)(3) of the Bankruptcy Code.

**B.    The Complaint Pleads Fraudulent Conveyance Claims that Properly Belong to the Debtors' Estates**

Similarly, Counts IV, VI and VIII of the Big Lots Complaint plead fraudulent conveyance claims against the Defendants in violation of Section 362(a)(3) of the Bankruptcy Code. By recasting commonplace fraudulent conveyance as "unjust enrichment" claims, "civil conspiracy" claims, and "contractual interference" claims, Big Lots seeks to assert these estate claims for its own benefit.

Section 544(b) of the Bankruptcy Code provides:

> Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b).

The Third Circuit recently explained that "[t]he policy concern evident in § 544(b) is the need to channel avoidance actions through the trustee, who acts as a gatekeeper and prevents independent avoidance actions by creditors that might prejudice the estate and rival creditors."

---

[4] In fact, as Big Lots pleads the facts in the Complaint, Big Lots is structurally subordinated to the creditors that provided the value for the Recapitalization Transaction. In other words, the funds for the Recapitalization Transaction originated in subsidiaries of the debtor that issued the Note to Big Lots. Thus, given that Big Lots holds a claim against a parent company of the Debtors which originated the payments, under state law, Big Lots is only entitled to a share of these funds if all creditors of the subsidiary-Debtors are paid in full. Big Lots seeks to turn that result on its head.

14

*Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568

(3d Cir. 2003) (en banc), *cert. denied*, 540 U.S. 1002 (2003). Thus, after a bankruptcy is

commenced, only a debtor in possession (or a party authorized by the bankruptcy court) is

empowered to commence an avoidance claim held by its creditors. *See id.*; *PHP Liquidating,*

*LLC v. Robbins*, 291 B.R. 592, 599 (D. Del. 2003).

   As discussed previously, to determine whether claims belong to the estate, courts look to

the nature of the wrong, not to how claims are actually pled. *See Granite Partners*, 194 B.R. at

325. The "wrong" asserted in Counts IV, VI and VIII of the Complaint are in the nature of (and

are) fraudulent conveyance claims.[5] The purpose behind fraudulent conveyance law is to

prevent assets from being transferred from the debtor in exchange for less than fair value, if the

debtor is either unable or rendered unable to pay other creditors. *Id.* At the core of each of Big

Lots' claims, Big Lots alleges that in connection with the Recapitalization Transaction the

Debtors made payments to the Chancery Court Defendants for which the Debtors did not receive

reasonable value, and that as a result of such payments, the Debtors are unable to pay their debts

to Big Lots under the Note. Simply put, Big Lots' entire Complaint states nothing more than a

fraudulent conveyance claim.

   Thus, Big Lots' attempt to pursue these estate claims is a violation of Section 362(a)(3)

of the Bankruptcy Code.

---

[5] Counts IV, VI and VIII, respectively, plead: (i) unjust enrichment against the Bain Defendants, Glazer and
Feldman; (ii) civil conspiracy against all of the Defendants; and (iii) intentional interference with contractual
relations against all the Defendants. Although Counts IV, VI and VIII are most clearly akin to fraudulent
conveyance claims, all the Counts in the Complaint should be characterized as either a fraudulent conveyance claim
or aiding and abetting a fraudulent conveyance.

62865.1001

C.     **The Complaint Seeks Proceeds of the Debtors' D&O Policy Which Is Property of the Estate**

The Big Lots Action also violates Section 362(a)(3) of the Bankruptcy Code by seeking proceeds of the Debtors' directors and officers insurance policy (the "D&O Policy"), which proceeds are property of the estate.

When the debtor is a co-insured along with its directors and officers under a business insurance policy, courts have found that the proceeds of the policy are property of the estate. *PHP Healthcare Corp. v. HIP Foundation, Inc. (In re PHP)*, Adv. No A99-18 (MFW) (Bankr. D. Del. Mar. 31, 1999) (Walrath, J.), *aff'd*, Civ. 99-657 (SLR) (a copy of each is attached hereto as Exhibit "B"). *See also A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1001-02 (4th Cir. 1986) ("actions . . . against officers or employees of the debtor who may be entitled to indemnification under such [corporate liability insurance] policy or who qualify as additional insureds under the policies are to be stayed under section 362(a)(3)"); *Circle K. Corp. v. Marks (In re Circle K Corp.)*, 121 B.R. 257, 261 (Bankr. D. Ariz. 1990) (staying securities fraud action against debtor's current and former directors and officers because policy constituted property of the estate and continuation of litigation could leave other potential claimants with "reduced, little or no coverage"); *Minoco Group of Cos., Ltd. v. First State Underwriters Agency of New England Reinsurance Corp. (In re Minoco Group of Cos., Ltd.)*, 799 F.2d 517, 519 (9th Cir. 1986) (same).

According to Collier on Bankruptcy:

> If, for example, the debtor and its officers and its directors are co-insureds under a business insurance policy, the estate will have an interest in apportioning the policy limits, otherwise it will suffer the irreparable injury of the loss of coverage, with concomitant reduction in the likelihood of successful reorganization.

2 Collier on Bankruptcy § 105.03[1][b] (Lawrence P. King ed. 15th rev. 2005).

Here, the Debtors are co-insureds under the D&O Policy. Thus, if Big Lots continued the Big Lots Action and was ultimately successful, the D&O Policy would be depleted by potentially $45 million or more. Big Lots should not be permitted to recover on an asset of the estate ahead of, and to the detriment of, all other creditors. This is exactly the result that Section 362(a)(3) seeks to avoid — a race to the courthouse. *See id.*

## II.    The Automatic Stay Should Be Extended to Temporarily Enjoin This Action.

Section 105(a) of the Bankruptcy Code provides that the bankruptcy court "may issue any order, process, or a judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105(a) thus empowers the Court to grant injunctive relief to prevent harm to the debtor, its estate, and its creditors, and to preserve the efficacy of the Bankruptcy Code. *See LTV Corp. v. Miller (In re Chateaugay Corp.)*, 109 B.R. 613, 621 (S.D.N.Y. 1990).

Courts have routinely entered injunctions pursuant to Sections 105(a) and 362(a) in order to extend the automatic stay to the debtor's directors and officers under circumstances such as these – *see, e.g., In re American Film Techs., Inc.*, 175 B.R. 847, 854 (Bankr. D. Del. 1994) (issuing injunction under section 105(a) "to make effective the automatic stay of [Section] 362(a)"); *Eastern Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs, Inc.)*, 111 B.R. 423, 435 (Bankr. S.D.N.Y. 1990), *aff'd in relevant part*, 124 B.R. 635 (S.D.N.Y. 1991) – and courts have repeatedly held that a bankruptcy court "has authority under Section 105 broader than the automatic stay provisions of Section 362 and may use its equitable powers to assure the orderly conduct of the reorganization proceedings." *See In re Baldwin-United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir. 1985); *LTV Steel Co. v. Board of Educ. (In re Chateaugay Corp.)*, 93 B.R. 26,

29 (S.D.N.Y. 1988) (bankruptcy court may enjoin a pending action to preserve its jurisdiction over the bankruptcy case).

Courts have granted injunctions: (i) to prevent distraction of the debtor during its reorganization; (ii) to prevent depletion of an asset that might otherwise be available to all creditors; and (iii) where the debtor is the real party in interest and will suffer harm if the proposed action is permitted to continue. While the Debtors need only satisfy one of these requirements, as demonstrated below, all three of these reasons favor entry of an injunction to stay the Big Lots Action.

### A. The Debtors Cannot Be Distracted at This Critical Time in the Chapter 11 Cases

The Debtors are at a critical phase in their Chapter 11 Cases. The Debtors have been in chapter 11 for approximately one year and are in the midst of determining how the case will conclude. The Debtors are currently negotiating terms for a possible plan of reorganization that would be funded by a new owner, negotiating terms for additional financing that might enable the Debtors to continue to operate on a stand-alone basis and implementing substantial changes to the merchandising and presentation of their stores and are preparing for a sale of their assets in the event these other initiatives fail. Big Lots' filing of the Complaint has seriously disturbed the Debtors' businesses and is distracting the companies' directors and officers from their jobs. If allowed to persist, this will undoubtedly cause harm to the Debtors' rehabilitation prospects and to their value as an enterprise.

In *Rickel Home Centers, Inc. v. Baffa (In re Rickel Home Centers, Inc.*), 199 B.R. 498, 501 (Bankr. D. Del. 1996), the bankruptcy court entered an injunction staying a securities class action suit pursuant to Section 105(a) largely on the basis that the continuation of the action would impose significant burdens on the debtor and its employees, and would interfere with the

debtor's reorganization efforts. Here, the continuation of the Big Lots Action would cause no less of an interference than in that case. As the Affidavit of William McMahon shows, the Big Lots Action has devastated current management. If the Big Lots Action is not stayed, those members of management who are Chancery Court Defendants will be required to exert significant energy defending against the Estate Causes of Action, and the Debtors and other members of management will be dragged into such litigation as witnesses and otherwise. This would leave no time and energy to operate the business at this crucial time, continue negotiations of a possible reorganization plan or the terms of additional financing, or to implement the Debtors' turnaround plan. The failure of these initiatives will lead to the Debtors having to close all of their stores, and will result in almost 8,000 individuals becoming unemployed.

Undoubtedly, each of the Defendants and other members of the Debtors' management will be served with discovery and required to attend multiple depositions. All the while, they will be required to help the Debtors emerge from chapter 11. The strain on management will damage the Debtors.

Thus, this Court should grant an injunction here because the Big Lots Action adversely impacts and undermines the Debtors' chances for a successful reorganization.

### B.     If Successful, the Big Lots Action Would Deplete Assets That Are Otherwise Available to Satisfy All Creditors' Claims

In the event that this Court determines that the proceeds of the D&O Policy are not property of the estate as discussed in Part I.C. above, the Big Lots Action should still be enjoined under Section 105(a) of the Bankruptcy Code because it would deplete an asset that is otherwise available to all creditors. 2 Collier on Bankruptcy § 105.03[1][b] (Lawrence P. King 15th ed. rev. 2005).

Recently, the Creditors' Committee filed a motion seeking authority to commence an action in the name of and on behalf of the Debtors' estates arising out of identical facts and is certain to allege the same harm. Although the Debtors do not believe that such motion should be granted (for reasons to be set out in its response to the Committee's motion) the fact is that a person or entity other than the Debtors' board of directors will make a decision whether to pursue these claims. If an estate representative pursues the claims and if Big Lots and the estate representative are successful in its prosecution of actions, the continuation of the Big Lots Action may deplete the proceeds of the policy, as the proceeds of the D&O Policy may be insufficient to cover all such claims. Big Lots should not be permitted to elevate the distribution on its claim to the detriment of other creditors, and the Big Lots Action should be stayed to prevent a potentially large loss by these estates.

### C.   The Debtors Are the "Real Party In Interest" in the Big Lots Action

Bankruptcy courts have stayed actions against non-debtors where the debtor is determined to be the real party in interest and the estate would be adversely effected if the action is permitted to continue. *See LTV Corp* , 109 B.R. at 621. Although Big Lots did not name the Debtors, the Debtors are the real party in interest in the Big Lots Action, and the continued prosecution of this action would adversely affect the Debtors' estates and unduly interfere with their reorganization efforts.

Courts have looked to the following factors to determine whether there is an identity of interest between the debtor and the true target of the litigation: (i) the claims asserted against all of the non-debtor defendants are so closely intertwined with claims asserted against the debtor that the debtor may be exposed to collateral estoppel, adverse precedent, vicarious liability, or imputed admissions if the litigation continues, *see In re Continental Airlines*, 177 B.R. 475, 481

20

(D. Del. 1993); *In re American Film Techs. Inc.*, 175 B.R. at 851; *Lomas Fin. Corp. v. Northern Trust Co. (In re Lomas Fin. Corp.)*, 117 B.R. 64, 66-67 (S.D.N.Y. 1990); *Sudbury, Inc. v. Escott (In re Sudbury, Inc.)*, 140 B.R. 461, 463 (Bankr. N.D. Ohio 1992); *Eastern Air Lines, Inc.*, 111 B.R. at 435; (ii) continuation of the litigation against the non-debtor defendants may expose the debtors' estates to indemnification claims by virtue of the debtors' by-laws and applicable state law, *see In re Continental Airlines*, 177 B.R. at 481; and (iii) continuation of the litigation against the non-debtor defendants would divert key personnel from the reorganization process and, as a result, undermine the administration of the estates and the ability of the debtors to successfully reorganize. *See In re Continental Airlines*, 177 B.R. at 479, 481; *In re Rickel Home Centers, Inc.*, 199 B.R. at 501. A discussion of the factors demonstrates that the Debtors are the real party in interest in the Big Lots Action.

> *Collateral Estoppel.* As discussed above, the Debtors are faced with the very real risk that the estates would be bound under the doctrine of collateral estopped by a decision in the Delaware Chancery Court. The Debtors will be required to participate in the litigation and the same issues will arise (i.e., solvency, the Defendants' "good faith" in authorizing the Recapitalization Transaction, breach of fiduciary duty, among other issues). An adverse determination would have a detrimental impact on the Debtors.

> *Indemnification.* Each of the Defendants that is an individual has indemnity rights against the estates that would be triggered by a judgment in the Big Lots Action. Thus, to the extent that the Big Lots Action results in a judgment, the effect may be to liquidate certain claims against the estates.

> *Effect on Debtors.* Also, as discussed above, the Debtors are necessary participants in the Big Lots Action. The Debtors' management and their records will be the focus of Big Lots Action. The Debtors will be drawn into the Big Lots Action as if they were a full party.

62865 1001

### D.     The General Requirements for a Preliminary Injunction Are Met

The Debtors satisfy each of the requirements for injunctive relief under Fed. R. Bankr.

P. 7065 or Section 105(a) of the Bankruptcy Code. In assessing whether to issue an injunction

pursuant to Fed. R. Bankr. P. 7065 or Section 105(a), courts apply the traditional four-part test:

1. the likelihood that the plaintiff will prevail on the merits;

2. the extent to which the plaintiff will suffer immediate and irreparable harm if injunctive relief is not granted;

3. the harm to the defendant if an injunction is granted; and

4. whether issuance of an injunction is in the public interest.

*See In re American Film Technologies*, 175 B.R. at 849; *In re PHP*, slip op. at 3. All four of

these prongs support injunctive relief in this case.

### *1     The Debtors Will Likely Succeed on the Merits*

The "likelihood of success" prong for injunctive relief is satisfied with respect to Counts I

and II (regarding violation of automatic stay) in the Debtors' Complaint because the Estate

Causes of Action are property of the Debtors' estates for the reasons set forth above. For

purposes of the preliminary injunction requested under Section 105(a) the likelihood of success

prong is satisfied by showing that the debtor will likely be adversely affected if the automatic

stay is not extended. *In re American Film Techs.*, 175 B.R. at 849 ("[t]he elements of probable

success on the merits and irreparable harm, in the context of this proceeding, are essentially a

matter of whether [the debtor] would be seriously adversely affected if the benefit of the

automatic stay is not extended."). Courts in circumstances indistinguishable from this case, have

granted the injunctive relief sought by the Debtors here. *See PHP,* slip op. at 7-9 (attached

hereto as <u>Exhibit "B"</u>); *In re Chateaugay Corp.*, 201 B.R. 48, 72 (Bankr. S.D.N.Y. 1996), *aff'd*

*in relevant part*, 213 B.R. 633 (S.D.N.Y. 1997); *In re Rickel Home Centers, Inc.*, 199 B.R. at

62865 1001

501; *In re Continental Airlines*, 177 B.R. at 481; *American Film Techs*, 175 B.R. at 855; *In re Sudbury, Inc.*, 140 B.R. at 467.

     2.    *The Debtors Will Suffer Immediate and Irreparable Injury*

The Debtors will suffer immediate and irreparable harm if the continued prosecution of the Big Lots Action is not enjoined for at least two reasons:  1) the time and energy of the Debtors' management will be diverted from reorganization efforts; and 2) the Debtors' estates will be put at risk by way of possible collateral estoppel, depletion of their insurance assets and indemnification claims.

Immediate and irreparable harm may be established "if the action sought to be enjoined would so consume the time, energy and resources of the debtor that it would substantially hinder the debtor's reorganization effort." *See In re Continental Airlines*, 177 B.R. at 481 n.6 (internal quotation marks omitted); *In re Sudbury, Inc.*, 140 B.R. at 465; *In re Chateaugay Corp.*, 201 B.R. at 72 (where action "threatens the reorganization process" or "would impair the [bankruptcy] court's jurisdiction" the irreparable harm requirement is met).  As stated, the Debtors will be the focus of the lawsuit and consume the Debtors' limited resources, whether they are a party or not.

Irreparable harm can also be established where (as here) continuation of the litigation against the non-debtor defendants will adversely impact the estates and their creditors.  Unless an injunction is issued to stop further prosecution of the Big Lots Action, the Debtors will have to begin participating in the action hindering their reorganization efforts.  As demonstrated in *In re American Film Techs., Inc.*, 175 B.R. at 849-52, the danger of collateral estoppel and indemnification liability is sufficient to establish immediate and irreparable harm for entry of an injunction.  *See also A.H. Robins Co.*, 788 F.2d at 1008 (same).  Such a risk is clearly present here.

As explained above, the Debtors will suffer immediate and irreparable injury if injunctive relief is not granted because:

> continuation of the Big Lots Action will divert key personnel from the reorganization.

> continuation of the Big Lots Action will adversely effect the assets of the estates by potentially reducing the proceeds available under the D&O Policy.

> the Big Lots Action may expose the estates to indemnification and contribution claims.

> continuation of the Big Lots Action may expose the Debtors to collateral estoppel, adverse precedent, vicarious liability, or imputed admissions.

Accordingly, the Debtors will be irreparably harmed unless injunctive relief is granted under Section 105(a) of the Bankruptcy Code.

>    3    *The Balance of the Harms Weighs in Favor of Granting an Injunction*

The harm to the Debtors if an injunction is not issued will significantly outweigh any harm suffered by Big Lots if the Big Lots Action is enjoined. As stated above, the Debtors will suffer significant and irreparable harm if the Big Lots Action continues during this critical phase of the bankruptcy case. On the other hand, Big Lots will suffer little or no harm if an injunction is granted. An injunction will not prevent Big Lots from asserting its claims; rather it will merely postpone the prosecution of its claims. *See, e g , In re American Film Techs , Inc.*, 175 B.R. at 849 (plaintiff was "not being asked to forego his prosecution against the individual defendants, only to delay it"); *In re Lazarus Burman Assocs.*, 161 B.R. 891, 901 (Bankr. E.D.N.Y. 1993) (granting preliminary injunction would "not invalidate the right of [the plaintiffs]," but instead, would "merely delay the enforcement of those rights, at least until a plan or plans of reorganization are confirmed").

24

4.    *The Issuance of an Injunction Is In the Public Interest*

In the context of a Section 105(a) injunction, the public interest prong of the four-part test is satisfied where (as here) the stay will promote a successful reorganization or liquidation of the debtor. *See In re PHP*, slip op. at 9 (attached hereto as <u>Exhibit "B"</u>); *In re American Film Techs., Inc.* 175 B.R. at 849; *Gathering Restaurant, Inc. v. First Nat'l Bank (In re Gathering Restaurant, Inc.)*, 79 B.R. 992, 999 (Bankr. N.D. Ind. 1987); *In re Lazarus Burman Assocs.*, 161 B.R. at 901 (preliminary injunction promoted public interest because the injunction would allow the principals of the debtor "to devote their full time and attention to and raise funds for the [d]ebtors' reorganization"). Here, a stay of the action will increase the chances for a successful reorganization, and will preserve the assets of the estates by preventing an unsupervised "first-come, first-served" dissipation of estate assets. Accordingly, an injunction will promote the public interest in these cases, and therefore, the Court should enjoin the Big Lots Action pursuant to Section 105(a) of the Bankruptcy Code.

## CONCLUSION

For the reasons stated above, prosecution of the Big Lots Action should be preliminarily

enjoined pending final resolution.

Dated: Wilmington, Delaware
      February 18, 2005

                    YOUNG CONAWAY STARGATT &
                    TAYLOR, LLP

                    Joel A. Waite (No. 2925)
                    M. Blake Cleary (No. 3614)
                    Matthew B. Lunn (No. 4119)
                    The Brandywine Building
                    1000 West Street, 17th Floor
                    P.O. Box 391
                    Wilmington, Delaware 19899-0391
                    Tel: (302) 571-6600
                    Fax: (302) 571-1253

                    - and –

                    WILMER CUTLER PICKERING
                      HALE AND DORR LLP
                    Mark N. Polebaum (BBO #402060)
                    Mitchel Appelbaum (BBO #558579)
                    60 State Street
                    Boston, MA 02109
                    Tel: (617) 526-6000
                    Fax: (617) 526-5000

                    Co-Counsel for Debtors and Debtors In Possession

62865 1001

**Exhibit "A"**

**See attached copy of the Complaint filed by Big Lots**

**EFiled: Feb 9 2005 4:00PM EST**
**Filing ID 5108097**

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**
**IN AND FOR NEW CASTLE COUNTY**

| | |
|---|---|
| BIG LOTS STORES, INC., <br><br> Plaintiff, <br><br> v. <br><br> BAIN CAPITAL FUND VII, LLC, a Delaware Limited Liability Company; BCIP ASSOCIATES II, a Delaware General Partnership; BCIP TRUST ASSOCIATES II, a Delaware General Partnership; BCIP ASSOCIATES II-B, a Delaware General Partnership; BCIP TRUST ASSOCIATES II-B, a Delaware General Partnership; SANKATY HIGH YIELD PARTNERS II, L.P., a Delaware Limited Partnership; MICHAEL L. GLAZER, individually; ROBERT J. FELDMAN, individually; JOSHUA BECKENSTEIN, individually; MATTHEW LEVIN, individually; and ROBERT WHITE, individually, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. |

## COMPLAINT

Big Lots Stores, Inc. ("Big Lots"), by and through its attorneys, for its complaint against Bain Capital Fund VII, LLC; BCIP Associates II; BCIP Trust Associates II; BCIP Associates II-B; BCIP Trust Associates II-B; Sankaty High Yield Partners II; L.P., Michael L. Glazer; Robert J. Feldman; Joshua Beckenstein; Matthew Levin; and Robert White, states as follows:

## INTRODUCTION

1. By this action, Plaintiff Big Lots seeks to recover $45 million plus interest from Defendants for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, fraud, and civil conspiracy resulting from the Defendants' actions in looting

the Havens Corner Corporation ("HCC"), and rendering HCC insolvent and unable to repay its debt to Big Lots, which now totals more than $52 million.

    2. HCC is a holding company formed by Big Lots in December 2000 to facilitate Big Lots' sale of its "K*B Toy" retail toy business to various of the Defendants. HCC's sole asset was 100% of the stock of KB Consolidated, Inc. ("KB Consolidated"), which itself was a holding company that, through intermediate holding companies, owned various operating subsidiaries doing business under the "KB" name (the "Operating Subsidiaries"). The value of HCC, therefore, was essentially the value of the Operating Subsidiaries.

    3. In December 2000, as part of a leveraged buy-out transaction, Big Lots sold HCC, and thus KB Consolidated and the Operating Subsidiaries, to the KB Acquisition Corporation ("KB Acquisition"), which was a wholly owned subsidiary of KB Holdings, Inc. ("KB Holdings"). KB Holdings was and is owned by various of the Defendants and other members of the KB Companies' (defined below) management. After the transaction, KB Holdings became the ultimate parent of HCC, various intermediate holding companies, and the Operating Subsidiaries. KB Holdings, its direct and indirect subsidiary holding companies, and the Operating Subsidiaries, are hereinafter referred to collectively as the "KB Companies."

    4. The purchase price for HCC consisted of approximately $302.5 million in cash and debt, plus certain warrants. Of the $302.5 million, the Defendants contributed a total of only $20.6 million as equity, and then immediately took out $2.5 million as a "success fee." As a result, Defendants' net equity investment was only $18.1 million. Big Lots continued as an investor in HCC, taking back a note for $45 million (the "HCC Note"). On information and belief, the remaining $237 million consisted of third-party loans secured by HCC's assets, including those of the Operating Subsidiaries. Thus, while Defendants made an $18.1 million

equity investment in the KB Companies, Big Lots retained a structurally superior $45 million debt investment.

5. In or around April 2002, notwithstanding the deterioration in the KB Companies' business as the nation slid into recession in 2001 and early 2002, the Defendants severely leveraged and further encumbered the already strained KB Companies by borrowing many millions of dollars[1] from secured lenders and paying the proceeds, together with substantially all of the KB Companies' available cash, to themselves in the form of bonuses and repurchases of 65% of KB Holdings' stock, worth in excess of $85 million. Together, the KB Companies' borrowings and the subsequent cash payments to the Defendants are hereinafter referred to as the "Equity Distribution Transaction."

6. The effect of the Equity Distribution Transaction was to encumber substantially all of HCC's assets and to strip all of the value from HCC and the Operating Subsidiaries. The Equity Distribution Transaction resulted in Defendants' receiving an enormous and unjustified return on their investment of more than 600% (not counting the substantial additional bonus payments made to Defendants Glazer and Feldman and other insiders) and ultimately in HCC's default on Big Lots' $45 million HCC Note.

7. As part of the Equity Distribution Transaction, HCC and the Operating Subsidiaries made millions of dollars of payments to certain of the Defendants and other insiders, including: (1) in excess of $85 million in cash payments, principally to the Bain Defendants (as defined below), as well as Defendant Glazer, Defendant Feldman, and various

---

[1] Big Lots has specific information regarding the details of certain of the transactions that are described in this complaint. At the present time, however, Big Lots has not disclosed that specific information out of an abundance of caution in light of certain confidentiality agreements to which Big Lots is a party. Big Lots reserves its right, at the appropriate time, to file an amended complaint containing such details.

other insiders, in redemption of 65% of KB Holdings' stock, resulting in enormous and unjustified gains on their initial equity investments; (2) multi-million dollar bonus payments to Defendants Glazer and Feldman; and (3) millions of dollars of additional bonuses paid to various other insiders.

8. Big Lots seeks recovery for breach of fiduciary duty against Michael L. Glazer ("Glazer") and Robert J. Feldman ("Feldman") for their conduct, as officers and directors of HCC and various other KB Companies, in facilitating and approving the Equity Distribution Transaction. Specifically, on information and belief, Defendants Glazer and Feldman (a) improperly manipulated the KB Companies' accounting to improve the KB Companies' apparent financial condition; (b) provided materially misleading information to an investment banker in an effort to obtain an opinion that HCC and its affiliates would be solvent after the Equity Distribution Transaction was completed; and (c) approved the Equity Distribution Transaction, including a substantial dividend payment from HCC to KB Acquisition, and ultimately to certain of the Defendants, bypassing and not paying the $45 million HCC Note.

9. The sources of these insider payments were substantially all of the KB Companies' cash on hand and many millions of dollars in loans secured against the Operating Subsidiaries' assets. These loans and cash payments stripped substantially all of the value from the Operating Subsidiaries and thereby from HCC. The actions of Defendants Glazer and Feldman in assuring a windfall equity return while leaving the KB Companies insolvent and unable to pay their obligations as they matured, proximately resulted in HCC's inability and failure to repay the HCC Note. Because the Equity Distribution Transaction rendered HCC insolvent and unable to repay its obligations, Glazer and Feldman owed fiduciary duties to Big Lots as HCC's sole substantial creditor. Moreover, because Defendants Glazer and Feldman

personally benefited from it, this self-dealing transaction is subject to the "entire fairness" standard of review.

10. Big Lots seeks recovery for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty against Joshua Beckenstein ("Beckenstein"), Matthew Levin ("Levin"), and Robert White ("White" and collectively with Beckenstein and Levin, the "Bain Director Defendants") as well as Bain Capital Fund VII, LLC;  BCIP Associates II; BCIP Trust Associates II; BCIP Associates II-B; BCIP Trust Associates II-B; and Sankaty High Yield Partners II, L.P. (collectively, the "Bain Defendants").  On information and belief, some combination of Glazer, Beckenstein, Levin, and White constituted the board of directors of KB Holdings, which is the ultimate parent of HCC and its affiliates.  The Bain Defendants own a majority and controlling equity interest in KB Holdings. The Bain Director Defendants and Bain Defendants induced Defendants Glazer and Feldman to breach their fiduciary duties to HCC in the manner described above, including by inducing Glazer and Feldman to approve the dividend payment from HCC to KB Acquisition.  The vast majority of the dividend personally benefited the Bain Defendants, because KB Holdings used the improper dividend to pay the Bain Defendants an inflated price for a substantial portion of their stock.  On information and belief, the Bain Director Defendants are also Managing Directors of the Bain Defendants and approved the Equity Distribution Transaction both as directors of KB Holdings and as agents of the Bain Defendants.

11. Big Lots seeks restitution for unjust enrichment against Defendants Glazer, Feldman, and the Bain Defendants, who each received many millions in cash as bonuses or for the repurchase of a substantial portion of their shares in KB Holdings.

12. Big Lots also seeks:  damages for fraud against Defendant Feldman, for his April 2002 material misrepresentations made directly to Big Lots;  damages for civil conspiracy against all Defendants, for their concerted actions in connection with Big Lots and the Equity Distribution Transaction; recovery for Defendant Glazer's breach of his fiduciary duty as a director of Big Lots, and damages against all defendants for intentional interference with contractual relations.

## PARTIES

13. Plaintiff Big Lots is an Ohio corporation with its principal place of business at 300 Phillipi Road, Columbus, Ohio.

14. Defendant Glazer is an individual residing at 5 Gleneagles Drive, Lenox, Massachusetts.  Glazer is a long-time manager and executive of the KB Toys companies.  On information and belief, Glazer was at all times relevant hereto a director of HCC and KB Holdings, as well as chief executive officer of various of the KB Companies, including HCC and KB Holdings.

15. Defendant Feldman is an individual residing at 6 Tyler Court, East Greenbush, New York.  Feldman is a long-time manager and executive of the KB Toys companies.  Feldman has had intimate financial knowledge of, and detailed and significant financial responsibility for, the KB Toys companies since 1988.  On information and belief, Feldman was at all times relevant hereto a director of HCC and KB Holdings, as well as chief financial officer of various of the KB Companies, including HCC and KB Holdings.

16. Defendant Beckenstein is an individual residing at 52 High Rock Road, Wayland, Massachusetts.  On information and belief, Beckenstein was at all times relevant hereto a director of KB Holdings (now KB Toys, Inc.), a Delaware Corporation.

-6-

17. Defendant Levin is an individual residing at 41 Stuart Road, Newton, Massachusetts. On information and belief, Levin was at all times relevant hereto a director of KB Holdings (now KB Toys, Inc.), a Delaware Corporation.

18. Defendant White is an individual residing at 23 Chadwick Road, Weston, Massachusetts. On information and belief, White was at all times relevant hereto a director of KB Holdings (now KB Toys, Inc.), a Delaware Corporation.

19. The Bain Defendants are each Delaware corporations that have their principal places of business in Boston, Massachusetts. On information and belief, each is an affiliate of Bain Capital, Inc., and is a private equity investment fund or other investment vehicle.

## FACTS

### Big Lots Sells KB to Bain

20. Prior to December 2000, Big Lots (then known as Consolidated Stores Corporation), through its wholly-owned subsidiary KB Consolidated, Inc. ("KB Consolidated"), owned and operated more than 1,300 retail toy stores across the 50 states, Puerto Rico and Guam under the K*B Toys, K*B Toy Works, and K*B Toy Outlet names. In addition, KB Consolidated conducted online sales of children's products under the name KBkids.com.

21. During 2000, Big Lots received various indications of interest or offers for its KB toy business, including an offer from Defendant Glazer to purchase KB Consolidated in a leveraged buy-out transaction.

22. Glazer ultimately withdrew his offer and joined with the Bain Defendants and other members of the KB Companies' management to make a new offer to purchase KB Consolidated.

23. On December 7, 2000, Big Lots sold KB Consolidated to the Bain Defendants, Glazer, and their group in a multi-step transaction in which Big Lots (1) created

-7-

HCC as a holding company for KB Consolidated, through which Big Lots owned the Operating Subsidiaries; and (2) sold HCC to KB Acquisition for approximately $302.5 million, plus certain warrants in KB Holdings (KB Acquisition's parent and now the ultimate parent of the Operating Subsidiaries).

24. The Bain Defendants and possibly others invested the net amount of $18.1 million in cash to purchase HCC. The remainder of the $302.5 million purchase price was financed. Big Lots provided the HCC Note, thereby financing $45 million of the purchase price. Approximately $237 million was paid by leveraging the assets of the Operating Subsidiaries, i.e., by borrowings secured by the existing assets.

25. By virtue of the HCC Note, Big Lots is the only substantial creditor of HCC.

**The 2001 Business Downturn**

26. In the Defendants' first year of ownership of and control over HCC and the Operating Subsidiaries, the economic climate in the United States began to deteriorate. Following the events of September 11, 2001, and by November 2001, Defendants knew or should have known that HCC and the Operating Subsidiaries' toy business had been severely and adversely affected by both the general economic downturn and by specific trends in the retail sales and toy sales businesses. The economy was entering a recession, retail sales were down, and mall sales (on which the KB Companies substantially relied) were down even in relation to depressed retail sales.

27. In addition to the general deterioration of the economy in 2001, KB Companies, along with other traditional retail sellers, suffered from increased competition from Wal-Mart and other "superstore" retailers. HCC and the KB Companies temporarily weathered the storm through the end of 2001 and into 2002.

**The Equity Distribution Transaction**

28. Despite the deterioration of HCC's business and the already tenuous cash-flow position of the Operating Subsidiaries, the Defendants determined to undertake a series of transactions in April 2002, by which they could loot the value of the Operating Subsidiaries by borrowing substantially against their respective assets and paying out the proceeds, together with cash previously on hand, as enormous and unjustified cash bonuses and share repurchases

29. Specifically, on April 23, 2002, the Defendants caused HCC and the Operating Subsidiaries to consummate the Equity Distribution Transaction, in part pursuant to a Redemption, Repurchase, and Equity Restructuring Agreement (the "Repurchase Agreement"). The Defendants participated in and caused the following transactions to occur: (1) the Operating Subsidiaries borrowed substantially all the money they could; (2) the Operating Subsidiaries made millions of dollars of bonus payments to Defendants Glazer and Feldman and various other insiders; (3) HCC paid an up-stream dividend of many millions of dollars to its parent, KB Acquisition, without paying or reserving against the $45 million HCC Note; (4) KB Acquisition in turn paid the dividend to its parent, KB Holdings; and (5) KB Holdings then used the proceeds of the dividend (financed with cash and debt) to repurchase 65% of its stock, worth in excess of $85 million, from the Bain Defendants, Glazer, Feldman, and other KB insiders.

30. KB Holdings also bought back $1.95 million in warrants from Big Lots. However, Big Lots was not involved in negotiating, and had no right as a warrant holder to approve or block, either the Equity Distribution Transaction or the sale of the warrants. Rather, Big Lots was contractually obligated, as a warrant holder, to surrender its warrants under a "drag along" provision in its Warrant Holder Agreement

31. To induce Big Lots to cooperate with and not object to or seek legal relief with respect to the Equity Distribution Transaction, and to surrender its warrants, Defendant Feldman wrote to Charles Haubiel, General Counsel of Big Lots, on or about April 23, 2002, certifying that following the Repurchase Agreement, which was undertaken as part of the Equity Distribution Transaction, KB Holdings would have "a consolidated net worth of not less than $20,000,000."

32. Feldman's representation was knowingly false, as KB Holdings was rendered insolvent and unable to pay its obligations by the Equity Distribution Transaction.

33. Defendants' conduct was targeted against Big Lots, which was the only substantial creditor of HCC. Moreover, Defendants acted with particular animus toward Big Lots when, on information and belief, Defendants specifically considered, but rejected, repaying Big Lots' structurally superior debt ahead of the payments to themselves that were made pursuant to the Equity Distribution Transaction. Defendants decided not to repay the obligation to Big Lots to enrich themselves and maximize their personal recovery from the Equity Distribution Transaction.

34. Defendant Glazer was personally interested in the Equity Distribution Transaction, which occurred while he was a director of Big Lots. At that time, Glazer knew or should have known that the alleged justification for the Equity Distribution Transaction was based on materially misleading information and projections and that the Equity Distribution Transaction would render HCC insolvent and unable to repay the HCC Note. Notwithstanding this knowledge, Glaser failed to inform Big Lots of these material facts and approved the Equity Distribution Transaction to obtain its benefits for himself.

35. The Equity Distribution Transaction resulted in the Defendants receiving an enormous and unjustified return of more than 600% on their investment in just over 16 months, not counting the substantial additional bonus payments made to Defendants Glazer and Feldman and other insiders.

36. The Equity Distribution Transaction had the effect of stripping essentially all of the value from HCC and its sole asset, KB Consolidated (owner of the Operating Subsidiaries). The transaction essentially converted all of the value in KB Consolidated and the Operating Subsidiaries into cash by using substantially all of their assets to secure these borrowings and then using the loan proceeds and cash on hand to pay out well in excess of $85 million, principally to the Bain Defendants, Glazer, and Feldman in the form of bonuses and share repurchases.

37. The Equity Distribution Transaction left HCC and the Operating Subsidiaries on the brink of bankruptcy, and left HCC insolvent and unable to pay its obligations as they matured, specifically rendering it unable to repay the HCC Note to Big Lots. Though the KB Companies limped through 2003, their over-levered, insolvent business could not survive the relatively weak 2003 holiday season. As a result, HCC and its direct and indirect subsidiaries sought protection from their creditors under chapter 11 of the Bankruptcy Code on January 14, 2004. HCC is a debtor in those proceedings. The HCC Note is currently due and payable in the amount of $52 million, consisting of $45 million in principal plus accrued interest at the time of the bankruptcy filing of $7 million.

**Defendants' Use of Erroneous and Misleading**
**Projections to Support the Equity Distribution Transaction**

38. To support the Equity Distribution Transaction, Defendants sought and received a "solvency opinion" from Houlihan Lokey Howard & Zukin ("Houlihan").

-11-

39. On information and belief, to obtain this solvency opinion, Defendants supplied Houlihan with materially misleading financial projections certified by Defendants Feldman and Glazer, which all Defendants knew or should have known were unrealistic.

40. The Defendants' proceeded with the Equity Distribution Transaction knowing that their purported reliance on the Houlihan solvency opinion was patently unreasonable and knowing that the transaction would leave the KB Companies insolvent and unable to pay its obligations as they matured.

## The Post Closing Operations and The Inevitable Insolvency

41. That the projections provided to Houlihan were patently unreasonable has been made clear by the performance of the KB Companies following the Equity Distribution Transaction.  Among other things, on information and belief, shortly after entering into the Equity Distribution Transaction, KB Companies ran into a substantial liquidity shortage.

42. Though the KB Companies continued to operate their businesses through 2003, the KB Companies (including HCC) were forced to file a chapter 11 bankruptcy petition on January 14, 2004.  As a result of that filing, the HCC Note was accelerated and HCC defaulted on its payment.

43. Neither HCC nor any of the debtors in the bankruptcy proceeding is a party to this action.  By this action, Big Lots asserts its individual claims against Defendants and does not seek a recovery against, or on behalf of, any debtor in that bankruptcy proceeding.

### COUNT I
### Breach of Fiduciary Duty Against Defendants Glazer and Feldman

44. Plaintiff realleges the allegations of paragraphs 1 through 43, above, and incorporates those paragraphs as if fully set forth herein.

45. On information and belief, Defendants Glazer and Feldman were the sole directors of HCC and KB Massachusetts.

46. The Equity Distribution Transaction rendered HCC insolvent and unable to pay its obligations as they matured, and Glazer and Feldman knew the Equity Distribution Transaction would render HCC insolvent and unable to pay its obligations as they matured. The Equity Distribution Transaction therefore created fiduciary duties running from Glazer and Feldman to Big Lots.

47. Defendants Glazer and Feldman breached their fiduciary and other duties to Big Lots by the conduct alleged above, including by intentionally, recklessly, or negligently manipulating KB's accounting; providing materially misleading information and projections to Houlihan to support the Equity Distribution Transaction; and approving that transaction, thereby rendering HCC insolvent and allowing HCC to bypass payment of Big Lot's debt in favor of legally subordinate equity dividends.

48. Defendants Glazer and Feldman were interested parties to the Equity Distribution Transaction because it gave them substantial bonuses. Their participation in and approval of the Equity Distribution Transaction constituted a breach of their duties of loyalty.

49. The breach of fiduciary duties injured Big Lots by causing HCC to be unable to repay the principal and interest on the HCC Note.

50. Plaintiff has no adequate remedy at law.

### COUNT II
### Breach of Fiduciary Duty
### Against the Bain Director Defendants

51. Plaintiff realleges the allegations of paragraphs 1 through 50, above, and incorporates those paragraphs as if fully set forth herein.

-13-

52. At all times material to this action, the Bain Director Defendants have served as directors of KB Holdings. In this position, the Bain Director Defendants have had the power, directly or indirectly, to control the affairs of HCC and the Operating Subsidiaries.

53. The Equity Distribution Transaction rendered HCC insolvent and unable to pay its obligations as they matured and the Bain Director Defendants knew or should have known that the Equity Distribution Transaction would render HCC and the other KB Companies insolvent. The Equity Distribution Transaction therefore created fiduciary duties running from the Bain Director Defendants to Big Lots.

54. The Bain Director Defendants were interested in the Equity Distribution Transaction, which caused in excess of $85 million to be paid to KB Holdings stockholders, principally the Bain Defendants. Among other things, on information and belief, the Bain Director Defendants were managing directors of the Bain Defendants and held significant economic interests therein.

55. The Bain Director Defendants breached their fiduciary duties to Big Lots, as HCC's creditor, by approving the Equity Distribution Transaction, which furthered their own interests and proximately harmed Big Lots.

56. The Bain Director Defendants' breaches of fiduciary duty injured Big Lots by causing HCC to be unable to repay the principal and interest on the HCC Note.

57. Plaintiff has no adequate remedy at law.

### COUNT III
### Aiding and Abetting Breach of Fiduciary Duty
### Against the Bain Defendants and the Bain Director Defendants

58. Plaintiff realleges the allegations of paragraphs 1 through 57, above, and incorporates those paragraphs as if fully set forth herein.

-14-

59. At all times material to this action, the Bain Defendants have owned or controlled a majority of the shares of KB Holdings, which is the ultimate parent of HCC and the Operating Subsidiaries. In this position, the Bain Defendants had the power, directly or indirectly, to control the affairs of HCC and the Operating Subsidiaries and to control or influence the actions of Defendants Glazer and Feldman through, among other ways, controlling the terms and conditions of their employment, including the payment of bonuses and other compensation.

60. At all times material to this action, the Bain Director Defendants have served as directors of KB Holdings. In this position, the Bain Director Defendants have had the power, directly or indirectly, to control the affairs of HCC and the Operating Subsidiaries and to control or influence the actions of Defendants Glazer and Feldman through, among other ways, controlling the terms and conditions of their employment, including the payment of bonuses and other compensation.

61. The Bain Director Defendants and the Bain Defendants knew or should have known that the Equity Distribution Transaction would render HCC and the other KB Companies insolvent and unable to pay their obligations.

62. The Bain Director Defendants and the Bain Defendants knew or should have known that Defendants Glazer and Feldman, as directors of HCC, had or would have as a result of the Equity Distribution Transaction, fiduciary obligations to Big Lots.

63. The Bain Director Defendants and the Bain Defendants knew or should have known that Glazer and Feldman would breach their fiduciary duties by, among other things, approving the Equity Distribution Transaction.

-15-

64. The Bain Director Defendants and the Bain Defendants knowingly induced Glazer and Feldman to breach their fiduciary duties, for the purpose of enriching the Bain Defendants. These actions constituted the aiding and abetting of the breaches of fiduciary duty.

65. The Bain Director Defendants and the Bain Defendants actions in aiding and abetting Glazer and Feldman' breaches of fiduciary duty injured Big Lots by causing HCC to be unable to repay the principal and interest on the HCC Note.

66. Plaintiff has no adequate remedy at law.

## COUNT IV
## Unjust Enrichment Against the Bain Defendants, Glazer and Feldman

67. Plaintiff realleges the allegations of paragraphs 1 through 66, above, and incorporates those paragraphs as if fully set forth herein.

68. As a result of the Equity Distribution Transaction, the Bain Defendants, Feldman, Glazer and other insiders received in excess of $85 million in cash for the repurchase of certain of their shares in KB Holdings.

69. Each of these payments constituted a benefit to the Bain Defendants, Glazer and Feldman for which the KB Companies did not receive any consideration, at a time when all Defendants knew of the HCC Note and that, a result of the Equity Distribution Transaction, HCC was insolvent and unable to pay its obligations as they matured.

70. The Bain Defendants, Glazer and Feldman each were unjustly enriched by the receipt of these payments. It would be unjust to Big Lots for the Bain Defendants, Glazer and Feldman to retain the benefit of these payments.

71. Plaintiff has no adequate remedy at law.

-16-

**COUNT V**
**Fraud Against Defendant Feldman**

72. Plaintiff realleges the allegations of paragraphs 1 through 0, above, and incorporates those paragraphs as if fully set forth herein.

73. To induce Big Lots to cooperate with and not object to the Equity Distribution Transaction, Defendant Feldman wrote to Charles Haubiel, General Counsel of Big Lots, on or about April 23, 2002, certifying that following the Repurchase Agreement, which was undertaken as part of the Equity Distribution Transaction, KB Holdings would have "a consolidated net worth of not less than $20,000,000."

74. Feldman's representation was false. In fact, following the Equity Distribution Transaction, KB Holdings was insolvent.

75. Feldman knew or should have known that his representation was false.

76. In addition to his false representations, Feldman failed to disclose that he and the only other HCC Director, Glazer, were interested in the Equity Distribution Transaction, and he failed to disclose the extent of that interest.

77. Feldman knew or should have known that his misrepresentations and omissions were material and that Big Lots would rely on them.

78. Big Lots relied to its detriment on Feldman's misrepresentations and omissions by, among other things, entering into the Repurchase Agreement, surrendering its warrants, acquiescing in the Equity Distribution Transaction, and not taking affirmative action to block the transaction and otherwise protect its rights.

79. Big Lots was injured by its reliance on Feldman's misrepresentations and omissions, because HCC was rendered insolvent and unable to repay the HCC Note as a result of the Equity Distribution Transaction.

## COUNT VI
### Civil Conspiracy Against All Defendants

80. Plaintiff realleges the allegations of paragraphs 1 through 79, above, and incorporates those paragraphs as if fully set forth herein.

81. The Bain Defendants and the Bain Director Defendants agreed and conspired with Defendants Glazer and Feldman to have the Bain Directors, together with Glazer and Feldman, use their respective positions as directors and/or officers of various of the KB Companies to cause the consummation of the Equity Distribution Transaction, for the purpose of enriching themselves and their principals.

82. Pursuant to this conspiracy, Defendants Glazer and Feldman prepared and provided to Houlihan materially misleading information and projections to support the Equity Distribution Transaction; and, with the Bain Director Defendants, approved that transaction, thereby rendering HCC insolvent and allowing HCC to bypass payment of Big Lots' debt in favor of legally subordinate equity dividends.

83. Big Lots was injured by the actions undertaken as part of this conspiracy because HCC was rendered insolvent and unable to repay the HCC Note as a result of the Equity Distribution Transaction.

## COUNT VII
### Breach Of Fiduciary Duty Against Defendant Glazer

84. Plaintiff realleges the allegations of paragraphs 1 through 83 above, and incorporates those paragraphs as if fully set forth herein.

-18-

85. At all time relevant hereto, through May 20, 2003, Defendant Glazer was a director of Big Lots. As a director, Glazer owed fiduciary duties to Big Lots, including duties of loyalty, candor, and disclosure.

86. Defendant Glazer breached his fiduciary duty to Big Lots by engaging in a plan and scheme that had the foreseeable effect of rendering an asset of Big Lots – the HCC Note – valueless.

87. Glazer's conduct in planning and implementing the Equity Distribution Transaction which rendered the HCC Note valueless breached his duty of loyalty to Big Lots because Glazer derived personal benefit from the Equity Distribution Transaction.

88. In addition, Glazer knew or should have known that the Equity Distribution Transaction would render HCC insolvent and failed to convey to his fellow Big Lots' directors information concerning the Equity Distribution Transaction known to him which the Big Lots' board could have used to take action to protect the value of the HCC Note. Glazer's sequestering of information from his fellow Big Lots' directors constituted a further breach of his fiduciary duty to Big Lots.

89. The breach of fiduciary duties injured Big Lots by causing HCC to be unable to repay the principal and interest on the HCC Note.

90. Plaintiff has no adequate remedy at law.

## COUNT VIII
### Intentional Interference With Contractual Relations Against All Defendants

91. Plaintiff realleges the allegations of paragraphs 1 through 90 above, and incorporates those paragraphs as if fully set forth herein.

92. The HCC Note is a contract between Big Lots and HCC.

-19-

93. All defendants knew of the existence of the HCC Note and that it constituted a contract between Big Lots and HCC.

94. The defendants' planning and implementation of the Equity Distribution Transaction was intentional conduct that rendered HCC insolvent, rendered HCC's performance of its obligations under the HCC Note impossible, and caused HCC to default on the HCC Note.

95. Defendants had no justification for rendering HCC's performance under the HCC Note impossible and causing HCC to default on the HCC Note.

96. As a result of defendants' intentional interference with HCC's performance under the HCC Note, Big Lots has been damaged in the amount of $45 million in principal of the HCC Note plus accrued interest of more than $7 million.

**WHEREFORE**, Big Lots respectfully requests that the Court enter judgment in its favor and against all Defendants, jointly and severally, and grant Big Lots the following relief:

A.    Recovery against all defendants, jointly and severally, in the amount of $45 million, representing the principal amount of the HCC Note, plus interest that has accrued or would accrue on the HCC Note through its maturity date of December 7, 2010;

B.    Restitutionary damages against Defendants Glazer and Feldman and the Bain Defendants individually in the amount by which they were unjustly enriched, which amounts shall be determined at trial; and

C.    Such other and further relief as the Court determines is just and appropriate.

-20-

Dated: February 9, 2005

ROSENTHAL MONHAIT GROSS &
GODDESS, P.A.

By:

Norman M. Monhait (DSBA #1040)
Kevin Gross (DSBA #209)
919 Market Street, Suite 1401
Citizens Bank Center
P.O. Box 1070
Wilmington, Delaware 19899-1070

Attorneys for Plaintiff

OF COUNSEL:

Jeff J. Marwil
James A. McKenna
Anders C. Wick
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350

Exhibit "B"

See attached copy of
*PHP Healthcare Corp. v. HIP Foundation, Inc. (In re PHP)*, Adv. No A99-18 (MFW)
(Bankr. D. Del. Mar. 31, 1999)

LIB.
5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                              )
                                    ) CHAPTER 11
PHP HEALTHCARE CORPORATION,         )
                                    )
                Debtor.             ) Case No. 98-2608 (MFW)
                                    )
_____      )
                                    )
PHP HEALTHCARE CORPORATION,         )
                                    )
                Plaintiff,          )
                                    ) Adv. No. A99-18 (MFW)
        v.                          )
                                    )
HIP FOUNDATION, INC., HEALTH        )
INSURANCE PLAN OF GREATER NEW       )
YORK, MARSHA BRODERICK, CAROLYN     )
HOFFMAN, BETTY GRAYSON              )
KURZWEIL, ROBERT GRAYSON, and       )
FLORENCE ROSENMAN,                  )
                                    )
                Defendants.         )
_____      )

OPINION[1]

I.    PROCEDURAL BACKGROUND

        This case is before us on the Motion of PHP Healthcare Corp.

("the Debtor") for a Preliminary Injunction, by which the Debtor

seeks to stay certain actions against the Debtor's current and

former officers and directors.  The Motion is supported by the

Creditors' Committee and opposed by the Plaintiffs in the three

_____

        [1]    This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Federal Rule of
Bankruptcy Procedure 7052.

19

3-31-94

actions.  For the reasons set forth below, we grant the Debtor's
Motion.

II.  FACTUAL BACKGROUND

The Debtor filed a voluntary petition under chapter 11 on
November 19, 1998.  Prior to the petition, an action had been
instituted in the United States District Court for the Central
District of California by Marsha Broderick and Carolyn Hoffman
against the Debtor and certain former and current officers and
directors of the Debtor at C.A. No. 98-1658 ("the California
Action").  Another action was commenced pre-bankruptcy in the
Delaware Court of Chancery by Betty Grayson Kurzweil and Robert
Grayson as Trustees under the will of Florence Rosenman against
the Debtor, as nominal Defendant, and certain former and current
officers and directors of the Debtor at C.A. No. 16582 ("the
Delaware Action").  Post-petition, an action was filed in the
Supreme Court of the Sate of New York by HIP Foundation, Inc. and
Health Insurance Plan of Greater New York against certain former
and current officers and directors of the Debtor at C.A. No. 99-
CV 66 ("the New York Action").

On February 8, 1999, the Debtor filed a Complaint against
the Plaintiffs in each of the above Actions seeking Declaratory
and Injunctive Relief.  The Debtor also filed a Motion for a
Preliminary Injunction, which was heard on March 11, 1999.  All

2

the Plaintiffs oppose the Motion.  The Creditors' Committee
supported the Motion.  After argument, we held the matter under
advisement.

III. DISCUSSION

To grant a preliminary injunction, we must consider:

1. The likelihood that the Debtor will prevail on the
   merits.

2. The extent to which the Debtor will suffer
   immediate and irreparable harm if the injunction
   is not granted.

3. The harm that the Plaintiffs in the Actions will
   suffer if an injunction is entered.

4. Whether issuance of the injunction is in the
   public interest.

See In re American Film Technologies, 175 B.R. 847, 849 (Bankr.
D. Del. 1994), quoting Merchant & Evans, Inc. v. Roosevelt
Building Products Co., 963 F.2d 628 (3d Cir. 1992).

A.  Likelihood of Success on Merits

The basis for the Debtor's request is that the continuation
of the actions will (1) reduce the proceeds of the insurance
available for other creditors who may have such actions, (2)
increase claims against the estate by creating indemnification

3

claims of such officers and directors, (3) expose the Debtor to
collateral estoppel, adverse precedent, vicarious liability, or
imputed admissions, (4) be disruptive to the estate by diverting
the officers and others from the essential task of reorganization
to address discovery and other issues in the Actions.

The Creditors' Committee supported the Debtor, primarily on
the first ground. Because we agree that the Debtor is likely to
succeed on the merits on this first ground, we do not address the
others.

The Debtor and the Committee assert principally that the
Actions should be stayed because they will otherwise dissipate
proceeds of an insurance policy ("the Policy") which are
available to pay all similar creditors and the indemnification
claims which may be filed against the Debtor by the officers and
directors. In support of this argument, they rely on the case of
In re Sacred Heart Hospital of Norristown, 182 B.R. 14 (Bankr.
E.D. Pa. 1995), where the court held that the proceeds of
liability insurance are property of the estate and, therefore,
enjoined creditors' actions. The court in Sacred Heart noted
that the insurance policy provided coverage for both the debtor
and for its officers and directors. See id. at 418. Therefore,
the court concluded that because the debtor was an insured under
the policy, it had a sufficient interest in the proceeds to make
them property of the estate. See id. at 420. See also, In re

4

Circle K Corp., 121 B.R. 257 (Bankr. D. Ariz. 1990)(insurance policy which provides payment to the debtor of indemnification claims it may pay is property of the estate).

The Plaintiffs respond to that argument by citing the case of In re Louisiana World Exposition, Inc., 832 F.2d 1391 (5th Cir. 1987). The Louisiana World court focused on whether the proceeds of the policy are paid directly to the officers and directors and not to the debtor. See id. at 1399. If the proceeds are not paid to the debtor directly, the Louisiana World court held that they are not property of the estate. See id. Accord In re Zenith Lab., Inc., 104 B.R. 659, 665 (D.N.J. 1989)(where the insurance policy does not increase the debtor's worth or decrease its liabilities, it is not property of the estate).

Thus, the Debtor and Committee assert that the insurance proceeds are property of the estate and that the automatic stay prevents the Plaintiffs from proceeding to obtain those proceeds. Section 362(a)(3) stays any act to obtain possession of property of the estate. The Debtor and Committee also assert that the Actions should be stayed now (even before any danger that a judgment will be entered or payments be made under the policy) because to the extent the Actions proceed, the officers and directors will have ongoing, increasing claims for

indemnification of defense costs.  The Policy covers defense
costs and losses under the same $15 million limit of liability.

   We agree with the holding of the court in <u>Sacred Heart</u> that
the type of policy in question in this case is property of the
estate.  Under the express terms of the Policy in this case, the
indemnification claims must first be paid by the Debtor, before
they can be covered as a Loss:  the Policy states it will pay the
Debtor for indemnification claims made against it by its officers
and directors "only when and to the extent that the [Debtor] has
indemnified the Directors or Officers for such Loss pursuant to
law . . . or By-laws of the [Debtor]. . . ."  (Declaration of
Hercenberg, Exhibit D at p. 4)  Unlike the policy in <u>Louisiana</u>
<u>World</u>, the policy here does affect the Debtor's worth.  The
Debtor's By-laws require indemnification of officers and
directors.  (<u>See id.</u> at Exhibit E, Article IX)  Accordingly,
regardless of the existence of the insurance policy, the Debtor
will be "out-of-pocket" for any indemnification costs.  The
policy will make the debtor whole, thus increasing its worth.

   Furthermore, we find that the Policy here, unlike the one in
<u>Louisiana World</u>, provides entity coverage in addition to director

and officer coverage.[2]  Thus, the Policy here is factually distinguishable from the policy in <u>Louisiana World</u> and more similar to that at issue in <u>Sacred Heart</u>.

Thus, we conclude that the proceeds of the Insurance Policy are property of the estate subject to the automatic stay.  We also agree that the Actions should be stayed to prevent the dissipation of the Policy proceeds through the accrual of indemnification claims for defense costs.  Thus, we find that the Debtor has a likelihood of success on the merits of its complaint for declaratory relief and an injunction.

---

[2]    Section 1 of the Policy, entitled "Insuring Agreements," under Coverage B provides Comprehensive Liability Insurance as follows:

> This policy shall pay the Loss of the Company arising from a:

> (i)   Securities Claim first made against the Company, or

> (ii)  Claim first made against the Directors or Officers,

> during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act, but, in the case of (ii) above, only when and to the extent that the Company has indemnified the Directors or Officers for such Loss pursuant to law, common or statutory, or contract, or the Charter or By-laws of the Company duly effective under such law which determines and defines such rights of indemnity.  The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

(<u>See</u> Hercenberg Affidavit, Exhibit D at p. 4)

B.    Immediate and Irreparable Harm to the Debtor

The Plaintiffs in the Actions assert that there will not be any irreparable harm to the Debtor by the continuation of these suits.  They argue that the cases are in their infancy and will not involve substantial discovery.  In fact, in private securities litigation the filing of a motion to dismiss stays discovery.  See Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 772-1(b).  The Plaintiffs argue that granting an injunction in these circumstances, where the burden on the estate is de minimus, is in effect extending the stay to all actions against officers and directors.  While it may be true that the cases are young and discovery may not be extensive, we find that any action in those cases will have an adverse effect on the estate.

Because we find that the Policy proceeds are property of the estate, we find that continuation of the Actions will constitute immediate and irreparable harm to the Debtor.  Specifically, to the extent that the Actions continue, there will be indemnification claims accruing against the estate which will be decreasing the value of the Policy. This is irreparable; to the extent the claims accrue, the Policy is irrevocably reduced. Thus, we conclude that the second prong is met.

8

C.    <u>Harm to the Plaintiffs</u>

Correspondingly, we do not find that there will be significant harm to the Plaintiffs by entering an injunction here.  As noted by the Plaintiffs, the Actions are in their infancy.  None are ready for trial.  A brief stay to permit the filing of a Plan in this case (which may deal with these claims and others like them) will not harm the Plaintiffs.

D.    <u>Public Interest</u>

The Bankruptcy Code policies of preserving assets of the estate and distribution of those assets in accordance with the priorities set forth in the Code favor granting an injunction in this case.

An appropriate Order is attached.

                              BY THE COURT:


March 31, 1999                _____
                              Mary F. Walrath
                              United States Bankruptcy Judge

9

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) CHAPTER 11 |
| PHP HEALTHCARE CORPORATION, | ) |
| | ) |
| Debtor. | ) Case No. 98-2608 (MFW) |
| | ) |
| | ) |
| PHP HEALTHCARE CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Adv. No. A99-18 (MFW) |
| v. | ) |
| | ) |
| HIP FOUNDATION, INC., HEALTH | ) |
| INSURANCE PLAN OF GREATER NEW | ) |
| YORK, MARSHA BRODERICK, CAROLYN | ) |
| HOFFMAN, BETTY GRAYSON | ) |
| KURZWEIL, ROBERT GRAYSON, and | ) |
| FLORENCE ROSENMAN, | ) |
| | ) |
| Defendants. | ) |
| | ) |

O R D E R

AND NOW, this 31ST day of MARCH, 1999, upon consideration of

the Motion of PHP Healthcare Corporation for a Preliminary

Injunction, the underlying Complaint for Declaratory and

Injunctive Relief, and the Memoranda and Responses submitted by

the interested parties, and after hearing argument by the parties

on March 11, 1999, it is hereby

ORDERED that the Debtor's Motion for a Preliminary Injunction against the Defendants be, and the same hereby is, GRANTED; and it is further

ORDERED that the Defendants are hereby enjoined from taking any acts in furtherance of their Actions against certain former officers and directors of the Debtor, as those Actions are defined in the Complaint and on the Record of the March 11 hearing and the hearing held this date; and it is further

ORDERED that this Preliminary Injunction shall remain in effect until the trial on the Debtor's Complaint.

BY THE COURT:

March 31, 1999

Mary F. Walrath
United States Bankruptcy Judge

cc:   See attached

2

Stephen E. Herrmann, Esquire
Thomas L. Ambro, Esquire
Daniel J. DeFranceschi, Esquire
Richards Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE  19899
Attorneys for PHP Healthcare Corporation

Charles G. Moerdler, Esquire
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY  10038
Attorneys for HIP Foundation, Inc. and
Health Insurance Plan of Greater New York

William S. Lerach, Esquire
Darren J. Robbins, Esquire
Milberg Weiss Bershad Hynes & Lerach LLP
600 West Broadway, Suite 1800
San Diego, CA  92101
Attorneys for Marsha Broderick and
Carolyn Hoffman

Pamela Tikellis, Esquire
Chimicles & Tikellis
One Rodney Square
P.O. Box 1035
Wilmington, DE  19899
Attorneys for Betty Grayson Kurzweil and
Robert Grayson as Trustees

John D. McLaughlin, Esquire
Office of United States Trustee
601 Walnut Street
Curtis Center, Suite 950 West
Philadelphia, PA  19106

Adam Gilbert Landis, Esquire
Duane Morris & Heckscher
1201 North Market Street
P.O. Box 195
Wilmington, DE  19899

Gerald H. Gline, Esquire
Cole Schotz Meisel Forman & Leonard
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, NJ  07602
Attorneys for Official Committee
of Unsecured Creditors

3

98-2608

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MARSHA BRODERICK, et al.,          )
                                   )
          Appellants,              )
                                   )
     v.                            )  Civil Action No. 99-657-SLR
                                   )
PHP HEALTHCARE CORPORATION,        )
                                   )
          Appellee.                )

### MEMORANDUM ORDER

At Wilmington this   20th   day of September, 2001,

IT IS ORDERED that the March 31, 1999 order and opinion
of the United States Bankruptcy Court for the District of
Delaware is affirmed, for the reasons that follow:

1.  This court has jurisdiction to hear an appeal from
the bankruptcy court pursuant to 28 U.S.C. § 158(a).  In
undertaking a review of the issues on appeal, the court applies a
clearly erroneous standard to the bankruptcy court's findings of
fact and a plenary standard to that court's legal conclusions.
American Flint Glass Workers Union v. Anchor Resolution Corp.,
197 F.3d 76, 80 (3d Cir. 1999).

2.  The parties agree that there are no disputed issues

of fact[1] and that the single issue of law that requires

consideration in this appeal is whether the bankruptcy court

erred in finding that the proceeds of the Directors' and

Officers' Liability Insurance Policy ("the D&O Policy") are

proceeds of the debtor's estate.[2]

3.  As the court reads the briefs, the parties appear

to agree with the analysis of the United States Court of Appeals

for the Fifth Circuit in Matter of Vitek, Inc., 51 F.3d 530, 535

(5th Cir. 1995):

> On one extreme, when a debtor corporation
> owns a liability policy that **exclusively**
> covers its directors and officers, we know
> from [In re Louisiana World Exposition, 832
> F.2d 1391 (5th Cir. 1987),] that the proceeds
> of that D&O policy are **not** part of the
> debtor's bankruptcy estate.  On the other
> extreme, when a debtor corporation owns an
> insurance policy that covers its own
> liability vis-a-vis third parties, we - like
> almost all other courts that have considered
> the issue - declare or at least imply that
> both the policy **and the proceeds** of that
> policy are property of the debtor's
> bankruptcy estate.

_____

[1]It apparently is undisputed that the insurance policy at
issue provides entity coverage in addition to director and
officer coverage.  (D.I. 3, Ex. H at 6-7)

[2]Although a plan of reorganization has been confirmed, it is
the court's understanding that the proceeds of the D&O Policy
have been deposited into a trust and, therefore, the issue on
appeal is not moot.  (D.I. 10 at 2)

2

4.   The case at bar is not at either end of this
continuum; here the policy-owning debtor is but one of two or
more insureds.  The bankruptcy court, therefore, was faced with
the choice of: (1) including the proceeds of the policy in the
bankruptcy estate, thus avoiding a "race to the courthouse" among
the various insureds, see id. at 535 n.21; or (2) dividing the
proceeds among all coinsureds on some basis, a choice which
apparently has not been implemented by any court to date.

5.   Under these circumstances and based upon the case
law cited in the record, the court sees no error in the
bankruptcy court's legal analysis and conclusion that the proceeds
should be deemed property of the debtor's bankruptcy estate.

United States District Judge

3