UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:*<br><br>KB TOYS, INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 04-10120<br>(Jointly Administered)<br><br>Hearing Date: March 3, 2005, 1:00 p.m.<br>Re: Docket No. 1984 |

### DEBTORS' OBJECTION TO MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER AUTHORIZING AND APPOINTING THE COMMITTEE TO COMMENCE AND PROSECUTE ACTIONS AGAINST INSIDERS AND IN THE ALTERNATIVE FOR THE APPOINTMENT OF A CHAPTER 11 OPERATING TRUSTEE

KB Toys, Inc. and its affiliated debtors and debtors in possession (the "Debtors"), by their attorneys, hereby object to the *Motion for an Order Authorizing and Appointing the Committee to Commence and Prosecute Claims Against Insiders* [Docket no. 1984] (the "Standing Motion") filed by the Official Committee of Unsecured Creditors (the "Creditors' Committee"), seeking an order authorizing and appointing the Creditors' Committee to commence and prosecute actions against insiders of the Debtors. The Standing Motion fails to establish circumstances which justify the requested relief, and therefore, the Debtors request that this Court deny the Standing Motion. In the alternative, and only in the circumstance in which the Court would otherwise grant the Standing Motion, the Debtors request that a Chapter 11 operating trustee be appointed for the Debtors. In support of this objection, and the alternative request, the Debtors respectfully submit as follows:

### I.   INTRODUCTION

1.   The Standing Motion brought by the Creditors' Committee seeks derivative standing to pursue certain avoidance actions on behalf of the Debtors' estates, including alleged fraudulent transfers arising from a recapitalization transaction completed by the Debtors in April

2002 (the "Recapitalization Transaction"). Because the Creditors' Committee has failed to establish the necessary factual basis for the requested relief and because granting the requested relief is not in the best interests of the Debtors' estates and creditors, the Standing Motion should be denied.

## II. STATEMENT OF FACTS

2. On January 14, 2004 (the "Petition Date"), KB Toys, Inc., and substantially all of its direct and indirect subsidiaries, each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 cases"). Since the Petition Date, the Debtors have remained in possession of their properties and the management of their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 cases.

3. The Debtors are headquartered in Pittsfield, Massachusetts and, as of the Petition Date conducted business in each of the 50 states of the United States, the Commonwealth of Puerto Rico and the Territory of Guam and operated approximately 1,231 stores, a wholesale business, and an Internet division under the names KBtoys.com and eToys.com. As of January 3, 2004, on a consolidated basis, the Debtors had total assets of approximately $507 million, total liabilities of approximately $461 million and a net stockholder's equity of approximately $46 million.

4. The toy business operated by the Debtors started in 1922 as a family owned business, and continued in that form until 1981 when the business was sold to Melville Corporation ("Melville"). Melville in turn sold the KB Toys business to Big Lots Stores, Inc. ("Big Lots"), then known as Consolidated Stores Corporation ("Consolidated") in 1996. On December 7, 2000, a corporation formed by management of the Debtors together with various

investment funds managed by affiliates of Bain Capital, LLC ("Bain") and certain related entities, purchased the shares of Havens Corners Corporation ("HCC") from Consolidated for a purchase price of approximately $300 million (the "KB Acquisition"). While Big Lots received a substantial portion of the purchase price in cash, the balance was paid by the issuance of a $45 million unsecured promissory note by HCC (the "Note").

5. The Debtors' corporate organization as of the Petition Date is summarized on Exhibit A hereto. Each of KB Toys, Inc., KB Acquisition Corporation and Havens Corners Corporation is a holding company whose sole assets are the shares in its direct subsidiary. KB Toys (US), Inc., an Ohio corporation, and Southdale Kay Bee Toy, Inc. ("Southdale"), a Minnesota corporation, are also holding companies whose sole assets are the shares in their respective direct subsidiaries (except for one store operated by Southdale). Mall of America Kay Bee Toy, Inc. ("Mall of America") is a Minnesota corporation, which owns the various corporations through which the Debtors' retail, wholesale and online toy businesses are conducted and directly owns and operates the leases and stores located in Minnesota.[1] KB Massachusetts is the principal operating company through which the Debtors' mall-based operations are conducted and which purchases substantially all of the merchandise, which is sold by the Debtors.

6. Over the past decade, from 1992 through 2001, the Debtors' averaged annual sales of approximately $1.4 billion, and earnings before interest, taxes, depreciation and amortization ("EBITDA") of approximately $80 million, excluding certain accounting adjustments. In 2002, however, the Debtors realized EBITDA of negative $39 million, their first

---

[1] Mall of America also owns, through certain indirect bankruptcy remote subsidiaries which are not debtors in these Chapter 11 cases (nor are the entities which are the direct parents of such entities), distribution centers located in Arizona and Alabama (Toys DC South LLC ("DC South")) and New Jersey (Toys DC East LLC ("DC East")). The distribution centers are leased to K B Toy of Massachusetts, Inc ("KB Massachusetts") and KB Toy of New Jersey, Inc ("KB New Jersey"), respectively.

3

loss in recent corporate history. For the fiscal year 2003, ending January 31, 2004, the Debtors' EBITDA was approximately negative $38 million.

7. A number of factors adversely affected the Debtors' profitability in 2002 and 2003, but the Debtors believe that the single overwhelming factor was the very aggressive price war launched by large discount department stores and their main competitor, Toys 'R Us.

8. During these Chapter 11 cases, the Debtors have sold their online business, and closed approximately 600 stores, of which approximately 549 stores were closed by court approved going out of business sales and the balance were closures in the ordinary course of business.

9. As the Debtors consolidated their operations, the Debtors also substantially reduced their annual overhead expenses from approximately $53 million to approximately $36 million.

10. During the summer of 2004 the Debtors extensively explored the possibility of selling their business as part of a plan. The Debtors, by and through their senior management, discussed terms for sale with various interested parties and responded to the due diligence requests, but unfortunately, the Debtors were unable to agree to terms with any purchaser or plan funder. As the Debtors entered into their busy holiday season in November and December 2004, the Debtors re-focused themselves on their operations, sales and customer retention efforts and on developing a new store format and merchandising strategy for 2005.

11. To assist the Debtors to develop a new store format and merchandise strategy, the Debtors and the Creditors' Committee retained Retail Forward, Inc., a strategic retail-consulting firm ("RFI"). With RFI's assistance, the Debtors' senior management developed a new store

format, merchandising strategy and operations plan, which the Debtors are beginning to implement.

12. The Debtors have also resumed plan negotiations with a potential purchaser of the Debtors through a plan of reorganization, continue to pursue and provide diligence to possible purchasers of some or all of the Debtors' assets, and are negotiating revised financing terms to improve the Debtors' liquidity outlook for 2005.

13. On February 11, 2005, the Creditors' Committee filed the Standing Motion seeking an order of this Court granting the Creditors' Committee standing to assert claims of alleged fraudulent conveyances and other alleged causes of action arising out of recapitalization transactions undertaken by the Debtors pursuant to the Recapitalization Transaction in April, 2002, approximately 18 months prior to the Debtors' Chapter 11 petitions. Pursuant to the Recapitalization Transaction, dividend distributions, stock redemptions and bonus payments were made to various parties, including shareholders of the Debtors (including Bain Capital Fund VIII, LLC, BCIP Associates II, BCIP Trust Associates II, BCIP Associates II-B, Sankaty High Yield Partners II, LP), and officers and management of the Debtors (including Michael Glazer, Robert Feldman, and other members of management), and certain warrants held by Consolidated Stores (Big Lots) were redeemed. By reason of the foregoing, the Creditors' Committee has threatened to commence litigation against the shareholders, Directors, and principal managers of the Debtors' business.

14. Furthermore, on or about February 9, 2005, Big Lots filed a complaint (the "Complaint") in the Delaware Chancery Court against certain shareholders of KB Toys, Inc. ("KBI") and certain current and former officers and directors of the Debtors (collectively, the "Chancery Court Defendants") asserting claims for (i) breach of fiduciary duty by Michael

Glazer, the Debtors' chief executive officer and Robert Feldman, the Debtors' chief financial officer; (ii) breach of fiduciary duty against the directors of KBI who are affiliated with Bain Capital LLC, two of whom currently are directors of the Debtors (the "Bain Directors"); (iii) aiding and abetting breach of fiduciary duty against the Bain Directors and the shareholders of KBI who are affiliated with Bain Capital LLC; (iv) fraud against Feldman; and (v) intentional interference with contractual relations against all of the Chancery Court Defendants. By the Complaint, Big Lots seeks to recover $52 million in damages, claimed to be due under the Note, on fraudulent conveyance and breach of fiduciary duty theories.

15. The filing of the Complaint by Big Lots, even in the short period of time since then, has had a significant and substantial negative impact on the Debtors and their operations. First, the filing of the Complaint in all probability caused the Creditors' Committee to file the Standing Motion. Second, the Debtors and their management have been forced to devote substantial time and effort preparing and filing against Big Lots a *Verified Complaint for Declaratory and Injunctive Relief* (Adv. Proc. No. 05-50475) and related *Debtors' Motion for Preliminary Injunction Staying prosecution of Certain Action* and related pleadings, in an effort to protect the Debtors and their estate from the irreparable harm and distraction from reorganization efforts such action will cause. Finally, the Debtors management and directors have already been distracted from the operation of the Debtors' business and reorganization by having to respond to questions from employees, customers and vendors about the Debtors' future (and ultimately, whether they should continue to work for or do business with the Debtors). For those members of management who are defendants to the Complaint, the filing of the Big Lots action has also distracted them, as they have had to take time to consult with their personal attorneys. These effects and impact on the Debtors' reorganization efforts would only be

6

compounded if the Court grants the Standing Motion.

16. Prior to February 9, 2005, the Debtors' Chapter 11 cases were focused on trying to achieve a business resolution that would benefit all creditors, while recognizing that the creditors were entitled to investigate and analyze claims related to the Recapitalization Transaction. As a result of the Big Lots filing the Complaint and the Creditors' Committee filing the Standing Motion, the action of non-debtor third-parties has changed the focus of these Chapter 11 cases from business issues and the Debtors' restructuring to litigation concerning the Recapitalization Transaction.

17. However, now is not the time for the Debtors, their leadership and even the Creditors' Committee to be distracted in this way. The Debtors' Chapter 11 cases are at a critical juncture. Important business decisions must be made as to a plan of reorganization and whether the Debtors have sufficient liquidity to operate their business through 2005.

### III. CREDITORS' COMMITTEE'S MOTION FOR STANDING

**A. The Creditors' Committee Has Failed to Establish Grounds Entitling Them to Derivative Standing to Pursue Alleged Claims Arising from the Transaction.**

18. The Third Circuit Court of Appeals has held that the Bankruptcy Code allows for a creditors committee to be granted derivative standing to pursue avoidance actions for the benefit of a debtor's estate. See, In re Cybergenics Corporation, 330 F.3d 548 at 579-580 (3rd Cir. 2003).

19. Standing will be granted to a Creditors' Committee only if a debtor has "unjustifiably" refused to bring a colorable claim when requested by the creditors committee that such action be taken. See id. at 568; see also, In re STN Enterprises, 779 F.2d 901 at 905 (2nd Cir. 1985) (for committee to have standing it must be shown that the debtor unjustifiably refused

to bring an action); In re Louisiana World Exposition, 858 F.2d 233 at 247 (5th Cir. 1988) (the debtor's unjustifiable refusal to pursue a colorable claim is a relevant consideration in determining whether to grant standing to a creditors committee); In re The Gibson Group, 66 F.3d, 1436 at 1438 (6th Cir. 1995) (a creditors committee may have derivative standing if, *inter alia*, the debtor's inaction in bringing a claim is an abuse of discretion in light of the debtor's duties in a Chapter 11 case); In re Xonics Photochemical, Inc., 841 F.2d 198 at 203 (7th Cir. 1988) (in dicta Court stated that a creditor could seek standing to bring a derivative claim if the debtor is not meeting its fiduciary obligations). The Debtors have ample justification for delaying the pursuit of the potential claims being raised by the Creditors' Committee. Therefore, the relief requested by the Creditors' Committee should be denied.

20.   The Debtors' cases are currently at a critical stage in the reorganization process. The Debtors are involved in discussions with various parties, including the Creditors' Committee, in connection with the formulation of a plan of reorganization for the Debtors' businesses. The Debtors anticipate that a resolution of the Debtors' Chapter 11 cases will occur within the next three to six months. The Debtors and the Creditors' Committee are currently negotiating with a potential plan sponsor on the terms of a plan of reorganization, a lender concerning additional financing and potential purchasers of the Debtors' assets. In addition to these case resolution matters, the Debtors are also implementing a new merchandising plan for its stores which is critical to the Debtors' future success. It is of critical importance that the Debtors' board of directors, management and employees not now be distracted by litigation that does not need to be commenced at this time. It is in the best interests of the Debtors' estates and their creditors that the Debtors focus all of their efforts to successful implementation of their turnaround plan and consummation of a plan of reorganization which preserves the going

WP3:1088568 1                                                                                                         62865 1001

concern value of the Debtors' businesses.

21. However, as stated in the Standing Motion, the potential defendants of the claims which the Creditors' Committee seeks authority to pursue include all of the members of the Debtors' board of directors as well as most of the members of the Debtors' senior management team, and therefore granting the requested relief and allowing the Creditors' Committee to prosecute the claims alleged in the Standing Motion will unnecessarily distract the Debtors management and board of directors from what should be the primary focus of these cases – the successful reorganization of the Debtors' businesses. Such a distraction at this crucial time could threaten the Debtors reorganization.

22. In order to avoid the distractions which are sure to result if the Standing Motion is granted, the Debtors submit that the proper time to address the continued investigation and possible prosecution of alleged claims arising from the Recapitalization Transaction is after a plan of reorganization has been confirmed and consummated. The creditors will not be harmed by a delay of several months since actions related to the Recapitalization Transaction will remain actionable after the confirmation of a plan. Furthermore, the statute of limitations for bringing avoidance actions will not expire until January 14, 2006, the second anniversary of the entry of an order for relief in these cases. See 11 U.S.C. § 546(a)(1). If there are any claims which are actionable related to the Recapitalization Transaction, there will be ample time for an independent party to commence and pursue such claims before the expiration of the statute of limitations in January 2006.

23. Based on the facts and circumstances of these cases, the Debtors delay in pursuing actions for alleged claims arising from the Transaction has been justified. As such, an essential element required for granting derivative standing to the Creditors' Committee as requested in the

Standing Motion is absent and therefore, the Standing Motion should be denied.

24. The facts of this case are strikingly similar to the facts in <u>In re Interco Incorporated</u>, 135 B.R. 631 (Bankr. E.D.Mo. 1992). In <u>Interco</u>, the official committee of unsecured debenture holders asked the court to appoint a special representative to pursue claims against an appraiser who provided the debtor with a solvency opinion in connection with a recapitalization transaction. <u>Id.</u> at 632-633. The movants in <u>Interco</u> argued that because the debtor's board of directors had a conflict of interest which would prevent zealous prosecution of an action against the appraiser, the court should appoint a special representative to bring the claim.

25. The <u>Interco</u> court denied the creditor committee's motion for several reasons. First, the court found that a debtor in possession is entitled to operate its business pursuant to Sections 1107 and 1108 of the Bankruptcy, which "includes the ability to make decisions regarding the initiation of litigation for the benefit of the estate." <u>Id.</u> at 633. The court also found that appointing a special representative could disrupt the reorganization at a critical time. At the time of the motion, the debtors were just weeks away from filing a plan of reorganization and the court found that "[w]ere this court to appoint a third party at this time, the attention of the Board of Directors and management would certainly be diverted from the reorganization process." <u>Id.</u> at 633. The court went on to find that a delay in appointing a special representative would not result in any harm to the creditors. "Any potential claims against [the appraiser] will be actionable even after the confirmation of a plan. No claims will be lost after reorganization." <u>Id.</u> at 633. The court also noted that the second anniversary of the filing of the petition, and therefore the statute of limitations for filing an action against the appraiser, was more than a year away. <u>See, id</u> at 633.

26. Since the inception of these cases, the Debtors understood that claims related to the Recapitalization Transaction needed to be investigated by an independent party because of the potential conflict of interest that could result if colorable claims against certain of the Debtors' current officers and directors are pursued for the benefit of the Debtors' estates and creditors. Because of this understanding, the Debtors have done nothing to impede the Creditors' Committee's investigation of the Recapitalization Transaction. The Debtors have responded to the Creditors' Committee's demands and have produced to them over 100,000 pages of documents relating to the Recapitalization Transaction. The Creditors' Committee has not had to file a single pleading with this Court to compel the production of documents or other information related to the Creditors' Committee's investigation. Throughout these cases, the Debtors' have exercised their business judgment to advance the reorganization of the Debtors' business, including the decision to delay the appointment of an independent party to pursue claims related to the Recapitalization Transaction. The decision to delay appointment of an independent party is the correct decision under these circumstances. That decision being fully justified, the Creditors' Committee has failed to establish grounds for standing.

B. **The Creditors' Committee is not the correct party to pursue any alleged claims arising from the Recapitalization Transaction.**

27. Any investigation into the merits of the claims related to the Recapitalization Transaction must include an investigation into the causes of the Debtors' Chapter 11 cases. As stated in the Standing Motion, the Creditors' Committee believes that the cause was the Recapitalization Transaction. The Debtors, however, believe that the principal reason for these Chapter 11 cases was a series of changes in the marketplace which ultimately resulted in the Debtors' competitors selling products at retail for less than the price at which Debtors could purchase the same products from the manufacturers. If the Debtors are correct, there are no

11

claims arising out of the Recapitalization Transaction, but there may be claims to be investigated and pursued against other possible defendants – including any toy manufacturers or other retailers that caused the Debtors' to have to file these Chapter 11 cases. As these theories might cause members of the Creditors' Committee to become the subject of any investigation of the Debtors' business failure, the Debtors believe that the Creditors Committee is not eligible to act as an independent investigator. Whoever is appointed to investigate the reasons for the Debtors' business failure must be free of conflicts to investigate (and if necessary and appropriate, pursue) all claims, causes and theories, not just the Recapitalization Transaction.

28. On repeated occasions representatives of the shareholders have requested that the Creditors' Committee investigate possible claims for predatory pricing, discriminatory pricing or other causes of action against major toy retailers and toy manufacturers. Despite the many hundreds of thousands of dollars of fees which the Creditors' Committee has billed to the estate, the Creditors' Committee and its professionals have refused to do such investigation. Instead, the Creditors' Committee has sought standing to pursue litigation solely allocating blame for the company's failure on the Recapitalization Transaction.

### C. An Operating Chapter 11 Trustee Should be Appointed if the Court Determines that Litigation Concerning the Recapitalization Transaction Should be Commenced at this Time.

29. For the reasons set forth above, the Debtors believe that now is _not_ the time to convert these Chapter 11 cases from ones that are focused on a business solution to cases that are consumed by litigation to the detriment of the Debtors' reorganization prospects. If the Court nevertheless decides that it is appropriate at this time to move forward with litigation, and since the Debtors believe that the Creditors' Committee is not the party to pursue these claims and that its board of directors will be adversely affected in its ability to manage the Debtors' business,

then the Debtors, in that case, request that the Court appoint an independent operating Chapter 11 Trustee.

30. By appointing a Chapter 11 trustee, the Court would separate the lightening rod for the litigation – namely, the Bain-related defendants - from all management and governance roles related to the Debtors, from the Debtors' business operations and reorganization efforts. After an initial period of dislocation that would be caused by the appointment of a Trustee, the Debtors expect that the business focus of these cases that existed prior to February 9, 2005 when Big Lots filed the Complaint and the Creditors' Committee filed the Standing Motion, would be reestablished.

31. Further, by appointing a Chapter 11 trustee, the interests of the Debtors' estates are best served as an independent, and conflict free fiduciary can review all of the facts and circumstances surrounding the Debtors' business failure and the Recapitalization Transaction, make an independent assessment of the viable claims, and determine whether it is appropriate to pursue any such claims on behalf of all creditors. Although the Creditors' Committee has invested a substantial amount of time and money in investigating the Recapitalization Transaction, the results of that investigation should be readily available to a trustee.

32. As described herein, the Debtors have reluctantly concluded that if the Court determines that it is appropriate at this time to move forward with litigation, and these Chapter 11 cases will become about litigation and not reorganization (which is the environment likely to result if the Standing Motion is granted), the estates are better served by having an independent operating trustee appointed to guide the Debtors business through the critical business decisions that must be made (rather being guided by a board of directors composed of individuals that are defendants in lawsuits in which they are alleged to have breached their fiduciary obligations to

the Debtors) and can independently evaluate and prosecute any and all claims that may exist for the benefit of the Debtors' estates. Difficult choices confront the Debtors about their future, and a decision maker that cannot be attacked for alleged conflicts is in the best interests of the Debtors.

### IV. CONCLUSION

33. Based on the facts and circumstances of these cases, the Debtors have been justified in delaying the prosecution of any claims arising from the Recapitalization Transaction because the prosecution of such claims will unnecessarily distract the Debtors' management from the primary goal of implementing the Debtors' turnaround plan and confirming a plan of reorganization for the Debtors. For the same reason, the Debtors have delayed the prosecution of any claims against parties that caused the Debtors' business failure. There is no basis to find that the Debtors have done anything but fully met their fiduciary obligations in these cases. Because there are insufficient grounds for granting derivative standing to the Creditors' Committee to pursue claims against certain insiders of the Debtors and the requested relief is not in the best interests of the Debtors' estates and creditors, the Standing Motion should be denied.

34.  However, if the Court decides that it is appropriate at this time to move forward with litigation, and decides that standing should be granted to someone other than the Debtors, then in light of the potential conflicts faced by the Creditors' Committee that may prohibit it from fully and completely investigating and pursuing any and all claims relating to the Debtors' business failure, then the Debtors request that the Court appoint an independent operating trustee who can serve, without question or the specter of conflict, the interests of the Debtors' estates.

Dated: February 25, 2005
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Paula Clear

Joel A. Waite (No. 2925)
M. Blake Cleary (No. 3614)
Matthew B. Lunn (No. 4119)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Tel: (302) 571-6600
Fax: (302) 571-1253

- and -

WILMER CUTLER PICKERING
HALE AND DORR LLP
Mark N. Polebaum (BBO #402060)
Mitchel Appelbaum (BBO #558579)
Michael S. Pandolfi (BBO #640654)
60 State Street
Boston, MA  02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Counsel for the Debtors and Debtors In Possession

EXHIBIT A

(Organizational Chart referenced in ¶5)

