IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KB Toys, Inc., *et al.*, | ) | Case No. 04-10120 (DDS) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **RE: D.I. 1984** |

### OPPOSITION OF BAIN CAPITAL FUND VII, L.P. TO MOTION OF COMMITTEE OF UNSECURED CREDITORS FOR AUTHORITY TO PURSUE CLAIMS

Bain Capital Fund VII, L.P. ("Bain") submits this opposition to the motion of the Official Committee of Unsecured Creditors (the "Committee") for authority to commence fraudulent conveyance actions, as well as related claims of breach of fiduciary duty, against Bain, officers of the debtors (hereafter, the "Debtors" or "KB Toys"), and others on behalf of the Debtors' estate.[1]

### Preliminary Statement

1. By this motion, the Committee seeks authority to commence, on behalf of the Debtors' estates, fraudulent conveyance actions against Bain, officers of the Debtors, and others arising out of dividend and recapitalization transactions which occurred a year and three quarters prior to the Debtors' Chapter 11 petitions. In addition, the Committee asserts related claims of breach of fiduciary duty which are premised entirely on the same transactions. Bain submits this opposition, first, to briefly respond to misstatements in the Committee's motion, and second, to object to the Committee's motion on the ground that the Committee has conflicts of interest which have already impaired the Committee's performance of its duties and establish that it is

---

[1] Bain expressly files this motion without appearing in the Bankruptcy Court or consenting to the jurisdiction of the Bankruptcy Court for purposes of any litigation against Bain, and without waiving any rights or

not the proper party to be authorized to initiate and pursue this litigation at a potential cost of millions of dollars to the estate.

2. As has been widely reported in the press, massive price-cutting by WalMart during the 2003 Christmas Season caused a number of retailers in the toy business either to file for Chapter 11 or to consider exiting the retail toy business altogether. As a result of that price-cutting, the Debtors were forced to file their Chapter 11 petitions in January, 2004. During the 2003 Christmas Season, WalMart engaged in a massive price-cutting spree during which, we are advised, it was selling key toy items at prices at or below the prices at which products were being sold by the toy manufacturers to KB Toys. In all likelihood, WalMart could only have sold toys at such prices if the toy manufacturers were selling their products to WalMart at prices significantly lower than the prices at which they were selling to KB Toys. For months, the Debtors and Bain have urged the Committee and its professionals to investigate the pricing practices of the toymakers in relation to mass retailers to determine whether these practices contributed to the Debtors' difficulties. However, the Committee -- three of whose six members[2] consist of the large toy manufacturers themselves, Hasbro, Inc., Mattel, Inc., and Lego Systems, Inc. -- has, not surprisingly, refused to even investigate such matters. Instead, the Committee seeks standing to assert claims allocating blame for KB Toys' failure to Bain, management, and others, based upon the dividend and recapitalizations transactions which occurred a year and three quarters before the Debtors' Chapter 11 petitions.

3. As we shall describe below, the Committee's claims that the April, 2002 dividend and recapitalizations transactions left the Debtors insolvent or with unreasonably small working capital are without merit. More to the point, however, the Committee has clear conflicts of

---

objections, including any objections to jurisdiction or venue and any rights to a jury trial.

interest and is not the proper party to be pursuing claims arising out of the Debtors' failure at a likely cost to the estate of millions of dollars. Bain recognizes that the Debtors cannot themselves investigate or prosecute actions against their officers or shareholders. However, the Committee, which has clear conflicts of interest, is not the proper party to be investigating or pursuing actions relating to the Debtors' failure, particularly now, when the Debtors are attempting to negotiate a sale of their business and a consensual Chapter 11 plan. At an appropriate time, a trustee, a liquidating trustee, or another party may be authorized and appointed to investigate and pursue any claims that he or she may think appropriate.

**A.     Background**

4.     In its papers, the Committee suggests that the Debtors were left "insolvent" or with "unreasonably small capital" as a result of the dividend and related recapitalization transactions by the Debtors in April, 2002, and that the recapitalization transactions were the cause of the Debtors' Chapter 11 petitions a year and three quarters later. While this is not the time to litigate those claims, the Committee's assertions call for a brief response.

5.     In December, 2000, Bain, other entities, and the company's management acquired the KB Toys business for a price of approximately $302 million, financed with a contribution of equity and debt.

6.     <u>Despite</u> the effects of a general slowdown in the national economy and the effects of September 11, 2001, KB Toys was a highly profitable business. For its fiscal year ending February 2, 2002, alone, the last fiscal year before the recapitalization transactions, KB Toys generated EBITDA of <u>more than $76 million</u>. Moreover, as of the end of the fiscal year ending February 2, 2002, the operating business had a shareholder equity <u>in excess of $150 million</u>, and

---

[2]     Bain is informed and believes that Big Lots, Inc. has resigned from the Committee.

current assets exceeded current liabilities by <u>more than $250 million</u>.³

7. The suggestion that the recapitalization transactions left the Debtors insolvent or with "inadequate" working capital is sheer nonsense. Thus:

- <u>Following the recapitalization transactions</u>, the Debtors' operating companies had shareholders' equity as reflected on their balance sheet in excess of $100 million.

- <u>Following the recapitalization transactions</u>, the Debtors had current assets in excess of current liabilities by more than $110 million.

- <u>Following the recapitalization transactions</u>, the Debtors had "excess availability" (i.e., borrowing capability) under their bank credit agreement equal to <u>many</u> <u>times</u> the amount that was required under that agreement. Moreover, contrary to the suggestion in the Committee's papers, the Debtors continued to have "excess availability" and borrowing capability <u>far</u> in excess of what was required under their credit agreement until Christmas 2003, when WalMart engaged in its drastic price-cutting practices.

- In April, 2003, nearly a <u>full</u> <u>year</u> <u>after</u> the recapitalization transactions, KB Toys' banks loaned the company additional monies and the banks further relaxed the limited covenant governing "excess availability" in KB Toy's credit agreement. The transactions in question had the approval of 100% of KB Toy's bank lenders.

8. There can be little dispute that the company could have and would have survived, and possibly thrived, but for the actions of the toy manufacturers and WalMart during the Christmas 2003 season. During that season, WalMart -- with whom KB Toys had been able to coexist in the marketplace for years -- slashed its prices. As was widely reported in the press, WalMart's pricing actions during the Christmas 2003 season caused widespread crisis throughout the toy industry, and resulted in the failure or decisions of a number of retail toy companies to exit the retail toy business. In sum, the Debtors' Chapter 11 petitions were the result of the actions by WalMart in slashing prices and, very likely, the actions of the toy

---

³ KB Toys corporate organization consists of a series of holding companies which in turn own the operating companies. The operating companies held substantially all of the assets. The only substantial debt at the level above the operating companies level was the $45 million Seller Note owed to Consolidated Stores Corp. (Big Lots, Inc.) issued to Consolidated in connection with the purchase of the business from Consolidated in December, 2000. However, none of the operating companies have any liability on that note and no payments of principal or interest were due on the note until December 7, 2010.

-4-

manufacturers in selling to WalMart at prices below the prices at which they were selling to KB Toys and others.

9. While Bain certainly does not dispute the right of an appropriate representative of the estate to bring whatever claims he or she might want, the facts here do not even approach the kinds of circumstances in which the courts have found fraudulent conveyances. See e.g., Moody v. Security Pacific Business Credit, Inc., 971 F.2d 1056, 1073 (3d Cir. 1992) (Rejecting claims that leveraged buyout transactions ("LBO") resulted in fraudulent conveyances where company did not fail for a year and a half after the transaction and resulted in part from price slashing and inventory dumping by a competitor, stating: "Businesses fail for all sorts of reasons, and the fraudulent conveyances laws are not a panacea for such failures"); Peltz v. Hatten, 279 B.R. 710 (D. Del. 2002) (Dismissing fraudulent conveyance claims challenging distributions in an LBO transaction, even though LBO occurred only one year before Chapter 11 petition and company had been losing -- not making -- money prior to the transaction); MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co., 910 F.Supp 913 (S.D.N.Y. 1995) (Rejecting fraudulent conveyance claim where Debtors were not in default of notes or credit agreements for a period of 9 months after LBO).

## THE COMMITTEE'S MOTION SHOULD BE DENIED

10. The Committee in this cases consists of six members, three of whom are the principal toy manufacturers who may, themselves, be to blame for the Debtors' chapter 11 petitions. Three of the six members of the Committee are Hasbro, Mattel, and Lego. There is no doubt that those members of the Committee -- and the Committee's counsel in this case -- have every incentive to blame Bain and others for the Debtors' Chapter 11 petitions, and to take the blame away from themselves, or WalMart, one of their largest customers, where it may well belong. Moreover, the actions of the Committee and its representatives clearly establish their

conflicts of interest.

11.   Bain, counsel for the Debtors, and the Debtors' own officers have advised the Committee's attorneys that the facts concerning the activities of the toy manufacturers in this case -- including the actions of the three toy manufacturers on the Committee—have direct bearing on the bona fides of claims of fraudulent conveyance and breach of fiduciary duty asserted against insiders.  Despite the many hundreds of thousands of dollars of legal and professional fees incurred by the Committee's professionals and billed to the estate to date, the Committee and its professionals have not even investigated the possible claims against toy manufacturers or against WalMart, with whom the toy manufacturers on the Committee continue to do a large volume of business.  Instead, the Committee and its professionals seek authority to file a lawsuit against Bain and the Debtors' management blaming them for the Debtors' Chapter 11 petitions as a result of a transaction which occurred a year and three quarters before the Debtors' Chapter 11 filings.

12.   Bain does not dispute the right of an appropriate representative of the debtor to file any legal proceeding he or she may wish.  But the Committee has clear and demonstrated conflicts in seeking to blame Bain and the Debtors' management rather than the toy manufacturers and WalMart.  Before the estate becomes obligated to pay millions of dollars of legal and other professional fees to pursue litigation allocating blame for the Chapter 11 petitions, it is incumbent that any such litigation be brought by a proper professional -- such as a trustee, liquidating trustee, or other person -- who will review such claims without the Committee's conflicts of interest.  The limited resources of the estate should be under the oversight of a party who can determine, free of conflicts, what litigation should be brought, against whom it should be brought, whether it should be resolved, and how much of the estate's

money should be spent pursuing such claims.

13. The rationale for granting creditors derivative standing to pursue claims under Sections 547 and 548 of the Bankruptcy Code has been articulated as follows:

> A debtor-in-possession often acts under the influence of conflicts of interest and may be tempted to use its discretion under Sections 547 and 548 as a sword to favor certain creditors over others, rather than as a tool to further its reorganization for the benefit of all creditors as Congress intended.

Canadian Pacific Forest Products Ltd v. J.D. Irving, Ltd. (In re The Gibson Group, Inc.), 66 F.3d 1436, 1441 (6th Cir. 1995); cited in In re Cybergenics Corp., 330 F.3d 548, 573 (3d Cir. 2003). This same rationale demands denial of a request for derivative standing where, as here, the creditors seeking standing to pursue claims on behalf of the estate also have conflicts of interest that 'may tempt them to use their discretion to favor certain creditors [i.e., themselves] over others.' See The Gibson Group, Inc., 66 F.3d at 1441; see also In re Bohack Corp., 607 F.2d 258, 264-65 (2d Cir. 1979) (finding that creditors' committee should not be permitted to recommend counsel to pursue action where complaint alleged, among other things, that several of the debtor's trade creditors improperly tightened the debtor's credit at a competitor's request and thus contributed to the "financial disaster which overtook [the debtor]").

14. As at least one court has noted, "there are distinct costs to permitting derivative standing, such as creditor conflicts of interest . . . potential for spiteful, dilatory or wasteful litigation tactics, and the risk of side deal settlements." NBP Park Ridge Bank v. SRJ Enters., Inc. (In re SRJ Enters., Inc.), 151 B.R. 189, 196, n.7 (Bankr. N.D. Ill. 1993). "The mirror image of these 'costs' are 'benefits' of appointing an independent examiner or trustee." Id. Such should occur here.

15. In light of the Committee's apparent conflicts of interest in this case, the Committee's request for derivative standing to pursue claims against Bain and the Debtors'

management should be denied.  Under the circumstances, there is a clear risk that the awarding the Committee standing to pursue such claims will result in a waste of the Debtors' limited resources and permit the Committee to divert attention away from the role that WalMart and the toy manufacturers (including three Committee members) had to play in forcing the Debtors into bankruptcy.  To date, the Committee and its professionals have consumed huge amounts of estate assets while obstructing every effort by management and the Board to fashion a timely plan of reorganization of the Debtor's estates.  It has taken seriatim inconsistent positions, which can only be understood as supporting the desire of certain Committee members to continue to sell toys to the Debtors whether the operations of estate contribute to realization of value by all creditors or not.  Given the willingness of the Committee members and counsel to prolong this Chapter 11 case for their own benefits, it is impossible to believe that they will resist the temptation to protect their own interests if they also control any litigation choices of the estates.  The only way to avoid that risk is to place the task of investigating and determining what, if any, litigation should be brought by the estate and against whom into the hands of an independent third party, such as a trustee.

WHEREFORE, Bain respectfully submits that the Committee's request for standing should be denied.

Dated:  February 25, 2005

Respectfully submitted,

MORRIS, NICHOLS, ARSHT & TUNNELL

*/s/ Daniel B. Butz*
Thomas R. Hunt, Jr. (No. 466)
Daniel B. Butz (No. 4227)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware  19899-1347
(302) 658-9200

-and-

William F. McCarthy, Esq.
David S. Elkind, Esq.
Don S. DeAmicis, Esq.
ROPES & GRAY LLP
45 Rockefeller Plaza
New York, N.Y.  10111
(212) 841-0608

-and-

One International Place
Boston, MA 02110-2624
Tel: (617) 951-7000
Fax: (617) 051-7050

Counsel to Bain Capital Fund VII, L.P.

452931

-9-