## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KB TOYS, INC., et al., | ) | Case No. 04-10120(DDS) |
| | ) | (Jointly Administered) |
| _____Debtors._____ | ) | |
| KB TOYS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 05-50475(DDS) |
| | ) | |
| BIG LOTS STORES, INC., | ) | |
| | ) | |
| _____Defendant._____ | ) | **Re: Docket No. 4** |

**RESPONSE OF BIG LOTS STORES, INC.'S TO MOTION OF
DEBTORS FOR PRELIMINARY INJUNCTION STAYING PROSECUTION
OF CERTAIN ACTIONS AND REQUEST FOR ALTERNATIVE RELIEF**

Dated: February 28, 2005

ROSENTHAL, MONHAIT, GROSS
& GODDESS, P.A.
Kevin Gross (DE Bar No. 209)
Suite 1401, 919 North Market Street
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433

And

Jeff J. Marwil, Esq.
James A. McKenna, Esq.
Anders C. Wick, Esq.
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
Tel: (312)222-9350

Attorneys for Big Lots Stores, Inc.

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ............................................................................................................ 1

BACKGROUND FACTS................................................................................................. 5

    The December 2000 KB Sale ..................................................................................... 5

    The April 2002 Equity Distribution Transaction ..................................................... 6

    Big Lots' Unsecured Claims...................................................................................... 8

    The State Court Action ............................................................................................. 9

ARGUMENT .................................................................................................................. 11

I.     BIG LOTS' DIRECT CLAIMS BELONG TO BIG LOTS, AND THEY
       ARE NOT PROPERTY OF THE DEBTORS' ESTATES. ............................. 11

      A.    Under Controlling Delaware Law, All of Big Lots' Claims Are Direct
            Claims, Not Derivative Claims. ............................................................... 11

      B.    Big Lots Does Not Assert Claims Over Any Insurance That Constitutes
            Property of the Debtors' Estates. ............................................................. 17

II.    INJUNCTIVE RELIEF EXPANDING THE APPLICATION OF THE
       AUTOMATIC STAY IS NOT WARRANTED. ............................................... 20

      A.    Big Lots' Claims Do Not Threaten Immediate Irreparable Harm. ......... 21

           1.    There Will Be No Disruption or Distraction to the Debtors
                During the Upcoming Allegedly "Critical Period," Because
                Big Lots Will Agree Not to Take Discovery From the Debtors
                for Ninety Days. ............................................................................ 22

           2.    The Threat to the Reorganization is Minimal or Non-Existent. .............. 22

           3.    Debtors' Have No Protectable Interest in Any Insurance Policy
                Justifying Injunctive Relief........................................................... 24

           4.    The Debtors Are Not the Real Parties In Interest And They
                Will Not be Prejudiced as a Result of the State Court Action by
                Collateral Estoppel or Indemnification. ......................................... 25

B.  The Balance of Harms Weighs in Big Lots' Favor and The Issuance of Injunctive Relief Would Be Unjust.......................................................... 28

C.  Even if Some Type of Injunctive Relief Were Necessary (It Is Not), It Should Be Narrowly Tailored. ........................................................... 30

III.  EVEN IF THE CLAIMS IN THE STATE COURT ACTION WERE DERIVATIVE (THEY ARE NOT), BIG LOTS SHOULD BE GRANTED LEAVE TO PROSECUTE HCC'S CLAIMS AGAINST THE INSIDER DEFENDANTS. .................................................................................. 30

A.  The Debtors, Under the Exclusive Control of the Insider Defendants, Cannot Fairly Investigate or Pursue the State Court Action................................ 31

B.  The Creditors' Committee Appointed in These Cases Cannot Pursue the State Court Action on Behalf of HCC. ........................................... 32

C.  Big Lots is Best Positioned to Pursue the State Court Action on Behalf of HCC. ................................................................................................. 35

CONCLUSION............................................................................................................. 38

## TABLE OF AUTHORITIES

### FEDERAL CASES

*A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986) ......................................................20,25

*In re Adelphia Communications Corp.*, 298 B.R. 49 (Bankr. S.D.N.Y. 2003) ...........................19

*In re Allied Digital Technologies, Inc.*, 306 B.R. 505 (Bankr. D. Del. 2004) ........................19, 25

*American Film Technologies, Inc. v. Taritero, (In re American Film
     Technologies, Inc.)*, 175 B.R. 847 (Bankr. D. Del. 1994) ................................................26

*Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988).......................................................16

*Bidermann Industrial U.S.A., Inc. v. Zelnik
     (In re Bidermann Industrial U.S.A., Inc.)*, 200 B.R. 779 (Bankr. S.D.N.Y. 1996)............28

*Canadian Pacific Forest Products, Ltd. v. J.D. Irving, Ltd.
     (In re Gibson Group, Inc.)*, 66 F.3d 1436 (6th Cir. 1995)................................................36

*Circle K Corp. v. Marks (In re Circle K Corp.)*, 121 B.R. 257 (Bankr. D. Ariz. 1999)................20

*In re Continental Airlines*, 177 B.R. 475 (D. Del. 1993)..............................................................26

*Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037 (2nd Cir. 1986).................................................15

*Eastern Air Lines v. Rolleston (In re Ionosphere Clubs, Inc.)*,
     111 B.R. 423 (Bankr. S.D.N.Y. 1990).................................................................................26

*G-I Holdings, Inc. v. Those Parties Listed on Ex. A (In re G-I Holdings, Inc.)*,
     313 B.R. 612 (Bankr. D. N.J. 2004) ..............................................................................31, 36

*Lomas Financial Corp. v. Northern Trust Co. (In re Lomas Finance Corp.)*,
     117 B.R. 64 (Bankr. S.D.N.Y. 1990)...................................................................................27

*Maintainco, Inc. v. Mitsubishi Caterpillar Forklift America, Inc.
     (In re Mid-Atlantic Handling Systems, LLC)*, 304 B.R. 111 (Bankr. D. N.J. 2003)..........20

*McCartney v. Integra National Bank, N.A.*, 106 F.3d 506 (3d Cir. 1997)....................................20

*In re Monroe Well Service, Inc.*, 67 B.R. 746 (E.D. Pa. 1986).........................................20, 21, 29

*Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*,
     330 F.3d 548 (3d Cir. 2003).................................................................................................31

*Official Committee of Unsecured Creditors of National Forge Co. v.*
*Clark (In re National Forge Co.)*, 304 B.R. 214 (Bankr. W.D. Pa. 2004) .......................36

*Official Unsecured Creditors Committee of Phar-Mor, Inc. v. Bowen*
*(In re Phar-Mor, Inc. Securities Litigation)*, 164 B.R. 903
(W.D. Pa. 1994) .................................................................................13, 21, 25 28

*Oschs v. Lipson (In re First Central Finance Corp.)*, 238 B.R. 9 .................................23

*PHP Healthcare Corp. v. HIP Foundation, Inc. (In re PHP),*
Adv. No. A99-18 (MFW) (Bankr. D. Del. Mar. 31, 1999).................................20

*Raytech Corp. v. White*, 54 F.3d 187 (3d Cir. 1995) ...................................................27

*Rickel Home Centers, Inc. v. Baffa (In re Rickel Home Centers, Inc.),*
199 B.R. 498 (Bankr. D. Del. 1996) .........................................................23, 24

*S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc. (In re S.I. Acquisition, Inc.),*
817 F.2d 1142 (5th Cir. 1987) ..........................................................................17

*Shaw & Levine v. Gulf & Western Industrial, Inc. (In re Bohack Corp.),*
607 F.2d 258 (2d Cir. 1979)..............................................................................33

*Southtrust Bank N.A. v. Jackson (In re Dur Jac, Ltd.),*
254 B.R. 279 (Bankr. M.D. Ala. 2000)...............................................................36

*Sudbury, Inc. v. Escott (In re Sudbury, Inc.)*, 140 B.R. 461
(Bankr. N.D. Ohio 1992) ...................................................................................26

*University Medical Center v. America Sterilizer Co.,*
82 B.R. 754 (Bankr. E.D. Pa. 1988) ..................................................................22

*VFB L.L.C. v. The Money's Trust (In re VF Brands, Inc.),*
282 B.R. 134 (Bankr. D. Del. 2002) ..................................................................29

*Williford v. Armstrong World Industrial, Inc.*, 715 F.2d 124 (4th Cir. 1983) ...............28

## STATE CASES

*Dietrich v. Harper*, 857 A.2d 1017 (Del. Ch. 2004)......................................................................16

*Lipton v. News International, Plc.*, 514 A.2d 1075 (Del. 1986).....................................................15

*Parnes v. Bailey Entertainment Corp.*, 722 A.2d 1243 (Del. 1999)........................................13, 14

*Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772
    (Del. Ch. 2004) ....................................................................................................................12, 14

*Tooley v. Donaldson, Lufkin,& Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004)............................11, 14

**RESPONSE OF BIG LOTS STORES TO MOTION OF DEBTORS
FOR PRELIMINARY INJUNCTION STAYING PROSECUTION
OF CERTAIN ACTIONS AND REQUEST FOR ALTERNATIVE RELIEF**

Big Lots Stores, Inc. ("Big Lots"), by and through counsel, presents this memorandum of law in response to the Motion of Debtors for Preliminary Injunction (the "Motion"), and in support of its Request for Alternative Relief.

Debtors would have this Court believe that the prosecution of Big Lots' state court action would result in severe and irreparable harm to the Debtors' reorganization (or liquidation) efforts, based solely on conclusory statements bereft of any factual support. In fact, the Debtors are attempting to use the protections afforded by the automatic stay and by section 105 of the Bankruptcy Code to protect, _not_ the Debtors' estates, but to protect the very non-debtor parties whose rapacious conduct — taking $120 million out of the company and paying it to themselves — caused the Debtors' insolvency, as well as the injury to Big Lots. The irony and disingenuousness of Debtors' position is apparent. Among other things, Debtors argue that Big Lots' claims against the non-debtor malfeasors belong to the Debtors' estates, even though Debtors are the last persons who would bring such claims against the same entities and individuals who control the Debtors.

For the reasons set forth below, Debtors' Motion should be denied.

## INTRODUCTION

On February 9, 2005, Big Lots filed a complaint (the "Complaint") in Delaware Chancery Court, styled _Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC et al.,_ Civil Action No. 1081-N (the "State Court Action"), against the equity owners and other insiders of the Debtors: defendants Bain Capital Fund VII, LLC; BCIP Associates II; BCIP Trust Associates II; BCIP Associates II-B; BCIP Trust Associates II-B; Sankaty High Yield Partners II; L.P., Michael L. Glazer; Robert J. Feldman; Joshua Beckenstein; Matthew Levin; and Robert White

-1-

(the "Insider Defendants").  <u>None of the Insider Defendants are Debtors in this bankruptcy case</u>. The State Court Action is brought only against non-debtors.

The Complaint asserts direct claims and seeks consequential damages arising out of a scheme to defraud Big Lots.  Pursuant to this scheme, the Insider Defendants, among other things: (1) purchased Havens Corners Corporation ("HCC"), together with its direct and indirect operating subsidiaries (collectively with HCC, the "KB Companies"), from Big Lots in exchange for a $45 million promissory note (the "HCC Note") and other consideration; (2) provided Big Lots with materially misleading financial information in order to induce Big Lots' acquiescence to a subsequent "restructuring transaction" (referred to herein as the "Equity Distribution Transaction"); (3) used the Equity Distribution Transaction to bypass Big Lots' structurally superior HCC Note and pay enormous and unjustified bonuses and equity returns to the Insider Defendants; and (4) effectively destroyed the KB Companies as going concerns by leaving them undercapitalized (and in fact insolvent) and therefore unable to continue in business or repay the HCC Note.  The State Court Action does not seek rescissory damages or the unwinding of the actual payments made to the Insider Defendants (almost $120 million) under a theory of fraudulent transfer or otherwise; instead, it seeks to recover the consequential damages Big Lots has suffered ($45 million plus interest) as a result of the Equity Distribution Transaction.

Nonetheless, the Debtors have filed the instant adversary action (the "Adversary Action") to interpose and extend the automatic stay provided under section 362(a)(3) of the Bankruptcy Code as a procedural defense to Big Lots' claims in the State Court Action.  The Debtors seek to have the State Court Action enjoined <u>indefinitely</u>, asserting two grounds to justify such extreme relief.  First, Debtors contend that maintenance of the State Court Action violates the automatic stay because, according to Debtors, Big Lots' claims belong not to Big

Lots but to Debtors' estates and because the State Court Action allegedly seeks to recover the proceeds of certain directors and officers insurance, which allegedly constitutes property of the estates. Second, Debtors argue that the State Court Action should be enjoined under section 105 of the Bankruptcy Code because maintenance of the State Court Action will allegedly "distract" the Debtors from their attempt to reorganize, deplete the assets of the estates, or bind the Debtors through some theory of collateral estoppel.

Neither of these grounds justifies the drastic relief Debtors seek.

(1)      In response to Debtors' argument that the State Court Action is barred by the automatic stay provisions of section 362(a)(3), Big Lots will show the following:

- The nature of the wrongs of which Big Lots complains shows that Big Lots has direct and unique claims that belong to Big Lots, not derivative claims that belong to the Debtors. Big Lots is the only creditor of HCC and is asserting direct claims for injuries caused by the Insider Defendants' conduct that was directed toward Big Lots. Only Big Lots has a claim for fraudulent inducement, and no creditor besides Big Lots was a specific target of defendants' wrongful conduct.

- The nature of the recovery sought by Big Lots shows that Big Lots has direct, not derivative, claims. Big Lots is not asserting a claim for fraudulent conveyance or seeking rescissory damages. Instead, Big Lots seeks consequential damages resulting from the tortious conduct of the Insider Defendants.

- As a matter of Delaware law, Big Lots was directly harmed by the unfairness of the corporate transaction engineered by the Insider Defendants.

- The proceeds of the directors and officers liability policy that Debtors cite are not property of the estate. First, that policy was not even issued to the Debtors; rather, the policy was issued and belongs to a non-debtor, one of the Bain entities that controls the Debtors. Second, the claims asserted in the State Court Action are not covered by the Debtors' insurance, which excludes coverage where the insured officers and directors personally benefited from their fraudulent or otherwise wrongful acts. Third, the Debtors will not have insured claims for indemnification, because they are legally prohibited from indemnifying the Insider Defendants for the conduct Big Lots has sued on.

-3-

(2)    In response to Debtors' argument that the State Court Action should be enjoined pursuant to section 105(a) of the Bankruptcy Code, Big Lots will show the following:

- Debtors have mischaracterized the standard under section 105. Contrary to Debtors' argument, injunctive relief under section 105 should be granted only in "unusual circumstances" and only when such relief is essential to a debtor's efforts to reorganize.

- Debtors have made no showing of imminent, irreparable harm. The assertion that certain officers of the debtors will be "distracted" from working on the reorganization is conclusory and insufficient. To the contrary, because the Debtors have been in bankruptcy for over 13 months, and must exit shortly or liquidate, the claims advanced by Big Lots will have to be resolved sooner rather than later in any event.

- There will be little, if any, disruption to Debtors' business for the additional reason that Debtors have retained the firm of Retail Forward to substantially assist in the management of the business. The State Court Action should not at all affect the work of Retail Forward.

- Discovery in the State Court Action will result in little, if any, incremental burden on the Debtors. The large bulk of any document discovery relating to the Debtors, consisting of approximately 100,000 pages, has already been produced by the Debtors to the Creditors' Committee. In the future, Big Lots will coordinate discovery with the Committee's fraudulent conveyance action (if and when it is filed) so as to avoid duplication of effort and to minimize the inconvenience to all parties.

- Debtors' assertion that now is a "critical time" in the reorganization effort, even if correct, does not justify enjoining Big Lots from pursuing its claims against non-debtors. Big Lots will agree not to pursue any discovery from Debtors or their officers and directors, other than the 100,000 pages of documents already produced to the Committee, for 90 days.

- Debtors have also made no showing that the State Court Action will deplete the assets of the estates. Debtors have not identified any claims that have been made directly against the Debtors that would be at risk if insurance coverage were not available and have not shown that the claims of any creditors will be prejudiced by the State Court Action.

The Adversary Action is thus simply an attempt by the Insider Defendants to use the Debtors' bankruptcy to shield themselves from liability for their own wrongful conduct. Their efforts should be rejected -- and their request for an injunction denied.

-4-

(3)    For the above reasons, Debtors' motion for a preliminary injunction should be denied, and Big Lots should be permitted to pursue its claims against the Insider Defendants, all of whom are non-debtors.  In the alternative, however, if this Court were to determine that the State Court Action should be enjoined (which it should not be), Big Lots should be allowed to prosecute those claims derivatively, on behalf of Debtor HCC.  For obvious reasons, the Debtors have an insuperable conflict in pursuing those claims, because those claims are brought against the very parties who control the Debtors.  The Creditors' Committee also has a conflict in prosecuting Big Lots' claims, because the claims of Big Lots are structurally subordinate to the claims of the Operating Subsidiaries' creditors represented by the Committee.

## BACKGROUND FACTS

The salient facts are alleged in Big Lots' Complaint, which is attached to Debtors' moving papers.  (Dkt. # 5.)  In the State Court Action, Big Lots seeks to recover $45 million plus contractual interest from the non-debtor Insider Defendants for their fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, tortious interference, and civil conspiracy.  Contrary to Debtors' repeated mischaracterization, the State Court Action does not sound in fraudulent conveyance, nor does it seek the rescissory relief that a fraudulent conveyance claim entails.  Rather, Big Lots has brought an action for compensatory damages caused by the conduct of the Insider Defendants that specifically targeted Big Lots (and no other creditor), while personally enriching the Insider Defendants to the tune of almost $120 million.  But for such illegal conduct, HCC would still be solvent and able to repay the HCC Note owing to Big Lots.

### The December 2000 KB Sale

HCC is a holding company formed by Big Lots in December 2000 to facilitate Big Lots' sale of its "K*B Toy" retail toy business to various of the Defendants.  HCC's sole asset was 100% of the stock of KB Consolidated, Inc. ("KB Consolidated"), which itself was a

-5-

holding company that, through intermediate holding companies, owned various operating subsidiaries doing business under the "KB" name (collectively, the "Operating Subsidiaries").

In December 2000, as part of a leveraged buy-out transaction, Big Lots sold HCC, including the Operating Subsidiaries, to a wholly owned subsidiary of KB Holdings, Inc. ("KB Holdings"). KB Holdings was and is primarily owned by various of the Insider Defendants, and is the ultimate parent of HCC and the Operating Subsidiaries.

The purchase price for HCC consisted of approximately $302.5 million in cash and debt, plus certain warrants. Of the $302.5 million, the Insider Defendants contributed a total of only $20.6 million as equity, and then immediately took out $2.5 million as a "success fee." As a result, the Insider Defendants' net equity investment was only $18.1 million. Big Lots continued as an investor in HCC, taking back a note for $45 million (the "HCC Note"). The remaining $237 million consisted of third-party loans secured by HCC's assets, including those of the Operating Subsidiaries.

Thus, Big Lots and the Insider Defendants became co-investors in the KB Companies, with Big Lots continuing as a debt investor and the Insider Defendants holding a structurally subordinate equity interest. No other creditor was similarly situated to Big Lots.[1]

**The April 2002 Equity Distribution Transaction**

In or around April 2002, notwithstanding the deterioration in the KB Companies' business as the nation slid into recession in 2001 and early 2002, the Insider Defendants entered into the Equity Distribution Transaction, in which they caused the KB Companies to borrow many millions of dollars from secured lenders and then to pay the proceeds, together with substantially all of the KB Companies' available cash, to the Insider Defendants in the form of

---

[1] While Big Lots' HCC Note was structurally superior to the Insider Defendants' equity interests, the HCC Note was structurally subordinate to interests of the KB Companies other creditors.

-6-

bonuses and repurchases of 65% of their KB stock. These payments approximated $120 million, giving the Insider Defendants and other insiders a 900% return on their investment in just 16 months.

To consummate the Equity Distribution Transaction, the Insider Defendants required Big Lots to sell a portion of the warrants it had received as part of the sale of HCC. In order to induce Big Lots to consent to this surrender (and not seek to protect its $45 million Note investment), Insider Defendant Feldman materially misrepresented the financial condition of the KB Companies, falsely representing to Big Lots in April 2002 that the KB Companies would have a net worth of in excess of $20 million following the transaction. Furthermore, the Insider Defendants were required to obtain a "solvency opinion" from their financial adviser, Houlihan Lokey Howard & Zukin ("Houlihan"). To obtain this solvency opinion, the Insider Defendants provided Houlihan with additional false and misleading financial information, and then failed to disclose to Big Lots that, under any reasonable reading of the Houlihan opinion, the Equity Distribution Transaction rendered the KB Companies insolvent and unable to repay the HCC Note. But for the false and misleading statements of the Insider Defendants, Big Lots would not have consented to the Equity Distribution Transaction.

The immediate effect the Equity Distribution Transaction was to encumber substantially all of HCC's assets, to strip all of the value from HCC and the Operating Subsidiaries, and to render HCC insolvent. Thus, the direct and proximate result of the Equity Distribution Transaction was to improperly subordinate Big Lots' structurally superior HCC Note to the Insider Defendants' structurally inferior equity positions, and to render that Note worthless.

-7-

**Big Lots' Unsecured Claims**

On January 14, 2004, the KB Companies (including HCC) filed chapter 11 bankruptcy petitions. Thereafter, the United States Trustee formed the Official Committee of Unsecured Creditors of KB Toys, Inc. (the "Committee"), and named Big Lots to the Committee. Each of the other member of the Committee were creditors of the Operating Subsidiaries. Big Lots is the only unsecured creditor of HCC or of any KB parent company. As HCC's creditor, Big Lots' HCC Note Claim in the KB Companies is likely structurally subordinate to the interests of the creditors of the Operating Subsidiaries, including the interests of remaining Committee members. Big Lots also maintains claims in excess of $10 million against the Operating Subsidiaries. Big Lots has resigned from the Committee, effective February 10, 2005.

The KB Companies collectively have in excess of $250 million of unsecured claims, of which approximately $56 million belong to Big Lots under the HCC Note, and more than $10 million belong to Big Lots on account of lease guarantee claims against the Operating Subsidiaries. While the Committee (on behalf of the Debtors' estates) may be able to recover the $120 million paid in the Equity Distribution Transaction as fraudulent transfers, absent agreement or substantive consolidation, such recovery will not inure to the benefit of Big Lots. Because the Equity Distribution Transaction payments came from the cash of and the proceeds of secured borrowing by the Operating Subsidiaries, any fraudulent conveyance recovery will inure first to the benefit of the Operating Subsidiary creditors. Only if those creditors are repaid in full and there is excess value at the Operating Subsidiary level will any recovery flow back up to the equity interests in the Operating Subsidiaries, such as HCC. Neither management's projections nor those of the Committee envision that sufficient value will ever exist at the Operating Subsidiary level for these equity interests to participate in a reorganization. Therefore, lacking any chance of recovering its interest in the HCC Note through a fraudulent transfer

-8-

action in the Bankruptcy, Big Lots sought to pursue its own claims against the non-debtor Insider Defendants for compensatory damages based on their conduct in rendering the HCC Note worthless.

Even if the Debtors or the Committee could recover damages on Big Lots' behalf, each would be hopelessly conflicted in prosecuting Big Lots' claims. The Debtors are conflicted because they are controlled by the very entities and individuals who caused Big Lots' damages in the first instance – i.e., the Insider Defendants. The Committee is conflicted because it represents structurally superior claimants that have no interest in pursuing a recovery in excess of what is necessary to fund 100% of the claims against the Operating Subsidiaries. As a result, if Big Lots is not permitted to pursue its claim against the non-debtor Insider Defendants in the State Court Action, Big Lots will be unrepresented in the pursuit of such claims.[2]

**The State Court Action**

Given the position described above, on February 9, 2005, Big Lots filed the State Court Action, in which it seeks damages principally for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraud, tortious interference, and civil conspiracy against 11

---

[2] In a filing made on February 25, 2005, by Bain Capital Partners (Dkt. # 2038), Bain disputed that the conduct of the Insider Defendants in taking $120 million out of the company and paying it to themselves injured the Debtors or caused their insolvency. Instead, Bain pointed to economic conditions and to alleged price discrimination by certain toy manufacturers who are members of the Committee, accusing those manufacturers of selling to Wal-Mart at unfairly low prices. In other words, Bain is asserting that the Insider Defendants have a causation defense to the claims of the Committee and Big Lots. These unproved factual assertions provide no basis to enjoin Big Lots' State Court Action or to deny the Committee's motion to prosecute claims against insiders. Moreover, Bain's criticism of the Committee for allegedly failing to investigate the causation issue is disingenuous. If the Debtors have a meritorious claim that any toy manufacturers violated the law and injured the Debtors as a result, why have the Debtors not pursued such a claim? Debtors' failure to do so speaks louder than Bain's self-serving statements. The Committee should be allowed to assert derivative claims on behalf of the Operating Subsidiaries (although not on behalf of HCC), and Big Lots should be permitted to maintain the State Court Action.

non-debtor defendants, two of whom are officers and directors of the Debtors (and each a former officer or director of Big Lots) and nine of whom are agents or affiliates of Bain Capital (the "Bain parties").

*The Officer/Director Defendants.*  Big Lots seeks damages for fraud, breach of fiduciary duty, and civil conspiracy against Defendants Michael L. Glazer ("Glazer") and Robert J. Feldman ("Feldman") for their roles in facilitating and approving the Equity Distribution Transaction.  Glazer is the KB Companies' CEO and Feldman is the CFO.  Each is a director of KB Holdings, the Debtors' ultimate parent, and of other KB Companies.  In addition, Glazer is a former officer and director of Big Lots and Feldman is a former officer of Big Lots.  Both Glazer and Feldman received substantial bonus payments, totaling more than $28 million, from the Equity Distribution Transaction.

Big Lots has sued Feldman for fraud, based on his April 2002 material misrepresentations made directly to Big Lots, and against Defendant Glazer for his breaches of duty as a Big Lots director, based on his conduct at the time of the Equity Distribution Transaction.  In addition, Big Lots has sued Glazer and Feldman for breach of their fiduciary duties to Big Lots as HCC's sole creditor.  But for the conduct of Glazer and Feldman, Big Lots would not have consented to the Equity Distribution Transaction and would have taken steps to protect its interests at that time, including taking steps to insure the repayment of the HCC Note.

*The Bain Parties.*  Big Lots also seeks damages for breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, tortious interference, and civil conspiracy against Joshua Beckenstein, Matthew Levin, and Robert White, as well as Bain-Capital Fund VII, LLC; BCIP Associates II; BCIP Trust Associates II; BCIP Associates II-B; BCIP Trust Associates II-B; and Sankaty High Yield Partners II, L.P.  The Bain parties own a majority and controlling

equity interest in the parent company KB Holdings. Some combination of Glazer, Beckenstein, Levin, and White constituted the board of directors of KB Holdings. Among other things, the Bain parties induced Defendants Glazer and Feldman to breach their fiduciary duties to HCC in the manner described above, including by inducing Glazer and Feldman to approve the improper dividend payment from HCC to its parent, which funded the improper purchases of the Insider Defendants' stock. The vast majority of the dividend personally benefited the Bain parties.

The Bain parties' wrongful conduct was specifically directed against Big Lots. For example, at the time of the Equity Distribution Transaction, the Bain parties considered paying off Big Lots' structurally superior HCC Note, but chose instead to pay themselves. To accomplish the Equity Distribution Transaction, the Bain parties also induced or participated in the fraudulent conduct of defendants Feldman and Glazer.

For these reasons, and as more fully described below, the claims asserted by Big Lots are direct claims that belong to Big Lots and not to the Debtors.

## ARGUMENT

**I.    BIG LOTS' DIRECT CLAIMS BELONG TO BIG LOTS, AND THEY ARE NOT PROPERTY OF THE DEBTORS' ESTATES.**

### A.    Under Controlling Delaware Law, All of Big Lots' Claims Are Direct Claims, Not Derivative Claims.

Big Lots' claims in the State Court Action arise from the intentional, fraudulent, and otherwise tortious conduct of the non-debtor Insider Defendants, conduct that was directed toward Big Lots. The claims of Big Lots are therefore direct claims that do not constitute property of the Debtors' estate(s) and which are not subject to the automatic stay in section 362(a)(3) of the Bankruptcy Code. The Debtors' motion should be denied.

Big Lots' claims meet the two-pronged test for direct claims that the Delaware Supreme Court set forth in *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031 (Del.

-11-

2004). That test requires an inquiry into "the nature of the wrong and to whom the relief should go" in determining whether a claim is direct or derivative. *Id.* at 1039. Under *Tooley*, Big Lots' claims are direct because they seek to recover for wrongs that were committed directly against Big Lots, and because Big Lots is the entity to which the compensatory damages should be paid.

As to the nature of the wrong, all of Big Lots' claims are based on conduct specifically directed at Big Lots, rather than being limited to actions that affected the Debtor or unsecured creditors generally.

Among the Complaint's allegations are the following. Defendants Glazer and Feldman failed to disclose material information to Big Lots, including the unreasonableness of the financial projections they provided to Houlihan, and approved the Equity Distribution Transaction with the intent of subordinating Big Lots' debt to their own equity interests, as well as to those of the Bain parties, who rewarded Glazer and Feldman as a result (Count I). Realizing the likely result (that HCC would default on the HCC Note which Defendants knew was a valid debt), the Defendants considered repaying the HCC Note to Big Lots but did not. The Bain parties participated in, or aided and abetted, this conduct (Count II-III). The Defendants were unjustly enriched by this conduct, not only because they arrogated to themselves property of the Debtors' estates, but because they undertook to subordinate Big Lots' superior creditor claims to their own equity interests (Count IV). Defendant Feldman affirmatively defrauded Big Lots by falsely representing to Big Lots that the KB Companies still had substantial net worth after giving effect to the Equity Distribution Transaction, specifically to obtain Big Lots' acquiescence in that transaction (Count V). Each of the Insider Defendants conspired to defraud Big Lots by providing it with materially false and misleading information in order to induce its acquiescence and non-objection to the Equity Distribution Transaction (Count

-12-

VI). Moreover, Defendant Glazer breached his fiduciary duty to Big Lots as a Big Lots director by participating in a scheme which injured Big Lots and by failing to disclose this scheme (Count VII).

The above-described conduct is precisely the sort that Delaware courts have held give rise to direct claims, because the conduct was directed at Big Lots, not merely at the Debtors' estates or creditors generally. *See Parnes v. Bailey Entm't Corp.*, 722 A.2d 1243, 1245-46 (Del. 1999); *see also Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 797-98 (Del. Ch. 2004) (cited at Debtors' Mem. at 12-13). Because the Insider Defendants' conduct was directed at Big Lots, and because Big Lots relied on that conduct to its detriment, the resulting claim belongs to Big Lots. *See Official Unsecured Creditors' Comm. of Phar-Mor, Inc. v. Bowen (In re Phar-Mor, Inc. Sec. Litig.)*, 164 B.R. 903, 905 (W.D. Pa. 1994) (holding that securities holders had direct cause of action against third-party accountants for fraud and negligence).[3]

Big Lots also satisfies the second prong of *Tooley*, the nature of the recovery and to whom it should go, because the damages that Big Lots has suffered directly flow from the specific actions that were directed against Big Lots. *See Phar-Mor*, 164 B.R. at 905. Indeed, Big Lots is the only entity that can recover these damages.

The Debtors repeatedly mischaracterize the nature of the damages sought by Big Lots. Big Lots does not seek fraudulent conveyance damages, which are rescissory in nature. Big Lots instead seeks consequential damages that are independent of any recovery by the Committee or other unsecured creditors under a fraudulent conveyance or any other theory. As

---

[3] As a creditor of HCC at the time of the Equity Distribution Transaction, Bit Lots could have either withheld its consent and/or taken legal action to block the transaction. Big Lots chose not to do so based in large part on Defendant Feldman's net worth representation and other materially false and misleading information. No other creditor was similarly targeted.

-13-

noted above, even if the other unsecured creditors were to recover 100% of their claims--which would result in a recovery of approximately $120 million--no amount of that $120 million would inure to Big Lots' benefit, because that entire recovery would go to the other creditors, who are structurally superior to Big Lots. (*See supra* pp. 8-9.) Likewise, if Big Lots were to recover 100% of its claims (*i.e.*, $45 million plus interest), that recovery would have no effect on the recovery available to the other unsecured creditors.

In addition to satisfying the two prongs of the *Tooley* standard, Big Lots' claims qualify as direct claims under the Delaware Supreme Court's holding in *Parnes*. Under *Parnes*, which is settled Delaware law, where an investor's interests in a corporation are directly harmed by the unfairness of a corporate transaction, as opposed to harm resulting from general corporate mismanagement, the investor is entitled to assert direct claims against those responsible for the harm. In distinguishing between direct and derivative stockholder claims in the context of a merger, *Parnes* held that:

> to state a direct claim with respect to a merger, a stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price.

722 A.2d at 1245. The allegations in Big Lots' Complaint are more than sufficient, under *Parnes*, to establish a direct claim.[4]

Finally, it has long been the rule in Delaware, that a defendant's course of conduct could give rise to both direct and derivative claims, in which case the plaintiff could choose

---

[4] Furthermore, Big Lots believes that discovery will uncover additional facts that may support further direct claims resulting from the Equity Distribution Transaction, and possibly earlier events. For example, the Complaint supports the inference that Defendant Glazer was induced to join Bain's offer for Big Lots' KB Toy business, possibly because he was promised the ill-gotten gains he ultimately received as part of the Equity Distribution Transaction. (Compl. 21-22.) Discovery may reveal evidence of Defendants' improper motivation dating back not just to the Equity Distribution Transaction, but even to the sale of the KB Companies themselves.

-14-

which to prosecute.   As the Delaware Supreme Court stated in *Lipton v. News International, Plc.*, 514 A.2d 1075, 1079 (Del. 1986):   "A shareholder who suffers an injury peculiar to itself should be able to maintain an individual action, even though the corporation also suffers an injury from the same wrong."   Neither *Tooley* nor any post-*Tooley* Delaware decisions have changed that rule.

The three primary cases cited by the Debtors support Big Lots and show that its claims are direct, not derivative.   In *Production Resources*, plaintiff PRG brought fiduciary breach claims against defendant NCT's officers and directors for inter alia, approving various payments to insiders and affiliates, thereby making NCT insolvent and frustrating PRG's ability to collect its debt. *Prod. Res.*, 863 A.2d at 774-76.   NCT defended by arguing that PRG's claims were derivative claims that belonged to NCT, which PRG therefore could not pursue. *Id.* at 775. The court, however, <u>denied</u> NCT's motion to dismiss PRG's fiduciary duty claims against the NCT board.   After noting that a shareholder may assert a direct claim where majority shareholders distribute dividends to themselves and then lie about the surrounding facts, the Court concluded that a creditor should be able to assert claims in similar circumstances, such as when a corporation frustrates a particular creditor's ability to recover its claim, to the advantage of other creditors or employees. *Id.* at 797.   Therefore, the court held that a direct claim would lie where "directors display such a marked degree of animus towards a particular creditor with a proven entitlement to payment." *Id.* at 798.   The *Production Resources* court also relied on the fact that NCT's board took "particular steps to disadvantage PRG as a creditor and to frustrate its efforts at collection."  *Id.* at 800; *see also Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1042-43 (2nd Cir. 1986) (holding that creditor's claim for intentional fraud was a distinct claim and was not property of the Debtor's estate).

-15-

Nor does the Debtors' citation to *Dietrich v. Harper*, 857 A.2d 1017, (Del. Ch. 2004) (Debtors' Mem. at 13), support their argument. In that case, the plaintiff-shareholders charged various defendant board members with breach of fiduciary duty in their negotiations leading up to the sale of the Starbase Corporation and in approving that transaction. *Id.* The court dismissed the negotiation-related claims as derivative, holding that they related merely to the directors' management of the company, and therefore were claims of the company. *Id.* at 1028. Citing *Parnes*, however, the court refused to dismiss the claims asserting that the directors were personally interested in the transaction and that one director had received under-the-table payments as part of the transaction, thereby implicating the "entire fairness" standard of review. *Id.* at 1028-29. These claims were related to a "disabling conflict of interest," they constituted a "direct attack on the fairness" of the transaction and therefore constituted direct claims. *Id.* at 1028. Here, Big Lots' breach of fiduciary duty claims are akin to the "entire fairness" claims asserted in *Dietrich*. Big Lots specifically alleges that the Insider Defendants' conduct was directed at Big Lots and resulted in a transaction that violated the "entire fairness" standard.

Similarly, *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988), supports Big Lots' right to pursue claims against the non-debtor Insider Defendants. There, Bankers Trust brought a RICO claim against the directors and officers of a bankrupt entity. Bankers Trust alleged that the defendants had engaged in various fraudulent acts directed at Bankers Trust, including attempts to hide estate assets, to induce it to consent to a plan. The district court dismissed the claims on the ground that Bankers Trust lacked standing to bring a RICO claim because its damages were merely derivative of damages suffered by the debtors' estates. The Second Circuit reversed the district court, holding that the defendants' actions in misleading Bankers Trust resulted in direct damages and that Bankers therefore had standing to bring a

-16-

RICO claim.[5]  As in *Bankers Trust*, the Insider Defendants affirmatively misled Big Lots, resulting in a direct claim for damages.

Lastly, *S.I. Acquisition, Inc. v. Eastway Delivery Services, Inc. (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142 (5th Cir. 1987) (see Debtors' Mem. at 12), does not address Delaware law or whether a creditor's claims for breaches of duty and fraudulent conduct directed at a plaintiff constitute direct or indirect claims.  That case involved the application of Texas law to a debtors' theoretical alter ego claims against its own parent.

Big Lots' damages are independent of any damages to the Debtors' estates resulting from the Equity Distribution Transaction.  Big Lots' claims are therefore direct and not subject to the automatic stay.

**B.    Big Lots Does Not Assert Claims Over Any Insurance That Constitutes Property of the Debtors' Estates.**

The Debtors' claim that the litigation should be stayed because it seeks control over "their" insurance policy is unavailing.  <u>First</u>, the policy at issue ("the Policy") is not even the Debtors' policy.  (Relevant excerpts from the policy that the Debtors claim is property of their estate are attached hereto as Exhibit A.)  Rather, the Policy was issued to Bain Capital Partners.  (*See* KB 032493.)  From the redacted copy of the Policy which Debtors have provided, it appears that the Policy insures the Bain entities and their portfolio companies, including KB Holdings, Inc.  (KB 032490.)  The Debtors' Motion did not attach the Policy, nor did Debtors inform the Court that the Policy actually belongs to Bain.  Bain's insurance policy is not property of the Debtors' estate, however, and thus provides no basis for imposing the automatic stay.

---

[5] The court noted in dicta that these claims were not ripe, because the extent of Banker's damages was dependent on the extent of its recovery in the bankruptcy.  That is not the case, here, however, because there is no prospect that any recovery by the Operating Subsidiaries will filter up to HCC, which is structurally subordinate to the remaining KB Company creditors.  In any case, that is an issue of damages for the Delaware Chancery Court to address.

-17-

Second, the State Court Action does not appear to implicate the Policy's coverage because the claims asserted by Big Lots are excluded. In fact, the Policy excludes claims "arising out of, based upon, or attributable to the gaining in fact of any profit or advantage to which an Insured was not legally entitled." (Exclusion (a), KB 032438.) Each of the claims asserted in the State Court Action arises out of decisions by the Insider Defendants, the direct and intended result of which were the illegal and excessive payments that the Insider Defendants paid to themselves. Accordingly, such claims are excluded from coverage. Similarly, the Policy excludes claims "arising out of, based upon, or attributable to the committing . . . of any fraudulent or dishonest act." (Exclusions (a) and (c), KB 032438.) Each of the claims asserted in the State Court Action involve the Insider Defendants' fraudulent and dishonest course of conduct directed at Big Lots, which claims are also excluded from coverage. In addition, Big Lots' claim against Defendant Glazer in his capacity as a Big Lots director falls within Exclusion (g), which excludes claims for acts committed in an insured's capacity as a director of an entity not insured under the Policy (Exclusion (g), KB 032438).

Third, the Debtors' coverage will only be implicated if the Debtors actually indemnify their officers or directors for their costs of defending and paying any judgment in the State Court Action. However, because the State Court Action alleges the willful and wrongful conduct of the Insider Defendants, such indemnification would be illegal because Delaware law, which prohibits indemnification payments to directors who have not acted in good faith or "in or not opposed to the best interests of the corporation." There is no way that the actions of the Insider Defendants can be viewed as in the best interests of the KB Companies. 8 Del. St. § 145(a). One cannot even reasonably conceive of an argument that the actions of the Insider

Defendants that are challenged in the State Court Action were taken in good faith or the best interests of the KB Companies.

Fourth, courts will not apply the automatic stay, nor enjoin actions against non-debtor officers and directors, where the potential implication of the debtors' insurance coverage is as attenuated as it is here.  For example, in *In re Allied Digital Technologies, Inc.*, 306 B.R. 505 (Bankr. D. Del. 2004), the court held that where an insurance policy provides coverage to officers and directors, and indemnity coverage to their company, the policy does not constitute property of the estate where "indemnification either has not occurred, is hypothetical, or speculative." That is certainly the case here.  The Debtors have failed to demonstrate that any of the Policy proceeds will be payable to them, notwithstanding that they are nominally covered entities under the Policy.  Only in the case that insurance proceeds will actually be paid to a Debtor do the proceeds become property of the estate to which section 362(a) applies. *See Allied Digital*, 306 B.R. at 512. ("when there is coverage for the directors . . . and the debtor, the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminishing.") (emphasis added).  Here, it is irrelevant that the Debtors are insureds under the policy, because they lack any claims by which the Policy proceeds would become their property. *See also In re Adelphia Communications Corp.*, 298 B.R. 49, 53-54 (Bankr. S.D.N.Y. 2003) (reversing the bankruptcy court and holding that, where policy provides entity coverage to the debtor as well as D&O indemnity coverage, the policy proceeds do not become property of the estate unless and until indemnification payments are made).

All of the cases relied upon by the Debtors are distinguishable for one basic reason:  In each case, the bankruptcy Debtor was itself a named defendant in the litigation and

-19-

therefore at risk of losing the benefit of its insurance proceeds if the policy was exhausted. For example, in *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986), the debtors were co-defendants with their insurers in the underlying action, which sought products liability damages related to A.H. Robins' production of the Dalkon Shield. The proceeds of the policies in that case were undoubtedly property of the estate, and necessary to a reorganization, because the claims in the underlying action were not only covered, but would have exhausted the policies at issue. *Circle K Corp. v. Marks (In re Circle K Corp.)*, 121 B.R. 257, 261 (Bankr. D. Ariz. 1999), similarly involved a case where the debtor was a co-defendant in the underlying case, which threatened to exhaust the debtors' policy. The same was true in *PHP Healthcare Corp. v. HIP Foundation, Inc. (In re PHP)*, Adv. No. A99-18 (MFW) (Bankr D. Del. Mar 31, 1999).

## II.    INJUNCTIVE RELIEF EXPANDING THE APPLICATION OF THE AUTOMATIC STAY IS NOT WARRANTED.

Contrary to Debtors' claim that "[c]ourts have routinely entered injunctions pursuant to section[] 105(a)" of the Bankruptcy Code to extend the stay provided by section 362(a) (Debtors' Mem. at 17), the clear weight of authority in this Circuit is that injunctive relief under section 105 should be granted only in "unusual circumstances" and when such relief is "essential" to the Debtors' efforts at reorganization. *Maintainco, Inc. v. Mitsubishi Caterpillar Forklift Am., Inc. (In re Mid-Atlantic Handling Sys., LLC)*, 304 B.R. 111, 128-29 (Bankr. D.N.J. 2003) (citing *McCartney v. Integra Nat'l Bank, N.A.*, 106 F.3d 506, 510 (3d Cir. 1997)).

The leading case of *In re Monroe Well Service, Inc.*, 67 B.R. 746 (E.D. Pa. 1986), demonstrates the heavy burden that should be placed on a debtor attempting to use section 105 to enjoin an action brought solely against non-debtors. In that case, the debtors owned and operated various low-yield oil wells that required a continuous stream of proceeds from oil sales to maintain the wells. If not maintained, the wells would quickly be destroyed. After lien

-20-

creditors threatened to assert their liens against non-debtor purchasers of the oil (threatening to cut off the debtors' ability to maintain the wells), the debtors sought relief under section 105. The *Monroe* court set forth the requirements for issuing such an injunction, holding that the debtors must show:

> [First,] that there be the danger of <u>imminent, irreparable harm</u> to the estate or the debtor's ability to reorganize. Second, there must be a reasonable likelihood of a successful reorganization. Third, the court must balance the relative harm as between the debtor and the creditor who would be restrained. Fourth, the court must consider the public interest; this requires a balancing of the public interest in successful bankruptcy reorganizations with other competing societal interests.

*Id.* at 752-53 (emphasis added).

The *Monroe* court determined that the debtors met this test, but only because of the exceedingly pressing circumstances and the limited nature of the relief ultimately granted. Specifically, the court determined that the Debtors would face immediate and irreparable harm because, if the payments were not made, the wells would fail and "the prospects for reorganization [would be] nil." *Id.* at 755; *see also Phar-Mor*, 164 B.R. at 907 (holding that debtors must show "significant and direct harm"). No such pressing circumstances exist here.

## A.    Big Lots' Claims Do Not Threaten Immediate Irreparable Harm.

The Debtors conclusorily assert that they will be irreparably harmed because (1) Defendants Glazer and Feldman will be "distracted" from the Debtors' reorganization; (2) the Debtors' D&O policies will be diminished; and (3) the Debtors are the real parties in interest and will be adversely affected by collateral estoppel, indemnification, and through their required participation as "necessary parties." None of the Debtors' claims are persuasive or carry their burden of establishing a threat of "immediate and irreparable harm" to their estates.

-21-

1.    **There Will Be No Disruption or Distraction to the Debtors During the Upcoming Allegedly "Critical Period," Because Big Lots Will Agree Not to Take Discovery From the Debtors for Ninety Days.**

Big Lots will agree not to take any discovery in the State Court Action from the Debtors or any officer or director of the Debtors for ninety days from this date, except for the approximately 100,000 pages of documents Debtors have already provided to the Committee. This will more than cover what the Debtors have represented to be the "critical period" in its reorganization efforts, and should dispel any legitimate concern that the pendency of the State Court Action will harm such efforts. Moreover, as Big Lots shows below, even in the absence of this concession on its part, the Debtors have not shown the irreparable harm necessary to support the relief they seek.

2.    **The Threat to the Reorganization is Minimal or Non-Existent.**

To justify section 105 relief based on the alleged distraction of management, the debtors must meet a "fact determinative" and "very demanding" burden. *Univ. Med. Ctr. v. Am. Sterilizer Co.*, 82 B.R. 754, 758 (Bankr. E.D. Pa. 1988). Such relief is appropriate where litigation truly threatens a reorganization, not where it is merely an inconvenience to management. The Debtor's Motion barely even attempts to meet this burden.

Rather, they make conclusory and alarmist claims that the two-week-old State Court Action "has devastated current management" and that "the Debtors and other members of management will be dragged into such litigation as witnesses and otherwise. This will leave no time and energy to operating the business at this crucial time . . ." (Debtors' Mem. at 19.) The Debtors' claims are excessive and absurd and cannot support the issuance of a section 105(a) injunction.

-22-

First, only two of the Insider Defendants, Glazer and Feldman, are involved in the reorganization, and the time demands on them in appearing for depositions and organizing their personal papers are not immediate, and will not be unreasonable. Moreover, the Debtors have offered no facts on which such a determination may be made. Thus, this is not a situation such as that presented by *Rickel Home Centers, Inc. v. Baffa (In re Rickel Home Centers, Inc.)*, 199 B.R. 498, 501 (Bankr. D. Del. 1996) on which the Debtors rely (*see* Debtors' Mem. at 18), where the court made specific findings regarding the limited managerial resources available to the Debtors' to focus on their reorganization. *See also Oschs v. Lipson (In re First Cen. Fin. Corp.)*, 238 B. R. 9, Bankr. E.D.N.Y. 1999) (distinguishing cases involving "numerous lawsuits" and "massive depletion" of assets and personnel where injunctive relief is necessary and cases lacking "mass litigation" where it is not.). In the absence of substantial proof of an actual threat to the reorganization, section 105 relief is unjustified.

Second, discovery in the State Court Action will focus not on the Debtors, but on information within the control of the non-debtor defendants and the professionals they used to further their conspiracy to represent to Big Lots that the KB Companies would remain solvent after the Equity Distribution Transaction.

Third, the issues presented in the State Court Action will likely require litigation prior to plan confirmation, meaning the Debtors' officers and directors will ultimately face the burden of responding to discovery and litigating the issues anyway.

Fourth, the Debtors have already produced in excess of 100,000 pages of documents in response to requests from the Creditors Committee, reducing the need for future documentary discovery and belaying their concern about the disruption such discovery will

-23-

cause. (*See* Aff. ¶ 16.) Furthermore, Big Lots has served document requests only to non-debtor defendants and those requests are reasonable in scope and are not unduly burdensome.[6]

At all events, Big Lots, as one of the Operating Subsidiaries' largest unsecured creditors, has every incentive to support a successful reorganization. While the State Court Defendants and Debtors have fiduciary duties to the Operating Subsidiary Creditors to work for a successful reorganization, Big Lots is an actual interest holder in such a reorganization. Even as a party interested in successful reorganization, Bug Lots rejects the State Court Defendants' self-serving and alarmist claims (made through the Debtors) that litigating Big Lots' claims against the Insider Defendants will threaten the Debtors' reorganization.

### 3.    Debtors' Have No Protectable Interest in Any Insurance Policy Justifying Injunctive Relief.

The Debtors' claim that they should be granted an injunction to protect the Bain Defendants' insurance Policy for the benefit of other estate creditors is also unavailing. First, as noted above (*see supra* section I.B., at 16), the Bain Defendants' Policy is not threatened because the claims asserted in the State Court Action are not covered by the policy and are not subject to indemnity by the KB Companies. Therefore, the State Court Action will not trigger any coverage under the Policy nor otherwise threaten the Debtors' estates.

Second, even assuming the Bain Defendants' policy did cover Big Lots' claims and thus was subject to depletion by the State Court Action, this is not a case such as *A.H. Robins* and other mass tort bankruptcies where insurance proceeds were either a necessary

---

[6] Furthermore, whatever basis there is for excusing the Officer/Director Insider Defendants from sitting for depositions and responding to discovery does not apply to the remaining Insider Defendants, who are not necessary to any reorganization. Thus, a blanket stay is inappropriate and the State Court Action should at the very least proceed against the remaining Defendants. Even in *Rickel*, on which the Debtors rely, the court refused to enjoin the action completely, staying the action as to the officer defendants for seven months and allowing motion practice and discovery against third-parties to proceed for the duration. *Rickel*, 199 B.R. at 501-02.

-24-

component of a reorganization or a substantial asset of the Debtors' estate. In the *Dalkon Shield* case, for example, the company and its insurer had already paid out $517 million in claims and was still facing an additional 8,000 to 10,000 claims. *A.H. Robins*, 788 F.2d at 996 n.4, 1013. The Debtors have identified no claims other than those of Big Lots and the Creditors' Committee that would invoke the polices. Thus, this is not a case where Big Lots' claims will "fire the starting gun" in a race to deplete the Debtors' insurers, because, other than the Creditors Committee, there are no other identified or conceivable claimants.

Third, and related, the existence of insurance coverage does not justify an enjoining the State Court Action in light of the relatively meager policy limits. Big Lots' claim is for $45 million plus interest and the Committee's separate fraudulent conveyance claim is for $120 million, while the policy limits are only $10 million. Granting the injunction sought by Debtors for this reason makes no sense and would be "allowing the tail to wag the dog."

Fourth, even if Big Lots and the Committee claims exhausted the Bain Defendant's insurance, they and the other Insider Defendants have ample resources with which to defend themselves and satisfy any judgment. There is thus no threat to the creditors or the estate. *See Phar-Mor*, 164 B.R. at 905-06 (declining to stay litigation against debtors' solvent accountant, which could satisfy multiple judgments in excess of its policy limits); *cf. Allied Digital*, 306 B.R. at 512 (policy proceeds are not property of the estate unless they "actually protect[] the estate's other assets from diminishing").

**4.    The Debtors Are Not the Real Parties In Interest And They Will Not be Prejudiced as a Result of the State Court Action by Collateral Estoppel or Indemnification.**

The Debtors next claim that Big Lots' claims against the non-debtor Insider Defendants are really claims against the Debtors' estates, and that the Debtors are therefore the real parties in interest. (Debtors' Mot. at 20-21.) Thus, the Debtors seek to play their position

both ways: On the one hand, they claim that Big Lots' claims are derivative in nature, that Debtors are the real claimants, and that Big Lots' claims should be enjoined pursuant to section 362(a)(3). *See supra*, 11 to 16. On the other hand, in their section 105 argument, Debtors contend that they are the real defendants. The Debtors' arguments are inconsistent and unavailing: Big Lots' claims are based on the fraudulent conduct of the non-debtor Insider Defendants, which conduct was directed at Big Lots. The Debtors are simply not part of that equation.

In addition to being inconsistent, the Debtors' claims are unsupported by case law. Without exception, the cases cited by the Debtors for the proposition that they are the real parties in interest to the State Court Action deal with situations in which a debtor would be subject to collateral estoppel because (a) debtor was a codefendant to an action against the non-debtors, (b) the non-debtors were being held vicariously liable for the actions of the Debtor, or (c) the debtor had absolute indemnity obligations to non-debtors that would bind the debtor to the non-debtors' judgment. (*See* Debtors' Mem. at 20-21.)

For example, in *In re Continental Airlines*, 177 B.R. 475, 481-82 (D. Del. 1993), the court concluded that the Debtor was the real party in interest because it allegedly committed the securities violations at issue and in fact was a named defendant in one of the suits. Similarly, *Sudbury, Inc. v. Escott (In re Sudbury, Inc.)*, 140 B.R. 461, 463 (Bankr. N.D. Ohio 1992) and *Eastern Air Lines v. Rolleston (In re Ionosphere Clubs, Inc.)*, 111 B.R. 423 (Bankr. S.D.N.Y. 1990) involved cases in which the debtor was initially named as a defendant and was primarily liable for the alleged conduct. *American Film Technologies, Inc. v. Taritero, (In re American Film Technologies, Inc.)*, 175 B.R. 847, 849 (Bankr. D. Del. 1994), involved a series of suits against the debtor and non-debtor officers and directors where the issues in each were identical

-26-

and collateral estoppel therefore could apply. In *Lomas Financial Corp. v. Northern Trust Co. (In re Lomas Fin. Corp.)*, 117 B.R. 64, 67 (Bankr. S.D.N.Y. 1990), the court predicated its finding of an identity of interests on the fact that it was "undisputed" that the debtors has absolute indemnity obligations that ran to the non-debtor defendants.

Each of these cases is distinguishable. <u>First</u>, the Debtors are not defendants in the State Court Action, only the non-debtor Insider Defendants are. <u>Second</u>, there is no legal identity of interests between the Debtors and the Insider Defendants, who looted the Company. In fact, the opposite is true. (*See* Creditors' Comm. Mot. ¶¶ 9-19.) <u>Third</u>, there is no identity of interests because Big Lots' claims against the Insider Defendants are categorically distinct from the bankruptcy claims Big Lots has against HCC as a debtor. The State Court Action sounds in tort; the bankruptcy claim seeks contract recovery on a promissory note. Thus, the facts and legal theories giving rise to the Insider Defendants' liability are wholly separate from those supporting Big Lots' claims against the Debtors, who are not potential co-defendants to the State Court Action. Thus, there is no threat of collateral estoppel because there is no identity of issues between the claims against the Insider Defendants and the Debtors. *Raytech Corp. v. White*, 54 F.3d 187, 191 (3d Cir. 1995)

<u>Fourth</u>, there is no realistic threat of indemnification against the Debtors. In fact, any finding of liability on the part of the Officer/Director Defendants or the Bain Director defendants will of necessity require a finding of bad faith on their part, precluding any indemnity obligation because Delaware law prohibits indemnification payments to directors who have acted in bad faith or contrary to the interests of the corporation. 8 Del. St. § 145(a). Collateral estoppel therefore will work, if anything, to the advantage of the Debtors.

-27-

Injunctive relief is therefore inappropriate because the Insider Defendants are liable independently of the Debtors, their indemnity obligations are merely contingent and there is no threat of collateral estoppel. *See Bidermann Indus. U.S.A., Inc. v. Zelnik (In re Bidermann Indus. U.S.A., Inc.)*, 200 B.R. 779, 783-85 (Bankr. S.D.N.Y. 1996) (holding that section 105 injunction was not justified where debtor's insider is independently liable, the right to indemnity is not absolute, and the continuation of the suit will not interfere with the bankruptcy).

### B.     The Balance of Harms Weighs in Big Lots' Favor and The Issuance of Injunctive Relief Would Be Unjust.

In their effort to protect themselves from liability, the Insider Defendants have caused the Debtors to exaggerate the harm that they claim will befall their estates if the State Court Action proceeds and to ignore the harm to Big Lots if the State Court Action is enjoined. But that is not all. The Debtors' Motion also ignores the harm to the Debtors themselves.

To start, the threat to the Debtors is minimal if not non-existent, as set forth above. The Debtors have not met their burden of demonstrating "by clear and convincing circumstances" that the harm to their reorganization outweighs the harm to Big Lots. *Phar-Mor*, 164 B.R. at 907 (quoting *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983)). In contrast, both Big Lots and the Debtors themselves will be severely prejudiced if the State Court Action is stayed.

First, without resolution of the Committee's fraudulent conveyance action and Big Lots' claims, it is doubtful any effective or confirmable plan of reorganization would emerge. It is also doubtful that the Insider Defendants would settle the Committee's action without also resolving the State Court Action. Imposing a stay of the State Court Action, and the resulting delay in its prosecution, will likely delay the resolution of such lawsuit (by settlement or final judgment), and with it, the Debtors' ability to reorganize. *See Phar-Mor*, 164

-28-

B.R. at 905 (noting that staying non-debtor claims against third-party accountants would delay settlement of debtors' claims, which were unlikely to be resolved except in a global settlement). Thus, the Debtors' request is an attempt to delay and not expedite the reorganization effort. Understanding the practical realities of resolving their liabilities to Big Lots and other creditors as part of plan confirmation, the Insider Defendants are using the Debtors' Motion and the protections of the Bankruptcy Code to hold the reorganization hostage, while attempting to secure favorable treatment for the Insider Defendants. *See VFB L.L.C. v. The Money's Trust (In re VF Brands, Inc.)*, 282 B.R. 134, 138 (Bankr. D. Del. 2002) (declining to enjoin litigation against non-debtor defendant, even where it could hold up plan confirmation, where the effect of an injunction would effectively be to release the claim).

Second, as Debtors' own authority demonstrates, courts in the Third Circuit will grant only limited injunctions under section 105, if any, to avoid harming plaintiffs such as Big Lots with legitimate claims against non-debtor defendants. *See., e.g., Univ. Med. Ctr.*, 82. B.R. at 758 (holding that section 105 relief "has typically been limited in time and proceedings impacted thereby"); *Monroe*, 67 B.R. at 757 (granting a § 105 injunction for 30 days, rather than the 90 requested). Here, the Debtors' Motion seeks a stay of indefinite duration, jeopardizing Big Lots' right to seek redress of the wrongs committed by the Insider Defendants. Big Lots' offer of a 90-day moratorium on discovery, as described above (§ II.A.1.), satisfies any legitimate concerns of the Debtors.

Issuing injunctive relief beyond that would be manifestly unjust and would serve only to protect the Insider Defendants.

-29-

C.    **Even if Some Type of Injunctive Relief Were Necessary (It Is Not),
It Should Be Narrowly Tailored.**

Section 105 injunctive relief is unnecessary in this case, especially in light of Big Lots' offer of the 90-day moratorium on discovery previously described. However, in the event that the Court determines that some relief is appropriate, the relief granted should be carefully tailored to protect the Debtors from any undue burden while simultaneously allowing Big Lots to pursue its State Law rights in an appropriate fashion. Big Lots proposes that such a balancing would require the parties to establish a discovery schedule and ground rules in the State Court Action to be overseen if necessary by this Court, in order to protect the Debtors' legitimate reorganization efforts and at the same time afford Big Lots its State Law rights and remedies against the Insider Defendants,

If the Debtors are unwilling to agree to such a reasonable proposal, one may conclude that their motivation is not the legitimate needs of the Debtors, but the self interest of the Insider Defendants. These bankruptcy cases are over a year old, the toy business is entering a quiet season, and there is no basis for delaying the adjudication of Big Lots' claims. The Debtors' request for open-ended and expansive injunctive relief must be denied.

III.    **EVEN IF THE CLAIMS IN THE STATE COURT ACTION WERE
DERIVATIVE (THEY ARE NOT), BIG LOTS SHOULD BE GRANTED
LEAVE TO PROSECUTE HCC'S CLAIMS AGAINST THE INSIDER
DEFENDANTS.**

If this Court finds that any of the counts of the State Court Action are derivative of HCC's estate, and not direct causes of action belonging to Big Lots, this Court should grant Big Lots the authority to pursue claims against the Insider Defendants derivatively on behalf of HCC. Big Lots is the only creditor and potential beneficiary of HCC estate assets. Moreover, Big Lots is the only party in interest in these proceedings that does not possess a conflict of interest in pursuing the State Court Action against the Insider Defendants. Indeed, both the

-30-

Debtors, who are wholly controlled by the Insider Defendants, and the Committee suffer from actual conflicts of interest that render them incapable and ineligible under the Bankruptcy Code from bringing any action on behalf of HCC against the Insider Defendants arising from the Equity Distribution Transaction. Big Lots should, in the end, be permitted to determine its own destiny in recovering from the Insider Defendants, by itself prosecuting the State Court Action. Any other alternative (except perhaps the appointment of a trustee in the HCC case) is irreparably prejudicial to Big Lots and inappropriately rewards the very individuals that caused Big Lots damage. Such a result is unjust, unfair and cannot be condoned by this Court, as a Court of equity, or under the Bankruptcy Code.

**A.    The Debtors, Under the Exclusive Control of the Insider Defendants, Cannot Fairly Investigate or Pursue the State Court Action.**

The Debtors, including HCC, are under the exclusive leadership and control (as board members, officers and owners) of the Insider Defendants. If this Court determines that the HCC estate is the proper plaintiff in the State Court Action, it is obvious that an irreconcilable and actual conflict of interest would exist if the Insider Defendants retained their exclusive control over HCC, and HCC were to maintain the State Court Action, as plaintiff, against the Insider Defendants. *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) ("This situation immediately gives rise to the proverbial problem of the fox guarding the henhouse."); *G-I Holdings, Inc. v. Those Parties Listed on Ex. A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 628 (Bankr. D.N.J. 2004). Such a scenario where the same individuals are on both sides of a lawsuit, acting as a fiduciary on the plaintiff side, and being a deep-pocket defendant with personal liability on the other side, is obviously inappropriate. *Id.* Accordingly, the HCC estate, absent the appointment of a trustee or a

-31-

creditors' committee,[7] is not legally capable of performing its fiduciary obligations in investigating or pursuing the State Court Action.[8]

**B.    The Creditors' Committee Appointed in These Cases Cannot Pursue the State Court Action on Behalf of HCC.**

With Big Lots having resigned, the Committee is comprised solely of creditors of the Operating Subsidiaries, who are not similarly situated to Big Lots. The following facts establish this point:

- Subject to entry of a Court order to the contrary, the creditors of the Operating Subsidiaries are structurally superior in right of payment of their creditor claims to HCC's right of dividends from its equity investment in the Operating Subsidiaries.

- By virtue of such structural superiority, the Operating Subsidiaries must be paid in full before any dividends on HCC's effective ownership of and equity interests in the Operating Subsidiaries can accrue or be paid to HCC, for ultimate distribution to Big Lots.

- The Committee intends to pursue a fraudulent conveyance action for the benefit of the Operating Subsidiaries creditors, and even if the entire $121 million proceeds of the Equity Distribution Transaction were recovered for the Operating Subsidiaries' creditors, those creditors will still be owed tens of millions of dollars. In other words, there is no hope of full payment of those creditors' claims from such a suit.

- The pursuit of the State Court Action by the Committee will place the Committee and its counsel in a position of conflict with the HCC estate, i.e., Big Lots.

---

[7] Since Big Lots is the only unsecured creditor of HCC, appointment of a creditors' committee in the HCC case is not warranted or necessary, especially given Big Lots' willingness to fund the fees and expenses necessary to pursue the State Court Action.

[8] Based on the filing last Friday by Bain Capital Partners (Dkt. # 2038), it appears likely that the prosecution of any litigation against the Insider Defendants, whether in the State Court Action or in this bankruptcy proceeding, will result in a claim being made by the Debtors against the toy manufacturer members of the Committee for price discrimination (e.g., selling toys to Wal-Mart at too low of a price). Because the Committee may fear such a claim (no matter how unmeritorious such a claim might be), the Committee's position in support of the Debtors' Motion should be given little or no weight.

-32-

- The State Court Action can be pursued wholly independently and apart from any fraudulent conveyance suit filed by the Committee.

It is well-settled that a creditors committee owes a fiduciary duty to all the creditors it purportedly represents. *See Shaw & Levine v. Gulf & W. Indus., Inc. (In re Bohack Corp.)*, 607 F.2d 258, 262 n.4 (2d Cir. 1979). Furthermore, Federal Rule of Bankruptcy Procedure 1015(b) requires that prior to entering an order allowing for the joint administration of two or more estates, "the court shall give consideration to protecting creditors of different estates against potential conflicts of interest." Fed. R. Bankr. P. 1015(b). The Bankruptcy Code further provides that "[a]n attorney . . . employed to represent a committee . . . may not, while employed by such committee, represent any other entity having an adverse interest in connection with the case. 11 U.S.C. § 1103(b). Thus, courts have held that the same professionals may not represent entities with interests even potentially adverse to those of the committee. *See In re Proof of the Pudding, Inc.*, 3 B.R. 645, 648-49 (Bankr. S.D.N.Y. 1980).

In *Proof in the Pudding*, for example, the bankruptcy court barred three creditors committees in three separate but related bankruptcies from employing the same counsel. *Id.* at 649. In so holding, the court noted that, due to the related nature of the bankruptcies, counsel for the creditors committees in each would be required to inquire into the debts that each estate allegedly owed to the others. *Id.* at 648. Counsel would be "put into the position of representing conflicting interests" and, therefore, the employment by more than one committee would be improper. *Id.*

In this case, the fiduciary duties of the Committee and its counsel to the general unsecured creditors of the Operating Subsidiaries would conflict with the interests of HCC and Big Lots. HCC, by virtue of its sole unsecured obligation to Big Lots (relating to the Insider Defendants' initial acquisition of the Debtors from Big Lots in 2000) and its status as a holding

-33-

company with no property interests other than worthless equity interests in other Debtors, is unique, and not similar to any of the other Debtors. None of the other holding companies have unsecured creditors of any material amount, if at all, and the Operating Subsidiaries all have business operations and assets, as well as unsecured trade debt. Moreover, because HCC is a separate and distinct corporate entity, HCC has separate and distinct claims against the Insider Defendants in connection with the Insider Defendants' roles at HCC in approving the Equity Distribution Transaction. The fact that the Committee, on behalf of the Operating Subsidiaries' creditors can assert damages against the Insider Defendants for the Insider Defendants' roles in directing the Operating Subsidiaries to consummate the Equity Distribution Transaction does not make the Committee's claims the same or even parallel with Big Lots' claims. As previously set forth, the Operating Subsidiaries' creditors theory of recovery is fraudulent conveyance, while Big Lots' theory of recovery is compensatory damages for direct and tortious conduct of the Insider Defendants in directing HCC to consummate the Equity Distribution Transaction. Unless the Committee collects the full amount of the fraudulent conveyance, $121 million, and all of Big Lots' damages ($56 million), the Committee will be hopelessly conflicted on how to distribute the proceeds. This conflict is even more pronounced if these claims are not fully litigated, and instead, settled for less than a full recovery.[9] To the point, how can a committee of structurally superior creditors, with respect to fraudulent conveyance recoveries, as fiduciaries for those creditors, agree to any settlement that does not pay all creditors in full, as a decision to distribute all such proceeds to the Operating Subsidiaries' creditors, (regardless of the merits and proceeds of Big Lots'/HCC's compensatory damage claims against the Insider Defendants) will be actionable by Big Lots, just as a decision to distribute proceeds to Big Lots at the expense of

---

[9] Certainly Committee counsel does not want to wrestle with this inherent and irreconcilable conflict, and as set forth above, under 1103(b), is not be able to.

-34-

creditors of the Operating Subsidiaries will be criticized.  The same point can be made in strategic and tactical decisions during the course of litigation.  Accordingly, the Committee cannot adequately protect the interests of its own creditor constituency if it is responsible to Big Lots, and vice-versa.

Moreover, while the creditors of the Operating Subsidiaries that the Committee represents may have similar claims, the claims and defenses of those entities differ materially from those of Big Lots.  For example, Big Lots is the only creditor to have been directly and affirmatively misled by the Insider Defendants in connection with the Equity Distribution Transaction.  The creditors of the Operating Subsidiaries received no specific or individualized representations at the time of the Equity Distribution Transaction and in fact may not of even been creditors of the Debtors at the time such transaction was consummated.  By the same token, the Insider Defendants may have additional defenses to the fraudulent conveyance action claims that they do not have to the claims of Big Lots.

As a result of these conflicts and differences, and the limitations imposed on the Committee and its counsel under section 1103(b) of the Bankruptcy Code, neither the interests of the Operating Subsidiaries' creditors nor those of HCC's creditor, *i.e.* Big Lots may be adequately represented by the same counsel, and the Committee, therefore, is not legally able to represent the HCC estate in pursuing the State Court Action.

**C.      Big Lots is Best Positioned to Pursue the State Court Action
          on Behalf of HCC.**

To the extent that this Court finds that the claims Big Lots has raised in the State Court Action constitute derivative claims of HCC, Big Lots should be granted leave to bring such derivative claims on behalf of HCC as the only party in these proceedings whose interests properly align with HCC's interests and duties.  In one of the most recent cases to address this

-35-

issue, one bankruptcy court identified four factors that courts typically apply in determining whether to grant a creditor standing to bring a derivative suit: (1) whether a demand has been made upon the statutorily authorized party to take action (be it the trustee or debtor-in-possession); (2) whether the demand is declined; (3) whether a colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court; and (4) whether the inaction by the trustee or debtor-in-possession is an abuse of discretion in light of the trustee's in the chapter 11 case. *See Canadian Pac. Forest Prods., Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436, 1446 (6th Cir. 1995); *see also In re G-I Holdings*, 313 B.R. at 628.

In this case, Big Lots has not yet made a formal demand upon the debtors, but the Court should excuse this requirement as futile. The Insider Defendants, who own and/or control HCC (and the other Debtors) to whom Big Lots would make a formal demand, are the very parties who were the sole and direct economic beneficiaries of the Equity Distribution Transaction, and have been named as defendants in the State Court Action. Making demand on certain individuals to sue themselves is futile. *In re G-I Holdings*, 313 B.R. at 630; *Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 304 B.R. 214, 222 (Bankr. W.D. Pa. 2004); *Southtrust Bank N.A. v. Jackson (In re Dur Jac, Ltd.)*, 254 B.R. 279, 286 (Bankr. M.D. Ala. 2000). Thus, demand should be excused.

The third element courts look to in deciding whether to allow a party standing to bring a derivative suit on behalf of a debtor focuses on whether the party has pleaded a colorable claim. As to this element, courts generally consider whether the party wishing to bring the derivative action has alleged facts that, if proved, would support a recovery for the estate. *In re*

-36-

*G-I Holdings*, 313 B.R. at 630. Big Lots has certainly met this element, assuming of course that the Court were to conclude that the State Court Action is derivative.

The fourth factor courts consider in determining whether a creditor should be granted standing to bring a derivative claim on behalf of a debtor is whether the failure of the trustee or debtor-in-possession to pursue the claim is an abuse of discretion in light of the duties of a trustee or debtor-in-possession under chapter 11. In this case, the Insider Defendants orchestrated and exclusively benefited from the Equity Distribution Transaction, devastating the Debtors, including HCC, and rendering Big Lots' HCC Note worthless. Yet, the same individuals remain in control of HCC and the other Debtors, and have selfishly exerted that control to shield themselves from liability to the detriment of creditors and in clear violation of their fiduciary duties. If Big Lots' suit is enjoined, it will leave the proverbial fox guarding the KB hen house. Nothing could be a more serious abuse of discretion or a more obvious conflict of interest in light of the fiduciary duties of HCC to its creditor, Big Lots.[10]

In sum, should the Court determine that the State Court Action is derivative of HCC's rights, and not a direct cause of action belonging to Big Lots, the Court should authorize Big Lots to prosecute the State Court Action on HCC's behalf, failure of which will likely doom a recovery for HCC/Big Lots and leave the Insider Defendants with an ill-gotten windfall. Equity abhors such a result.

---

[10] Failure to allow the prosecution of the claims asserted in the State Court Action to proceed, either as the direct claims of Big Lots, or by Big Lots on behalf of HCC's estate, will leave no alternative other than the appointment of a trustee to oversee HCC's creditors' interests.

## CONCLUSION

For the reasons set forth above, the Debtors' Motion should be denied.


Dated: February 28, 2005        Respectfully submitted,

ROSENTHAL, MONHAIT, GROSS
& GODDESS, P.A.


By_____
Kevin Gross (I.D. No. 209)
919 Market Street, Suite 1401
Citizens Bank Center
Wilmington, DE 19801
Tel:  (302)656-4433
Fax: (302)658-7567

And

Jeff J. Marwil, Esq.
James A. McKenna, Esq.
Anders C. Wick, Esq.
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
Tel: (312)222-9350

Attorneys for Big Lots Stores, Inc.


-38-