UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* <br><br> KB TOYS, INC., *et al.*, <br><br>　　　　　　　　　　　Debtors. <br><br> KB TOYS, INC., *et al.*, <br><br>　　　　　　　Plaintiff(s), <br><br>　　　v. <br><br> BIG LOTS STORES, INC., <br><br>　　　　　　　Defendant. | Chapter 11 <br><br> Case No. 04-10120 (DDS) <br> (Jointly Administered) <br><br><br><br> Adv. Proc. No. 05-50475 (DDS) |

### REPLY IN SUPPORT OF THE DEBTORS' MOTION FOR PRELIMINARY INJUNCTION STAYING PROSECUTION OF CERTAIN ACTION

KB Toys, Inc., and the other above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by their undersigned attorneys, submit this reply (i) in response to Big Lots Stores, Inc.'s ("Big Lots") response (Docket No. 13) (the "Big Lots Response") to the Debtors' motion for a preliminary injunction pursuant to Sections 105(a) and 362(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 7065 of the Federal Rules of Bankruptcy Procedure (Docket Nos. 4 and 5) (the "Motion"), and (ii) in support of the Debtors' Motion which seeks to enjoin Big Lots from continuing to prosecute the complaint (the "Complaint") it filed on or about February 9, 2005 in the Court of Chancery of the State of Delaware, styled as *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC, et al.* (the "Big Lots Action") against current and former officers and directors of the Debtors named therein (the "KB Defendants").

## PRELIMINARY STATEMENT

In its response, Big Lots unsuccessfully attempts to shoehorn the claims it alleges into direct claims. The nature of the wrong alleged by Big Lots is that the defendants took actions that rendered Big Lots' obligor, Havens Corner Corporation ("HCC") insolvent, thereby impairing HCC's ability to pay a promissory note owing to Big Lots. The nature of this wrong is a wrong to the corporation, not to the individual creditor whose claim is not paid. Big Lots argues that the KB Defendants' actions were directed solely at Big Lots. Big Lots' Complaint, however, does not allege facts, which support any specific promises of HCC or the KB Defendants to Big Lots that were breached, which under Delaware law is a critical and necessary element of a direct claim.

The Delaware case law is clear that, in order to plead a direct claim, a plaintiff must demonstrate that he or she can prevail *without showing an injury to the corporation*. Big Lots' claims, however, are entirely dependent on harm to the Debtors. At the core, Big Lots alleges that the Debtors were rendered insolvent, thereby making them unable to pay Big Lots. This is a classic derivative claim.

Big Lots entirely avoids the question of whether the Complaint pleads fraudulent conveyance claims in substance. The case law is clear that courts look to the substance of allegations, not their form. The substance of all of Big Lots' claims, other than Count VII, are fraudulent conveyance claims, breach of duty to the corporation claims, aiding or abetting such behavior or conspiring to commit such behavior.

Big Lots seeks to evade the claim that it has violated the automatic stay by taking action, which will result in the depletion of the Policy (defined below) which belongs to the Debtors by arguing that the policy is not property of estate, and is not implicated. This, however, is simply incorrect to the extent any claims are made against the policies for defense costs or otherwise.

Alternatively, the Big Lots Action should be stayed in accordance with the Court's powers under Section 105(a) of the Bankruptcy Code. The Debtors are at such a critical stage in their Chapter 11 cases that the Big Lots Action poses a real and substantial threat to the Debtors' reorganization. Big Lots has named as defendants almost the entire senior management team of the Debtors. The day-to-day portion of the management team will be distracted from their critical reorganization efforts and the board of

directors has threatened to resign if these Chapter 11 cases devolve into nothing more than litigation. The Debtors are fearful that these estates will be irreparably harmed if the business part of the Chapter 11 cases is not resolved before litigation becomes front and center. Accordingly, the Big Lots Action should be stayed to prevent irreparable harm to the reorganization.

## REPLY

### I. The Automatic Stay Enjoins the Big Lots Action

#### A. The Big Lots Action Asserts Derivative Claims That Are Property of the Estate

Big Lots contends that its claims are not derivative because the KB Defendants' allegedly wrongful conduct was directed "towards Big Lots." *See* Big Lots Response, p. 11. Other than conclusory statements, however, Big Lots does not point to any alleged acts by the KB Defendants which were directed specifically at Big Lots other than the allegations in Count V concerning a letter certifying the amount of HCC's net worth after giving effect to the Recapitalization Transaction (as defined in the Debtors' Verified Complaint). As the Debtors explained in their opening brief, the form of Big Lots' allegations does not govern the derivative/direct claim analysis, only the substance of the allegation is important. *See Goldin v. Primavera Familienstiftung, TAG Assocs., Ltd. (In re Granite Partners, L.P.)*, 194 B.R. 318, 325 (Bankr. S.D.N.Y. 1996) at 325. At its core, the Big Lots Action alleges that the KB Defendants' acts (in the form of the Recapitalization Transaction) rendered the Debtors' insolvent, which, in turn, caused Big Lots to be damaged. This states a classic derivative claim.

Big Lots agrees with the Debtors that the derivative/direct claim analysis is governed by the *Tooley* inquiry: "[w]ho suffered the alleged harm — the corporation or the suing stockholder individually — and who would receive the benefit of the recovery or other remedy?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del. 2004). This two-pronged analysis shows all Counts of the Complaint, other than Count VII (the "Estate Claims") are derivative claims. These Counts are predicated on harm that was done to the Debtors as a whole, not to harm directed at Big Lots. It follows that, if the Big Lots Action is entitled to damages, such damages should properly go to all of the Debtors' creditors as a whole, and not just Big Lots.

*The Debtors as a Whole Allegedly Suffered the Harm.* In *Tooley,* the court explained that a direct claim will exist — when "[l]ooking at the body of the complaint and considering the nature of the wrong alleged and the relief requested [—] the plaintiff [has] demonstrated that he or she can prevail without showing an injury to the corporation." *Id.* (quoting *Agostino v. Hicks,* 845 A.2d 1110 (Del. Ch. 2004)). It is clear that Big Lots cannot prevail on the Estate Claims without showing harm to the Debtors.

In the Complaint, Big Lots alleges that:

> [T]he sources of these insider payments were substantially all of the KB Companies' cash on hand and many millions in dollars in loans secured against the Operating Subsidiaries and *thereby from HCC.* The actions of the Defendants Glazer and Feldman in assuring a windfall equity return while leaving the KB Companies insolvent and unable to pay their obligations as they matured, *proximately resulted in HCC's inability and failure to repay the HCC Note.*
> Complaint ¶ 9 (emphasis added).

The Complaint further alleges in paragraph 29 that: "(1) the Operating Subsidiaries" borrowed the funds underlying the Recapitalization Transaction; "(2) the Operating Subsidiaries made millions of dollars of bonus payments" to the KB Defendants; and (3) the KB Defendants caused the Debtors to "up-stream" the Recapitalization Transaction funds past HCC to its parent in order to be paid as dividends. Complaint ¶ 29. Thus, the nature of the harm alleged in the Big Lots Action is that the Debtors were rendered unable to pay their debts which derivatively harmed Big Lots like any other creditor. Big Lots cannot prevail on the Complaint without showing injury to the Debtors.

*Who Should Receive the Benefit of Big Lots' Claims.* Since the core of Big Lots' assertions is that the Debtors were harmed, any resulting recovery for these claims should go to the Debtors. Big Lots argues that it is somehow entitled to the damages on its claims because — if the estates were successful in their prosecution of these claims — Big Lots would not be entitled to the benefit of the proceeds. *See* Big Lots Response, p. 14. Big Lots argues that since it is structurally subordinated to the creditors of the operating subsidiaries and because the operating subsidiaries were the source of the payments complained of by Big Lots, any recovery from the claims asserted by the Debtors' estates will inure to the benefit of the operating subsidiaries' creditors and will not reach Big Lots. Big Lots' argument underscores the

4

Debtors' point. Because the value came from the operating subsidiaries, their bankruptcy estates are the proper plaintiffs to seek damages for the Recapitalization Transaction.

*The Caselaw Demonstrates that These Are Derivative Claims*. Contrary to Big Lots' assertions, the Delaware Chancery Court's decision in *Production Resources Group, L.L.C. v. NCT Group, Inc.*, supports the Debtors' view that Big Lots is asserting derivative claims. 863 A.2d 772 (Del. Ch. 2004). In *NCT*, the Delaware court found that most of the breach of duty claims alleged by the unpaid creditors were derivative in nature. The court allowed for the possibility that under extraordinary facts that a direct claim "might" exist if a creditor alleges facts that show that specific promises to the creditor were breached *id.* at 800, or "a marked degree of animus towards a particular creditor" *id.* at 798. Big Lots has not alleged such facts (nor could it).

In *NCT*, after the judgment creditor had been frustrated for years attempting to collect its judgment, it filed an action in Delaware state court seeking, among other things, damages against the judgment debtor's directors for breach of their fiduciary duties/mismanagement. The thrust of the creditor's complaint was that (i) the directors mismanaged the judgment debtor, causing it to lose significant value, and (ii) that the judgment debtor was being managed in such a way as to prevent this specific creditor from collecting on its judgment.

The judgment creditor in *NCT* alleged a number of disturbing facts about the judgment debtor's capital structure and liquidity. The judgment debtor had issued over 100 million shares of stock more than it was authorized to issue under its charter (and obligated itself to issue billions of additional shares). The judgment debtor's financials demonstrated that it was "balance sheet" insolvent at all relevant times. The judgment debtor was allegedly being funded by a former director's wife in exchange for issuing certain promissory notes to her.[1] The judgment debtor had defaulted on and refinanced a number of these promissory notes. As a result of this financing arrangement, by the time the complaint was filed in

---

[1] The court seemed particularly concerned that the debtor's financial sponsor had no apparent means of financial support

Delaware, the financial sponsor had received significant liens on the judgment debtor's assets and controlled over 1.2 billion shares of the judgment debtors' stock (nearly twice the amount authorized by the debtors' charter). It was apparent that the court had concerns about the legitimacy of the debtor's financing, and whether the financing was being used — as a vehicle to frustrate the creditors' collection efforts.

In *NCT*, the court found that the judgment creditor's breach of fiduciary claims and mismanagement claims were derivative in nature. Because the facts in that case were so egregious, the court left open the possibility that the judgment creditor could prove a direct claim. The court specifically stated that "there might, possibly exist circumstances in which the directors display such a marked degree of animus towards a particular creditor with a proven entitlement to payment that they expose themselves to a direct fiduciary duty claim by that creditor." *Id.* at 798.

The Big Lots Action does not approach the factual allegations in *NCT* and lacks any indication of a "marked degree of animus" towards Big Lots. Big Lots has not asserted any specific action taken by the Debtors to frustrate the collection of its debt (beyond the Debtors' financial inability to pay). Indeed, Big Lots has not alleged, because it cannot, that the note was in default or was due and payable at any time prior to commencement of these Chapter 11 cases. In *NCT*, the debtor's entire capital structure and method of financing was allegedly devoted to frustrating the creditor's collection efforts.

Further, Big Lots admits in the Complaint that it had no contractual or other right to block the Recapitalization Transaction. *See* Complaint ¶ 30. Thus, the Debtors could not have taken steps to frustrate Big Lots' rights or induce Big Lots to waive certain rights — it had none. Unlike in *NCT* where it was alleged that the entirety of NCT's business was operated in a way to avoid paying a creditor, here all that happened was HCC declared and paid a dividend. If the dividend was improper, the estates have their remedies, but it is not the type of manipulative behavior alleged in *NCT*. The only right that Big Lots had was to be paid on its debt, a right that it shared with all other creditors equally.

Big Lots also argues that *Parnes v. Balley Entertainment Corp.* supports its assertion that its claim was direct. However, the Third Circuit has specifically limited *Parnes* to only those cases

6

involving a merger. *See Furst v. Feinberg*, 2002 WL 31831545, *4 (3rd Cir. 2002) (upholding the finding of the lower court that the scope of *Parnes* is limited to merger transactions). The Recapitalization Transaction was not a merger and therefore *Parnes* is not applicable.

Big Lots also argues that *Official Unsecured Committees' Committee of Phar-Mor, Inc. v. Bowen (In re Phar-Mor, Inc. Sec. Litig.)* supports its claim that these are derivative claims. *Phar-Mor* is distinguishable from the instant case. In that case, a group of equity holders commenced an action against the former accountants of the debtor. The plaintiffs in that case argued that they would not have invested in the debtor's equity but for the accountants' fraudulent financial statements. That case did not involve alleged harm to the debtors, only to the equity holders. Equally fundamental is that the claims in *Phar-Mor* were not against *Phar-Mor's* officers and directors. This is the reverse case, Big Lots has alleged that the KB Defendants caused the Debtors to enter into the Recapitalization Transaction, which harmed the Debtors.

### B. The Complaint Pleads Fraudulent Conveyance Claims that Properly Belong to the Debtors' Estates

Big Lots hardly contests that Counts IV, VI and VIII of its Complaint are essentially fraudulent conveyance claims owned by the estates in violation of Section 362(a)(3) of the Bankruptcy Code. Big Lots' only response is that "it is not asserting a claim for fraudulent conveyance or seeking rescissory damages." *See* Big Lots Response, p. 3. Big Lots misses the point. It is not how a claim is plead or what damages it asserts, courts look to the nature of the wrong alleged. *See Granite Partners*, 194 B.R. at 325.

The central question that Big Lots fails to address is how Counts IV, VI and VIII are substantively different from fraudulent conveyance claims. Fraudulent conveyance claims avoid transfers by the debtor that are made in exchange for less than fair value, if the debtor is either unable or rendered unable to pay its creditors. Counts IV, VI and VIII in the Big Lots Action are indistinguishable from any fraudulent conveyance claims that an estate representative could bring in these cases. In Count IV, Big Lots alleges that the Recapitalization Transaction (for which the Debtors did not receive a benefit) rendered the Debtors insolvent and unable to pay Big Lots. In Count VI, Big Lots asserts that the KB

Defendants' conspired to receive a benefit from the Recapitalization Transaction rendering the Debtors insolvent and unable to pay Big Lots. In Count VIII, Big Lots alleges that the KB Defendants' intentionally rendered the Debtors insolvent and unable to pay Big Lots. Each of these claims is merely a thinly disguised fraudulent conveyance claim.

The case *In re Swallen's, Inc*, 205 B.R. 879, 883 (Bankr. S.D. Ohio 1997) illustrates the Debtors' point. In *Swallens*, the creditors' committee asserted fraudulent conveyance claims against former equity holders of the company for claims arising out of a prepetition equity sale to a third party. *Id.* at 881. The creditors' committee settled these claims. After the settlement, a group of noteholders commenced an action in state court against the former equity holders alleging "fraud and breach of duty," "tortious interference with contractual relationships," and breach of duty for "failure to disclose" the financial impact of the transaction at issue. The plaintiffs in that case argued, much like Big Lots, that their claims were not property of the estate because those actions were commenced against non-debtors and sought money damages. The *Swallens* court found that the plaintiffs in that case did violate the stay by asserting estate claims. It found: "[t]hough [the plaintiffs] assert that they seek only damages, any recovery may well have to be paid out of the proceeds of the putative fraudulent transfers upon which debtor and the [the creditors' committee] base their claim against the [equity holders]. The [plaintiffs'] litigation is violative of the spirit as well as of the letter of § 362."

Counts IV, VI and VIII of the Big Lots Action are indistinguishable from *Swallens*. In fact, the plaintiffs in that case made the same arguments that Big Lots now makes; namely, that it only seeks money damages and it does not assert fraudulent conveyance claims. The plaintiffs in *Swallens* like Big Lots elevate form over substance, which is exactly what courts will not do in analyzing whether claims belong to the estate. Like *Swallens*, Big Lots is stayed from appropriating estate claims for its own benefit to the detriment of all other creditors. This case is particularly inappropriate because Big Lots has admitted that it is structurally subordinate to the claims of other unsecured creditors at the operating company level (where the funds for the transfer originated). *See* Big Lots Response, p. 14.

In a effort to disguise the derivative claims it asserts, Big Lots attempts to focus on only one part of the Recapitalization Transaction — the fact that the funds were upstreamed past HCC without stopping to pay the HCC debt to Big Lots (or for that matter, any other creditor of HCC or a subsidiary of HCC). It ignores that the value originated in and derived from the assets of the operating companies. It also ignores the fact that a large portion of the funds at issue were paid to management by the operating subsidiaries and were never upstreamed to HCC. Big Lots' argument is contrary to applicable case law that analyzes multi-step transactions like the Recapitalization Transaction by collapsing them and treating them as one transaction. *United States v. Tabor Realty Corp (In re Tabor Realty Corp.)*, 803 F.2d 1288, 1302 (3d Cir.1986) (affirming district court's decision to collapse several transactions into each other in order to determine whether they constituted a fraudulent conveyance). When the Recapitalization Transaction is viewed as one integrated transaction, it becomes plainly clear that the claim complained of by Big Lots is property of the operating subsidiaries where the funds originated.

Big Lots' argument is flawed in another important respect. Big Lots argues simultaneously that the Debtors should not have paid a dividend to the KB Defendants, but instead should have paid Big Lots on its note. It is unclear how Big Lots can contend that the dividend from its operating subsidiaries to HCC was appropriate, but the dividend to the KB Defendants was inappropriate — which is the practical effect of allowing Big Lots to collect on its claims.

Thus, regardless how Big Lots' casts its claims, it attempts to appropriate estate claims is a violation of Section 362(a)(3) of the Bankruptcy Code.

### C. The Insurance Policy and its Proceeds are Property of the Debtors' Estates and Are Protected By the Automatic Stay, Which Big Lots Has Violated

Big Lots denies that prosecuting the Complaint is an attempt to obtain possession of, or to exercise control over, property of the Debtors estates and thereby a violation of the automatic stay. *See* Big Lots Response, p.17. However, the five arguments asserted by Big Lots in support thereof are incorrect:

9

First, Big Lots asserts that the insurance *policy* at issue (the "Policy") does not belong to the Debtors. Big Lots Response, p.18. Endorsement #1 of the Policy specifies that KB Holdings, Inc. ("KBH") is a named insured under the Policy with its own line of coverage of $10 million. The "Insureds" under the Policy include not only KBH, but its subsidiaries (which include all of the Debtors). Thus, the Debtors do not share their $10 million of insurance coverage with any other party. The insured-insuror relationship runs solely between KBH and the named insurer. This is the Debtors' insurance, and property of their estates.

Second, Big Lots asserts that the Big Lots Action does not diminish the Policy's coverage because defense and indemnification for the claims asserted by Big Lots are excluded from coverage under the Policy. Big Lots Response, p.18. This argument puts the cart before the horse, because it assumes that Big Lots' claims are valid and correctly characterized, something which is clearly in dispute and may never be proven. If Big Lots fails in its claims, however, it is incontrovertible that the Debtors' estates will have been harmed, because claims have already been filed against the Policy and the coverage will be diminished by the amount of the KB Defendants' defense costs. Even the claim against Glazer under Count VII is likely to diminish the proceeds of the Policy because Glazer will surely claim that he is being sued for activity he took as an officer and director of the Debtors which would entitle him to defense costs. For each dollar paid to the KB Defendants for their defense, the coverage available to the Debtors' estates is reduced by one dollar.

Third, Big Lots asserts that the Debtors' coverage will only be diminished if the Debtors' actually indemnify the KB Defendants, which Big Lots claims the Debtors are prohibited from doing under Delaware law. This argument also puts the cart before the horse. The Policy includes three types of coverage: (1) direct coverage to the directors, officers and employees; (2) coverage to the Debtors for indemnification payments they may make to their directors, officers and employees; and (3) coverage to the Debtors for (non-indemnification) claims brought against them directly. To the extent anything is paid on account of the defense of Big Lots' Complaint, the amount of coverage available in the event the Debtors' estates bring actions against the KB Defendants (or other insureds) will be reduced. By

10

prosecuting the Big Lots Action, Big Lots has unilaterally placed the estates' coverage at risk even if the Big Lots Action is not successful.

Fourth, Big Lots asserts that the Debtors' interest in the coverage is too "attenuated," to make the coverage property of the estate, because "only in the case that insurance proceeds will actually be paid to a Debtor do proceeds become property of the estate." *See* Big Lots Response, p. 19. As a basis for that conclusion, Big Lots alleges that the Debtors' "lack any claims by which the Policy proceeds would become their property." Big Lots Response, p. 19. This argument ignores the real possibility that a representative of the Debtors' estates will be a plaintiff in claims against the KB Defendants, in which case the Debtors' estates and Big Lots will be directly competing for policy proceeds. The current case is quite different from the *Allied Digital* case relied upon by Big Lots. *See In re Allied Digital Technologies Corp., et al.*, 306 B.R. 505 (Bankr. D.Del. 2004). In *Allied Digital* the trustee was suing the bankrupt estates' former officers and directors. Because of statute of limitations reasons there could be no claims asserted against the Debtors. There, unlike this case, the trustee was not competing with another claimant (other than an insured) for policy proceeds. There, unlike in this case, the time within which claims could be asserted has not expired.

Fifth, Big Lots asserts that the policy is not necessary for the Debtor's reorganization, because there are no claims directly against the Debtors that would be covered by the Policy. Big Lots Response, p. 24. Indeed, this is true *at the moment*, but the Debtors have not confirmed a plan and obtained a discharge. Nor would it be appropriate for the Debtors to admit that there are potential claims against them directly. That said, it is no secret that the Recapitalization Transaction is one source of controversy involving the Debtors, as evidenced by the Committee's proposed suits and the Big Lots Action. The Debtors coverage for direct claims is fairly broad and could be implicated in any direct action against the Debtors arising out of that Recapitalization Transaction.

**II.    The Automatic Stay Should Be Extended to Temporarily Enjoin This Action.**

    **A.    The Big Lots Action Threatens the Debtors' Reorganization**

Big Lots does not contest the Debtors' assertion that these cases are at a critical juncture. Instead, it argues that the Big Lots Action will not have a significant impact on the Debtors' estates if allowed to continue at this time. Big Lots is simply wrong. Should the Big Lots Action continue, given what needs to be accomplished by the Debtors in the near term, it will undoubtedly irreparably harm the Debtors' rehabilitation efforts. The Debtors' board of directors and management (excluding Robert White), and in particular Michael Glazer and Robert Feldman, are actively involved in the Debtors' restructuring initiatives and operating the Debtors' business on a day-to-day basis. The Debtors' management is currently spending nearly all of their time and efforts developing business and financial plans, engaging in discussions with the Creditors' Committee and possible plan funders, and moving towards a plan of reorganization or other bankruptcy alternatives. Achieving these goals is demanding and will continue to consume all of the management's time and resources.

Big Lots has sued all of the Debtors' most-senior leadership (with one exception). Filing of Big Lots' Complaint precipitated the Creditors' Committee's filing of its standing motion, which is also now before this Court. The Debtors' ability to persuade the Creditors' Committee to stand down from proceeding with its standing motion is hindered by the Creditors' Committee's concern that if the Court does not enjoin the Big Lots Action and there is a race to the courthouse with respect to the Debtors' assets, Big Lots should not have a head start. The Debtors' board of directors has stated that they will resign if these Chapter 11 cases devolve into nothing more than litigation. The Debtors' employees and, in particular, the Debtors' management who are KB Defendants, will be consumed by such litigation. Even with the proposed limitation on discovery offered by Big Lots, that it would not seek discovery from the Debtors or their officers or directors for 90 days, the Debtor and senior management will be distracted by this $50 million lawsuit, which would still be able to proceed with third-party discovery, which would require the active participation of all of the KB Defendants. Moreover, all of the KB Defendants will have to respond to or otherwise answer the Big Lots Action, further distracting the Debtors' management. Should the Big Lots Action be permitted to continue at this time, the Debtors' loss of senior management will certainly irreparably harm the Debtors' rehabilitation efforts.

12

The Big Lots Action will also have a serious impact on the key employees of the Debtors. These individuals will undoubtedly be asked to provide the entirety of the information for the Big Lots Action. The Debtors have already reduced their management staff by close to 30% over the past year. The Debtors' leadership team and their employees have all taken on substantially increased operational responsibilities.

Big Lots' assertion that the Debtors will not be burdened by this additional $50 million litigation is simply untenable. Big Lots has commenced its action (and is fighting to prevent this Court from staying its action) to achieve maximum leverage over the plan process. Big Lots recently resigned from the Creditors' Committee at the same time that it filed the Complaint. Big Lots knows all-too-well the effect that this litigation will have on the success of these Chapter 11 cases and is exploiting that knowledge.

Undoubtedly, if the Big Lots Action is allowed to proceed, the strain on management and the Debtors' staff will be great, at a time that the Debtors can least afford it. Thus, if permitted to continue the Big Lots Action will irreparably harm the Debtors' estate.

### B. Extending the Stay through a Supplemental Injunction under Section 105 that enjoins further prosecution of the Big Lots Action will Benefit the Estates by Protecting their Valuable Interest in Insurance Coverage

In the event the stay does not apply to the Debtors' interest in the Policy proceeds, the Debtors have requested a supplemental injunction under §105 of the Bankruptcy Code to extend the effect of the stay to protect the insurance proceeds by enjoining the Big Lots Action (Counts II and IV of Debtors' Complaint). In response Big Lots made two arguments:

First, Big Lots asserts that the Debtors' $10 million in insurance coverage does not merit protection when compared to the size of Big Lots $50 million claim plus the Committee's $120 million claim. Big Lots Response, p.25. In essence, this is an argument about the balance of harms, in which regard, the greater harm falls upon the Debtors' estates. Each day that passes in which defense costs are accrued by the KB Defendants in defense of an unstayed Big Lots Action, the coverage limits available to protect the Debtors and their estates from other claims is reduced. In contrast, each day that Big Lots is enjoined from prosecuting the Big Lots Action there is no harm. In fact, it has taken Big Lots almost

13

three years since the Recapitalization Transaction to bring the Complaint — and Big Lots has not alleged that it will suffer any harm if the Big Lots Action is stayed. Instead, Big Lots' efforts are devoted to speculation about why the Debtors may not be harmed if the injunction is not granted.

Second, Big Lots argues that even if the Policy coverage is exhausted by Big Lots' and Creditors' Committee's claims against the KB Defendants, the KB Defendants have non-insurance resources with which to defend themselves, and therefore the estate will not be harmed. Big Lots Response, p.25. Big Lots has not provided any evidence concerning the KB Defendants' resources. Moreover, Big Lots offers no explanation why it should be entitled to all of the Policy proceeds and the estates left to the uncertainty of collecting a judgment. Finally, Big Lots' argument also fails to account for the direct coverage of the Debtors under the Policy, which coverage is drawn from the same policy limit as the coverage afforded to the KB Defendants under the Policy. No amount of wealth of Bain or the KB Defendants can replace this insurance for the Debtors if it is dissipated in defense of the Big Lots Action.

### C. If the Big Lots Action Remains Unstayed, Debtors and their Estates will be Compelled to Participate in that Litigation Notwithstanding the Automatic Stay in Order to Protect Themselves and their Claims from Any Preclusive Consequences of that Litigation and Testimony Given Therein.

If Big Lots is permitted to continue to prosecute the Big Lots Action, the Debtors and their estates will be irreparably harmed, either because the Debtors will be forced to (a) not participate in the Big Lots Action, thereby exposing themselves to risks of collateral estoppel and other preclusive effects of that litigation and related testimony, or (b) forgo the benefits of the automatic stay by voluntarily participating in the Big Lots Action in order to protect their interests.

Big Lots argues that collateral estoppel is not a legitimate concern of the Debtors, because: "Big Lots' claims are based on the fraudulent conduct of the non-debtor Insider Defendants, which conduct was directed at Big Lots. The Debtors are simply not part of that equation." Big Lots Response, p. 26. In making this bold assertion, Big Lots conveniently overlooks the similarity between its claims and the claims (including claims for fraudulent conveyance) that a representative of the estates may want to bring on behalf of the Debtors' estates. For example, the Creditors' Committee has indicated that the claims it

14

is considering are premised on the Recapitalization Transaction being "effected during the zone of insolvency or when the Debtors were insolvent, or, alternatively, the Transaction rendered the Debtors insolvent." Creditors' Comm. Mot. ¶¶16. Obviously, the key fact of such claims will be the Debtors' solvency or insolvency before and after the Recapitalization Transaction. Similarly, as an element of *each* of its eight claims, Big Lots' must show that the Debtors were insolvent or rendered insolvent:

- **Big Lots Count I.** "The Equity Distribution Transaction rendered HCC **insolvent and unable to pay** its obligations as they matured, and Glazer and Feldman knew the Equity Distribution Transaction would render HCC **insolvent and unable to pay** its obligations as they matured." Big Lots Complaint, ¶ 46.

- **Big Lots Count II.** "The Equity Distribution Transaction rendered HCC **insolvent and unable to pay** its obligations as they matured, and the Bain Director Defendants knew or should have known that the Equity Distribution Transaction would render HCC and the other KB companies **insolvent**." *Id.*, at ¶ 53.

- **Big Lots Count III.** "The Bain Director Defendants and the Bain Defendants knew or should have known that the Equity Distribution Transaction would render HCC and the other KB Companies **insolvent and unable to pay** their obligations" *Id.*, at ¶61. "The Bain Director Defendants and the Bain Defendants actions in aiding and abetting Glazer and Feldman' breaches of fiduciary duty injured Big Lots by causing HCC to be **unable to repay** the principal and interest on the HCC Note." *Id.*, at ¶65.

- **Big Lots Count IV.** "Each of these payments [the Equity Distribution Transaction] constituted a benefit to the Bain Defendants, Glazer and Feldman for which the KB companies did not receive any consideration, at a time when all Defendants knew of the HCC Note and that, a result of the Equity Distribution Transaction, HCC was **insolvent and unable to pay** its obligations as they matured." *Id.*, at ¶69.

- **Big Lots Count V.** "To induce Big Lots to cooperate with and not object to the Equity Distribution Transaction, Defendant Feldman wrote to Charles Haubiel, General Counsel of Big Lots, on or about April 23, 2002, certifying that following the Repurchase Agreement, which was undertaken as part of the Equity Distribution Transaction, KB Holdings would have "a **consolidated net worth of not less than $20,000,000**. Feldman's representation was false. In fact following the Equity Distribution Transaction, KB holdings was **insolvent**." *Id.*, at ¶¶73-4.

- **Big Lots Count VI.** "Pursuant to this conspiracy, Defendants Glazer and Feldman prepared and provided to Houlihan materially misleading information and projections to support the Equity Distribution Transaction; and, with the Bain Director Defendants, approved that transaction, thereby rendering HCC **insolvent** and allowing HCC to bypass payment of Big Lots' debt in favor of legally subordinate equity dividends. Big Lots was injured by the actions undertaken as part of this conspiracy because HCC was rendered **insolvent and unable to repay** the HCC Note as a result of the Equity Distribution Transaction." *Id.*, at ¶¶82-3.

- **Big Lots Count VII.** "Glazer's conduct in planning and implementing the Equity Distribution Transaction which rendered the HCC Note valuele4ss breached his duty of loyalty to Big Lots

because Glazer derived personal benefit from the Equity Distribution Transaction. In addition, Glazer knew or should have known that the Equity Distribution Transaction would render HCC **insolvent** and failed to convey to his fellow Big Lots' directors..." *Id.*, at ¶87-8.

- **Big Lots Count VIII.** "The defendants' planning and implementation of the Equity Distribution Transaction was intentional conduct that rendered HCC **insolvent**, rendered HCC's **performance of its obligations under the HCC Note impossible**, and caused HCC to default on the HCC Note." *Id.*, at ¶94.

The claims themselves reveal the real risk that the requisite identity of subject matter and issues for collateral estoppel exists between the Big Lots Action and the claims the estate may bring. *See*, In re American Film Technologies, Inc., 175 B.R. 847, 849 (Bankr. D.Del. 1994).

If Big Lots is allowed to proceed with the Big Lots Action and then fails to prove that the Debtors were insolvent, as it must prove if it is to succeed on any of its claims, the Creditors' Committee or other representative of the estates that is later pursuing any claims of the estate, such as fraudulent conveyance claims, which also depend on a finding of insolvency, may be estopped from proving this element of their claims by the prior adjudication in the Big Lots Action of the question of the Debtors' solvency. *See*, Sudbury, inc. v. Escott, 140 B.R. 46, 463 (Bankr.N.D. Ohio 1992) (because claims were premised on defendants' alleged fraud while acting as officers and directors of the debtor, it was not plausible that the defendants could be found liable except on facts that would impose liability on the debtor). Thus, allowing Big Lots to proceed now on claims that are at the core of the claims the estate may yet bring is effectively the same as giving control over the estates' claims to Big Lots, with the estate receiving in return none of the benefits if Big Lots is successful but all of the costs if Big Lots fails.

Surely, whether collateral estoppel would actually arise from the Big Lots Action is a complicated question of law that depends also in part on how the Big Lots Action actually proceeds and the positions the KB Defendant's take with respect to their relationships with the Debtors, but the risk is real. As the Third Circuit recently observed when considering these same issues and arguments in another case, the plaintiff's theory that the debtor would not be harmed by collateral estoppel by absenting itself from litigation against the debtor's agent should not be tested at the debtor's peril. In re W.R. Grace & Co., 115 Fed.Appx. 565, 2004 WL 2404546 (3rd Cir.). In that court's view, questions of

collateral estoppel arising from a suit against a debtor's agent were "mere supposition at this juncture" (*Id* at 569) and "at least unclear" (*Id*. at 569, n 4, *citing* United Nat'l Ins. Co v. Equip. Ins. Managers No. 95-CV-0116, 1997 WL 241152, 1997 U.S. Dist. LEXIS 6177, at *11-13 (3d Cir. May 6, 1997); American Film, 175 B.R. 847; and In re Johns-Manville Corp., 40 B.R. 219, 225 (S.D.N.Y 1984)), and thus it was prudent for the court deciding the merits to err in favor of the debtor's desire to protect itself from this collateral estoppel risk by enjoining the plaintiff. Moreover, the Third Circuit observed:

> Courts have never adopted the absence of collateral estoppel as the test for preventing actions from proceeding against third parties when the debtor is protected by the automatic stay. Rather, courts employ a broader view of the potential impact on the debtor. The standard for the grant of a stay is generally whether the litigation "could interfere with the reorganization of the debtor," In re A.H. Robbins Co., 828 F.2d 1023, 1025 (4th Cir. 1987) or "would interfere with, deplete or adversely affect property of [the] estates or which would frustrate the statutory scheme of chapter 11 or diminish [the debtor's] ability to formulate a plan of reorganization" In re Johns-Manville Corp., 26 B.R. 420, 436 (Bankr. S.D.N.Y. 1983)

Even without the risk of collateral estoppel, the Debtors and the KB Defendants would likely feel compelled to participate in the Big Lots Action, absent a stay, in order to avoid other non-collateral estoppel preclusive consequences possibly prejudicial to them and their estates. For instance, to prove insolvency in their respective actions, Big Lots and the Creditors' Committee or other estate representative will inevitably want the testimony of the same persons. As the Third Circuit observed in W.R. Grace, 115 Fed Appx. at 569 n.4, *citing* Johns-Manville, 40 B.R. at 225, witness testimony can have an adverse and preclusive effect on the absent, non-party debtor. The court in Manville explained:

> Once a witness has testified to a fact, or what sounds like a fact, that witness may be confronted by his prior testimony under oath in a future proceeding directly involving [the debtor], whether or not [the debtor] was a party to the record on which the initial testimony was taken. Once an admission against interest is made, under oath or otherwise, by the agent of a party, that admission stands for all time. No matter what [the plaintiff] may stipulate, the thousands of other claimants and cross-claimants who are after [the debtor's] assets, would be entitled to use the product of such discovery

The Debtors' officers and directors will undoubtedly defend the Big Lots Action by claiming that the Debtors were solvent at all relevant times, and that they were not aiding and abetting or conspiring,

17

but rather acting at the Debtors' direction. Another person may seek to impute these admissions to the Debtors or their estates, which could be harmful to any claims brought by the Creditors' Committee or other estate representative. Even where the witness or deponent is not an employee, officer, director or agent of the Debtors, or one of the KB Defendants and the issue is not a party admission, once a witness has given testimony one way, in an effort to be consistent, the witness is likely to give the testimony the same way a second time, or if the testimony changes, its value is undermined. Thus, to protect the record, the Debtors will inexorably have to participate in the discovery of the KB Defendants and of other witnesses with information about the Debtor's solvency and intentions with respect to the Recapitalization Transaction, such as the Debtor's financial advisor at the time who rendered the solvency opinion.

### III.  Big Lots Request for Authority to Prosecute the Big Lots Actions Should be Denied

Big Lots' request for authority to prosecute the Big Lots Action should be denied because it is procedurally flawed. In the Big Lots Response, as a form of "cross-motion", it requests authority to prosecute a $50 million claim on behalf of all creditors without having notified any of them of this request. Once Big Lots has filed an appropriate motion and all parties-in-interest have had a chance to respond, the Debtors will respond.

Otherwise, the Debtors' substantive response to Big Lots' request is contained in the Debtors' response to the Creditors' Committee's motion for derivative standing.

## CONCLUSION

For the reasons stated above, and as set forth in the Motion and supporting memoranda and affidavit, prosecution of the Big Lots Action should be preliminarily enjoined pending final resolution.

Dated: Wilmington, Delaware
March 2, 2005

                                   YOUNG CONAWAY STARGATT &
                                   TAYLOR, LLP

                                   /s/ Joel A. Waite
                                   Joel A. Waite (No. 2925)
                                   M. Blake Cleary (No. 3614)
                                   Matthew B. Lunn (No. 4119)
                                   The Brandywine Building
                                   1000 West Street, 17th Floor
                                   P.O. Box 391
                                   Wilmington, Delaware 19899-0391
                                   Tel: (302) 571-6600
                                   Fax: (302) 571-1253
                                   - and –

                                   WILMER CUTLER PICKERING
                                     HALE AND DORR LLP
                                   Mark N. Polebaum (BBO #402060)
                                   Mitchel Appelbaum (BBO #558579)
                                   60 State Street
                                   Boston, MA  02109
                                   Tel: (617) 526-6000
                                   Fax: (617) 526-5000

                                   Co-Counsel for Debtors and Debtors In Possession

WP3:1089982.3                                                                                                            62865.1001