1    THE COURT:  That may be a good idea.  If I had let

2    the Committee -- Let me think about that.

3    MR. KENNEY:  Your Honor, I mean, regardless of

4    whether it is the Committee or a trustee, I think that needs

5    to be dealt with quickly.  Thank you.

6    MR. POLEBAUM:  Your Honor --

7    THE COURT:  Okay, everybody's spoken, now you.

8    MR. POLEBAUM:  Thank you, Your Honor.  It seems to

9    me that the right solution for all of this, Your Honor, is to

10   not -- You have the debtors' commitment.  It is not going to

11   investigate, prosecute, or compromise any of the claims that

12   the Committee is so concerned about.  We're not going to do

13   that.  What we need is the sixty to ninety-day period to try

14   to bring the business deal together on the plan with this

15   proposed plan sponsor and as part of that plan negotiation to

16   finalize the terms on which the claims that we will not

17   compromise will be pursued.  I think we can do that, and I

18   think in order to allow that to happen, the Court should not

19   be pre-deciding things by granting standing or allowing Big

20   Lots' litigation to go forward.

21   THE COURT:  What does standing have to do with it?

22   If I can get a commitment out of the Committee not to go to

23   court before the negotiations --

24   MR. TRAUB:  You have that.

25   MR. POLEBAUM:  What's left undone, Your Honor, is

1  identifying who it is who's going to be responsible for

2  reviewing all of the circumstances that led to the debtors'

3  Chapter 11 case and deciding who or against whom claims

4  should be brought.  And that's something that should get

5  negotiated and decided as part of the plan of reorganization

6  not through a motion that's brought on during the Chapter 11

7  case.

8  THE COURT:  Don't you credit that motion with too

9  much?  The argument is that if the Committee had standing to

10 file a lawsuit then that would even the playing field in

11 negotiation.  I think that's it.

12 MR. POLEBAUM:  It has nothing to do with the

13 playing field, Your Honor.  I mean the playing field clearly

14 has on the playing field all of these claims, and the debtor

15 has said three or four times now today, we are not going to

16 compromise --

17 THE COURT:  Why do you care?

18 MR. POLEBAUM:  Because we do have an interest in

19 knowing who is going to be responsible for investigating the

20 circumstances around the debtors' Chapter 11 and who should

21 be held responsible for it.  And what I guess what we're

22 concerned about is that when the Court says, well, the

23 Committee has standing, does that mean that it's the

24 Committee that's going to be irrevocably appointed under the

25 plan or is that still an open issue to be decided as part of

1    the plan negotiation.

2              THE COURT:  Isn't that a negotiable issue?

3              MR. POLEBAUM:  Well, we want it to be a negotiable

4    issue, Your Honor.  We're concerned that your ordering

5    otherwise would make it a non-negotiating issue.

6              THE COURT:  I'm not ordering otherwise -- I'm

7    trying to stay out of the plan.

8              MR. POLEBAUM:  And I think that's the perfect

9    resolution, Your Honor.

10             THE COURT:  Okay, thanks.  Anything further from

11   anybody?

12             MR. POLEBAUM:  Okay.  Can we go onto the

13   preliminary injunction at this time?

14             THE COURT:  Yeah, let's go --

15             MR. TRAUB:  Your Honor, I just want to point out

16   the debtor has no dog in this fight, and if we decide that we

17   come up with a plan we're negotiating that includes this

18   provision, we may make Your Honor very happy and file a plan

19   very quickly.

20             THE COURT:  Look, unless somebody says something to

21   talk me out of it, I'm going to give you the chance to

22   negotiate but this is sort of a last chance.  I don't know

23   how to measure it, whether it's sixty or ninety days, but --

24             MR. TRAUB:  Does that mean that we're going to get

25   the standing?

1    THE COURT:  Well, I want to think about that for a

2  minute.  Let me get through -- It sounds like the standing

3  issue, which, of course, leads to allegations against the

4  insiders, which I know is a dispute -- is sort of a hang-up

5  and I guess, I don't know why, but I'll think about it.

6    MR. TRAUB:  And if Your Honor heard at least the

7  United States Trustee on this deal that it has made it

8  impossible to negotiate so far.

9    THE COURT:  Give me a chance to think about it.

10    MR. TRAUB:  Okay.

11    THE COURT:  Let's get on with the preliminary

12  injunction.

13    MR. POLEBAUM:  Yes, Your Honor.

14    THE COURT:  Let me ask you something.  This is the

15  third time this week I've cited the case dealing with the

16  jurisdiction on the authority of the Bankruptcy Court to

17  enjoin third-party lawsuits, and I'm going to suggest that

18  you read the _American Horowitz_ (phonetical) case, which is a

19  Ninth Circuit case.  Maybe some of you have already read it,

20  but nobody has cited it.  I was really looking for it, and I

21  --

22    UNIDENTIFIED SPEAKER:  Is that an Oregon case?

23    THE COURT:  _American Horowitz_, it's in 885 F2d 621.

24  A Ninth Circuit case, I don't know how it does in the Third

25  Circuit, but I -- again, it's the third time this week I've

1   mentioned it, and it's going to influence my decision on the

2   issue of the injunction.  So, go on.

3            MR. POLEBAUM:  All right, thank you, Your Honor.

4   The debtors are seeking to enjoin -- and Your Honor, what I

5   propose to do is I have an opening statement.  I have one

6   witness, Mr. McMahon.

7            THE COURT:  Any way you want to do it.

8            MR. POLEBAUM:  Fine, thank you, Your Honor.  The

9   debtors are seeking to enjoin further prosecution of Big

10  Lots' complaint pending a final determination of the merits

11  of the debtors' complaint on two separate theories.  First,

12  Your Honor, that the Big Lots' complaint violates the

13  automatic stay because all but one of the claims asserted by

14  Big Lots are property of the estate.  And alternatively, or

15  in addition to that, because prosecution of any of the Big

16  Lots' claims will dissipate the debtors' interest as an

17  insured under a debtor's and officer's policy that includes

18  the debtors as an insured party.  Secondly, Your Honor, the

19  second theory on which we're seeking to enjoin this

20  litigation is under § 105 of the Bankruptcy Code, and on that

21  theory, Your Honor, we believe that we're entitled to an

22  injunction for three reasons.  One, in each --

23            THE COURT:  Permanent or preliminary?

24            MR. POLEBAUM:  Well, here we're just here on a

25  preliminary injunction, Your Honor.  And under 105, Your

1   Honor, I don't believe that would ultimately be a permanent.

2   On the first set of claims, Your Honor, that these are estate

3   causes of action, we are asking for a permanent injunction

4   because this creditor is trying to usurp for its own benefit

5   an asset of the debtors' estate, and we believe that we will

6   ultimately be able to show to Your Honor that those are

7   estate claims.  So, we're only here on a preliminary

8   injunction but the merits of the case do seek a permanent

9   injunction with respect to the first part of the relief

10  requested.  Your Honor, on the 105 basis, Your Honor, we

11  think we're entitled to the injunction for three reasons:  to

12  prevent distraction of the debtors, to avoid depletion of the

13  debtors' insurance asset, and because the debtors' estate

14  will be harmed if the action is permitted to continue because

15  the debtors are the real party in interest.  Your Honor, we

16  believe that the debtors' Chapter 11 cases hang in the

17  balance.  The filing of the Big Lots' complaint has entirely

18  shifted the focus of these Chapter 11 cases from one in which

19  the parties have worked together to find a business solution

20  to these cases to one in which the parties hurl accusations

21  at each other and nobody focuses on or thinks about the

22  significant business issues that these debtors need to

23  resolve in the next sixty to ninety days, and I couldn't have

24  a better example of that than this hearing, Your Honor.  If

25  the Court does not put a stop to the litigation in these

1  cases for the period of time to bring the focus back to the
2  debtors' business, prospects for these cases are indeed very
3  bleak.   The debtors have requested a preliminary injunction
4  which is governed by the well-known four part test:
5  likelihood of success on the merits, harm to the debtors,
6  balance of harm between the debtors and Big Lots, and the
7  public interest.  With respect to the request for an
8  injunction to enforce the automatic stay, the likelihood of
9  the debtors succeeding on the merits turns on whether the
10  claims asserted by Big Lots are property of the estate, or
11  whether the debtors' interest in its DNO insurance policy is
12  adversely affected by the Big Lots' action.  Debtors only
13  need to satisfy the Court that it is likely to succeed on
14  either of those theories to satisfy the first prong of the
15  preliminary injunction test.  The debtors believe for reasons
16  I will turn to shortly that they are likely to succeed on
17  both theories.  With regard to the injunction request under
18  § 105, this first prong of the preliminary injunction test,
19  likelihood of success, requires the debtors to show that
20  their reorganization will be adversely affected if Big Lots
21  is permitted to continue to prosecute its complaint.   The
22  debtors believe that there is an overwhelming case for
23  adverse affects on the debtors' reorganization, and I will
24  turn to that shortly as well.  The second prong, harm to the
25  debtors, is the same as the likelihood of success under the

1  § 105 standard and for the same reasons, strongly weighs in

2  favor of issuing the injunction.  The third and fourth

3  prongs, balance of harm and public interest, are virtually

4  uncontested in this case.  Big Lots does not allege any harm

5  to it that would result from the injunction, but rather

6  spends most of its time ineffectively arguing that there

7  would be minimal harm to the debtors.  The fourth prong,

8  public interest in this context, is defined as what will

9  further the debtors' reorganization.  And here staying the

10  litigation is unquestionably in the interest of the

11  reorganization.  Big Lots has decided to retreat from the

12  reorganization process as evidenced by its resignation from

13  the Committee and set out on its own to maximize its recovery

14  to the detriment of all of the debtors' other creditors.  To

15  the extent it is successful, all other creditors are hurt.

16  The public interest favors issuance of the injunction.  Now,

17  I'd like to focus on the likelihood of success aspect --

18  likelihood of success on the merits portion of the

19  preliminary injunction test, and to do that, I need to

20  provide the Court with some brief factual background.  In

21  December of 2000 affiliates of Bain Capital in management of

22  KB Toys purchased the KB Toys business from Big Lots for

23  approximately $300 million.  The acquisition was structured

24  as a sale by Big Lots of its shares in Haven's Corner to a

25  company called KB Acquisition.  And the purchase price was

1  paid in cash except for a $45 million purchase money note

2  that Haven's Corner issued to Big Lots.  There's another one

3  or two holding companies about Haven's Corner, and it's

4  through those other holding companies that the Bain

5  affiliated into these and management of KB owned their

6  interest in the KB Toys business.

7      THE COURT:  Somehow I thought that note was 52

8  million, but it's 45?

9      MR. POLEBAUM:  Your Honor, the original principal

10  amount was 45.  I believe that interest has accrued on that

11  note and that's what has increased the amount.

12      THE COURT:  Okay.  It's the same note you're

13  talking about.

14      MR. POLEBAUM:  It is the same note, yes, Your

15  Honor.  In April 2002, a number of KB entities and

16  shareholders entered into a redemption repurchase and equity

17  restructuring agreement pursuant to which $88.4 million was

18  paid to shareholders in redemption of shares and

19  approximately $33.7 million was paid as bonuses to about 25

20  senior managers.  And I will refer to this transaction as the

21  recapitalization transaction.  Big Lots alleges in its

22  complaint that the money to make the payments in the

23  recapitalization transaction was obtained from the cash of

24  the various operating subsidiaries and as proceeds of loans

25  taken out by those same operating subsidiaries.  Big Lots

1    further alleges that the payments made in the

2    recapitalization transaction rendered the operating

3    subsidiaries and HCC insolvent.  Now, a number of the parties

4    with an interest in the case hotly dispute the causes of

5    debtors' insolvency.  Fortunately, for purposes of today's

6    hearing, the Court does not need to assess what caused the

7    debtors' insolvency.  Rather, what the Court needs to

8    determine is whether the debtors are likely to succeed in

9    their claims that the claims alleged by Big Lots, which are

10   based on the recapitalization transaction, are claims of the

11   estate or can a single creditor appropriate such claims to

12   its own exclusive benefit.

13           THE COURT:  Can I get you to wind this up?

14           MR. POLEBAUM:  Absolutely, Your Honor.

15           THE COURT:  You have a witness you're going to --

16           MR. POLEBAUM:  Yes, Your Honor.

17           THE COURT:  I'd like to hear him.  I'll give you

18   two more minutes, and then --

19           MR. POLEBAUM:  Two more minutes.  Well, Your Honor,

20   then what I'd like to focus on is the Delaware test for

21   determining derivative versus direct claims.  And there's a

22   Delaware Supreme Court case Tuley vs. Donaldson, Lufkin &

23   Gerett (phonetical), which establishes the test, and in that

24   case, the Delaware Supreme Court said whether a claim is

25   direct or derivative turns on who suffered the harm and who

1  would receive the benefits of the recovery.  And the Court

2  went on to say that in the context of a claim for breach of

3  fiduciary duty, the Chancellor articulated the inquiry as

4  follows, and I'm quoting from the case now:  "Looking at the

5  body of the complaint to consider the nature of the wrong

6  alleged and the relief requested, has the plaintiff

7  demonstrated that he or she can prevail without showing any

8  injury to the corporation."  That's the critical question.

9  Is, can the plaintiff prevail without showing injury to the

10  corporation?

11          THE COURT:  And this case is pending, the Big Lots

12  case is pending in the Delaware court.

13          MR. POLEBAUM:  Yes, Your Honor.

14          THE COURT:  And the appeal would go to the same

15  court that wrote that opinion if I understand, if there is an

16  appeal.

17          MR. POLEBAUM:  No, Your Honor, that --

18          THE COURT:  Maybe I've got the courts mixed up.

19          MR. POLEBAUM:  No, no, no.  Their case, the Big

20  Lots case is pending in the Chancery Court, that's actually

21  true.

22          THE COURT:  All right.

23          MR. POLEBAUM:  But the debtors' position is that

24  the claims that are asserted by Big Lots is property of the

25  estate under § 541 of the Bankruptcy Code and that their use

1    of that property violates § 362.  It is this Court's

2    responsibility to decide whether this is or is not property

3    of the debtors' estate.

4            THE COURT:  I understand that, but you're citing me

5    a Delaware case.

6            MR. POLEBAUM:  Yes, Your Honor.

7            THE COURT:  That kind of lays down a Delaware rule

8    on determining what's derivative and what isn't.

9            MR. POLEBAUM:  Yes, Your Honor.

10           THE COURT:  Which is another way of saying what's

11    property of the estate and what isn't.  But anyway, go on.  I

12    --

13           MR. POLEBAUM:  Does the Court have any questions as

14    to whether --

15           THE COURT:  No, I really don't.  I want to hear

16    your witness.  I think we've got to wind this up pretty soon.

17    That's why I don't mean to be cutting you off.  So, I'll give

18    you another minute, and then you can call your witness.  I've

19    give you a chance to close, all right?

20           MR. POLEBAUM:  All right.  Well, why don't I put my

21    witness on, Your Honor, and then I'll save it for closing.

22           MR. MARWIL:  Your Honor, may I make an opening

23    statement, counsel for the --

24           THE COURT:  I'll give you a couple of minutes,

25    okay?

1          MR. MARWIL:  Thank you very much.

2          THE COURT:  You bet.  And I have to, you're the --

3    your client's the brunt of the motion for preliminary

4    injunction.  So, I'll listen to you.

5          MR. MARWIL:  Thank you very much, Your Honor, and I

6    will try to be brief.  In our papers, we made very clear what

7    we were prepared to do to try to resolve this by agreement

8    without having to come and get a court order, without having

9    to have all of the effort and the papers.

10          THE COURT:  And I did read it.

11          MR. MARWIL:  It was a ninety-day -- We talked about

12   this, Your Honor.  We were willing to forego discovery for

13   ninety days provided we get the hundred thousand pages that

14   are already produced to the Committee that are easily

15   deliverable to our office.  And to the extent after the end

16   of those ninety days -- and it sounds to me like this case is

17   going to be resolved by then, if there's anything else that

18   we're doing in the state court lawsuit that has some impact

19   on the debtor that the debtor's concerned about, we'll come

20   back and see Your Honor and get it resolved.  And we can work

21   out some kind of, you know, ground rule order or ground rule

22   agreement in that regard.  That's our proposal, and we got no

23   response from the debtor on that, and it seems to me that we

24   got no response --

25          THE COURT:  Would you be willing to put that in the

1  form of an order?

2          MR. MARWIL:  Certainly.

3          THE COURT:  Okay.

4          MR. MARWIL:  Certainly.  Now, the debtor says that

5  there's all this distraction of management as a result of the

6  action we filed in the Chancery Court, and I would beg to

7  differ quite markedly with the debtor.  The distraction, if

8  there really is any, and I'll get to that in a moment, the

9  distraction isn't about our lawsuit that is on file.  There's

10  a sixty-day period to answer, file a motion to dismiss.

11  We've agreed to deal with the discovery the way I've just

12  articulated to Your Honor.  The distraction is about the

13  insider defendant's desire to have our suit stayed so we

14  can't get to the motion to dismiss stage, and that's why the

15  debtor filed the instant adversary proceeding and the 105

16  motion.  And this is a distraction of their own making.

17          THE COURT:  What do you mean "motion to dismiss"?

18  Is there a pending motion to dismiss?

19          MR. MARWIL:  Your Honor, it's been made clear from

20  Bain counsel that they will file a motion to dismiss because

21  they don't believe that they are liable.  They have said that

22  the liability associated with insolvency are objective facts

23  relating to Wal-Mart.  So they're going to file a motion to

24  dismiss.  I think we can all take notice of that.  That

25  motion to dismiss is going to take many months to work its

1  way through.  That's not going to distract management.  It's
2  not going to distract management in particular because
3  they've got Retail Forward to help them.  They've got FTI
4  Consulting to help them.  Frankly, Your Honor, Big Lots
5  doesn't want management really distracted because Big Lots
6  has a $25 million claim on account of lease liability
7  guarantees at the operating subsidiary level in addition to
8  the $52 million note claim that we have at HCC.  So, we're on
9  both sides, okay?  And this isn't about -- this is not about
10 trying to prefer a $52 million note claim at the expense of
11 the operating subsidiary creditors.  It's about getting our
12 recovery in addition to what the operating subsidiaries or
13 creditors are entitled to.  And, Your Honor, we're more than
14 ten percent of that $200 million balance at the operating
15 subsidiary level.  So, what we have, is we have the debtor
16 and its management exclusively controlled by the insider
17 defendants in our lawsuit looking to have Your Honor act as
18 an instrumentality to continue the delay and deferment of
19 their liability to Big Lots and frankly, their liability to
20 the operating subsidiary creditors through the Creditors
21 Committee's motion, and that delay of that suit -- If Your
22 Honor enters a stay, we can't proceed, and we can't get to
23 that critical motion to dismiss junction, and if we don't get
24 there -- We've heard from Bain.  They don't see any value in
25 the lawsuit.  We're not going to settle it.

1    THE COURT:  What kind of an order would you agree

2  to?

3    MR. MARWIL:  We would agree to the ninety-day

4  moratorium on discovery provided we got the hundred thousand

5  pages of documents, and we would agree that at the end of

6  that ninety days if the continuation motion to dismiss,

7  whatever is happening in the state court, to the extent the

8  debtor feels that there's a problem, an impairment of the

9  debtor's ability to manage, then we would come back to Your

10  Honor and talk about it and try and get it resolved.  But it

11  would not be an order that would stay prosecution of that

12  lawsuit.  They've got -- Insider defendants have sixty days

13  to answer or otherwise plead.  Let that proceed.  Let them

14  file their motion to dismiss.  Let us get going.  It's

15  lawyers filing papers.  It's not management filing papers,

16  and we just heard really a fundamental contradiction.  The

17  debtor says February was a great month.  They hit their plan.

18  Better same store sales in February based on Retail Forward's

19  plan and implementation.  Now we filed our lawsuit on

20  February 9th, and I'd like the debtor to figure out how

21  they're going to explain how they did great in February with

22  our lawsuit pending, if our lawsuit created all of this

23  ruckus and interfered with management.

24    THE COURT:  Is the Committee on board with this --

25    MR. TRAUB:  The hearing argument makes it very

1  obvious that the debtor has no stake in these claims.  The

2  reason we need standing today, if you're inclined to --

3      THE COURT:  No, I wasn't asking -- We're talking

4  about the delay, and we'll get to the standing.

5      MR. TRAUB:  No, I know, as far as the delay, I

6  mean, you know, quite frankly, I mean at some point there are

7  some claims where we believe that a good deal of the claims

8  that he's asserting are derivative while we believe we

9  represent all creditors and we'll deal with it.  Whatever

10 Your Honor does about it, we don't need a Dutch uncle debtor

11 imposing defenses.  We need to be able to be on the opposite

12 side of the table of him directly, not the debtor.  The

13 debtor has no interest in it.  Mr. Polebaum said he's not

14 going to investigate the claims.  What has he just done?

15 He's giving his opinion as about where they belong.  We're

16 supposed to do that, not him.

17     THE COURT:  Well, I'm going to tell you, you do

18 agree then a sixty or a ninety day sort of a standstill

19 agreement would work.

20     MR. MARWIL:  On discovery.

21     THE COURT:  On discovery.

22     MR. MARWIL:  Without staying the action.

23     THE COURT:  And the reason that you don't want to

24 stay the action is you want him to file an answer; is that

25 it?

1        MR. MARWIL:  Or a motion to dismiss and allow that

2   to proceed.

3        THE COURT:  Whatever you want to file.

4        MR. TRAUB:  But how could the Committee not be

5   involved in that since we -- the debtor has conceded if we

6   get the Bain defendants, that the actions are derivative and

7   they have no interest and won't do it.  So if we have

8   standing, which hopefully you'll grant us today, whatever

9   happens in that lawsuit, we can protect creditors.  We don't

10  need Mr. Polebaum's firm to do it.  We agree -- We filed a

11  pleading that said we agree many of these claims are

12  derivative.

13       THE COURT:  Besides giving you standing, what do

14  you want?

15       MR. TRAUB:  That's it.

16       THE COURT:  Just standing.  You don't care whether

17  I impose a moratorium on discovery?

18       MR. TRAUB:  If, look, letting him look at a hundred

19  thousand documents, I could care less.  If he comes down our

20  office any day that he wants and looks at a hundred thousand

21  documents, makes no difference to me.  If he feels that will

22  be helpful to him to understand it and it promotes a dialogue

23  which it seems is what Your Honor wants, I'm all for that.

24  What I'm not in favor of is the Bain defendants, they have

25  their own lawyers, they'll do their thing.  The debtor has

1  said to you, it will not investigate or do anything to

2  compromise these claims.  How could they be in the middle of

3  a lawsuit.  The party that should be in the middle of that

4  lawsuit is the Creditors Committee to the extent that

5  proceeds in any way.  Did we say we're going to commence a

6  lawsuit in this case?  No.  They're saying in that case,

7  which we need to worry about, they may move to dismiss.  We

8  need standing today to protect ourselves whatever you do.

9          THE COURT:  No, I understand if I give you standing

10  you don't care if I impose a standstill on discovery except

11  for the hundred thousand pages.

12          MR. TRAUB:  If he wants it -- Look, we are

13  supporting -- our view is we don't want this to be a

14  distraction.  If he wants to read a hundred thousand

15  documents --

16          THE COURT:  We're going to let him do it.  Okay,

17  that's fine.  Go ahead.

18          MR. MARWIL:  Your Honor --

19          MR. TRAUB:  Even at that, we'd like to try to

20  reorganize that in case they --

21          THE COURT:  Really, I was beyond that, but anyway,

22  go on.  I didn't mean to cut you off.

23          MR. MARWIL:  Your Honor, it just shouldn't be that

24  hard for us to have the kind of order that Your Honor's just

25  talking about.  You know, we're addressing all the concerns

1    of the debtor really, and, you know, if there's a basis for

2    dismissal, the insider defendants will file their motion.

3    That will proceed, and with any luck, during this sixty to

4    ninety day plan negotiation period, somebody will come to us

5    with some kind of rational proposal that we'll be able to

6    negotiate and make it all go away, and I think the Creditors

7    Committee is hopeful for the same thing.

8         THE COURT:  You know, I'm not sure that I can draw

9    the kind of an order that you'll be satisfied.  I'm inclined

10   to stay the action -- If I'm inclined, I should say, to stay

11   the action.

12        MR. MARWIL:  Your Honor --

13        THE COURT:  For a limited period.

14        MR. MARWIL:  The staying of the action, Your Honor,

15   is damaging to Big Lots because it prohibits Big Lots from

16   pursuing its direct claims.  And let me talk about that for a

17   minute.

18        THE COURT:  You mean --

19        MR. MARWIL:  Well, our lawsuit is not a derivative

20   claim notwithstanding the debtor's continued use of that and

21   the mischaracterization, intentional mischaracterization in

22   their papers calling it a fraudulent conveyance action.  Very

23   telling.  If we were pursuing a fraudulent conveyance action,

24   we would have sued all 21 members of the management team that

25   got a bonus out of the equity distribution transaction.  We

1    only sued two.  The two guys that lied to us, misrepresented

2    to us and got our agreement to go along with the deal that

3    had we known the actual facts, that the company was insolvent

4    and that the basis of the solvency opinion it got were

5    projections that were pie in the sky.  Had we known those

6    facts and had we been properly represented to by Feldman and

7    Glazer, we would have been able to come to a court, file an

8    injunction action then to prohibit the transaction, protect

9    our rights somehow.  It was our rights and they wanted our

10   signature on the Warren (phonetical) agreement.  We were a

11   creditor at the time.

12            THE COURT:  I read your complaint.

13            MR. MARWIL:  So, what we're doing is we're suing

14   the individuals who illegally benefitted from the deal, and

15   it's illegal because it was based on fraud and

16   misrepresentation.  And because of that, Judge, Your Honor,

17   the policy that they talk about, Bain's insurance policy, by

18   the way, that they talk about, is not implicated.  It does

19   not cover fraud, dishonesty, or coverage for illegal gains.

20   That is exactly what our complaint is about.  If we win on

21   the complaint, absolutely, positively no coverage under that

22   policy.  And to do it, Your Honor, they can't argue that the

23   debtor has indemnification obligations because Delaware law

24   prohibits indemnifying officers and directors for deceitful

25   conduct, and that's the basis of our lawsuit, is the

1  deceitful conduct.

2         THE COURT:  Well, I understand.  I read your

3  complaint.

4         MR. MARWIL:  Okay.

5         THE COURT:  And I'd like you -- You know, you're

6  free to go forward with it except I'm just trying to get

7  enough of an umbrella for a limited period of time to

8  encourage negotiations and perhaps a plan.

9         MR. TRAUB:  I have a three-sentence answer.

10         THE COURT:  Pardon me?

11         MR. TRAUB:  Let him read a hundred thousand

12  documents, stay the action for as long as you give us to do

13  the --

14         THE COURT:  Well, I think, somehow the difference

15  between staying the action and no discovery; isn't it

16  semantics?

17         MR. MARWIL:  No, Your Honor.  We're amenable to no

18  discovery.  We're not amenable to any kind of stay of the

19  action.

20         THE COURT:  Why?  What do you want to do?

21         MR. MARWIL:  There's no basis -- We want the time

22  period to start clicking on their answer or their motion to

23  dismiss, and when that time period clicks and it's time for

24  them to file the answer or the motion to dismiss, let them

25  file it.  Nothing's going to happen to the debtor or the

1   debtor's reorganization efforts because they filed some

2   papers in Chancery Court.

3          MR. TRAUB:  Then we need standing, if you don't do

4   that, because we're --

5          MR. MARWIL:  And we should grant standing.  The

6   picture that we ought to have coming out of here, Your Honor,

7   is standing for the operating subsidiary creditors to the

8   Committee.

9          THE COURT:  Okay.

10         MR. MARWIL:  Prosecution of our suit.

11         THE COURT:  Okay, I think I understand where you're

12  at, but I'm not sure I understand the difference between

13  enjoining the action and enjoining discovery, but --

14         MR. MARWIL:  Again, it's the clicking off of the

15  days by which there has to be an answer or otherwise plead in

16  the underlying discovery.  If you stay the action, none of

17  that time elapses.  If you don't stay the action --

18         THE COURT:  Well, it puts you two or three months

19  behind.

20         MR. MARWIL:  Indeed, and if you grant the Creditors

21  Committee standing and stay my action, then I'm even further

22  behind than the Creditors Committee, and these things ought

23  to proceed in tandem -- both actions come out of the same set

24  of facts.  Our harm and our damages are direct because of the

25  fraud.  Their harm and damages result from the objective

1  constructive fraudulent conveyance, and they're two totally
2  separate theories and two totally separate causes of action
3  relating to the same facts.

4          THE COURT:  Okay, thanks.

5          MR. MARWIL:  Thank you, Your Honor.

6          THE COURT:  Go ahead, let's get on with your
7  witness.

8          MR. POLEBAUM:  I would like to, Your Honor, but if
9  I could just have -- get two minutes from the Court, Your
10  Honor.

11          THE COURT:  Two minutes.

12          MR. POLEBAUM:  There's not -- we're not able to go
13  forward with all of the litigation that everybody wants to go
14  forward with and the Committee cannot have standing if this
15  Court wants the debtors to have a chance to reorganize.  If
16  we're going to go forward with litigation and the Committee's
17  going to have standing, the debtor has requested that the
18  Court appoint a trustee.  That's the debtor's request, Your
19  Honor.  And if you were going to allow the Big Lots action to
20  go forward, then Mr. Traub stands up and he says, I need to
21  go forward.  Your Honor, we need a period of time within
22  which we try to get all of this done, get a plan of
23  reorganization confirmed that deals with the litigation, puts
24  in a home, funds it and appoints somebody responsible to go
25  after those actions.  If we can't do that, Your Honor, if we

1  can't get there --

2      THE COURT:  You know, I'm not inclined to appoint a

3  trustee.  I really am not.

4      MR. POLEBAUM:  Well, Your Honor --

5      THE COURT:  I don't have that motion.  I know that

6  was an alternative that I think you briefed, but I'd like to

7  deal with -- Is there anything further?

8      MR. POLEBAUM:  Yes.  And I'll be brief, Your Honor.

9  On the insurance policy --

10      THE COURT:  I want to say, if I appoint a trustee,

11  you're going to start all over again, and I think we will

12  have lost ground at least at this point.  I really am not

13  going to give up the negotiation process, and if I appoint a

14  trustee that would be the equivalent of doing that.  So, I --

15      MR. POLEBAUM:  Well, Your Honor, then you can't let

16  the litigation go forward because you are not going to have

17  that negotiation opportunity unless we put all the stuff to

18  rest.

19      THE COURT:  Oh, I understand that, I understand

20  that.  Okay?

21      MR. POLEBAUM:  But on the insurance, Your Honor,

22  just two words on that.  The debtor is an insured under the

23  policy.  It is insured against any loss that it suffers,

24  suffers for claims that are brought against the debtor.  The

25  various offices and directors are also insureds under the

1    policy and they have a right under the policy to have their

2    defense costs reimbursed.  Big Lots assumes they're going to

3    win.  That is not a safe assumption.  If Big Lots loses this

4    case, the officers and directors are absolutely entitled to

5    reimbursement of their expenses, and it will be very

6    expensive.  And that will come out of the policy and the

7    debtor as an insured under that policy still has a right to

8    make claims under the policy but it will have been

9    diminished.  And there's clear precedent in this Court, Your

10   Honor, in the Allied District case, that says that under

11   those circumstances where both the company and the directors

12   and officers are insured under the same policy and the loss

13   to the company is not hypothetical and it's not hypothetical

14   here because the company is insured as a principal for losses

15   --

16         THE COURT:  You know, they lost more than the limit

17   of the policy.  What is it 10 million?

18         MR. POLEBAUM:  It's 10 million.  Your Honor, Big

19   Lots is claiming 52 and Mr. Traub's claiming 120.

20         THE COURT:  Have you read the Tachour (phonetical),

21   State Farm vs. Tachour, the Supreme Court has dealt with

22   this.  I mean it stands for the principal that a low limit on

23   the policy doesn't necessarily justify or doesn't justify an

24   injunction against the world.

25         MR. POLEBAUM:  It's not against the world, Your

1    Honor.  It's against --

2          THE COURT:  Well, against other people.

3          MR. POLEBAUM:  Well, in the specific context of a

4    bankruptcy, where property of the estate's involved, I

5    believe the rule is different, Your Honor.

6          THE COURT:  I'm surprised nobody cited that case,

7    but in any event, let's get on with the witness.

8          MR. POLEBAUM:  Your Honor, I'd like to call Mr.

9    William McMahon, please.

10                    WILLIAM McMAHON

11   being duly sworn according to law, testifies as follows:

12          THE COURT:  Would you give your full name for the

13   record and would you spell your last name.

14          THE WITNESS:  William Lance McMahon, M-c-M-a-h-o-n.

15                    DIRECT EXAMINATION

16   BY MR. POLEBAUM:

17   Q.   Mr. McMahon, by whom are you employed?

18   A.   KB Toys.

19   Q.   And what is your position and what are your

20   responsibilities with KB Toys?

21   A.   I'm the chief operating officer.  I basically run the

22   business.

23   Q.   And when did you start working for KB Toys?

24   A.   About two years ago.  It was in April of 2003.

25   Q.   And before you stared working with KB Toys can you

1    describe your prior work experience.

2    A.    For three years previously, I was the president and CEO

3    of Decorative Concepts, a $300 million company based in

4    Cincinnati that dealt with gift items and home accents.

5    Prior to that, I worked at Bain Capital for two years and

6    previous to that I was a partner at Bain & Company in Boston.

7    Q.    And what is your educational background?

8    A.    I had a BS/BA from Georgetown University in financing

9    and marketing.

10   Q.    Okay.  And when did KB Toys file this Chapter 11

11   petition?

12   A.    January 14th, 2004.

13   Q.    And could you please tell the Court the  -- Let me ask

14   you this:  Did KB Toys take any actions at the time it filed

15   the Chapter 11 case to address the financial difficulties

16   that led it into Chapter 11?

17   A.    Yes, very quickly, we had plans in place within a couple

18   of days after we filed regarding the store closing process.

19   We closed nearly 400 stores.  We also had plans regarding the

20   fixed costs, the general administrative costs.  We had a

21   termination of nearly one hundred people within the first

22   couple of months.

23   Q.    Okay, and did the debtor also arrange for financing of

24   its operations at the beginning of the case?

25   A.    We did.  We were successful with Bank of America and a

1  $325 million DIP facility with an additional $25 million

2  over-advance.

3  Q.   And what actions if any did the company take with

4  respect to it's relationships with various vendors?

5  A.   At the time we filed, it coincided with an annual even

6  call the Toy Fair in New York City.  We had, typically pretty

7  much everyone that manufactures toys attends.  The management

8  team presented to about 30 different toy manufacturers our

9  situation, kind of the elements of why we went in bankruptcy,

10 what our plans were to get out of bankruptcy.  We had quite a

11 bit of explaining to do about the new DIP facility to assure

12 our vendors that we did have the financial wherewithal to pay

13 them in bankruptcy, and we spent quite a bit of time talking

14 about the beginnings of a vision to get out of bankruptcy.

15 Q.   Uh-huh.  Did you make any financing arrangements with

16 the other vendors?

17 A.   At that time we did incorporate a trade lien program

18 which allowed the vendors to ship under the terms of the lien

19 program with even more assurance then they normally would

20 under regular financing.

21 Q.   Uh-huh.  And this initial period of the Chapter 11 case,

22 what period of time do you think that covered?

23 A.   I typically look at the first twelve to fourteen months

24 in three phases.  This first phase I would say was January

25 through April.  I would call it the stabilization phase where

1   we did the store closings, had a lot of issues internally

2   with morale given some of the cost reduction and a lot of

3   external issues with the vendors in terms of (1) shipping us

4   in general, just actually shipping the goods, and (2) the

5   terms I mentioned earlier.

6   Q.    Okay.  So, after this initial stabilization phase which

7   you say takes you to about April or so of 2004, what was the

8   second phase?

9   A.    The second phase really was after the dust settled a

10  bit, it was a bit of shock obviously to the internal and

11  external audiences of the bankruptcy.  In May through

12  probably about August, right up to about Labor Day, I would

13  call it the fix-the-business stage.  We tried to come up with

14  some ways to change the merchandising mix, ship the mix of

15  products to be more in target with our consumers.  We also

16  were looking at a real estate strategy to change our store

17  look, to lower the overall inventory levels in the store,

18  open up the field of the store, improve the shopping

19  experience.  A lot of the market research had suggested our

20  customers found the stores a bit cluttered and a bit

21  difficult to shop.  So we were working on those programs.

22  Q.    Okay, and did the company take any action to deal with

23  any unprofitable divisions of the company?

24  A.    Yes, at that time, we had begun investigations really at

25  the end of the first phase on the internet business, KB

1  Toys.com as well as eToys.com and in that early part of that

2  second phase we sold that business to DE Shaw a New York

3  based company.

4  Q.    Okay.    And during this period of time -- What's the

5  approximate time frame for the second phase.

6  A.    I use the bookend of really Labor Day because that

7  starts the third phase which is kind of a busy season, so

8  really May through the end of August.

9  Q.    Okay, and during that second phase were there any

10 discussions with the Committee or other parties over a plan

11 of reorganization?

12 A.    Yes, there were.    Our high level plan and vision of kind

13 of how we were changing the shopping experience, how we were

14 going to shift the product mix as well as real estate

15 strategy of growing additional stores and strip centers was

16 well received by several investors who signed confidentiality

17 agreements.    One in particular, we did actually have

18 negotiations with and eventually a term sheet.

19 Q.    And what happened with that negotiation?

20 A.    We did not proceed with that.    It stopped in the later

21 half of that phase.

22 Q.    Uh-huh, and was the Creditors Committee party to that

23 negotiation?

24 A.    Yes, in fact the Creditors Committee and the company

25 worked hand in hand with that investor group.    The financial

1    sponsor actually met with us jointly in New York, in which

2    case we were negotiating pretty much out loud with the

3    potential investor.

4    Q.    But you say that that ended up with no deal being -- no

5    agreement being reached on terms for a plan of

6    reorganization.

7    A.    That is correct.

8    Q.    Okay.  So after it was determined that there were no

9    available plan sponsors, where did the company focus its

10   efforts?

11   A.    The company really had in its third phase, which I will

12   call the busy season, which is really, as you can imagine in

13   the toy business, September through December, we have many

14   days and weeks that are very large in sales and bigger than

15   the earlier half of the year.  A lot of internal focus on

16   getting the logistics of shipping that many products into the

17   stores, our staff basically doubles at that time overall.  We

18   have a seasonal staff that is quite large.  So, pretty much

19   all the internal focus is on the business needs.  The second

20   thing, though, we had jointly retained Retail Forward, which

21   was mentioned before.  We often refer to that group as RFI.

22   Retail Forward is a retail expert that the company and the

23   creditors jointly retained.  We felt that the lack of success

24   we had in getting some traction during that second phase was

25   for a lot of reasons.  One of the reasons we thought is we

1    can improve our strategy, refine our strategy, and we brought

2    Retail Forward in as an expert to help us with that, and that

3    really covered the entire process through September all the

4    way through December and even into January.

5    Q.    And did the company also investigate some store --

6    whether it should close additional stores during this time

7    frame?

8    A.    Yes, as part of the overall process, we looked at the

9    stores on a monthly basis that were not performing up to our

10   standards.  We closed an additional 163 stores in the

11   December and January time frame as a result.

12   Q.    And you mentioned RFI and the company working with RFI

13   to develop new strategic direction for the company.  Can you

14   describe what that plan looks like?

15   A.    I mentioned the refinement of the strategy.  The

16   strategy really got very particular in terms of understanding

17   our customer.  One of the criticism with KB is we try to be

18   all things to all people in the past.  With Retail Forward's

19   help we really focused on a core customer that liked, we

20   call, the thrill of the hunt.  A customer that would come in

21   every week, every three weeks into the mall, look for a new

22   store, a new look, get excited about the bargains that they

23   saw, and that really was the crux of the difference of the

24   shopping experience.  And along side that we had changes in

25   the product mix, changes in the store signage, even changes

1   in some of the associate training as a result.

2   Q.   Uh-huh.  And when did the company begin rolling out this

3   new look for the store?

4   A.   We had a lot of discussions with Retail Forward.  As you

5   can imagine, in December, around the Christmas time, our

6   stores are pretty much full to the ceilings.  Don't tell the

7   fire marshall that, but the time really wasn't right to make

8   the changes to the store during December.  So, we really

9   started to do that in January right around mid-January and

10  completed that at the end of January.  So, February 1st is

11  when the stores finally had what Retail Forward would call

12  our new look.

13            THE COURT:  You're talking about February.  This --

14            THE WITNESS:  Just recently, yes, Your Honor.

15  BY MR. POLEBAUM:

16  Q.   And I'm going to ask you about the operating results

17  with that new store look, but before I get that, could you

18  just summarize for the Court what the operating results were

19  for fiscal year 2004 ending in January of 2005?

20  A.   Yes.  Our fiscal year does end January 31st, so we just

21  completed about a month ago, fiscal year 2004.  We lost

22  roughly about $40 million in our operating earnings, I

23  believe $38, $39 million was mentioned earlier.  That's about

24  the approximate amount for operating loss.  We were

25  disappointed overall by the sales performance in November and

1    December which led to that.

2    Q.    And why do you think the company fell so far short of

3    its sales in November and December of 2004?

4    A.    There are a lot of reasons.    If you look at the retail

5    business, one of the things a lot of people underestimate is

6    how far in advance decisions are made.    We actually start

7    making decisions and are making decisions today.    As an

8    example:    February, March, and April for decisions for

9    November and December product.    We start buying our product

10   from China and other sources.    It takes quite a bit of time,

11   so I think one of the issues we had was we were stuck with a

12   lot of product and a lot of decisions in the November and

13   December time frame last year that were tainted somewhat by

14   the early phase, that first phase of bankruptcy.    One of the

15   challenges I mentioned is we had a real difficulty in getting

16   shipments in the early part of the bankruptcy, but we also

17   had a challenge in even having discussions with vendors about

18   the longer term supply product for that fourth quarter.    The

19   second thing, just quickly, is the market overall has been

20   well documented.    The toy industry did suffer during that

21   fourth quarter overall.    A lot of people believed the toy

22   industry was down anywhere from four to six percent for the

23   year.

24   Q.    Now, during this third phase that you're talking about,

25   you've described to the Court some store closings.    You

1   described the work on the new business plan with RFI.  Did

2   the company also have any plan negotiations with any parties?

3   A.   Yes, we did.  We had discussions with Angelo Gordon, one

4   of the claims traders that was presented earlier.

5   Q.   Uh-huh.  And did the company negotiate a term sheet with

6   Angelo Gordon?

7   A.   We did.  We actually did reach a term sheet with

8   jointly, again, negotiating with the Creditors Committee and

9   Angelo Gordon.

10  Q.   And what did the -- Was the company able to move forward

11  with that term sheet?

12  A.   Angelo Gordon expressed some concern, and that time

13  frame was the end of October, expressed some concerns about

14  the company's performance going into November and December

15  and elected to wait and see how the year progressed in those

16  two months.

17  Q.   And was its concern based on the fact that the company

18  was not attaining its sales forecast?

19  A.   Yes, they were concerned that we had not kind of proven

20  out that our model was working.

21  Q.   And when you were negotiating with Angelo Gordon, did

22  you provide Angelo Gordon with financial information?

23  A.   We did.  We provided them with historical information as

24  well as up-to-date kind of the weekly financial information

25  as well as projections going forward.

1    Q.    I'd like to go back now, to the RFI business plan, which

2    you say you started implementing in January of '05 and fully

3    going forward in February 1 of '05.  What have been the

4    initial results of that new marketing program?

5    A.    They've been quite positive.  Actually, even the stores

6    started to implement in the middle of January we saw

7    immediate results.  The simplistic way to think about it is,

8    we literally took the top shelf of the store and took the

9    inventory off the top shelf and replaced it with bright

10   signs, whether they were signs of children playing with toys,

11   blue skies and clouds, and a lot more lifestyle shots.  We

12   also -- I mentioned cleaned up the overall stores to improve

13   the shopping experience.  Really from the middle of January

14   through today, we have experienced numerous positive days,

15   which was quite unusual for us in the last eighteen months.

16   And year to date, on this fiscal year, we actually are

17   positive in toy comps about three or four percent.

18   Q.    And overall sales?

19   A.    The overall sales are slightly positive as well.

20   Q.    And when was the last time that the company was able to

21   achieve overall positive comps?

22   A.    It's been about eighteen months.  My recollection it was

23   around June, about eighteen months back.

24   Q.    And did the RFI business plan include changes, regular

25   changes in the stores?

A.    Yeah.    Probably the most exciting thing, in fact, we
just had a company-wide meeting yesterday in Pittsfield, we
have seventeen store sets.    The way to think about that is
when you walk by a store, what does the store look like?
What would be your two or three quick impressions?    What the
store colors are?    What items do you see in the front of the
store?    What messages you see?    Is it a buy-one get one-free?
Or in case of right now, there's a promotion called the two-
for sale.    Two for $5, two for $10, and two for $15.    We have
planned out the entire calendar year.    That are seventeen
store sets so you can imagine that they pretty much last a
roughly three weeks.    The store looks very different.    We are
on our second store set as an example.    Over the next ninety
days we'll have four more store sets.    The customer will see
that difference, but probably most importantly as a company,
we actually are now planning a product to flow according to
those store sets.    We are purchasing our signs and planning
our signs and displays that much further out in advance, and
even our vendors have started to rally around us.    The toy
fair I mentioned in January, again we just had one recently,
we have vendors who are making special packaging of special
products knowing about certain toy -- certain store sets.    So
they will even refer to it in your Summer Sizzle store set in
June, we are going to ship you this product just for thirty
days.    This is unprecedented for KB to have that kind of

1    planning, that kind of organization, all part of that Retail

2    Forward strategy.

3    Q.    All right, now, coming out of the 2004 holiday season,

4    the company missed it sales plans and did the company access

5    it's operating position and its ability to continue operating

6    in 2005?

7    A.    Yes, we did, if you're referring to our overall

8    financial liquidity.  That was a part of the analysis that we

9    did both internally with the Creditors Committee.

10    Q.    Yes, the overall liquidity --

11    A.    Yes.

12    Q.    -- is exactly what I wanted to ask you about.  And did

13    you share that with the Creditors Committee?

14    A.    Yes, we did.  We had numerous discussions about our

15    ability to finance the year 2005 with the current assumptions

16    that were in the plan that were all called the Retail Forward

17    plan, that was agreed to with the Committee as a good plan

18    for the year 2005.

19    Q.    The business plan was a good plan.  Did the Committee

20    have concerns about the liquidity of the company?

21    A.    Yes, they did.  They actually liked the plan.  I think

22    they jointly supported the plan, but they did have some

23    concerns that the sensitivity analysis around the plan be

24    looked at, and they asked us to look at three different

25    conditions:  sales, margin, and the terms that were given to

1   us by creditors.

2   Q.   And if you were sufficiently negative on one or more of

3   those factors, would the company then have liquidity

4   problems?

5   A.   Yes, the scenario that they asked, there really was one

6   specific one which was missing sales by about ten percent,

7   missing margin by about four or five hundred basis points,

8   and having the terms that were given to us by the trade be

9   reduced by about fourteen days.  If all three of those were

10  to happen, we did have a liquidity shortfall of about $20 to

11  $30 million.

12  Q.   And so, did the Committee express the concern that the

13  company might need an addition $20 to $30 million in order to

14  operate in 2005?

15  A.   Yes.  In order to think about comfort with the plan, but

16  also a financial downside to the plan.  They articulated that

17  it would be good for the company to find (1) a group that

18  could help finance the plan going forward, and (2) would be

19  willing to give you some kind of cushion order in magnitude

20  to $20 to $30 million.

21  Q.   Okay.  And what has the company done to try to address

22  it's situation in 2005?

23  A.   We tried to address those issues directly, given that

24  they were very well stated as the two major issues with the

25  Committee.  We are in negotiations currently with four banks.

1  That process started at the company, started several months

2  back, and we now have preliminary term sheets from I think

3  three of those four banks for financing the company going

4  forward in the next year.

5  Q.   And do those term sheets provide liquidity over and

6  above what's available under the current financing?

7  A.   They do provide additional liquidity, but it's anywhere

8  from $4 to $8 million.  We still would need additional

9  liquidity to cover that $20 to $30 million.  In that regard,

10  we have been talking to a financial investor, the plan

11  sponsor we referenced earlier today and made that a specific

12  request as part of any plan.

13  Q.   And so could you -- Why don't you tell us a little bit

14  about that plan sponsor and the negotiations with that plan

15  sponsor.  Has the plan sponsor proposed a term sheet?

16  A.   Yes, we are in negotiations with that plan sponsor as

17  well as with the Committee.  As Mr. Traub mentioned, this is

18  not the first time we've spoken with this sponsor, potential

19  sponsor, so they have come back to us several times and now

20  we're in negotiations with a number of details including the

21  -- what we'll call the over-advance, which would be that

22  liquidity issue of $20 to $30 million.  They have made

23  suggestions how they might be able to bridge that gap given

24  a downside scenario.

25  Q.   Have they specifically offered to provide the financing

1 | needed to cover that gap if it should occur?

2 | A.    Yes, they absolutely have offered it, and we are jointly

3 | in discussions with the Committee and with the proposed

4 | sponsor and to how the mechanics of that would work.

5 | Q.    Okay.  Are there any other options available -- let me

6 | put it this way:  You've mentioned financing options that are

7 | available to the company from a variety of financial

8 | institutions.  You've mentioned the plan option that's

9 | available to the company where the sponsor would propose to

10 | provide that liquidity.  Are there any other options that are

11 | available to the company?

12 | A.    Yes, there's really -- there are probably two big

13 | options in addition to a plan.  One would be another

14 | additional loan, probably a traunch C loan, is how we would

15 | characterize it.  We have been speaking with a group that

16 | would be willing to provide that.  That would most likely

17 | result in the company staying in bankruptcy and trying to

18 | turn itself around, but that loan would provide the

19 | additional liquidity of that $20 to $30 million.

20 | Q.    And has the company received the term sheet proposing

21 | that type of traunch C loan?

22 | A.    Yes, we have.

23 | Q.    When you say, "traunch C loan", could you just describe

24 | what you mean by that?

25 | A.    It's basically just a way of thinking about the order of

1 which the loans have seniority.  The bank loan that provides

2 us with our revolving credit to buy merchandise would be the

3 senior bank loan, and then a loan below that would be

4 characterized as a, you know, the traunch B and then the

5 third loan, the traunch C would be the last to be paid.

6 Q. Uh-huh.  And is there any third option that's available

7 to the company?

8 A. I think there is obviously if you applied a personal

9 preference, we would like to have the plan done, but

10 certainly there is still the option that it's been mentioned,

11 which is the company could be sold in pieces in a 363

12 auction.

13 Q. Okay.  And what is the time frame in which you expect to

14 reach a conclusion on whether terms for a plan of

15 reorganization can be finalized?

16 A. Realistically I think sixty to ninety days would be the

17 right time frame to finish the discussions and the

18 negotiations and see whether or not we do have a plan and

19 whether or not the sponsor would be able to agree to the

20 detailed negotiation topics.

21 Q. And is that also the time frame within which you think

22 decisions need to be made as to whether the company can

23 operate with its liquidity resources available to it?

24 A. Yes.  You learn a lot.  In the next sixty to ninety

25 days, we will have obviously clarity on this potential

1    sponsor.  We would also understand a lot more about the other

2    two options that we mentioned, and we would have a high

3    degree of visibility under the liquidity profile of the

4    company for the remaining calendar year.

5    Q.    Who are the individuals that constitute the senior

6    management team of KB Toys?

7    A.    There's a team of five:  Michael Glazer (phonetical),

8    the CEO; myself as COO; Rob Feldman (phonetical), chief

9    financial officer; Ken Grady is our general counsel as well

10   as executive vice president of administration; and Sal Vasta

11   (phonetical) as our executive vice president of

12   merchandising, our chief merchant.

13   Q.    And what are Mr. Feldman's responsibilities?

14   A.    As chief financial officer, he handles the basic

15   financial duties of any -- typical of any company, of

16   finance, accounting, treasury, dealing with the banks, but he

17   also has in his responsibilities the information technology

18   group reporting to him as well as the distribution network

19   reports to Rob as well.

20   Q.    And could you tell us what the responsibilities are of

21   Mr. Glazer.

22   A.    Mr. Glazer as CEO has the -- again, a fairly typical

23   slate of duties.  All things that -- all the high level

24   strategic issues that I deal with whether it's in product or

25   merchandising, real estate questions, most of those issues

1  are Mr. Glazer and myself dealing with and on occasion with

2  Mr. Feldman as well.

3  Q.   And who are the members of the Board of Directors of KB

4  Toys?

5  A.   Mr. Glazer and Matt Levin and Josh Beckenstein

6  (phonetical) from Bain Capital.

7  Q.   Okay.  And so when you say from Bain Cap is that both

8  Mr. Levin and Mr. Beckenstein?

9  A.   Yes, it is.

10  Q.   And do you know Brian Murphy?

11  A.   Yes, I do.

12  Q.   And who is he?

13  A.   Brian Murphy works for Bain Capital.  I believe his

14  title is also executive vice president.

15  Q.   And does he have any involvement in this case?

16  A.   Yes, Brian is quite involved with the business day to

17  day.  He's basically our liaison to Bain Capital and bit of

18  an advisor to the company as well.

19  Q.   Does Mr. Murphy keep up to speed with the financial

20  performance of the company?

21  A.   Yes.  The five members I mentioned earlier of management

22  form what I call an Executive Committee, and Brian Murphy

23  speaks with each of those five members on a regular basis if

24  he has questions about how sales are doing, what new

25  promotions we might be doing, or certain financial issues he

1   could speak directly with any members of that Executive

2   Committee.

3   Q.   And in addition to the operating part of the business,

4   does he also -- is he also involved and aware of the various

5   strategic options available to the company?

6   A.   Yes, definitely.

7   Q.   And do you know whether he reports his knowledge and

8   information to the members of the Board?

9   A.   Yes, I know he does on a regular basis.

10  Q.   Okay.  Now, you mentioned an Executive Committee; can

11  you describe the responsibilities that Committee has?

12  A.   Yes.  About a little over a year ago, when I was made

13  chief operating officer in October of 2003, one of the first

14  things I did was formed a weekly meeting with the five

15  executives including myself.  We address issues that would

16  typically come up to a company at very high levels.  They may

17  be legal issues to deal with the issue of the day, but large

18  scale challenges we might have whether there's some product

19  or promotions, financial issues, human resource issues, and

20  general strategy of the company is directed by that

21  Committee.

22  Q.   And are Messrs. Feldman and Glazer participants and

23  members of that Executive Committee?

24  A.   Yes, they are.

25  Q.   Now, in your earlier testimony, Mr. McMahon, you

1    described various overhead reduction initiatives that the

2    company has taken, can you summarize the size of those

3    overhead reductions?

4    A.    I think the simple way to think about it is we were

5    about $58 to $60 million of fixed costs at the time we filed.

6    That run right now is closer to $36 million.  So about a one-

7    third reduction in the overall fixed costs.  From the people

8    point of view, we have about 140 people have been terminated

9    from the Pittsfield office.  That original base was about

10   480, and in the field we have, basically have the size of the

11   organization in the field which has resulted in terminations

12   of about 50 to 60 people.

13   Q.    And the reductions in the staff at the home office, has

14   that resulted in any reallocations of responsibilities?

15   A.    Yes.  These changes were a necessity given our overall

16   re-sizing of the business.  We have half the business, just

17   as a reminder, Your Honor, we have half as many stores as

18   when we filed, roughly 650 stores.  The duties that people

19   have had to do, people have had to pick up additional

20   responsibilities.  We've been unable to kind of rehire in

21   those positions sometimes because of costs, sometimes we've

22   just been unable to find people.

23   Q.    And has that resulted in Messrs. Feldman and Glazer

24   having to take on additional responsibilities?

25   A.    Yes.  I think an example would be with Mr. Feldman, he's

1    lost a few people, his controller and other senior people in

2    finance.  We also lost a senior vice president in

3    distribution, and we've had to change the vice president of

4    information technology.  In each of those cases, Mr. Feldman

5    has had to take on additional duties.  I've been unable to

6    get him additional resources that I mentioned for both costs

7    reasons and just the ability to find someone.

8    Q.   And had Mr. Feldman and Mr. Glazer participated in the

9    various discussions and meetings with the Creditors

10   Committee?

11   A.   Yes, all three of us have attended the Committee

12   meetings on a regular basis, actually many of the five of us

13   have, but consistently the three of us have attended those

14   meetings as well as any additional meetings relevant to

15   restructuring the company.

16   Q.   So, if you meet with -- for example, have there been any

17   meetings with Sun -- have there been any meetings with the

18   potential plan sponsor?

19   A.   Yes.  In each of those meetings, Mr. Glazer and I have

20   attended and in some cases Mr. Feldman as well, but in all

21   cases Mr. Glazer and I have attended.

22   Q.   And do Mr. Feldman and Mr. Glazer play an important role

23   in those strategic discussions?

24   A.   I would say, yes, very much so.  I've only been with KB

25   for two years.  I do have over a decade of experience in

1    consumer products, but not all in retail.  Their combined

2    experience in retail and understanding of KB Toys has been

3    invaluable in those meetings.

4    Q.    And if Mr. Glazer, Mr. Feldman were required to spend

5    time on litigation related to the recapitalization

6    transaction, do you believe that would detract from their

7    ability to perform their responsibilities?

8    A.    I believe it already has, quite honestly.  There have

9    been times when I have had business-related issues that I

10   would go down at, you know, 9:30 and look for a meeting with

11   Mr. Feldman or walk across the hall to meet with Mr. Glazer

12   and they've been behind closed doors dealing with attorneys

13   regarding all the issues that we're discussing today.  It

14   already is a distraction to them.

15   Q.    And if those gentlemen were continued to be distracted,

16   could it adversely affect the company's ability to implement

17   its business plan successfully reorganized?

18   A.    I would say, again, yes.  As I mentioned, it's already a

19   distraction, and you have to remember that we as the three

20   senior executives of the company are very visible to the

21   remaining group within Pittsfield, and people are noticing

22   the distraction of those two executives.

23   Q.    Does it also affect your daily routine?

24   A.    It does.  I don't have a day that goes by that I don't

25   have to kind of read some motion, some filings.  I typically

1  get in the office between 7:30 and 8 o'clock in the morning.

2  I typically look of the sales reports by store, by region.  I

3  look at different product categories that have done well for

4  the previous day.  As an example, the last three or four

5  working days, I spent between 7:30 and 9 o'clock reading all

6  the various court filings to make sure I was well prepared.

7  Q.    And has there been any effect on the general work force

8  in the home office from this litigation?

9  A.    Yes.  As chief operating officer, virtually everyone

10  kind of reports up through me.  I have on any given day four

11  or five people of various levels from vice president down to

12  the, you know, lower level management, and everyday a person

13  coming into my office with concerns about how this litigation

14  or potential litigation would affect the company, and most

15  importantly they typically ask how it will affect them.

16  They're not always logical about that, but their emotion does

17  have to be dealt with given that we've lost a lot of key

18  people in the last six months, and we can't afford to lose

19  people even if it's for an irrational reason.

20  Q.    And these are actual effects that have already occurred;

21  is that correct?

22  A.    Yes.  We lost -- Last week I lost my vice president of

23  store operations, someone who was probably referred to

24  internally as Mr. KB.  A great attitude, a sparkplug of a

25  personality, and he was not actively looking, but he cited to

1  me the uncertainty of the case and said it was absolutely

2  exacerbated by the distractions and the issues regarding the

3  litigation.

4  Q.    But don't you think all of this will -- all that

5  distraction will just blow over after the initial noise about

6  the litigation?

7  A.    I would say not.  I think -- It's a company that I would

8  characterize, people are on edge.  People are basically have

9  their antenna out very high waiting to hear anything, and

10 whether it's an article in the local paper, again, just a

11 reminder, Pittsfield's a very small town.  We are a very

12 large employer there.  Or if they read something on the

13 internet.  Nowadays, with technology, everyone has the

14 ability to do a Google search or a Yahoo search based on a

15 key phrase and every time something is mentioned, even if

16 it's a very innocuous article, if it says something in the

17 title about KB Toys and bankruptcy or lawsuits, they will

18 read it, and they will become anxious.

19         MR. POLEBAUM:  I have no further questions, Your

20 Honor.

21         THE COURT:  We're going to take about a ten minute

22 recess at this time.

23         (Whereupon at 3:20 p.m. a recess was taken in the

24 hearing in this matter.)

25         (Whereupon at 3:37 p.m. the hearing in this matter

1    reconvened and the following proceedings were had:)

2              THE COURT:  Where's Mr. McMahon.

3              MR. POLEBAUM:  He's right here, Your Honor.

4              THE COURT:  Here he is, okay.  Mr. McMahon, you

5    have the floor.  Okay.  Does the -- I'm going to give you a

6    chance but I'm wondering if the Committee will have any

7    further direct --

8              MR. TRAUB:  A few questions of Mr. McMahon?

9              THE COURT:  Pardon me?

10             MR. TRAUB:  Are you going to have any questions of

11   Mr. McMahon?

12             THE COURT:  Yes.

13             MR. TRAUB:  I do.

14             THE COURT:  Okay, I think it's more efficient if

15   you cross-examine after the Committee.

16             MR. TRAUB:  I'll try to be brief.

17                         CROSS-EXAMINATION

18   BY MR. TRAUB:

19   Q.   Good afternoon, Mr. McMahon.

20   A.   Good afternoon.

21   Q.   You say that in the early stages of the cases the

22   company came up with a trade lien program.  Did in fact the

23   Creditors Committee suggest to you the trade lien program?

24   A.   Yes, to be worked on together, yes.

25   Q.   Was it successful?

1  A.    Yes, I believe so.

2  Q.    Have you gotten all the credit that you can possibly

3  need in the case, the full term of your projection?  In other

4  words, you had a projection early on in the case, you needed

5  a certain amount of days' credit.  With this program you did

6  meet that amount of credit during the season; correct?

7  A.    The credit terms we are achieving are on our plan, yes.

8  Q.    Okay.  Was it your stated intention numerous times --

9  One other thing.  Do we meet every month?

10 A.    We meet on a regular basis.  There's given calendars.

11 It's not necessarily every month, but pretty much every

12 month, yes.

13 Q.    And we speak on a regular basis about various issues

14 going on in the case?

15 A.    The attorneys speak on a regular basis.  The company

16 executives don't typically speak with the creditors'

17 attorneys.  We speak with the Creditors Committee members but

18 not with the attorneys.

19 Q.    Would you say it's an active committee?

20 A.    Yes.

21 Q.    And what is -- Did we have a disagreement earlier on the

22 case about when the company should emerge from Chapter 11?

23 A.    I don't know if I understand the question.

24 Q.    Did you take the position that you thought the company

25 should emerge from Chapter 11 in the fall of 2004?

1   A.   Yes, when we talked about the potential sponsor we did

2   indicate we thought that would be a viable plan and a

3   reasonably good time to come out.

4   Q.   And even after the sponsor went out, wasn't it your view

5   that you should try to emerge from Chapter 11 in November of

6   2004?

7   A.   I'm not too sure, again, I understand.  When you say --

8   You're asking for an opinion was it a good time to come out

9   in November?

10  Q.   Was it your intention to come out of Chapter 11 in

11  November of 2004, which was the last exclusivity extension

12  before this one?

13  A.   We had discussions with Angelo Gordon, as I mentioned

14  earlier, in October, and the intention of doing a plan with

15  Angelo Gordon was at that time, yes.

16  Q.   And during that period of time from the time you started

17  in Chapter 11 until around that time, would it be fair to say

18  you gave us no less than four different business plans?

19  A.   Again, could you repeat the time reference?

20  Q.   Between the time you filed for Chapter 11 and November

21  of 2004, did you give us not less than four different

22  business plans that you felt the company could reorganize

23  under whether it was through a plan funder who we didn't work

24  out with or Angelo Gordon?

25  A.   The term "plan" is a dangerous term just because of the

1   way we reference our budgets and our business plan, how we

2   operate our day-to-day business.  So, the business, our

3   business performance in each of those different times that we

4   had discussions with various potential sponsors had changed

5   at that time, so, we had to update those financials and

6   therefore, the forecast going forward would change, if that's

7   what you're referencing --

8   Q.   No, I'm not.

9   A.   -- that did change.

10  Q.   What I'm suggesting is, that as you were determining --

11  you were taking the position that the company should emerge

12  from Chapter 11 early on, you presented several three-year

13  business plans which would have gone to the viability,

14  feasibility to the Committee.  Would you say there was at

15  least two of those?

16  A.   Well, with each case that we had a plan we had one.  So

17  in the case of the sponsor we mentioned in that June/July

18  time frame, then later on in October, yes, there were

19  separate plans that were revised based on our knowledge at

20  the time.

21  Q.   And in the November time frame, did we tell you that we

22  would not extend exclusivity any further unless we brought in

23  somebody who could help devise a business plan that we

24  thought was achievable?

25  A.   I don't know about the specific timing.  I know we did

1   jointly agree to bring in Retail Forward, which I believe was
2   before that time.
3   Q.   Did we make the suggestion to you that we needed an
4   outside plan consultant and you agreed to that?
5   A.   It's hard to remember who actually said the first point.
6   I think that we had, as you mentioned, pretty regular
7   contacts, so we did agree jointly that bringing someone in
8   from the outside and I think we had a very good discussion
9   was my recollection as to the type of person that would be --
10  the type of group that would be.
11  Q.   Don't you recall that we originally said that unless you
12  could agree, we could some to somebody who would help you
13  devise a business plan.  We'd like to have somebody come in
14  with hiring and firing powers because you hadn't been able to
15  achieve any of your other business plans?  Do you recall
16  that?
17  A.   I recall that the Committee mentioned that they were not
18  satisfied with the pace of the changes and the success to
19  date, and they said an outside group should be brought in and
20  that you would probably not support a plan going forward
21  unless such a group was brought in, and we did bring that
22  group in.
23  Q.   Had you gone forward with either of the business plans
24  that were developed, any of the business plans that were
25  developed before we agreed on Retail Forward, would you have

1    made those business plans as you sit here today?  Would you

2    have achieved them or would you have failed to make them?

3    A.    Well, that's a hypothetical question that I --

4    Q.    Well, you know what the business plan said.  You know

5    how you did, so you would have failed; right?

6    A.    I don't know.  With all due respect, if one of the

7    sponsors in particular which owns about twelve other

8    retailers had purchased us, it's hard to say what they would

9    have done differently and what ideas, what changes, what

10   investments they would have made, so I can't answer.  I don't

11   know.

12   Q.    Point in fact, didn't you revise your business plan in

13   December -- after December's results so that we could try to

14   have a conversation with you guys about whether or not we had

15   a viable plan?   Didn't you revise it right after Christmas?

16   A.    Yes, we revised our plans pretty much every week in

17   terms of --

18   Q.    I'm talking about emergence plans, plans that would form

19   the basis for emerging from Chapter 11 to try to satisfy us

20   on a constituency that I believe this is viable and it can be

21   done.  Didn't you revise it at our insistence?

22   A.    Yes, with your assistance and also Retail Forward, we

23   mentioned earlier, that the three of us, the three groups

24   together did form a new plan that, my recollection is that we

25   all agreed, had viability.

1   Q.   Okay.  And didn't during some of those revisions we ask

2   you to really look very closely at some of the assumptions in

3   it to make sure that it accurately reflected expenses,

4   inventory adjustments, and other details which you eventually

5   made those revisions; isn't that true?

6   A.   Yes, that would be true.  We did make adjustments as

7   required.

8   Q.   Okay.  And would you say that we're working very hard

9   with this plan funder to try to see if we can come up with a

10  viable business plan?

11  A.   I would say that overall the Committee has worked very

12  closely with the company on all these situations.  I would

13  say, though, that both sides seem to have been a bit

14  distracted in the last thirty days.

15  Q.   I'm not testifying, but I've been working on it every

16  day.  In any event, when you say -- You heard testimony

17  earlier that we were only a million dollars apart on a plan.

18  What's the basis for you knowing that given that my firm has

19  been the party directly negotiating with this plan funder

20  about each of the things that it would need to have the

21  company emerge from bankruptcy.

22          MR. POLEBAUM:   Objection, Your Honor.  The question

23  is referring to testimony that was never made by Mr. McMahon.

24  I'm the person who made the statement in oral argument to the

25  Court, and it's nothing that Mr. McMahon has ever testified

1    to.

2            THE COURT:   He says he can't answer the question;

3    is that right?

4            THE WITNESS:   It's a complicated question.

5            THE COURT:   Why don't you rephrase the question so

6    he can answer it.

7            MR. TRAUB:   Certainly.

8    BY MR. TRAUB:

9    Q.   You heard -- You've been in the courtroom the whole day;

10   right?

11   A.   Yes, I have.

12   Q.   Okay.  And did you hear a representative of the debtor

13   say that they believed that we're only about a million

14   dollars apart on a plan?

15   A.   That's not the exact phrase that I heard, but I

16   understand -- I was here during the testimony in which you're

17   referring to, yes.

18   Q.   Okay.

19   A.   Not the testimony, excuse me, the --

20   Q.   Do you have any direct knowledge of the most recent

21   negotiations as to how far apart we are in a plan?

22   A.   My understanding was that there was a discussion for the

23   emergence costs.  We had, with the Committee, put together a

24   plan of $26.5 million, and in that plan, that included $3

25   million set aside for litigation.  The Committee, I believe

1    countered back to this potential sponsor that that's what

2    they wanted, and the potential sponsor came back and said

3    originally $20 million but then came back and said, we would

4    be willing to fund up to $25 million.  That's my

5    understanding.

6    Q.    Those are not the only items in the plan or the term

7    sheet; are they?

8    A.    That's correct.

9    Q.    So, to say that we're only potentially a million dollars

10   or so apart on those items, that would not clearly set forth

11   that we may be apart by some degree on many other items; is

12   that right?

13   A.    My understanding, and this is from speaking directly

14   with members of the Creditors Committee as has my CFO, that

15   there were two issues.  That was one big issue.  The second

16   was the terms and mechanics of the seasonal over-advance and

17   if those two issues were satisfied that the Committee had

18   said they were very supportive of, and those are from

19   individual conversations that both I and the CFO have had.

20   So, my understanding was those were the two remaining issues.

21   Q.    Maybe you didn't speak to enough people, but there are

22   other open issues including the residual -- Excuse me --

23            MR. POLEBAUM:  Your Honor, this is examination.

24   Mr. Traub is not asking a question.  He's testifying.

25            THE COURT:  Oh, sit down.  Go on.