BY MR. TRAUB:

Q.   In those conversations you had, the Committee did say it was a critical issue that a sum of money had been set aside for the purpose of pursuing the 2002 redemption transaction; is that correct?

A.   Yes, and the company has agreed to that from the beginning.

Q.   Who is principally negotiating this transaction with this particular point at the moment?

A.   I, again, don't know if I understand the question.

Q.   This plan funding deal that it will emerge from bankruptcy, who's the principal party in negotiating that transaction at this time?

A.   Are you asking from the company's perspective or your perspective or just in general?  I don't understand the question.

Q.   The Creditors Committee or the debtor, who's the principal party doing the negotiating at this time?

A.   My assumption, my impression is that we are jointly negotiating with the creditors and with this potential sponsor.  I think we've been very respectful in the past, both you and Mr. Fox have asked to have private meetings with all potential sponsors, and we've been supportive of that.

Q.   Okay.  So would you say the Committee's supportive of the company's reorganization efforts?

1    A.    Yes, and as I mentioned, I've spoken with members of the

2    Committee, and I had sensed that as well.

3            MR. TRAUB:    I have no further questions.

4            MR. MARWIL:    (Microphone not recording.)

5            THE COURT:    Can you see him?

6            MR. MARWIL:    Your Honor, my partner, James McKenna

7    . . . (microphone not recording).

8            THE COURT:    That's fine.

9            MR. McKENNA:    Good morning, Your Honor.    I'm James

10   McKenna from Jenner & Block, Mr. Marwil's partner.

11           THE COURT:    Glad to meet you.

12           MR. McKENNA:    Glad to be here, Judge.    The last

13   time there was a completely different looking judge on the

14   bench from the last time I was in this courtroom.    Judge

15   Walrath sat.

16           THE COURT:    I can't help it.

17                      CROSS-EXAMINATION

18   BY MR. McKENNA:

19   Q.    Mr. McMahon, good afternoon.

20   A.    Good afternoon.

21   Q.    You began working for KB in February of 2003; is that

22   right.

23   A.    It was closer to April, first week of April.

24   Q.    All right.    And how did you get the job at KB?

25   A.    I had finished -- I had a three-year assignment as the

1  president and CEO of Decorative Concepts, and I finished that

2  in December, previous few months, and I was actually speaking

3  to some colleagues, having previously worked at Bain Capital

4  about some ideas I had about some other business

5  opportunities and just ran into some people that had

6  expressed, you know, an interest in whether or not I wanted

7  to come back to Bain.  I said I wasn't too sure I would be

8  interested in maybe working for one of the portfolio

9  companies.  That opportunity arose, and I did get a call a

10  few weeks back -- a few weeks later, excuse me, suggesting

11  that there might be an opportunity to work at KB Toys.

12  Q.   And is it your understanding that someone at Bain

13  recommended you for a position at KB?

14  A.   Oh, it's my knowledge, yes.  It was Mr. Levin. I had

15  worked with Matt Levin and Josh Beckenstein, two board

16  members, previously.

17  Q.   Okay.  And before going to KB you were in Cincinnati at

18  Decorative --

19  A.   Decorative Concepts.

20  Q.   Okay, and how did you get that job?

21  A.   I was working at Bain Capital at the time, and I was

22  approached by Fleet Bank who mentioned that there was a CEO

23  search going underway for a company called Fenway Partners, a

24  buy-out firm based in New York City, and that they thought I

25  would be a good candidate and wanted to know if it would be

1    okay if they passed my name along, and I said, I'm not that

2    interested but you may, and I did end up having conversations

3    with the Fenway Partners group and became CEO shortly

4    thereafter.

5    Q.    Okay.  And Fenway Partners is based in New York?

6    A.    Yes it is.  They're former Bostonians.

7    Q.    Well, okay, that explains it then.  What was your job at

8    Bain Capital?

9    A.    I was an executive vice president, working on portfolio

10   companies.

11   Q.    When was your first contact you had involvement with KB

12   Toys?

13   A.    Pretty much the day I started, I guess, in April.

14   Q.    Okay.  So when there was the acquisition of KB Toys from

15   what is now Big Lots Stores in December 2000, you had no

16   involvement.

17   A.    I was selling artificial flowers to Wal-Mart at the time

18   for Decorative Concepts.

19   Q.    All right.  And you had no involvement then in April of

20   2002 when the transaction that we call the equity

21   distribution transaction and the debtors call the

22   recapitalization transaction?

23   A.    That's correct.  I was still with Decorative Concepts.

24   Q.    And then before Bain Capital, you were with Bain and

25   Company?

1    A.    Bain and Company, which is the consulting firm.  Despite

2    sharing the name, is not connected with Bain Capital.

3    Q.    Different management consultants primarily?

4    A.    Yes, they are.

5    Q.    All right, well, let me -- maybe jump into this a little

6    bit.  You were here in court when Mr. Polebaum this morning

7    said that these days nobody is focusing on the business at

8    KB; do you remember that statement?

9    A.    I was here throughout the day, yes.

10   Q.    Is that true?

11   A.    There are -- I don't remember the exact quote, because I

12   --

13   Q.    Well, nobody is focusing on the business.

14   A.    I think there is a tremendous amount of distraction in

15   the company, yes.  I would say that the ability to focus has

16   been difficult for everyone from the most senior person down

17   to the most junior.

18   Q.    And you've had trouble focusing; have you?

19   A.    Yes.  I mean it is a major distraction from my time.  I

20   have very long days to begin with, and this is added to that.

21   Q.    Okay.  You've read the complaint that Big Lots filed in

22   Delaware Chancery Court have you?

23   A.    Yes, I did.

24   Q.    How many times?

25   A.    Three or four times.

1    Q.    Okay.  And no other paper has been filed in that case;

2    right?

3    A.    Excuse me?

4    Q.    I said, no other paper, other than Big Lots' complaint

5    has been filed there; right?

6    A.    There was the original complaint and there was a

7    response too, another filing that Big Lots filed as well, but

8    yes, those are the two that I know of.

9    Q.    What else has been filed in the Delaware case other than

10   the Big Lots complaint?

11   A.    I don't know of any others.

12   Q.    Okay.  When you come into the office and from 7:30 to 9

13   o'clock, read court filings, what you're reading are papers

14   and documents that are filed in the bankruptcy case; right?

15   A.    That would be inclusive, yes, all of them.

16   Q.    Okay.  And in connection with the present motion for

17   preliminary injunction that the debtors have filed, you read

18   that motion before it was filed; right?

19   A.    Yes.

20   Q.    Okay.  And you submitted an affidavit; right?

21   A.    Yes.

22   Q.    How long did you spend preparing, working on your

23   affidavit?

24   A.    I don't recall the exact time frame.

25   Q.    Okay.  And how long did you spend preparing to testify

1  today?

2  A.    Well, of course, had several conversations.  Again, I

3  don't have hours that add up, but, you know, each day there

4  seems to be two or three hours of each of my days that I gave

5  to something related to different forms of litigation.

6  Q.    Okay, and where are you based?

7  A.    In Pittsfield.

8  Q.    Okay, and when did you come down to this hearing?

9  A.    I came down yesterday afternoon.

10  Q.    Yesterday afternoon and stayed overnight near --

11  A.    Yes, I did.

12  Q.    -- here today and you're going back tonight or --

13  A.    I'm going to go back tonight.

14  Q.    -- if you're lucky.  Okay.  Mr. Traub asked you some

15  questions about the negotiations, I guess so did Mr.

16  Polebaum, the negotiations that are currently ongoing with a

17  plan sponsor.  I want to ask you some questions about that.

18  Is the identity of that sponsor confidential?

19  A.    I don't know the procedures in the Court, Your Honor,

20  but I think that most people prefer to not mention it by

21  name.

22          THE COURT:  I'm not going to require him to get

23  into that.

24          MR. McKENNA:  I wasn't asking, okay.

25          THE COURT:  Okay.

1    BY MR. McKENNA:

2    Q.    You've been personally involved in those negotiations.

3    A.    Yes, I have.

4    Q.    Okay, and is that in person, on the telephone, or both?

5    A.    Both.

6    Q.    Okay, and what is your role individually in those

7    negotiations?

8    A.    Well, as in any negotiations whether you're buying a

9    company or trying to work with the company to get it out of

10   bankruptcy, the sponsor or potential inquirer asks a lot of

11   questions about the different levers within a company, the

12   sales, the gross margin, the different cost areas.  So my

13   knowledge of that in the workings of the business as CEO is

14   where I spend quite a bit of the discussion explaining the

15   strategy.  I mentioned before the Retail Forward strategy in

16   the seventeen store sets.  I'm kind of the champion of that

17   process, so I spend quite a bit of time explaining how that's

18   working, how it will work.

19   Q.    Are there, to your knowledge, and if you don't know,

20   please tell us, but to your knowledge, Mr. McMahon, are there

21   face-to-face or telephonic negotiations with the plan sponsor

22   which you are not present?

23   A.    Conversations with whom?

24   Q.    With the plan sponsor.

25   A.    The plan sponsor has conversations with whom?

1    Q.   With any -- fair enough, with any -- Let me rephrase the

2    question.   To your knowledge, are there any negotiations with

3    the plan sponsor involving the debtors at which you are not

4    participating?

5    A.   I don't know, but I would be surprised if there have not

6    been discussions both with the company and with the Creditors

7    Committee.   I do know that there has been conversations with

8    the plan sponsor and the Creditors Committee, and I would

9    assume that there have also been meetings with other people

10   at the company besides myself.

11   Q.   At which you were not present.

12   A.   Yes, I would assume so.

13   Q.   Okay.   You don't know of any in particular?

14   A.   One or two phone calls where somebody's trying

15   logistically to set up a call.   I know people have spoken.   I

16   have not been on every call.

17   Q.   Okay.   Well, I wanted to specifically talk about not

18   logistics but about the actual negotiations with them.

19   A.   I do not know of any.

20   Q.   From the KB side, from the debtors' side, who else has

21   been involved in the face-to-face or telephonic negotiations

22   with the plan sponsor?

23   A.   I mentioned earlier that Mr. Glazer and Mr. Feldman and

24   I are the trio that has the vast majority of those

25   discussions, and in pretty much all the discussions, Mr.

1   Glazer and I are together, both on the phone and in person.

2   Q.   Now, has anyone from Retail Forward been involved in any

3   of those negotiations?

4   A.   Not with this particular plan sponsor that I know of.  I

5   may be wrong, but not that I know of.

6   Q.   Okay.  When was your last face-to-face or telephonic

7   negotiation with this plan sponsor?

8   A.   Mr. Glazer and I went down to Florida to visit with the

9   plan sponsor.  My recollection is about a month ago was when

10  the last time I had a face-to-face with them.

11  Q.   Okay.

12  A.   And I had no subsequent phone call conversations.

13  Q.   Okay.  What is your understanding as to -- Is the ball

14  in the debtors' court to get back to them or is the ball in

15  their court to get back to you?

16  A.   We were given the impression, as I mentioned before, Mr.

17  Feldman and I have had conversations with members of the

18  Creditors Committee, as Mr. Traub has mentioned as well, they

19  are discussing, the Creditors Committee, with this potential

20  plan sponsor quite a bit.  We were in impression that those

21  discussions were continuing, and that they were going to

22  jointly coming back to resolve those issues, that they had.

23  So, which, you know, which players is the next, I don't know.

24  Q.   Well, do you owe them a phone call as of today?

25  A.   Not to my understanding.

1    Q.   Okay.  So, the last meeting either face-to-face or

2    telephonic negotiations that you had with the plan sponsor

3    was when you and Mr. Glazer went to Florida about a month

4    ago.

5    A.   Yes.  And just as you asked me, I did recall, there was

6    an analyst with the sponsor that has had some follow-up

7    questions with our CFO on some numbers just to make sure

8    their model was correct, so that was part of the discussions

9    as well.

10   Q.   Okay, and you know that that has happened?

11   A.   Yes, I do know that.  There was, I think, two or three

12   occasions where there was some fine tuning that they were

13   trying to do mostly in regards to trying to understand these

14   emergence costs, I mentioned earlier, of roughly $25 to $26

15   million.

16   Q.   And that was Mr. Feldman who had those calls?

17   A.   Yes.

18   Q.   Okay. And approximately when were they?  There were two

19   or three, when were they?

20   A.   Probably once a week, you know, over the last three

21   weeks.  They're fairly regular conversations that you have in

22   this kind of thing where someone's putting a model together,

23   and, you know, they just want to make sure they get the

24   numbers exactly right.  So there weren't many changes, but I

25   think they were just confirming some of their assumptions.

1  Q.   Okay.  Now this meeting that you had in Florida, that

2  was before Big Lots filed its lawsuit or after?

3  A.   I believe it was before.

4  Q.   Okay.  And since that time, you haven't had any

5  telephonic conversations with the plan sponsor; correct?  You

6  personally.

7  A.   I have not personally, no.

8  Q.   And the Big Lots lawsuit has nothing to do with the fact

9  that you haven't had any conversations with the plan sponsor

10 since being in Florida; right?

11 A.   No, it has not.

12 Q.   When's your -- Do you have any currently scheduled date

13 for your next either face-to-face or telephonic contact with

14 that plan sponsor?

15 A.   No, when you asked where the ball is, in which court, I

16 think from the company's perspective, the ball would be more

17 in the Creditors Committee's court.  We had raised some

18 specific issues that were consistent with the Creditors

19 Committee regarding how the mechanics would work with that

20 seasonal over-advance, and we are waiting to hear what the

21 Committee and its potential sponsor had discussed on that.

22 So we don't have a set time frame for that, no.

23 Q.   Okay, but --

24 A.   I would have liked it to have been the last week, but I

25 think everyone's been a little bit focused on other issues.

1   Q.   Okay.  So, but in any event, if the focus -- Are you

2   saying the Creditors Committee is distracted from negotiating

3   with the plan sponsor?

4   A.   I think everyone's distracted.  With all due respect, if

5   we didn't have this meeting today, I think we probably would

6   have been meeting with that potential sponsor this week and

7   not all been here.

8   Q.   Okay, well, that's a good point, a very good point.

9   Okay, now, I'd like to ask you some questions about Retail

10   Forward, please.

11   A.   Yes.

12   Q.   How many people from Retail Forward are working on the

13   KB account?

14   A.   Two primary people.  They have a third from time to time

15   but it's really the two people.

16   Q.   And who are they?  What are their names?

17   A.   Peter Wile and Diane Hamilton.

18   Q.   And where are they based?

19   A.   They're actually not together.  Peter is based outside

20   of Boston and Diane is outside of Pittsburgh, I believe.

21   Q.   And Retail Forward has been -- I'm sure this is in the

22   record and I apologize, has been retained for how long?

23   A.   The exact dates, I won't be able to give you but roughly

24   around the September through December time frame.  We did

25   extend them, their time, through January to I think February

PENGAD • 1-800-631-6989

FORM FED 25

1   22nd was their final day.

2   Q.    Okay.  So as of today, they are no longer retained by

3   the debtors?

4   A.    No.  Your Honor, I believe you agreed to an extension if

5   the Committee and the company felt that made sense, and at

6   this point we've not had a chance to have that discussion.

7   Q.    Okay.  Do you personally want to have them retained?

8   A.    They've been very helpful, and I think you've already

9   described the excitement that we had a company, the seventeen

10  store sets and new strategy, and if they continue to help us

11  implement that strategy, I think the company would welcome

12  the help.

13  Q.    You're satisfied with their performance so far?

14  A.    I think the results are showing that it's starting to

15  work, and I think based on that, I think that if there were

16  doubters within the company.  I think they're more supportive

17  now to see that -- we're staring to see the results.

18  Q.    Has Retail Forward made any recommendations concerning

19  the management of the debtors, the KB enterprise going

20  forward?

21  A.    We did have conversations even in the very early part of

22  Retail Forward's engagement where we suggested that we had

23  some challenges within our management ranks, some players

24  that we thought we could upgrade and some positions that we

25  thought we needed to fill and asked them for a list of

1    recommendations in terms of people, and they did provide such

2    a list to us, to the company and shared that with the

3    creditors.

4    Q.    Okay.  Did they prepare a draft report?

5    A.    The list that I saw was just a list of names and by

6    positions.  I did not receive a report.  If you're referring

7    to a human resources report?

8    Q.    That might be it, yes.

9    A.    No, I did not receive a report.  The reports that I

10   received from Retail Forward, the company received, were

11   based on the strategy of the plan.

12   Q.    Okay, have you ever -- Let me ask the question this way:

13   Have you ever received in writing, whether in file form or in

14   draft, any recommendations of Retail Forward -- by Retail

15   Forward about the management of KB, specifically who should

16   be on the management team --

17   A.    I have not received anything in writing from Retail

18   Forward, in that regard.

19   Q.    Did you participate in any discussions where Retail

20   Forward expressed any opinions regarding their views on KB's

21   management going forward?

22   A.    Yes.  We welcomed that, actually.  We're a pretty open

23   organization.  We said to the Committee, Creditors Committee

24   as well, from the first time we met, that the company was

25   very open to criticisms, suggestions of how we could change

1    our organization and change people, and we made similar

2    comments to Retail Forward, and they were very open with all

3    different levels of people that they thought we could change

4    or improve.

5    Q.    They didn't -- Well, did they recommend that certain

6    members of KB current management not be retained on a going-

7    forward basis?

8    A.    Not explicitly.  I think they -- When you say

9    management, you have to remember how I define management is

10   the top maybe thirty people in the organization, and we did

11   have recommendations and discussions that I kind of offered

12   to start the conversation, we might be able to improve a

13   certain director or certain vice president.  So those kind of

14   discussions we had on a very regular basis.

15   Q.    Okay, well, didn't they recommend, for example, that Mr.

16   Feldman not be retained on a going-forward basis?

17   A.    No, they never recommended that to me.

18   Q.    Okay.  Was there any member of KB management, as you

19   define it, that Retail Forward recommended not be retained on

20   a going-forward basis?

21   A.    No, there was not a single person they recommended not

22   be retained.

23   Q.    Did you have any role in preparing the KERP filing in

24   this bankruptcy?

25   A.    Yes.

1    Q.    Key Employment Retention --

2    A.    Yeah, we had actually by the suggestion of ENY, at the

3    time now Juliani Partners, one of their partners suggested

4    that for most of us who had not been in a bankrupt company

5    before that a critical first thing to do would be make sure

6    that the key employees have a retention plan, which also tied

7    into a severance plan.  It turned out to be a very true

8    statement in the sense that we did put together a plan

9    jointly with the Committee, and it was well-received by

10   roughly about thirty people in terms of the overall retention

11   plan, in terms of communication and their importance, but

12   also the payout obviously over a twelve-month period kept

13   some people motivated enough to stay.

14   Q.    Okay, and so -- and I apologize for not knowing this,

15   but there are about thirty people that were part of the

16   program?

17   A.    Roughly, between 24 and 30, I think is the right number.

18   Q.    I'm sorry, 24?

19   A.    Twenty-four and thirty, somewhere in that range, I don't

20   have the exact figure.

21   Q.    Okay, and you're one of those people?

22   A.    Yes, I am.

23   Q.    The person who recently left, you referred to him as Mr.

24   KB; was he one of those people?

25   A.    Yes.  Pete Longo is his name.  He was my vice president

1    of store operations and he was also one of those people.

2    Q.    And he was a VP of store --

3    A.    Store operations.

4    Q.    And did he get a severance package?

5    A.    No, he voluntarily resigned, so he does not receive

6    severance in that case for the KERP.

7    Q.    And where is he working today?

8    A.    There is a start-up of a day-care chain based in Denver,

9    Colorado that he is working with as the chief operating

10   officer.  It's an opportunity that he felt was something, a

11   little bit different from toys but something that he wanted

12   to try.

13   Q.    Not to cast aspersions on Pittsfield, but the fact that

14   he had the chance to go to Denver, Colorado, did that have

15   anything to do with his decision to leave?

16   A.    I would say no.  Mr. Longo is married and his wife works

17   in Pittsfield.  He has been in Pittsfield for a very long

18   time, very well regarded, knows a lot of locals.  That was

19   not part of his consideration.  He told me in the exit

20   interview that he really thought that the uncertainty and the

21   different scenarios for the company were such that now is the

22   right time for him to take a chance and do something else.

23   Q.    Yeah.  I assume -- I assume is not right.  I assume he

24   knew that there had been a previous expectation, if you will,

25   of KB merging from bankruptcy last November; did he know

1   about that?

2   A.    I don't think so.  You know, I think our discussions at

3   a management level had been very thoughtful and very cautious

4   in terms of the proceedings of any week.  We would tell the

5   management group, the vice presidents that we are speaking

6   with potential investors and we're encouraged, but not to

7   read into our encouragement that it's easy to get a deal

8   done.  So that would be probably what the message that Pete

9   would have received, Mr. Longo would have received in

10  November or October, in this case.

11  Q.    Okay.  What is FTI currently doing for the debtors?

12  A.    They work with -- very closely with Mr. Feldman on

13  various financial aspects of the company.  They help with a

14  large amount of the modeling and financial scenarios.  That's

15  kind of been their expertise as well as the fact that we've

16  lost several resources in our Financial Department, so they

17  spend quite a bit of time there.

18  Q.    And how many people from FTI are generally assigned to

19  the KB account?

20  A.    I don't know the exact figures.  They're also working on

21  the claims from Reconciliation, which is an area I don't know

22  how many people -- I know they have at least one supervisor

23  who's done quite a bit of that.  Maybe there's ten.  I don't

24  know, but several people there.  But in terms of working

25  closely with me and the rest of the management, Mr. Feldman,

1  there are two partners then they -- a man named Jonathan, I

2  don't recall Jonathan's title but basically those three

3  people are the primary contacts on the financial side.

4  Q.    Right, and those three are not working on the claims,

5  they're working --

6  A.    That's correct, they're not working on the claims.

7  Q.    I would like to show you, Mr. McMahon, your affidavit

8  that was submitted in support of the current motion for a

9  preliminary injunction.  Do you happen to have a copy with

10 you?

11 A.    No, I do not have one here, no.

12         THE COURT:  Well, I may have a copy, I don't know.

13         MR. McKENNA:  I have one for me and one for the

14 witness, Judge.  I just don't have one for you or for Mr.

15 Polebaum.

16         THE COURT:  Oh, go ahead then.  Do you want to mark

17 that?  Can we mark the affidavit?  Call that Exhibit 1.

18 BY MR. McKENNA:

19 Q.    Okay, Mr. McMahon, we've marked as Big Lots' Exhibit 1 a

20 copy of your affidavit submitted in support of the Debtors'

21 motion, a preliminary injunction, and I'm not going to go

22 through this.  I want to ask you a few questions about

23 paragraph number (12), so if you could turn there, please.

24 Okay, do you see that paragraph?

25 A.    Yes, I do.

1    Q.    I want to read to you the second sentence of paragraph

2    (12):    "The Chancery Court defendants, other than Robert

3    White, and other senior management have been extensively

4    involved in the development and implementation of the

5    debtors' business plan during these Chapter 11 cases."    Do

6    you see that?

7    A.    Yes, I do.

8    Q.    And my question is, which of the Chancery Court

9    defendants are you referring to in that sentence in your

10   affidavit?

11   A.    I was referring to all of them, notably the three board

12   members and Mr. Feldman.

13   Q.    Okay, so you're referring to Mr. Feldman --

14   A.    Mr. Glazer, Mr. Beckenstein, Mr. Levin.

15   Q.    Okay.    Any of the other defendants were you referring

16   to?

17   A.    No.

18   Q.    And the last sentence of that paragraph, "Their

19   involvement has been critical to the debtors' restructuring

20   efforts."    Do you see that?

21   A.    Yes.

22   Q.    And what were you referring to by "restructuring

23   efforts"?

24   A.    Restructuring efforts, as I characterized early, fixing

25   the company, trying to improve the company's performance as

1   well as ultimately getting to a plan of reorganization.

2   Q.   Were you intending to mean that just to include running

3   the business?

4   A.   Yes.   In restructuring would lead to a plan of

5   reorganization as the ultimate goal, but yes, improving the

6   business day to day, yes.

7   Q.   Okay.  So was there any aspect of running the business

8   that you meant to exclude from your sentence there?

9   A.   I don't understand that question.

10  Q.   Okay.  I'm not going to follow up.  You spoke of three

11  phases in the -- I don't want to mischaracterize it.  I've

12  got -- You spoke of three phases in the year, one of which,

13  Labor Day forward was the busy --

14  A.   The busy season,  yes.

15  Q.   Busy season, okay.  And you said that during that time

16  your staff basically doubles and, you know, that's where the

17  --

18  A.   Yeah, we currently employ about 8,000 people at KB Toys,

19  and during that time, the number gets closer to 15,000

20  associates, company-wide.

21  Q.   Okay.  So then what are the other two phases other than

22  the busy season?

23  A.   The first phase, I mentioned, what I was referring to

24  was if you look at the last fourteen months, the first

25  roughly four months we were trying to stabilize the business.

1    The second phase we were trying to fix the business, try to

2    come up with some new strategy, new visions.  We developed

3    the -- what I call the value store concept.  There are a lot

4    of things that we had ultimately done with Retail Forward

5    itself.  The third phase was basically a period where we

6    tried to do that, but recognizing that it's a very busy time,

7    and that it's very difficult to implement things.  As I

8    mentioned, many times in our Creditors Committee meetings

9    that we would like to have twelve to eighteen months to turn

10   the plan around, and those phases kind of coincide with that

11   period.  We're really now adjusting January and February at

12   the implementation phase of what we've been talking about for

13   the last fourteen months.  So, really we are just now in what

14   I would call the forth phase, which is developing a plan that

15   works in terms of the company's strategic plan, at which time

16   we think that it would be appropriate to have a plan of

17   reorganization.

18   Q.   Okay.  You mentioned February, March, and April was a

19   time for, quote, "product decisions".

20   A.   Yeah, I was referencing the fact that when we buy

21   product, it's -- sometimes it take awhile for that product to

22   be made and shipped overseas, if it's coming from Asia, so

23   that decisions that are made in February, March, and April

24   may actually not be in our stores until September or October.

25   Q.   Okay.  And is there a department within KB that is

1   responsible for those product decisions?

2   A.    Yeah, it's fairly standard for a retail group.  We have

3   a merchandising group which represents the buyers and the

4   DMMs and I'll say the senior merchant above them.

5   Q.    And is that Mr. Vasta?

6   A.    Sal Vasta is our executive vice president who oversees

7   that merchant group.

8   Q.    Okay, so he oversees that merchant group.

9   A.    Yes, he does.

10  Q.    Okay, and Brian Murphy, you testified was the debtors'--

11  the company's primary contact with Bain Capital?

12  A.    I don't know if I used that exact terminology, but yes,

13  he is a contact that we use and is our primary contact.

14  Q.    He would be your -- okay.  And for the record, Mr.

15  Murphy is not a named defendant in the Big Lots lawsuit;

16  right?

17  A.    So you state, and I believe that's correct.

18  Q.    Okay, and neither are you; right?

19  A.    No, I am not.

20  Q.    Okay.  Neither is Mr. Vasta; correct?

21  A.    I don't believe so, no.

22  Q.    You testified about the 140 people being terminated or

23  let go from the Pittsfield operations.

24  A.    Yes.

25  Q.    And that that's from a base of 480?

1    A.    That's an approximate number, but, yes, that's about

2    right.

3    Q.    So approximately you've gone from 480 to approximately

4    --

5    A.    Three forty, that's correct.

6    Q.    And what group is that?  Is that your management team in

7    Pittsfield?

8    A.    That is all the operations.  That is our corporate

9    office which is encompassing all of the functional areas.  We

10   do not have field offices per se.  We have district sales

11   managers who oversee groups of stores, but that is really the

12   entire corporate office.

13   Q.    Does that include secretaries, for example?

14   A.    Yes.  It includes all functional areas.

15   Q.    All right.  So, do you have a calculator with you?

16   A.    I can probably do it in my head.

17   Q.    Well, okay, 480 to 340 is about a 30 percent reduction?

18   A.    That is correct.

19   Q.    Okay.  And let's, you've got a 30 percent reduction in

20   employment at your headquarters.  In the meantime your stores

21   have gone down by about, what, 50 percent --

22   A.    Right.

23   Q.    -- you testified?

24   A.    Yes, that is correct.

25   Q.    You testified at some length to your perception of the

1    disruption that, what you called "this litigation" is causing

2    KB, were you referring to the Big Lots lawsuit?

3    A.    I was referring to all the litigation, but Big Lots

4    being the first, clearly, would be part of that as well, yes.

5    Q.    When you say, "Big Lots being the first", what do you

6    mean?

7    A.    I believe it was the first litigation that was filed.

8    Q.    Okay.  So you're not referring to the bankruptcy action

9    that has --

10   A.    I made the generic comment.  Everything that's happening

11   today and everything that's been filed, every motion, is

12   getting picked up by the press, so I really was more generic

13   in referring to all, you know, all motions, all filings.

14   Q.    If the Creditors Committee would commence litigation

15   against KB that you think that would have a disruptive effect

16   as well?

17   A.    I would be very surprised if the Creditors Committee

18   commenced litigation against the company.  I think they would

19   be remiss there.  They might make it against other

20   defendants, but I don't think they have a case against the

21   company at this point that I know of.

22   Q.    Well, let me ask:  If the Creditors Committee commenced

23   litigation against the same parties that Big Lots has

24   commenced litigation against, do you think that would have a

25   disruptive effect?

1    A.    Yeah, at this point, literally, if there's a motion

2    that's filed to change the venue of the next court date, that

3    will be a distraction.  People are on edge, as I mentioned

4    earlier.  It's really not the quality of any of the filings

5    or any of the motions.  I am dealing with people that are

6    quite anxious and irrational, are making decisions, have had

7    interviews and are making decisions based on the clarity of

8    the future they can see for KB.  So, we don't sit down and

9    discuss the details of filings just in general.  The more

10   noise that's out there the less stable the organization

11   appears to be.

12   Q.    Okay, so among the things that has caused disruption

13   have been reports in the press about --

14   A.    Yes, definitely.

15   Q.    Okay.  Do you see Mr. Glazer daily?

16   A.    Yes, we sit about twenty feet apart from each other.

17   Q.    Okay, and is he in at 7:30 reading pleadings with you or

18   --

19   A.    We don't read together, but he is -- Michael and I tend

20   to be the first two in and the last two out.  Yes, he's in at

21   7:30.

22   Q.    And how would you describe what Mr. Glazer is doing in

23   terms of the restructuring effort?

24   A.    Well, the CEO's job is kind of a vague job in the sense

25   that it's very similar to a COO in the sense that we touch

1    all the areas.  So, a typical day, Mr. Glazer and I may have

2    a meeting talking about the previous days' sales.  May have

3    some discussions on something that's working well or not

4    working well.  I may ask him for his help with a certain

5    company, a certain supplier that he knows very well from his

6    decade's long experience.  We may want -- for example,

7    there's a hot product right now called Fly Wheels.  We may

8    want to try to get more additional, you know, additional

9    product of that kind.  Sometimes a senior level call can help

10   you get a little bit of an allocation.  He'll sit in on

11   meetings.  We have meetings at least once a week, sometimes

12   twice a week with the field.  Mr. Glazer and I sit and talk

13   to our general managers.  There are six field general

14   managers, and we listen to their feedback as to what's

15   working, what's not working.  In some cases they'll make

16   suggestions about reports or things they'd like to see

17   differently and the fact that you have the two most senior

18   people in the company there on a phone call, things usually

19   happen pretty quickly.  So, I think we're a pretty good team

20   in that regard.

21   Q.   Okay.  Since February 9th, has Mr. Glazer, in your view,

22   you know, dropped the ball on any projects or --

23   A.   I wouldn't use the term "drop the ball", I would just

24   say it's been a distraction.  I mentioned earlier there are

25   times when you go to have a meeting and clearly he's having,

1  you know, dissusions regarding the litigation.  There have
2  been times when he's been called out of the office to deal
3  with the litigation, but, no, I would not say he's dropped
4  the ball.

5  Q.  Okay, all right.  Can you think of any business
6  initiative that in your view has suffered since February 9th
7  because of Mr. Glazer's distraction?

8  A.    It's a difficult question to ask, I mean, because it's
9  not something that manifests itself, you know, doesn't happen
10 on a Wednesday and manifests itself on Thursday.  We had the
11 entire office together yesterday for our lunch meeting, and
12 Mr. Glazer and I attended that meeting, and that was really
13 to kind of boost morale, keep people focused on the business.
14 You can say that it's a good idea to do that from time to
15 time, but that's two hours out of our day that, you know, we
16 did not spend with some other issues, and you add that up
17 each week.  There are times that, you know, we're just not
18 spending on more critical issues, for example, real estate.
19 That keeps getting the back burner, so, it's hard to say that
20 I can point to one thing that happened overnight, but I would
21 think that the cumulative effect has been that it's going to
22 hurt some other areas.

23 Q.    It's hard to quantify specifically the effect on KB's
24 business; right?

25 A.    I think that's right.  I think the question I would ask

1    anyone I were to ask is I work from 7:30 in the morning till

2    9 o'clock at night.  I touch every single employee in the

3    building.  I think I've got a pretty good pulse on whether or

4    not someone is distracted or not, whether it's because

5    they're pregnant or because they're worried about litigation

6    or other things, and I see a noticeable change in the entire

7    office morale and focus, and I would include Mr. Glazer on

8    that.  He's not pregnant though, Your Honor.

9    Q.    Does Mr. Glazer confide in you about his view of the

10   litigation?

11   A.    No, I think he and I are both very professional and

12   realize that would not be a prudent conversation to have.

13   Q.    Did he tell you that his attorney called us the other

14   day and asked for an additional thirty days to file an answer

15   or otherwise plead to the Big Lots complaint, and we said,

16   fine?

17   A.    I really -- I've had no conversations with Mr. Glazer on

18   anything regarding his litigation issues.

19   Q.    Anything that, since February 9th, that you can think of

20   where in your view, where Mr. Feldman has dropped the ball on

21   a project because he's been distracted?

22   A.    No.  Again, I would say he has not dropped the ball, but

23   I've noticed a significant distraction, a significant

24   challenge for him to stay focused.

25              MR. McKENNA:  Okay.  Your Honor, may I have a

1  minute.  Thanks.

2  BY MR. McKENNA:

3  Q.  Okay, Mr. McMahon, you've been in court for the entire

4  session this afternoon; have you?

5  A.  Yes, I have.

6  Q.  Let me ask you this:  In your view, what additional harm

7  or distraction will result to the debtors if in the next

8  ninety days and the Big Lots lawsuit the only things that

9  happen in that lawsuit are, number one, Big Lots' attorneys

10  look at the one hundred thousand pages of documents that the

11  Creditors Committee have received from KB, and secondly, that

12  the attorneys for the state court defendants file an answer

13  or a motion to dismiss with the Court in that action?  If

14  those are the only two things that happen in the next ninety

15  days, what additional harms will result to KB?

16  A.  I guess I refer back to there are 340 people in the

17  office that are on edge.  All 340 are all very well aware

18  that I am down here as well as some of the other senior

19  executives.  If there are any additional filings or any

20  agreements to go forward with any form of litigation, again,

21  they're not going to read the details.  We are going to have

22  an organization that's very much on edge.  Probably lose

23  additional people.  You ask my personal views, I mean,

24  personally my ideal world would be the Creditors Committee

25  and the company could sit down with this potential sponsor

1   over the next sixty/ninety days and work out a deal, and just

2   let everyone kind of back off around a circle and just have

3   no litigation of any kind, and in due course and in due time,

4   we will prove ourselves worthy and have a plan or not.  And

5   if we don't then we can address all these issues in sixty to

6   ninety days.  I don't sense the urgency from my personal

7   perspective or from the company perspective.  What I do know

8   is that every day I'm dealing with five or six different

9   people with different issues all related to the litigation

10  and distractions, and they are all over the map in terms of

11  it's not the quality of the filings or the pleadings, it's

12  just the fact that there continues to be this issue.

13  Q.   Let me ask the question a different way.  What

14  distraction will there be at KB if the individual lawyers or

15  the Bain Companies, the Bain directors, and Mr. Feldman, and

16  Mr. Glazer file a motion to dismiss in, you know, in forty-

17  five days from today and that's the only thing that happens

18  in the litigation?

19  A.   Hard to say exactly, but my impression remains the same

20  that you can't -- you're trying to dissociate Mr. Glazer and

21  Mr. Feldman from the company as if they're separate

22  individuals, but what happens to them, two of the most three

23  senior executives of the company, the company feels as if

24  it's happening to them.  I don't know how to explain it

25  better.  It may be irrational, but that is what is happening,

1    it's what has been happening for the last month.

2    Q.    Okay.  Have you talked to Mr. Glazer about him

3    personally writing a motion to dismiss?

4    A.    No.  Again, I've not had any conversations with Mr.

5    Glazer about any of the litigation.

6              MR. McKENNA:  Okay, Your Honor, I have nothing

7    further.  Thank you.

8              THE COURT:  Any further questions.

9              MR. TRAUB:  Your Honor, I've got two.

10             THE COURT:  Two, okay.

11             MR. TRAUB:  If it's three you won't hold it against

12   me?

13             THE COURT:  All right, three.  That's it.

14                     FURTHER CROSS-EXAMINATION

15   BY MR. TRAUB:

16   Q.    You testified, Mr. McMahon, that you're familiar with

17   the key terms of the negotiations between the plan funder and

18   the open issues with the Creditors Committee; correct?

19   A.    Yes.

20   Q.    And isn't it so that one non-negotiable issue is that

21   whatever the plan funder gets in terms of an interest in the

22   debtor, it will not get any serious five actions against

23   anybody; is that correct?

24   A.    I don't know what that means, I'm sorry.

25   Q.    Any claims against the insiders or any preference

1    claims, that those would be left behind solely for the

2    benefit of the creditors; is that correct?

3    A.    Again, you're probably challenging me on the legal

4    details.  My understanding is, yes, that there would be a

5    litigation trust set aside, as we've discussed, $3 million

6    was part of the discussions.

7    Q.    The concept is that the company, the reorganized

8    company, will not have any interest in those claims that are

9    to be brought against insiders because of the 2002 redemption

10   transaction; is that correct?

11   A.    I have to plead I do not know.  I don't know the exact

12   details of that.

13   Q.    You're not familiar with that at all.

14   A.    Well, I'm familiar with it, but there's been a lot of

15   moving parts, and I'd hate to say that I am the expert on

16   that.  We have plenty of other attorneys around that --

17   Q.    So you're not familiar that that asset has been a key

18   item that the creditors have negotiated with the plan funder

19   that would remain for the sole benefit of the creditors?  As

20   you testify today, you're not aware of that.

21   A.    I'm aware that has been positioned as one of the

22   arguments by the creditors, what you asked.  I think what you

23   asked was has that been agreed to, and I don't know that.

24            MR. TRAUB:  I have no further questions, Your

25   Honor.

1    THE COURT:  Okay.  Any further questions.

2    MR. POLEBAUM:  No further questions, Your Honor.

3    THE COURT:  Okay, thanks, Mr. McMahon.  Okay, we

4  wound up the evidentiary phase of this --

5    MR. POLEBAUM:  Yes, Your Honor.  Your Honor, I

6  would point out that we had pre-submitted to the Court a set

7  of exhibits that I believe Big Lots has stipulated to as

8  being admissible, and  --

9    THE COURT:  You know what, I wished you got them

10  marked.  I don't know what you're talking about.  If you've

11  got a set of them, get the clerk to mark them.  You don't

12  have to do it now, but I -- and I was a little unsure myself,

13  so maybe -- I want the exhibits and you've seen the exhibits?

14    MR. MARWIL:  Your Honor, we agreed to the

15  submission of those exhibits to the Court yesterday with the

16  reservation of rights to object to relevance of those

17  exhibits.  So we have not stipulated to the admissibility of

18  those exhibits.  I thought we --

19    THE COURT:  Can you work this out in the next ten

20  minutes if I give you some time?

21    MR. POLEBAUM:  To work out what, Your Honor?

22    MR. MARWIL:  We can certainly try.

23    THE COURT:  Okay, I want the exhibits that are to

24  be presented to me now to be marked.  You can mark them in

25  bulk if you want.  And I'll have to say I will accept them

1  subject to an objection of relevance, and I'll figure out
2  whether or not they're relevant, but I don't want to cut you
3  off.

4        MR. MARWIL:  If Your Honor will prefer for us to
5  take time now, we'll be happy to do so.

6        THE COURT:  Why don't you -- If there's something
7  -- You don't trust me to discern whether or not it's
8  relevant, you can tell me; okay?

9        MR. MARWIL:  Your Honor, if you want to determine
10  the relevance as you're reviewing them that's fine also.

11        THE COURT:  Okay.  When you get a chance -- We
12  don't have a staple that big but I'd say mark them Exhibit 2,
13  I guess.  Well, the whole binder will be the exhibit then,
14  that's fine.  Go ahead.

15        MR. POLEBAUM:  Your Honor, then, with those
16  exhibits and with the testimony of Mr. McMahon, that is the
17  evidence that the debtors have to present to the in support
18  of its request for preliminary injunction.

19        THE COURT:  Okay, thanks.

20        MR. POLEBAUM:  And if I may --

21        THE COURT:  Well, let me ask Big Lots if they have
22  evidence or anything they want to -- Go ahead.

23        MR. POLEBAUM:  Your Honor, there's been a lot of
24  suggestions that have been made to the Court about how to
25  deal with this circumstance, and it's -- I think the right

1   way to deal with this is to give the debtor this last chance

2   to pull together a plan of reorganization.

3             THE COURT:  Give me some dates.

4             MR. POLEBAUM:  And I would suggest, Your Honor,

5   that we have ninety days.  And I'm not sure what the Court's

6   calendar is, but that would be a --

7             THE COURT:  I'll worry about the calendar.  You

8   tell me --

9             MR. POLEBAUM:  I would say --

10            THE COURT:  -- how much time you need.  Ninety days

11  puts it in May.  Would May 15 be adequate time?

12            MR. TRAUB:  If I may, it's a motion for joint

13  exclusivity.  It's not just the debtors' motion.

14            THE COURT:  Joint motion, yes, that's correct.  The

15  Committee is free to submit their own plan if they want to.

16  Okay, May 15th should work.

17            MR. TRAUB:  June -- May is only sixty days.

18            MR. POLEBAUM:  Yeah, it would be June.

19            THE COURT:  All right, June 15th.

20            MR. POLEBAUM:  June 15th, Your Honor.

21            THE COURT:  Somebody was standing up.

22            MR. DEHNEY:  Your Honor, I'm not . . . (break in

23  taping).

24            THE COURT:  Well, you know, you may be right.  It's

25  not mentioned, but I'm not sure I can say it's excluded.  I'm

FORM FED-25          FENGAD • 1-800-631-6989

1    going to allow Toys exclusivity; okay?  Are you objecting to

2    it, by the way?

3         MR. DEHNEY:  ASM did file an objection to

4    exclusivity to the duration of the extension, Your Honor.  We

5    want a further extension period than was we requested.

6         THE COURT:  You want a shorter one.

7         MR. DEHNEY:  Yes.  That was ASM's objection to . .

8    . (microphone not recording).

9         THE COURT:  All right.  I'm going to go back to May

10   15; all right?  That's it.  May 15.  There must be a

11   confirmable plan filed, and by confirmable plan, I don't mean

12   a piece of junk --

13        MR. POLEBAUM:  Yes, Your Honor.

14        THE COURT:  -- just to gain more time.  If you get

15   a confirmable -- a reasonably confirmable on its face, how

16   much time do you need to get it confirmed?  Can you do it in

17   thirty days?

18        MR. POLEBAUM:  Well, I don't think so, Your Honor,

19   just --

20        THE COURT:  Sixty days?

21        MR. POLEBAUM:  Sixty days is almost the minimum

22   because you need to get the disclosure statement hearing

23   first.  That's a 25-day notice requirement.  Then after the

24   disclosure statement's approved, you've got another 25-day

25   notice requirement, and then depending on whether there's

1  litigation over the plan, that could either get done within

2  sixty days or not, but I think that that's a pretty -- very

3  difficult time frame.

4          THE COURT:  Okay, ninety days; okay?

5          MR. POLEBAUM:  Yes, Your Honor.

6          THE COURT:  Okay.  Get it filed.  You must have a

7  confirmable -- reasonably confirmable plan on its face filed

8  by June 15, and you must take whatever steps are necessary to

9  get it confirmed by September 15th; does that work?

10          MR. TRAUB:  That's more than enough.

11          MR. POLEBAUM:  Your Honor, ninety days I believe is

12  August 15.

13          MR. TRAUB:  Are we doing June or --

14          MR. POLEBAUM:  I'm sorry --

15          MR. TRAUB:  Are we doing to June or to May.

16          THE COURT:  To June, to June.

17          MR. POLEBAUM:  Goes to June, I'm sorry.

18          THE COURT:  Okay, the two dates are June 15 and

19  September 15; all right?

20          MR. POLEBAUM:  Now, Your Honor, in order to make

21  this --

22          THE COURT:  I may have counted the months wrong.

23          MR. POLEBAUM:  No, I think I counted them wrong,

24  Your Honor.  I'm very dangerous with math.  In order to make

25  that the debtors' ability to propose a reasonably confirmable

1   plan within the time frame that the Court's required, what we

2   need is a halt to all of the litigation, and we need the

3   preliminary injunction against Big Lots, and we need the

4   standing issue adjourned or whatever until we're able to file

5   that reasonably confirmable plan.  Everybody today is looking

6   for some advantage in that plan negotiation.  Big Lots wants

7   to force the parties, the defendants to the edge --

8            MR. TRAUB:  I'm just --

9            THE COURT:  Go on.

10            MR. POLEBAUM:  Big Lots wants to proceed with this

11   litigation because they think that is going to enhance their

12   bargaining leverage, and the Creditors Committee wants to

13   have the standing, even though they say, Your Honor, they

14   tell the Court they're not going to sue anybody.  They agree

15   with the debtor that litigation at this time is a bad thing

16   and --

17            THE COURT:  Well, what about giving them the

18   standing but without authority to file a suit without further

19   order of the Court.  That means you can defer them.

20            MR. TRAUB:  That's all I'm asking for Your Honor.

21   They've already testified -- I did ask for more but I'm

22   willing to accept, let's say.

23            THE COURT:  They can't file suit without an order

24   of the Court; okay?

25            MR. MARWIL:  That's not standing.

1        THE COURT:  If they have standing.

2        MR. MARWIL:  Judge, I thought what we said if we

3  were able to get standing we would give some advance notice

4  before we commenced.

5        THE COURT:  No, I changed my mind.  I think I want

6  an order of the Court on it --

7        MR. TRAUB:  The reason we need standing, and we

8  appreciate it, is to negotiate an asset that everybody agrees

9  that we're going to get.  So if we get standing we won't

10 commence a lawsuit until further order of the Court, we'll do

11 that.

12       THE COURT:  Which won't be unreasonable.

13       MR. TRAUB:  That's all we ask for, Your Honor.

14       MR. POLEBAUM:  Your Honor, all I will say to that

15 is that the Committee doesn't need standing in order to

16 negotiate the term of the plan.  They really don't need that,

17 and all that they're looking for is to have some advantage in

18 that plan negotiation.  So why don't we just leave everybody

19 where they are.  You've given the parties a very hard, firm

20 deadline.  Get it done or it's over.  And I think that that,

21 hopefully, will get everybody focused on getting it done and

22 leave everybody otherwise where they are.

23       THE COURT:  Okay, go on.  Sit down, please.  I'll

24 give you a chance.

25       UNIDENTIFIED SPEAKER:  Okay.

1        MR. POLEBAUM:  And in the meantime, Your Honor,

2   with the Committee standing still, the Committee shouldn't

3   have standing now.  If the Committee's given standing now, it

4   said it's not going to litigate.  In any event, there

5   shouldn't be any litigation during this next ninety-day

6   period while we're trying to get this plan done.  We need the

7   preliminary injunction that we've asked for.  I point out,

8   Your Honor, we're here today only on the preliminary

9   injunction.  We're not looking for permanent injunction --

10       THE COURT:  Oh, I understand.

11       MR. POLEBAUM:  --  we're not asking for a permanent

12   injunction under 105 at any time, Your Honor.  This is purely

13   a preliminary injunction.  We believe we've made the showing

14   that we need to show to justify the Court exercising both its

15   equitable powers under 105.  Again, Your Honor, we think that

16   in order to enforce the automatic stay under 362, the

17   issuance of an interim injunction is entirely appropriate.

18       THE COURT:  I thought you filed a complaint in the

19   bankruptcy in this proceeding; didn't you?

20       MR. POLEBAUM:  Yes, we did, Your Honor.  We filed a

21   complaint.

22       THE COURT:  And you're asking for an injunction, a

23   permanent injunction.

24       MR. POLEBAUM:  We're asking for a permanent

25   injunction on the basis that there are state assets involved.

1    We're not asking for a permanent injunction with respect to

2    the 105 relief, Your Honor.  And in any event, we're not here

3    before the Court asking for a permanent injunction.  We're

4    only here on --

5         THE COURT:  Okay, that can be construed then as not

6    asking for a permanent injunction.  Okay.

7         MR. POLEBAUM:  And, Your Honor, with that, I

8    believe -- with the debtors' suggestion, we will put this

9    case on course for a resolution.  I think it will be

10   successful.  I think we'll be able to file that confirmable

11   plan by May 15th.  But in any event, everybody's got a real

12   firm deadline and --

13        THE COURT:  Should I make it May 15th?

14        MR. POLEBAUM:  I'm sorry, I'm sorry.  It's my son's

15   birthday.  It's a special day for me.

16        THE COURT:  June 15th.

17        MR. POLEBAUM:  June 15th, that's right.

18        THE COURT:  Okay, are you done?

19        MR. POLEBAUM:  Thank you, Your Honor.  Yes, Your

20   Honor.

21        THE COURT:  Okay.  Let him -- I'll give you a

22   chance.  You're arguing in favor of the preliminary

23   injunction as well as the standing issue.

24        MR. TRAUB:  Your Honor, we believe that you should

25   give us standing under the conditions that you've described.

1    We are -- It was already testified it belongs for the benefit

2    of creditors.  We would get it in any event if in the event

3    we come up -- can file a confirmable plan, the creditors may

4    file that plan, and that plan may require us to do that.  So,

5    it's only -- there's no equity in this case.  If you ask

6    them, there's absolutely no possibility of there being any

7    money for equity.  They're out of the money.  This was solely

8    for the benefit of the creditors.  We need it.  It should be

9    determined now.  We've heard the U.S. Trustee.  We've agreed

10   to not take action on it, but we need that right, and we need

11   it in case we need to propose a plan to do it.

12           THE COURT:  All right, add another condition,

13   absent a plan by the Committee.

14           MR. TRAUB:  Say that again.

15           THE COURT:  In other words, I don't want you filing

16   -- You know, filing a lawsuit would be like throwing a bomb

17   in the negotiations.

18           MR. TRAUB:  We don't want to do that.

19           THE COURT:  And I know you don't want to do that,

20   but, you know, tempers get --

21           MR. TRAUB:  We've already told you we wouldn't.

22           THE COURT:  No, no, anyway -- and I'm going to -- I

23   don't mind -- I'm considering giving you standing, but I

24   don't think you should throw a bomb without asking the Court

25   first.  In addition -- Oh, anyway, go on.

1    MR. TRAUB:  That's all I ask for, Your Honor.  I

2  mean, you've heard the testimony.  We are the principal party

3  in negotiating with this plan funder.

4         THE COURT:  Sure.

5         MR. TRAUB:  I can tell you that it has been an

6  impediment not to have it.  It's caused a great deal of

7  difficulty.  It's always been a part of the -- what's going

8  to be left behind for creditors.  Once it's clear, as we

9  develop this plan, what's going to happen, having standing  -

10  - We may need to -- We'll come to Court if we need to

11  commence a lawsuit.  In the meantime, it properly belongs in

12  a plan for the benefit of creditors.  It does not belong to

13  the debtor.  So, we just request standing under the condition

14  that you've laid out.

15         THE COURT:  Okay, thanks.  How about the U.S.

16  Trustee.  I think maybe they may have an observation.

17         MR. KENNEY:  Your Honor, I think what you're

18  proposing to give them the standing requiring further leave

19  of the Court to commence a lawsuit, is going to give them

20  what they need, which is basically, the leverage that comes

21  with standing.

22         THE COURT:  How about the merits of the preliminary

23  injunction?

24         MR. KENNEY:  Much more difficult issue, Your Honor,

25  and --

1           THE COURT:  If you don't have --

2           MR. KENNEY:  -- I haven't really taken a position

3  on that.

4           THE COURT:  Okay, that's fine.  Okay, your turn.

5           MR. MARWIL:  With respect to the preliminary

6  injunction, Your Honor, the debtor is trying to argue

7  practicality in imposing a stay.  The problem that they've

8  got and the reason that they're arguing practicality is

9  because they didn't make out the case.  They've got a

10  requirement and a burden to show imminent and irreparable

11  harm that prosecution of that lawsuit would impose on the

12  estate, and they haven't done it.  Mr. McMahon can't quantify

13  anything about what's going to happen --

14           THE COURT:  You know, your complaint seeks $45

15  million, and that would unnerve me if I was being sued for

16  $45.  And that might unnerve Mr. Glazer, Feldman,

17  Beckenstein, and Levin.

18           MR. MARWIL:  It unnerves Bit Lots that we were

19  misrepresented and lied to.

20           THE COURT:  No, I understand.  You don't --

21           MR. MARWIL:  It's independent of the debtor.  It is

22  absolutely independent of the debtor, and the imminent

23  irreparable harm to the estate or the debtors' ability to

24  reorganize has not been shown by the evidence or by argument.

25  They concluded but they haven't shown it.  And under the

1    Monroe case, they have to show that. And I don't believe
2    Your Honor has the flexibility to give into their
3    practicality argument unless they've shown it, and they
4    haven't. But even if Your Honor wants to look at the
5    practicality and equity, what we've offered in our agreement
6    and what we would propose by way of order is we're not going
7    to proceed with discovery for ninety days other than that
8    hundred thousand pages that's already been provided to the
9    Creditors Committee. There's no imposition whatsoever. It's
10   not going to --

11          THE COURT: Nobody has any objection to giving you
12   that.

13          MR. MARWIL: So, we're going to get that, we're
14   going to agree to a ninety-day moratorium on discovery, and
15   the only thing that's going to happen in the state court
16   action is the defendants who defrauded us are going to have
17   to answer the complaint or file a motion to dismiss. Mr.
18   McMahon's testimony does not, does not establish any imminent
19   irreparable harm from that one event. And until they can
20   present evidence that shows imminent and irreparable harm,
21   they can't have the 105 injunction. And none of the rest of
22   it matters. That's the key. They haven't shown it. They
23   can't show it, and they can't have the injunction. If Your
24   Honor really takes a step back from all that's happened here
25   today, and we look at what we're in court on, we're here on

1  the adversary proceeding that the debtors filed to get this

2  injunction that they can't have, because they haven't

3  established grounds.  And all the pleadings reading and the

4  attention to pleadings and witness prep, all of it is related

5  to the debtors' affirmative determination to file the

6  adversary proceeding, to seek the stay of an action that

7  doesn't have any activity associated with it for some time.

8  What was -- If we weren't here today at all and they never

9  filed the adversary proceeding, they never filed the 105

10  action, what would happen in the state court?  What would

11  happen is we would have given an extension of time to answer,

12  which we did, and in sixty days there would be an answer or a

13  motion to dismiss and discovery would be stayed.

14           THE COURT:  Is there any reason why Big Lots can't

15  negotiate with respect to the plan?

16           MR. MARWIL:  Your Honor, we can, but we need the

17  ability --

18           THE COURT:  You need a little step up on this;

19  don't you?

20           MR. MARWIL:  We are not going to get anywhere

21  negotiating on the plan until we get somewhere in negotiating

22  with the insider defendants on their liability to Big Lots,

23  and I tend to believe that the Creditors Committee would say

24  the same thing about their fraudulent conveyance action.

25  That they want standing so that they can try to negotiating

1  with Bain.  And staying the action is only going to further

2  entrench Bain.  If Your Honor wants more litigation in the

3  bankruptcy case, stay the state court action, and we will be

4  here every month arguing and fighting in order to enforce our

5  rights and make sure that we don't lose our right to our $52

6  million.

7          THE COURT:  Okay.

8          MR. MARWIL:  I think that it -- if staying the

9  action benefits the insider defendants and allows them to

10  further entrench themselves in saying, I'm not liable, and we

11  have no ability to prove, Yes, you are liable --

12          THE COURT:  Can I ask you why did you choose to

13  file this at this time?  To file the complaint in state

14  court?

15          MR. MARWIL:  Your Honor, a lot of that has to do

16  with the fact -- and this is another element that the debtor

17  has to prove that they haven't proved, a lot of it has to do

18  with the fact that we're not making a lot of progress toward

19  reorganization in this case.  And, you know, the second prong

20  in Monroe is there must be a reasonable likelihood of a

21  successful reorganization.  A $38 million loss in 2004?

22  Inability to bring any plan sponsor or purchaser to the table

23  on a deal?  This has been through an entire cycle.  There is

24  not necessarily a prospect of successful reorg.  And the

25  debtor certainly hasn't proven that today.  So that's just

1    another reason why they can't have their 105 injunction.

2    And, because of the claims that we assert against these

3    individuals, which are based on the individual's direct

4    conduct with Big Lots representatives at the time of the

5    equity distribution transaction, and they were individual

6    actions of misrepresentation and omission that caused Big

7    Lots to do certain things and to refrain from doing certain

8    other things that caused the injury to Big Lots.  It's got

9    nothing to do with the debtor.  We didn't sue any debtor.

10   It's got nothing to do with the bankruptcy case.  It's got to

11   do with damages associated with fraud.

12        THE COURT:  Now, at the heart of what you -- of the

13   damages is the redistribution -- what is it, recapitalization

14   plan; am I right?

15        MR. MARWIL:  The equity distribution transaction,

16   yes.

17        THE COURT:  Equity.  I named it wrong but and also

18   the Committee is very interested in that too, as are other

19   creditors very interested in that because it affected them or

20   at least if true, would affect them.

21        MR. MARWIL:  Here's the interesting point though.

22   Our theory is not a fraudulent conveyance theory, so we're

23   not competing with the Creditors Committee on recovery.  The

24   Creditors Committee on behalf of the subsidiary creditors who

25   lost all of that value and moved up the chain and went out to

1    the pockets of Mr. Glazer and Mr. Feldman and the Bain

2    defendants, they can recover all that for the benefit of the

3    operating subsidiary creditors.  The full $121 million.  And

4    you know what?  The action I have against the individuals for

5    fraud still exists, and I can recover my $52 million from

6    those defendants.

7         THE COURT:  Well, there would be an argument

8    otherwise, but anyway, I don't want to get into that, but I

9    --

10        MR. MARWIL:  The point, Your Honor, is that they

11   are different causes of action and they sounded different

12   legal theories.

13        THE COURT:  No, I understand that, and I know a lot

14   of thought went into framing the cause of action, and

15   selecting the defendants, and it -- but the issue here is

16   whether or not it would interfere with the potential

17   reorganization of this debtor.

18        MR. MARWIL:  Given that both the Committee and the

19   debtors have stipulated that in the next thirty to ninety

20   days they have to complete the reorg plan, and Your Honor has

21   now just ordered that, and there's a --

22        THE COURT:  I haven't order that yet, but actually

23   I will.

24        MR. MARWIL:  Well, it sounds like it's going -- It

25   sounded to me at least like it was going to be ordered.

1  We've agreed to the ninety-day moratorium on discovery, and

2  the only thing that's going to happen in that ninety-day

3  period is the answer or the motion to dismiss.  There's no

4  immediate irreparable harm from that, and delay, not along

5  those time periods to run in the state court action, impairs

6  our state law rights.

7       THE COURT:  All you'd have to wait another sixty-

8  day period.

9       MR. MARWIL:  Your Honor, we won't be able to

10  negotiate a plan with the -- a settlement with the Bain

11  defendants unless they are at risk in that lawsuit and

12  engaged.  And a stay by Your Honor will not engage them, and

13  we will have -- continue to have the same positioning that

14  we've had for the last fourteen months.

15       THE COURT:  Okay.

16       MR. MARWIL:  If we want to move this case along,

17  let us do our thing.  We've agreed to make sure that there's

18  no disruption, and Mr. McMahon has not been able to show

19  immediate irreparable harm.  It's just that simple.  And

20  there's no -- Based on a legal standard, Your Honor, I don't

21  think there's any real flexibility to give the debtor what

22  they're asking for.  And in effect, they're pretty much

23  getting it based on what we're willing to do.

24       THE COURT:  Okay, thanks.  I'll give you a chance,

25  go on.

1    MR. McKENNA:  Your Honor, just to answer Your

2 Honor's question about why we filed when we did on behalf of

3 Big Lots.  In addition to many other things, we were running

4 up against a potential statute of limitations issue as well.

5    THE COURT:  Well, my understanding is that an

6 injunction prevents you, it will take it out of the statute

7 of limitations period during which you're unable to file.

8    MR. McKENNA:  Well, we filed it, Judge, so now we

9 don't have any statute of limitations.

10    THE COURT:  Well, I guess you're right.  Okay.

11    MR. McKENNA:  But, I just wanted to answer your

12 question.

13    THE COURT:  I see what you're -- I'm sorry.

14    MR. McKENNA:  Yeah.

15    THE COURT:  Okay, anything further?  Otherwise I --

16    MR. POLEBAUM:  Your Honor, I just wanted to speak

17 to the --

18    THE COURT:  Make it quick.

19    MR. POLEBAUM:  -- to the harm to the debtor, Your

20 Honor.  The Court has heard Mr. McMahon testify.  He's

21 testified to the specific instances during his days where

22 he's had to deal and address with the fallout from the

23 litigation.  It is impossible to separate the Big Lots

24 litigation from the debtor.  It's, in fact, impossible to

25 separate the Big Lots' causes of action from the causes of

1    action that they Creditors Committee wants to --

2            THE COURT:  You know, if I let you go on --

3            MR. POLEBAUM:  But I won't discuss derivative

4    versus direct.  I just focus on the harm to the debtor, Your

5    Honor, and I'll just emphasize that Mr. McMahon did not

6    testify about vague generalizations.  He talked about the

7    specific effect that this is having on Mr. Glazer and Mr.

8    Feldman and on the Board of Directors.  He talked about the

9    specific effect it's having on the employees of the company

10   and their ability to perform their job.  He talked about the

11   fact that the organization has been slimmed down

12   substantially since the commencement of this case.  All of

13   the management have additional responsibilities which fill

14   their day.  In addition, they're trying to run the company.

15   They need to work on the strategic plans for exiting, and

16   they just simply cannot deal with all of the distraction

17   that's coming from this Big Lots litigation.  It's real.

18   It's harmful.  The Court's  trying to give us a meaningful --

19   if the Court wants to give us a meaningful last ninety days,

20   the Court needs to enjoin this litigation.  In telling me,

21   Your Honor, Big Lots has not been able to say a single word

22   about any harm that it's going to suffer if it can't force

23   this motion to dismiss that it expects.

24           THE COURT:  Well, they need the money.  That was a

25   smart-aleck remark, I'll take it back.  Okay, listen, come

1   back in fifteen minutes.  It's 5 o'clock right now.  See you

2   at quarter after.  I don't plan to take this under advisement

3   and I'm going to give you the decision at this time.

4           MR. POLEBAUM:  Thank you, Your Honor.

5           (Whereupon at 4:57 p.m. a recess was taken in the

6   hearing in this matter.)

7           (Whereupon at 5:50 p.m. the hearing in this matter

8   reconvened and the following proceedings were had:)

9           THE COURT:  Counsel, and ladies, and gentlemen, I

10  have listened carefully to the testimony, the arguments of

11  counsel.  I have read the memos, studied the exhibits such as

12  they are.  I have given a lot of thought to the issues

13  presented by the motion to temporarily enjoin Big Lots from

14  continuing the action filed on February 9 against the various

15  management and other personnel of the debtor in the Delaware

16  Chancery Court.  I hereby designate my oral findings as the

17  Court's findings in lieu of written findings under Rule 52(a)

18  because I do not have time to file a masterful, written

19  opinion or a written finding, and as I perceive it, it's very

20  essential that this motion be decided now and not next week

21  or a full week later.  I just do not think I should take it

22  under advisement.  I find that the motion for a preliminary

23  injunction or temporary injunction should be granted.  The

24  plaintiffs, Big Lots, should be enjoined temporarily during

25  the next few months, during the pendency of the Chapter 11.

1  Now, when I say the next two months, I was talking about I'm

2  going to adopt the dates that were suggested or given in the

3  motion.  I'll get to that in a minute.  The debtor has been

4  in Chapter 11 for the past thirteen months.  Depending on the

5  season it employs from 8,000 to 15,000 people in its stores

6  throughout the country.  It has earnestly pursued a plan

7  during this period with the very active participation of the

8  Creditors Committee and I assume even Big Lots participated

9  in whatever activities there were of the Committee or was

10  available or could have.  Up until the time of the filing,

11  Big Lots was on the Committee when at about the time, and

12  maybe it was a little later, a few days here and there, it

13  resigned from the Committee.  Based upon the testimony, I

14  find that the Chancery Court lawsuit for over $45 million and

15  other relief against all but one of the active -- well,

16  against many except one person of the active management of

17  the debtor interferes unduly with the progress of the Chapter

18  11 and the negotiations that Chapter 11 contemplates that

19  must be undergone between the parties.  I don't know, I'm not

20  calling Big Lots a spoiler, but that's the word that is

21  suggested.  In other words, they participated in the

22  Committee, filed a lawsuit and quit.  And the lawsuit, of

23  course, is aimed at some active management of the company.

24  Now, a $45 million lawsuit is enough to make anybody kind of

25  pause in whatever they're doing, and I think realistically

1   the defendants that are named, the individual defendants that

2   are named have great reason to be concerned, and it

3   necessarily interferes with the progress of the case.  I

4   frankly wish Big Lots would get back to the bargaining table,

5   but apparently I don't know, that's up to them.  But in

6   addition, it sort of makes a mockery out of the Committee's

7   efforts and the Chapter 11 process, which of course the name

8   of that game is negotiation.  For them to walk off from the

9   Committee, then file a lawsuit against some of the -- in

10  another court against some of the management, if not all of

11  management, but some of management, certainly of the debtor,

12  I believe the testimony of Mr. McMahon who underlines that it

13  does interfere with the prosecution of the Chapter 11.  In

14  addition, and it's necessary to my findings, I also find that

15  the complaint which has been filed by the debtor, it's likely

16  -- I don't know if the debtor will get all of the relief that

17  it seeks in the complaint, but I think it's very likely

18  they'll get some of the relief, but I don't think that I have

19  to try that case now other than I have to make the finding

20  that you take the -- I won't say it's the guts of the Chapter

21  11, but it's a very important part of the Chapter 11 to

22  another court for litigation during the proceeding of the

23  negotiations to come up with a confirmable plan and perhaps

24  keep the jobs of 8,000 other people is very important, and

25  again, I think -- Now, on balance, I find that allowing the

1  Big Lots lawsuit to go forward threatens the reorganization
2  and great harm to the debtor as well as these 8- to 15,000
3  other people that work for the debtor while the delay of the
4  Big Lots in granting a preliminary injunction is minor
5  compared to the potential and likely harm that would be done
6  by allowing it to go forward.  Finally, I think public policy
7  favors Chapter 11, favors negotiation rather than litigation,
8  and I would urge, if it's possible, Big Lots to go back to
9  the table and perhaps negotiate their concerns in the context
10 of the Chapter 11, and they can save their lawsuit in the
11 Chancery Court as Plan B, if that's what their plan is.  Now,
12 I -- those are my findings, and I think that a preliminary
13 injunction should be granted.  In addition, there's some
14 other motions.  I considered the request of the Committee of
15 Unsecured Creditors for standing, and I think I'm going to
16 grant that with some qualifications.  It is ordered that the
17 debtor and Official Committee of Unsecured Creditors shall
18 have until May 15, 2005, not June 15, May 15, which is what
19 you asked for, and with the Committee, the debtor and the
20 Committee shall have until May 15, 2005 the co-exclusive
21 right to file a plan or separate plans of reorganization, and
22 until July 15, the co-exclusive right to solicit acceptances
23 of the plan or plans, if that's the way it turns out.  Two,
24 the Official Committee of Unsecured Creditors has standing to
25 prosecute actions against the insiders but must seek

1    authorization of this Court before filing such prosecutions

2    in any courts of law, and that of course, would be on notice

3    to the debtor.  The debtors are granted a preliminary

4    injunction through July 15 staying prosecution of the Big

5    Lots State Chancery Court action provided, and this is a

6    provision that I take seriously, that the debtors file timely

7    a reasonably confirmable plan on its face.  So if you're

8    going to -- if the debtor files a piece of junk, they're not

9    going to get the additional time, so --

10    MR. TRAUB:  Did you say debtors or Committee?

11    THE COURT:  Pardon me?

12    MR. TRAUB:  We just have that the debtors or the

13    Committee.

14    THE COURT:  And that's also for the Committee too.

15    I guess -- I don't want this injunction to be used as a means

16    of delaying the Chapter 11 or delaying or interrupting

17    negotiations that obviously they have yet to be consummated.

18    I want to thank counsel.  You've been all very courteous and

19    there's a lot of people here -- there was a lot of people

20    here, and I thank you all for your help and your courtesy.

21    That will be my order.  I'm going to ask the debtor to do an

22    order, and it's a three-part order based upon my oral

23    findings under Rule 52(a), to designate it as the Court's

24    findings under Rule 52(a), it is ordered that one, two,

25    three.  Okay?  Any questions?

1          MR. POLEBAUM:  No, Your Honor.

2          ALL:  Thank you, Your Honor.

3          THE COURT:  Okay, have a good day or good evening,

4   I should say.

5          (Whereupon at 6 p.m. the hearing in this matter was

6   concluded for this date.)

7

8

9

10

11

12

13

14

15          I, Elaine M. Ryan, approved transcriber for the

16   United States Courts, certify that the foregoing is a correct

17   transcript from the electronic sound recording of the

18   proceedings in the above-entitled matter.

19

20   *Elaine M. Ryan*                          3-08-05
     Elaine M. Ryan
21   2801 Faulkland Road
     Wilmington, DE 19808
22   (302) 683-0221

23

24

25