UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                    .    Chapter 11
                                          .
KB TOYS, INC., _et al._,                  .    Case No. 04-10120(DDS)
                                          .    Jointly Administered
                                          .
          Debtors.                        .    March 3, 2005 (1 p.m.)
                                          .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE DONAL D. SULLIVAN
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.



2

INDEX TO TESTIMONY

DEBTORS'
EVIDENCE

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| William McMahon | 86 | 112 | | |
| | | 121 | | |
| | | 252 | | |

139

INDEX TO EXHIBITS

BIG LOTS' EXHIBITS

| EXHIBIT NO. | DESCRIPTION | PAGE |
|-------------|-------------|------|
| 1 | Copy of Affidavit of Mr. McMahon | 139 |
| 2 | Binder | 156 |

1    THE CLERK:  All rise.

2    THE COURT:  Good afternoon --

3    MR. WAITE:  Good afternoon, Your Honor.

4    THE COURT:  -- counsel, ladies, and gentlemen.  We

5    have a number of matters scheduled in KB Toys.  I'm going to

6    go through the short matters first, and then we'll get into

7    the motion for preliminary injunction.  But, go ahead.  Go

8    through the short matters.

9    MR. WAITE:  Thank you, Your Honor.  Joel Waite from

10   Young, Conaway, Stargatt & Taylor on behalf of the debtors.

11   Your Honor, just briefly for the record, the first three

12   items on the agenda were adjourned.  Items 4 and 5 were

13   matters for which we filed certificates of no objection.  I

14   understand orders have been entered.  Item number 6, which is

15   the motion of Broadspire for relief from stay, has been

16   adjourned to the March 29th hearing.  Item number 7 is a

17   motion filed by the debtor to reject three non-residential

18   real property leases.  There have been no objections filed to

19   that motion.  We have had discussions with two of the

20   landlords and have made two modifications to the order.

21   THE COURT:  Well, there were a couple of landlords

22   that had something to say about it.

23   MR. WAITE:  Well, that was on the 365(d)(4)

24   extension order.

25   THE COURT:  Oh.

1          MR. WAITE:  This is the motion to reject three

2    leases.

3          THE COURT:  Okay.  Oh, okay.

4          MR. WAITE:  Your Honor, we did make two changes to

5    this order.  One of the leases for store number 8210 located

6    in Goldsboro, North Carolina.  We have provided in the motion

7    for that lease to be rejected effective as of January 31st.

8    The landlord contacted us regarding that, and we have agreed

9    to modify the order to have that rejection be effective as of

10   February 17th, which is about the time they received the

11   notice of the motion.  As --

12         MR. BRANCH (TELEPHONIC):  (Microphone not

13   recording.)

14         THE COURT:  Pardon me, who's on the phone?  Is

15   there anybody participating on the phone?

16         MR. BRANCH (TELEPHONIC):  Yes, Your Honor.

17         THE COURT:  Would you identify who you are?

18         MR. BRANCH (TELEPHONIC):  Dustin Branch

19   representing various landlords.

20         THE COURT:  Okay.  Is there anybody else on the

21   phone?  Okay, we're talking about the landlords now.  Go on.

22         MR. WAITE:  Your Honor, with respect to the office

23   lease in Marietta, Georgia that was covered by the motion, we

24   have provided for that lease to be rejected as of February

25   28th, which is the date by which we thought we would have

1  vacated the premises.  It turns out it's going to take us a

2  little additional time, and we've spoken with the landlord,

3  and they've agreed that we can modify the order to have that

4  lease rejected as of March 15, and with those changes --

5  we've revised the order to reflect that, and we ask that the

6  Court enter that order.

7           THE COURT:  Okay.  You might provide the order and

8  if you -- anybody interested can assume that it will be

9  signed today.  It will be docketed today, and you can date

10  your copy today.  Does anybody have any comments about the

11  rejection that we just read off?  Okay, go on to the next

12  one.

13           MR. WAITE:  Your Honor, items number 8 and 9 are

14  both contested matters, so I'll skip over those for now and

15  move to item number 10, which is the debtors' motion for

16  further extension of the time to assume or reject leases

17  under 365(d)(4).  Your Honor's correct in your earlier

18  comments.  There were three -- four objections filed to this

19  motion.  One of the objections was filed by a landlord,

20  Yellowstone.  We had agreed with that party to adjourn that

21  matter over to the end of March as there's some discovery

22  going on with that landlord regarding our motion and a

23  separate motion to compel the day it filed.  I believe Your

24  Honor signed the stipulation to that effect yesterday.

25           THE COURT:  Okay.

1    MR. WAITE:  There were three other objections filed

2  and in addition we had conversations with a number of

3  landlords who did not file objections, and based upon those

4  additional objections and our conversations with other

5  landlords, we have resolved all of those objections by

6  modifying the order to provide that the extension will only

7  run through April 29th without prejudice to further

8  extensions, and we've added in language that was in the prior

9  order regarding our obligation to comply with 365(d)(3).  So

10  with those changes, all the objections other than the

11  Yellowstone, which has been continued, have been resolved.

12    THE COURT:  Okay.  Does anybody have any comment --

13  I take it you have orders or do we have orders today?

14    MR. WAITE:  I do have an order today, and I know it

15  was provided to the objecting landlords, and I know Mr.

16  Branch got a copy as well, as he's one of the parties we

17  talked to prior to the objection deadline.

18    THE COURT:  Okay.  I'll sign it today, and you can

19  date your copy.  It will be entered today.  Go ahead.

20    MR. WAITE:  Your Honor, that leaves the three

21  remaining items, and for those, I'll turn the podium over to

22  Mr. Polebaum of Wilmber Cutler.

23    MR. POLEBAUM:  Good afternoon, Your Honor.

24    THE COURT:  You're going to have to excuse me.  I'm

25  going to write down your names.

1    MR. POLEBAUM: Yeah. My name is Mark Polebaum.

2    THE COURT: P-o-l?

3    MR. POLEBAUM: P-o-l-e-b-a-u-m.

4    THE COURT: Okay, Polebaum. Go ahead.

5    MR. POLEBAUM: Thank you. And thank you very much,

6    Your Honor, for hearing the debtors on its motion for

7    preliminary injunction. Your Honor, we're here this

8    afternoon on the debtors' request to stay Big Lots from

9    further prosecution of the complaint that it filed on

10   February 9th, 2005 in the Delaware Chancery Court against

11   current and former officers and directors of the debtors as

12   well as certain of the debtor shareholders.

13   MR. TRAUB: Your Honor, may I just be heard one

14   second. I'm Paul Traub, counsel for the Creditors Committee.

15   Why did we skip over the standing motion which we brought,

16   which I think --

17   THE COURT: You know, I'm going to deal with that

18   in connection with the preliminary injunction. In other

19   words, the Committee has asked for authority to sue some of

20   the officers and insiders or at least for permission to do

21   so.

22   MR. TRAUB: Well, to be the appropriate party to

23   bring those actions and to deal with those issues.

24   THE COURT: Well, I understand that, and I didn't

25   mean to ignore you. We're going to talk about what's to be

1   done in this area.

2        MR. TRAUB:  I just think that -- I mean, it is on

3   the calendar first, and I think it's really -- a lot of

4   things that the debtors is saying in its preliminary

5   injunction motion, I think when you consider the context of

6   the standing motion, the standing motion is really better

7   heard first, and the reason for that is, the debtor makes

8   some statements in its preliminary injunction motion about

9   the reason for the company's decline, which are totally

10  inappropriate, which compromise issues against the estate,

11  and the proper party to be dealing with those issues in terms

12  of what was the cause of the debtors' demise is the

13  Committee.  To let the debtor make those statements is not

14  appropriate until we get standing.

15        THE COURT:  I'm going to ask you to sit down until

16  he gets done; okay?

17        MR. TRAUB:  Okay.

18        THE COURT:  Go ahead.

19        MR. POLEBAUM:  Thank you, Your Honor.  This

20  preliminary injunction motion as the Court has noted is part

21  and parcel of several other matters that are on for hearing

22  this afternoon, and it really does all raise the question for

23  the Court to decide today, Is this Chapter 11 case going to

24  turn into one big litigation fight with everybody suing

25  everybody or are we going to try to put the litigation off to

1   the side for some short period of time and let the parties

2   with the financial stake in the debtor try to find a business

3   solution to the debtor's Chapter 11 case.  As I go through

4   the hearing on the preliminary injunction, Your Honor, we are

5   going to present to the Court evidence concerning where we

6   are in this Chapter 11 case, how close the debtor thinks it

7   is to this case being resolved on a business basis, and that

8   we're able to deal with all of the litigation that is the

9   subject of the Big Lots claim, the litigation that the

10   Committee wants to bring, we can deal with that after the

11   business problems are solved.  And the debtors firmly believe

12   that that is the most reasonable and logical way to proceed

13   in this case.

14           THE COURT:  Let me ask you something.  How is the

15   debtor doing since the filing of the Chapter 11?  I

16   understand there have been very great losses, but I could be

17   wrong.

18           MR. POLEBAUM:  No, Your Honor, when we were

19   here last in January, we did report to the Court that the

20   debtors did suffer very substantial operating losses.  For

21   fiscal year 2004, the debtors suffered an operating loss of

22   $38 million, approximately, and fiscal 2004 ended in January

23   of 2005.  And there's no question that the debtor suffered

24   those losses, and that those losses are unfortunate.  However

25   --

1    THE COURT:  The reason I ask that is that I'm

2    trying to get a reading on whether this debtor is heading for

3    Chapter 7.

4    MR. POLEBAUM:  And, Your Honor -- And Mr. McMahon

5    is here in the courtroom.  We've submitted his affidavit, and

6    we also would like to have an opportunity to put him on the

7    witness stand to answer those questions, because those are

8    all very important questions.  They're fair questions, and we

9    do need to address them.  We don't think this company is

10   heading towards Chapter 7.  We think this company can be

11   successfully reorganized, but what we need to do is to get

12   people focused back on reorganizing this company rather than

13   suing everybody.

14   THE COURT:  Well, who's here on behalf of Big Lots?

15   MR. MARWIL:  Good afternoon, Your Honor.  Jeff

16   Marwil, M-a-r-w-i-l, on behalf of Big Lots.

17   THE COURT:  Okay.  I understand Big Lots was on the

18   Committee.  They were represented on the Creditors Committee

19   up until a couple of weeks ago; am I right on that?

20   MR. MARWIL:  We were on the Committee until early

21   February, and we resigned from the Committee.

22   THE COURT:  Well, I understand that, and I'm going

23   to ask you some more about why you quit.  I know there may be

24   a conflict, but I think it may go deeper than that.  Okay,

25   thanks.  What I'd like to do is pose maybe a question.  This

1  case has been in Chapter 11 for fourteen months?

2      MR. POLEBAUM:  Approximately fourteen months, yes,

3  Your Honor.

4      THE COURT:  And I also understand -- I know very

5  little about it, it's been in Chapter 11 before.

6      MR. POLEBAUM:  No, Your Honor, no.  KB Toys was

7  never in Chapter 11 before.

8      MR. TRAUB:  It's a different toy business.  Almost

9  every other toy company you know of has been in Chapter 11.

10     THE COURT:  I'm sorry.  I don't want to malign the

11 debtor.  But, I have to say, the debtor's entitled to --

12 rather wasting a chance to reorganize, and after fourteen

13 months, I'd like to get a reading on how good that chance is,

14 and that has a lot to do with what I'm going to do with

15 respect to the preliminary -- the request for a preliminary

16 injunction and as well as the Committee's --

17     MR. POLEBAUM:  Yes, Your Honor, and we do intend to

18 address that issue as part of this preliminary injunction.

19     THE COURT:  Well, you tell me -- I don't want to --

20     MR. POLEBAUM:  What I would like to do, Your Honor,

21 if I may --

22     THE COURT:  Am I going to have a plan?  Are we

23 going to have a plan, I should say.

24     MR. TRAUB:  I think I missed the particular issue

25 maybe it would be important what the creditors think where we

1    stand in the case.

2            THE COURT:  Well, I'll give you a chance in a

3    minute.  He's got the floor.

4            MR. TRAUB:  I'm just anxious, Your Honor.

5            THE COURT:  Okay.

6            MR. POLEBAUM:  Yes, Your Honor, we can have a plan

7    of reorganization in this case if people will start focusing

8    on the business.  I can't tell you what's happened since

9    February 9th when the Big Lots complaint was filed.  Since

10   that time, we've not made progress on negotiating a plan of

11   reorganization because everybody's been focused on getting

12   ready for this hearing.  Everybody's been hiring lawyers to

13   represent them, and nobody's focusing on the business.  Your

14   Honor, we are in the middle of negotiating a plan of

15   reorganization with a third party.  We think that the

16   economic terms -- the economic terms have not been finalized.

17   There are still open issues.  We think the parties are fairly

18   close to being able to bring that to fruition, and we think

19   that if everybody would start focusing on that rather than

20   what we're here on this afternoon --

21           THE COURT:  Well, you've been focusing on it for

22   fourteen months, and there's been, as I understand it, rather

23   substantial loss of property --

24           MR. POLEBAUM:  Yes, Your Honor.

25           THE COURT:  -- since the filing and I guess, that's

FORM FED 25   PENGAD • 1-800-631-6989

1    not -- that doesn't recommend me thinking that there's going

2    to be at least a confirmable plan.  You may have a plan --

3        MR. POLEBAUM:  No, Your Honor, we think the plan is

4    a highly confirmable plan.  It provides for a third party to

5    come in to put some new equity into the debtor, to provide an

6    additional loan facility, to distribute some cash to

7    creditors, to distribute a note.  We think it's a viable,

8    feasible plan, and we'd like the opportunity to try to bring

9    that to fruition and to file it with the Court.  In addition

10   to that, Your Honor, the debtors are also negotiating with

11   some third-party lenders to provides some additional

12   financing to the debtors, and if all else fails, Your Honor

13   --

14       THE COURT:  When you say "additional financing",

15   for purpose of financing a plan?  A confirmation of a plan?

16   Or the purpose of staying out of the range indefinitely in

17   Chapter 11.

18       MR. POLEBAUM:  Your Honor, we think the debtor has

19   three choices,and we're right at the critical point in time

20   where we need to make those choices.

21       THE COURT:  How much time do you need?

22       MR. POLEBAUM:  We think we need sixty to ninety

23   days to bring this to a conclusion, Your Honor.

24       THE COURT:  You know, this is almost the whole --

25   this process is like a distress sale, and, of course, I'm

1   sure there may be people out there waiting to buy the case

2   cheaply, and I don't want to encourage that.  But you know, I

3   have no control over the last fourteen months, and so I'm

4   going to say, maybe it's your own fault.  But you can take

5   that as a criticism.  That can be a criticism on most Chapter

6   11s I guess, but --

7           MR. POLEBAUM:  Your Honor, I think I would like the

8   opportunity to be able to tell the Court what has happened

9   during this Chapter 11 case, and we're prepared to do that,

10  and so that the Court understands where the debtor is today

11  and what the choices are before it --

12          THE COURT:  Well, my question is, is negotiation a

13  viable option today, and if it isn't, let's get on with it.

14  I'll ask you in a minute.  I'll let him finish.

15          MR. POLEBAUM:  Yes, Your Honor, I believe that

16  negotiation is absolutely a viable option.  There's -- In the

17  early fall of 2004, the debtors recognized that their sales

18  were continuing to lag, and that they needed to refine the

19  strategy and direction of their stores.  They weren't

20  performing, and the debtors, in connection with the Creditors

21  Committee, hired a consulting firm called Retail Forward.  In

22  fact, I think Your Honor, one of the first things you did in

23  this case, Your Honor, was to approve an extension of their

24  retention.  With Retail Forward, Your Honor, the debtors

25  prepared a business plan that changes the format of the

stores, changes the merchandise for the stores, changes the

signage, and brings a whole new approach to how the KB stores

present themselves to consumers.  That plan started being

implemented in mid-January and really rolled out to all 625

stores February 1st.  Since February 1st, Your Honor, the

debtors' sales, for the first time I believe in fourteen

months or perhaps sixteen months, the debtors' sales,

comparable store sales year over year have increased.  The

debtor had not been able to make that happen for at least

fourteen months prior to now.  It's unfortunate that the

business plan only started getting implemented when it did

start getting implemented, but it is now in place.  The

debtor's moving forward with that plan, and the sales have

responded fairly dramatically, frankly.  Not only are the

comparable store sales higher year over year, but as against

the debtor's plan, it's about 15 percent over plan.  So that,

the debtors believe that they are now at this time -- and

again, it is unfortunate that it took as long as it did, but

we are where we are, but the debtors do believe that their

business is now gaining traction, that the sales are firming

up, and it has an opportunity to continue as a viable toy

retailer in a mall-based environment.

           THE COURT:  And you'll know in the next sixty days

whether or not you can put together a confirmable plan; is

that --

1    MR. POLEBAUM:  Well, I asked for sixty to ninety,
2  Your Honor, but, yes.

3    THE COURT:  Sixty to ninety.  Okay.  Thanks.  I'd
4  like to hear from Big Lots, and I'll give the Committee a
5  chance in a minute.  I know you're dying to --

6    MR. TRAUB:  It's just my personality, Your Honor.

7    THE COURT:  By the way, I have read your brief, and
8  I've read all of the briefs that have been furnished to me,
9  and it is my intention to make a decision today, not to take
10  it under advisement.  So, if that helps you.  Go ahead.  How
11  is -- I have a couple of questions of Big Lots.

12    MR. MARWIL:  Certainly.

13    THE COURT:  Obviously, Big Lots feels that they've
14  been imposed on in connection with the acquisition of these
15  stores, and I -- and you filed a lawsuit, but is it possible
16  -- and I want to thank you for your brief, by the way.  You
17  really kind of articulated the priority or at least the level
18  at which the -- what is it, a $52 million note stands, and of
19  course that leads me to the thought that maybe you didn't
20  realize that until rather late, and -- or your clients didn't
21  or alternatively, you realized that the Committee knew about
22  it and that might have led to the resignation from the
23  Committee and the filing of the lawsuit, but I wonder is
24  there's some disillusionment that occurred.

25    MR. MARWIL:  No, Your Honor, I don't think so.

1  Your Honor asked why we resigned from the Creditors Committee

2  --

3       THE COURT:   You don't have to tell me, but I have

4  to -- and I can just guess at why.

5       MR. MARWIL:   Well, I think that it would not be

6  accurate to say we resigned because of the structural

7  subordination potential with respect to our note.   In fact we

8  were aware of that potential and are obviously aware of that

9  potential given the outline in our brief, but for a variety

10 of reasons including the fact that we don't think the debtor

11 is making sufficient progress toward reorganization and we do

12 think that the debtor -- in fact that the Committee, as well,

13 suffered from conflicts of interest that really prohibit them

14 from acting as fiduciaries for the benefit of Big Lots as a

15 HCC creditor in looking at this lawsuit.   And it's not just

16 in pursuing the lawsuit as a plaintiff, it is in the

17 deferment of a lawsuit which is the subject of the 105 action

18 as a substantive economic issue that benefits the insider

19 defendants who are in control of the debtor, and that's the

20 problem with the motion itself and the problem with the

21 insider defendants from remaining in control with respect to

22 the motion.

23       THE COURT:   I'm going to get to that matter.   But

24 what I do want to ask you is, has things gone beyond the

25 prospect of one more chance to negotiate a plan and perhaps

1  resolve maybe not perfectly but at least imperfectly your

2  client's interest?

3         MR. MARWIL:  Your Honor, I think if we know that

4  our state court lawsuit is going to proceed a pace, and I

5  think it's important that we all understand how that lawsuit

6  is going to proceed if Your Honor does not enjoin it.

7         THE COURT:  Well, I --

8         MR. MARWIL:  It's going to take months --

9         THE COURT:  Well, I know.  I understand --

10         MR. MARWIL:  -- before we get into any well beyond

11  the sixty to ninety days before there's any real action in

12  that suit, and for the debtors to come in and say that

13  there's going to be all this activity, we know, based on the

14  papers we've already read, that the defendants are going to

15  file a motion to dismiss, and when they file that motion to

16  dismiss, the Chancery Court Rules say no discovery, and that

17  motion to dismiss is going to be briefed, and the Judge is

18  going to decide that motion over the course of four months,

19  five months, six months.  We've already agreed to give the

20  insider defendants a thirty-day extension of their time to

21  answer or to file that motion to dismiss in the action

22  anyway.  So, they have what they want just by virtue of how

23  the state court is going to proceed with the action, and on

24  top of that, we offered in our papers, we won't take

25  discovery for ninety days other than getting what you've

1  already delivered to the Creditors Committee, and we said, To

2  the extent that we need to do anything else, we'll come back

3  to Your Honor if we can't get it worked out by agreement, and

4  the debtors have said --

5  THE COURT:  Can I assume that in good faith your

6  client will negotiate, assuming an acceptable plan or a plan

7  comes in?

8  MR. MARWIL:  It would be easier for us to believe

9  that we could get to an acceptable plan if we are not

10  hamstrung in getting started on our state court lawsuit.  If

11  Your Honor issues the stay, and we're not allowed to at least

12  proceed toward that motion to dismiss and, from our

13  standpoint beating the motion to dismiss, we're going to be

14  that much further behind before we're comfortable settling at

15  anything other than a very significant amount of money.

16  THE COURT:  You know, I have the feeling that if I

17  do the wrong thing this is going to collapse into an orgy of

18  litigation, and I really would like to do my best to avoid

19  that.

20  MR. MARWIL:  I would offer to Your Honor the

21  following:  I think the easiest way to avoid litigation in

22  this bankruptcy case is to allow the state court action to

23  proceed the way I just outlined.  That's how it's going to

24  go.  They're going to file a motion to dismiss, and it's

25  going to take four to six months to brief it and get a

1    decision, and if we can get the hundred thousand pages of

2    discovery that they already have, that are sitting in boxes,

3    and file them somewhere that is not going to take anything

4    other than a copy machine to get us, we're happy.

5            THE COURT:  You're talking about that monument of

6    paper --

7            MR. MARWIL:  That the Creditors Committee has gone

8    through.

9            THE COURT:  -- delivered to the Committee.

10           MR. MARWIL:  And if that happens, the state court

11   suit's often -- the state court and the debtor actually then

12   can focus on the reorganization, and, you know, this flurry

13   here today, all these people sitting back here, it's self-

14   induced by the debtor and by the insider defendants.  They

15   didn't have to file this adversary proceeding in the 105

16   motion.  There's nothing happening of any immediate threat at

17   all in the state court action.  They got an additional thirty

18   days to answer.

19           THE COURT:  Well, you got their attention.

20           MR. MARWIL:  Well, we did.

21           THE COURT:  You sure did.

22           MR. MARWIL:  Properly so.

23           THE COURT:  Okay, listen, I'll get to the

24   preliminary injunction in a minute.  I want to hear -- the

25   Committee wants to say something.  Maybe you can cover some

1    of the questions I've asked.

2         MR. TRAUB:  I'd like to give you some context of

3    where we are, what the real plan negotiations going on are.

4    You came late to the case, and we told you -- actually we had

5    sort of a non-event hearing the first time you were here just

6    to sort of get to know each other and say, Look, we're going

7    to get to the crux of this case the next time that we see

8    you, which we picked February 28th.  What's happened in the

9    case that's led to where we are -- and I'm going to tell you

10   very specifically about plan negotiations which you're

11   entitled to know and you'll see how important the standing

12   issue is and how the case will move correctly if you deal

13   with it that way.  So, where we've been in this case, we've

14   had numerous extensions of exclusivity.  We told you the last

15   time that we had objected to the debtor filing a premature

16   plan because we felt the plan was not viable.  Numerous

17   revisions got made.  We hired this consultant and the plan is

18   either a good plan, it's worked for three weeks in February.

19   Three weeks in February is not the end of the world.  I mean,

20   it's not exactly the highest selling season of toys.

21   Valentine's Day cards are good in February, that's important.

22   Where we're at is as follows:  The debtor has always taken

23   the position in this case, and you can see it, and I'm happy

24   to introduce if you haven't seen them, in every extension of

25   exclusivity motion, the debtor has always taken the position

1  that it might be free to settle claims against its insiders.

2  So, what we did, in terms of preserving the status quo to

3  work during these fourteen months on the business, is to say,

4  You know what? We'll put off this standing motion. We have

5  no intention of suing you tomorrow, but you're serious? You

6  really think that there will be a circumstance in which a

7  Board of Directors that is solely made up of insiders and no

8  outside directors that you, the debtor, could reach a

9  settlement with them? That's why we haven't ruled out the

10  possibility. Let's focus on the business and in each

11  stipulation there was a clause that said, Without our

12  consent, they could not compromise claims against their

13  insiders. They then invited us, as the shareholder

14  defendants, directed defendants, to investigate the claim for

15  the purpose of seeing if we could come up with some solution

16  to it. Quite frankly, I thought that part of the solution

17  might have been that they would fund a new value plan,

18  economics would go forward, and we'd have an argument about

19  how much money got distributed because the business would be

20  a little better capitalized. We finished our investigation

21  during the last period -- just before we saw you, and we

22  concluded that the debtor was insolvent at the time in April

23  of 2002 when it distributed $120 million. From every day

24  thereafter, they were insolvent. That's what our

25  investigation shows. That's what Big Lots is saying. From

1    April 2002, because of taking out that gigantic sum of money,

2    the company was insolvent.  We then, as we got to this

3    hearing that you're having today, have been negotiating with

4    one party for the purpose of seeing -- We're down to one

5    party.  During the month of January, I'm happy to say, Your

6    Honor, we had two or three hot prospects where I would have

7    come in very present, We have a sale to tell you about that

8    you'll be proud about.  It didn't work.  We're down to one

9    party.  This one party, the crux of what -- Who's doing the

10   negotiation?  In all due respect to Mr. Polebaum, we're

11   negotiating.  It's for the creditors' benefit.  We're the

12   ones who are saying what we need and what has to happen for

13   us to support it, and the critical element that seems to be

14   missing is that nobody will agree that a sum of money should

15   be set aside -- not for today, but as we can see where there

16   is a business deal, a sum of money should be set aside for

17   the purpose of pursuing litigation which we believe is valid

18   and meritorious and either will provide a substantial

19   dividend -- $120 million goes a long way towards a $200

20   million debt to navigate an agreement on that.  So we tried,

21   you don't know me, Your Honor, but I try to make a deal every

22   day rather than have to have this kind of thing.  Up until

23   last Friday, we tried to come to a deal with the debtor which

24   said, Are you now finally willing to waive your right to ever

25   settle with your clients  -- I'm sorry, with the insiders?

1   And they said, Yeah, but not under all circumstances.  If for

2   instance, the Judge allows that case to go forward and we

3   want to intervene or other events happen, then we get our

4   right back to try to settle with our insiders.  I said, Guys,

5   what are you talking about?  We're not doing that.  So, we

6   went back and forth and back and forth and we started to read

7   these pleadings, and what we're saying, very, very clearly is

8   if you understand the history of a group of -- of a debtor

9   controlled by these insiders, who has up until this last

10  Friday taken the position until they filed their pleadings,

11  that they had the right under certain circumstances to settle

12  against the insiders and promulgate a plan for people to vote

13  on, that's forced our hand.  So, now why do I say the

14  standing motion should be heard first?  First, most

15  important, you supervise this case.  Is there a confirmable

16  plan of reorganization?  So long as we don't have standing

17  where we can tell this particular plan funder, Guys, here's

18  what we need.  Here's what the business needs.  Here's the

19  stuff you can work out with the company in terms of

20  financing, but unless there's a budget that will be in there

21  to be set aside to prosecute claims if they want to prosecute

22  claims -- claims are going to get prosecuted or not -- Unless

23  there's a budget, there can be no business deal.  So, for the

24  debtor to come up here and say, We're close to a deal, we're

25  not close.  You know why we're not close?  Nobody's agreeing

1    to set aside money in these negotiations for the prospect of
2    litigation later down the road.  If that doesn't -- The only
3    way that's going to change, if we get standing.  Second, most
4    important, and I think will put the case on an even keel, two
5    remaining points:  One, we're not looking to start litigation
6    tomorrow.  On the other hand, when we read in the debtors'
7    pleadings, the debtors' pleadings that, you know, it's one
8    thing that's a valuable assets of the estate, these causes of
9    action, solvency and everything else, and, you know, we want
10   them for the estate, we the debtor, but really we believe and
11   the word in the affidavit of Mr. McMahon in the other
12   pleadings, that's not the real reason we're here.  The real
13   reason we're here is because it was a lousy Christmas season
14   in December of '03.  Who cares?  The company was insolvent is
15   what we're saying and they're saying in April of 2002.  It's
16   a red herring.  It means nothing that it was a bad Christmas
17   season.  We're all sorry it was a bad season, but the
18   allegation is in April of 2002.  So, we're the -- To have
19   them put in papers that says, Oh, yeah, we'd really like it
20   for the company.  Keep in mind, while they were putting those
21   papers in was before last Friday, they still weren't
22   conceding that they didn't have the right to settle it
23   themselves, which we wanted.  We asked for the rights --
24   Listen if Big Lots settles, do we have the right to -- Do we
25   have standing for that purpose?  Well, we're not sure we're

1    willing to give you that.  I said, Guys, enough is enough.

2    So, for the two principal purposes of this case, is there a

3    reorganizable case?  We must have standing so we can dictate

4    that money gets set aside for litigation.

5        THE COURT:  Let me ask you a question.

6        MR. TRAUB:  Yeah.

7        THE COURT:  As I understand the exclusive period as

8    an exception in favor of the Committee, the Committee --

9        MR. TRAUB:  Not the new one.

10       THE COURT:  Pardon me?

11       MR. TRAUB:  Not the new one.

12       THE COURT:  Not the new what?

13       MR. TRAUB:  The new one says there's a joint plan.

14   There's an ability of each party, a joint exclusivity, the

15   new proposed issue.  The new proposed extension of

16   exclusivity.

17       THE COURT:  So what are you saying?  Are you saying

18   you have not had the authority to file your own plan?

19       MR. TRAUB:  The only way we could have filed a

20   plan, up until now, through this bridge order, is if they

21   filed a plan that we didn't like.

22       THE COURT:  Okay, would that help --

23       MR. TRAUB:  We need standing.  And let me say one

24   other thing I think is important, since you understand --

25       THE COURT:  Well, we're talking about filing

1  lawsuits.

2      MR. TRAUB:  We're not filing a lawsuit tomorrow.

3      THE COURT:  Okay, but a plan though, if that could

4  be opened up so that the Committee -- I mean, it is a plan to

5  say we're going to sue everybody in sight and everybody will

6  be happy --

7      MR. TRAUB:  No.

8      THE COURT:  If you want to file it, you can do

9  that.  You can file a plan that would authorize you to do go

10  ahead, and --

11      MR. TRAUB:  Yes, but I could just say one thing to

12  clarify it?

13      THE COURT:  Yeah.

14      MR. TRAUB:  We're charged -- they make these

15  conflicts of interest things which are just so offensive to

16  me because I want to introduce a document, they'll show you

17  some conflicts of interest that would make your hair -- would

18  make my hair stand up.  But in any event -- Sorry about that.

19  I'm going to take my foot out of my mouth.  But in any event,

20  we've reached out, there are several major stakeholders in

21  the case:  ASM and Angelo Gordon, who bought tens of millions

22  of dollars worth of claims.  Early on, Angelo Gordon got

23  under the tent, so to speak, signed a confidentiality

24  agreement.  We communicate with them regularly letting them

25  know what's going on.  When ASM filed their motion, we

1  contacted their counsel and said, You know what?  We're at

2  such a critical phase of the case, it's time that you become

3  ex officio members of the Committee.  You are large

4  stakeholders.  You got a real handle of what's going on, and

5  we're either going to come up with a reorganizable plan

6  funded deal or, perhaps and hopefully -- I mean, Chapter 7, I

7  don't like that word, but under Chapter 11, an orderly wind

8  down because many businesses that they would participate in.

9  Both of those parties are in court today, both represented by

10 counsel, both of whom support us getting standing today

11 because we can't negotiate a plan with this third-party

12 funder without it, and we can't continue to operate where the

13 debtor's making statements in the public record.  You know,

14 it's a wonderful thing that the company was insolvent in '02,

15 but that's not the real reason, there are other reasons.

16         THE COURT:  You use the word "standing".  Do you

17 mean standing to file a lawsuit against the insiders?

18         MR. TRAUB:  Yes.

19         THE COURT:  Okay.  And standing to file your own

20 plan, if that's what you decide to do.

21         MR. TRAUB:  Well, both of those, sure.

22         THE COURT:  Huh?

23         MR. TRAUB:  Yes, both.

24         THE COURT:  Okay.

25         MR. TRAUB:  Now, I will say to the Court, and I

1  will say it to everybody present, I believe that in the next

2  thirty to sixty days, we will know whether we can have a

3  consensual deal.  If we don't have standing today to bring

4  that lawsuit, it will never happen because we can never come

5  to -- we've been negotiating with this party on two different

6  occasions to eight months.  They are not setting aside the

7  money for the litigation which is important to any plan.  He

8  wants it.  Consolidated wants it.  We want it.  ASM wants it.

9  Angelo Gordon wants it.  That's what creditors want.  I don't

10  care what the debtor wants, it has to please creditors to do

11  that.  If we have standing today, we will not commence a

12  lawsuit until the end of this period of time to see whether

13  we have a deal.  That's our agreement.  We will not commence

14  that lawsuit.  There will be no distraction whatsoever.  But,

15  it will enable us in plan negotiations to say, Listen, guys,

16  we have standing.  It's us you need to talk to.  And in order

17  for us to agree to a reorganization plan, you have to set

18  aside this money, and where's it's gone, to give you the

19  flavor of it, like in every business deal, Your Honor,

20  there's a --

21          THE COURT:  How much money are you talking about?

22          MR. TRAUB:  For what?

23          THE COURT:  To set aside.

24          MR. TRAUB:  Three million.

25          THE COURT:  Three million.

1    MR. TRAUB:  Yeah.

2    THE COURT:  That's a lot of attorney's fees.

3    MR. TRAUB:  It's mostly -- you know who it goes

4    mostly to, I mean, is the -- There are professionals of

5    accountants, et cetera, who have to testify as to solvency

6    and other opinions, and, you know what the good news is, Your

7    Honor, you get to rule on all that.  If there's not a budget,

8    hopefully not, we'll settle it, maybe.  If there's not a

9    budget, these are very deep -- this is one of the biggest

10   private equity funds in the world, if they know we have $40

11   to sue them, we're not going to last to long.  We need a

12   certain amount of money -- we wanted 10 but we've come to 3.

13   We want $3 million set aside in a fund for the purpose of

14   commencing litigation, and so you're aware, because you're

15   entitled, it's your case, over the last month and over the

16   next month, we have been adding up until our ears -- adding

17   up every penny.  How much is it to wind down this?  How much

18   to wind down that?  How much if we exclude this?  How much if

19   we exclude that?  And there are a lot of scenarios, there's

20   no money to sue.  So, and that's because we don't have the

21   right to do it.  We need standing today.  We can't have

22   either plan negotiations.  They will fail.  There's no point

23   in going any further.  We cannot do it without standing

24   today.

25   THE COURT:  Let me ask you, is it possible that a

1    plan could be negotiated that eliminates your Committee or

2    Big Lots' right to sue the insiders?

3           MR. TRAUB:  Yeah, if they settle.

4           THE COURT:  Is that a non-negotiable --

5           MR. TRAUB:  They have to settle.

6           THE COURT:  Oh, they have to settle, that's right.

7    Absent settling.

8           MR. TRAUB:  Well, no.  I mean, just to give the

9    flavor of it, Your Honor, we negotiated for a year.  We made

10   a settlement demand on the defendants.  It was, I promise

11   you, not take it or leave it.  It was to try to reach a

12   business solution.  Haven't heard a word.  As a matter of

13   fact, all we hear now is, you know, two or three toy

14   manufacturers are hopelessly conflicted because they didn't

15   investigate unfair pricing in 2003.

16          THE COURT:  It's Wal-Mart's fault.

17          MR. TRAUB:  It's Wal-Mart and -- you know, Hello.

18   We're saying you were insolvent in 2002, who cares?  We'll

19   deal with it later, and in terms of conflicts, Your Honor, I

20   have to point out one thing because there was some nasty

21   remarks made about the Committee.  We take ourselves very

22   seriously.  I'm prepared to hand up an exhibit.  There were a

23   lot of people that got money out of that recap transaction,

24   some officers, don't want to sue them tomorrow.  I told you,

25   we'd like to take one last stand once you give us standing to

1    try to present a plan and say, Your Honor, we did a heck of a

2    job.  We'll leave this for another day or we'll settle it.

3    Insiders got money.  Shareholders got money.  The party who

4    is representing Bain, Ropes & Gray, their investment company

5    received almost a million dollars as an investor in the deal.

6    So before people start to throw darts, I'm happy to introduce

7    -- I have an exhibit for everybody.

8              THE COURT:  Another time.

9              MR. TRAUB:  Before they start throwing darts, we

10   can't do this, we can't do that, we represent all creditors;

11   okay?  We have refrained for fourteen months to do a detailed

12   investigation.  Why did we do it without seeking authority

13   from day one?  Because, as you know, Your Honor, if you can

14   do it in a private board room, here's what we have, nobody

15   has to know much about it, let's come to a deal.  Eventually,

16   they said, Well, we still may have the right to settle with

17   ourselves.  I said, Guys, we're at the planning stage and you

18   want to settle with yourselves?  You've  got to be kidding.

19   We can't do that.  So we have no conflicts.  We represent all

20   creditors.  Every major creditor constituency will stand up

21   today and say, Your Honor, if there's going to be a

22   successful plan negotiation -- Traub and his group, they're

23   not suing tomorrow, but let the business part plan out, work

24   on the business.  Let them use that as an ability to help

25   negotiate a plan, and each of us will stand up and say we

1   want to actively get involved and see if there's a deal.  ASM

2   must have $15 or $20 million in claims.  Angelo Gordon, $20

3   or million in claims.  Their counsel is here.  They're

4   prepared to stand up and support us.  Give them standing so

5   that we can negotiate a fair plan.  Once we do that, we're

6   going to roll up our sleeves for as long as you give us, and

7   we will either say we can cut a deal --

8           THE COURT:  It won't be very long.

9           MR. TRAUB:  I don't want it to be very long.  How

10  do you like that?  I really don't.

11          THE COURT:  I have in mind the next three, four,

12  five months.  Either we're going to have a proposal --

13          MR. TRAUB:  Your Honor, to be honest with you, I

14  have shorter in mind.  The company's going to start to lose

15  money.  I believe that a couple of months -- and I'll tell

16  you, it's a hundred percent doomed if we don't have standing

17  because there's not enough money to be set aside to protect

18  people's interests.  You give us that, we'll work like dogs.

19  We're not commencing suit.

20          THE COURT:  I'm assuming when you say standing, you

21  want to make the insiders kick in something.

22          MR. TRAUB:  Yes.  We are the party to bring that

23  action.  We're not going to bring it tomorrow.  We're

24  prepared -- even though there were some nasty things said --

25          THE COURT:  No, I mean in negotiation, you want --

1        MR. TRAUB:  Yes, we're the one.

2        THE COURT:  Okay.

3        MR. TRAUB:  Nobody else.  And, you give us that,

4   we'll roll up our sleeves and try to cut a deal.  We'll also

5   commit to not commencing a lawsuit.  If the case is not

6   reorganizable in its current form and pieces have to be sold

7   and we have say, you know, somebody, you want to buy 300

8   stores?  You want to buy Puerto Rico?  You want to buy the

9   wholesale business?  At some point down that road, depending

10  on what happens, we may have to commence suit, but we're not

11  here -- we've never said to commence suit until they said,

12  you know what, we were in the final phase of plan

13  negotiations, but we may have the right to settle with

14  ourselves, and now, you know, we'll give up that right, but

15  we want an independent party to investigate that after they

16  authorize us to do all the work.  We've done all the work.

17  We're the appropriate party, and if you don't do that, Judge,

18  I mean, you know, we're going to blow ourselves up.  We're

19  going to want a Chapter 11 Trustee.  We're just going to dive

20  under the covers, and say, we can't function.  We've got to

21  be a little more strong-willed than that.  They can function.

22  We're not suing them tomorrow.

23        THE COURT:  Well, I have in mind a Chapter 7

24  Trustee, and I know that's a bad word, but it --

25        MR. TRAUB:  If they want a Chapter 11 Trustee, Your

1  Honor --

2          THE COURT:  Chapter 7.

3          MR. TRAUB:  Well, we'd like to be able to brief

4  that, but I believe there are several Chapter 11 Trustees, if

5  they really want to run for the hills, that would do an

6  excellent job and we still may get a plan done.  I believe

7  that if you give us standing, give us as short a period of

8  time as you think is appropriate so that we can level the

9  playing field, we will not commence suit and then we won't

10 have these kind of statements made that we allege is a

11 substantial asset.  They allege is a substantial asset, and

12 saying, Yeah, that's true, but you know what, it's really

13 more important that Wal-Mart attacked us in 2003.  It's like

14 saying, you know, we're going to fly to the moon in 2011.

15 Who cares?

16         THE COURT:  Can I assume that when you talk about

17 standing your interests are very similar to --

18         MR. TRAUB:  Absolutely.

19         THE COURT:  -- Big Lots?

20         MR. TRAUB:  Just let me say this -- He's a guy who

21 likes to speak for himself, but let me say one thing first:

22 Our interests are not unaligned; okay?  They clam that they

23 have a dibs at a certain portion of the claim that we don't.

24 At the end of the day, if there were to be a negotiation, and

25 Mr. Marwil can deal with that, if we were to file the

1   creditor plan, and let's say we move forward, and one of

2   those things I would commit to the Court I would certainly

3   try to do is say, You know what?  Let's say the cases could

4   be substantively consolidated and we could do away with some

5   of your structural subordination so that we all share, and

6   the Judge doesn't have to see that your legal bill is six --

7   high, and my legal bill is high.  One way to solve that at

8   the end of the day is to figure out -- Right now, do you know

9   why they're upset?  You asked that, and I'm going to

10  speculate and he can answer for himself.  They're upset

11  because under the debtors' liquidation analysis it shows that

12  their entire plan is structurally subordinated.  Who would

13  like that?

14           THE COURT:  Whenever it would get to zero.

15           MR. TRAUB:  Zero.  So, in our plan, I commit that

16  we're not going to do that to them.  I mean, he's a nice

17  enough guy.  He certainly was nice to us when he was on the

18  Committee.  We're going to try to cut a deal -- Who wants to

19  get nothing?  So, are our interests the same?  They're not

20  identical, but we're on the same side.  We think that those

21  guys should kick in some money.  It's a question of how we

22  share it.

23           THE COURT:  Okay.  Thanks.  Go ahead, I --

24           MR. POLEBAUM:  I would like an opportunity to --

25           THE COURT:  I'm going to give you a chance, but I

1    think you may want to respond to what he's going to say.

2              MR. POLEBAUM:  No, I don't, actually.  I think it's

3    more important to focus on what Mr. Traub has just said.

4              THE COURT:  All right.

5              MR. POLEBAUM:  Because I don't think he's

6    accurately portrayed the status of negotiations to Your

7    Honor.  Your Honor, the Committee throughout this case has

8    taken strongly the position, and it is absolutely entitled to

9    do that, that there needs to be a litigation trust created

10   under a plan of reorganization, and it needs to be funded,

11   and it needs to be funded with $3 million.  That's been a

12   number that they've used for quite some time.  And frankly,

13   the debtor has always expected that that will be a portion of

14   a plan.  The debtors have acknowledged that they are not the

15   right party, they are not able to do the investigation and

16   the prosecution or the compromise of these claims.  They

17   understand that their Board of Directors and their senior

18   management are the targets of this litigation.  So, the

19   issue, Your Honor, is when do you make those final decisions

20   about who, how, when is the litigation going to be done?  The

21   debtors answer to that is you do it in the plan of

22   reorganization, and we are ready, willing, and able, prepared

23   to negotiate that.  I believe, Your Honor, contrary to what

24   Mr. Traub has said, that we are very close to achieving the

25   budget that the Committee has asked for in order to fund the

1    emergence of wind-down costs.  And just to be very specific,
2    Your Honor, the debtor had put together a budget of twenty-
3    six and a half million dollars, is the cost for curing leases
4    that need to be cured, paying administrative expenses that
5    need to be paid in winding down the estate, reconciling
6    claims in funding litigation.  We are about a million and a
7    half dollars apart with the plan -- potential plan funder on
8    funding that budget.  The creditors don't need to have
9    standing today to negotiate that with this plan funder.
10   They've been negotiating it with this plan funder for eight
11   months.  We can deal with that issue, and we can resolve that
12   issue as part of a plan of reorganization.  That's what plans
13   of reorganization are for.  That's what Chapter 11 is about,
14   is to get parties together to negotiate and settle their
15   differences.  It's not to try and resolve issues in advance
16   and say, this is written in stone forever.  Leave it on the
17   table, let the parties resolve it.  I believe that this plan
18   fund is going to satisfy the Committee on the budget --

19            THE COURT:  I am going to tell you, I am going to
20   give you a chance to put it together, and I'm going to
21   encourage that people don't start litigating until that
22   effort's been spent.  I don't know how much time we need.
23   I've heard the word sixty days, ninety days, whatever it is,
24   and, you know, I could -- Well, I'm going to do this:  Now we
25   get to the injunction.  Is there anything further that you

want to say on this?

MR. POLEBAUM: Yes, Your Honor. I mean the injunction is a lot, but I would like to --

THE COURT: Well, I'm going to get to that in a minute, but I'm gonna change the subject. Yeah, Big Lots wants to say something.

MR. MARWIL: May I be heard with respect to standing, Your Honor?

THE COURT: Sure.

MR. MARWIL: Mr. Traub is right in certain respects about our position. We are not unaligned with respect to wanting to see the Creditors Committee in standing to pursue the insider defendants on fraudulent conveyance grounds on behalf of the operating debtor subsidiaries. Now there's a big difference between representing the creditors of the operating subsidiaries, which is who they represent, and representing Big Lots as the only unsecured creditor, and frankly only real creditor at HCC. And there is an inherent conflict if they're representing both. And what we're suggesting as part of standing is, grant them standing with respect to the operating subsidiaries and allow them to proceed on their fraudulent conveyance point. Our lawsuit is not a fraudulent conveyance claim. It is a direct claim for breeches of fiduciary duty, fraud, to seek legal gain, unjust enrichment; okay? And our lawsuit to the extent that we can

1    settle it, great, but the Creditors Committee can't settle

2    our lawsuit without somehow compromising the operating debtor

3    creditors' recovery and vice versa. So we have to be there

4    to protect ourselves on behalf of HCC.

5    THE COURT: And what you say may be the price of

6    having a confirmable plan, but I -- it may require some

7    movement, but anyway, go on.

8    MR. MARWIL: And as far as the -- I don't know if

9    it did -- if it's an implicit threat in the being in debtors'

10   papers about a trustee coming in if the standing has to be

11   granted and somebody else has to do this. Our view is, you

12   know, if we have to appoint a trustee, we have to appoint a

13   trustee. It's not that big a deal. It's basically swapping

14   out the Board of Directors and putting in the trustee. I'm

15   sure that all of management and the directors will coordinate

16   and cooperate with the trustee that comes in, and maybe Mr.

17   Traub's right, maybe we can negotiate quickly, fairly, and

18   independently with the trustee about a reorganization and

19   about how to go after the insider defendants who got all of

20   this money and who harmed us. Harmed us for $45 million.

21   And so, you know, if there are key members of management that

22   need to be retained, we can put an additional program in

23   place. Whatever is necessary to keep the debtor operating

24   but operating under the flag of independence and not

25   operating and making decisions that when you peel back one

1    layer of the onion, it's obvious that decisions are being

2    made to benefit the insider defendants in connection with

3    their personal liability to Big Lots and to the unsecured

4    creditors.  And that's not right.  So --

5        THE COURT:  What can I do about it?

6        MR. MARWIL:  I think that -- two things:  Standing

7    to the Creditors Committee with respect to the operating

8    subsidiaries and allow us to proceed in our state court

9    lawsuit, the way we're doing, and, you know, frankly, Your

10   Honor, from what I've heard from both Mr. Polebaum and from

11   Mr. Traub, within ninety days, both of them agree there's

12   going to be a deal or it breaks up.  We're not doing anything

13   in the state court law suit for the next ninety days.  We've

14   agreed not to pursue discovery for the next ninety days.  No

15   irreparable harm.  What are we all doing here?

16       THE COURT:  Okay.  When you say "discovery", any

17   discovery.  If you're going to go out to third parties, they

18   want to be there with something.

19       MR. MARWIL:  What we have said is the hundred

20   thousand pages of documents that the Committee already got,

21   that we know is sitting in some law office somewhere in

22   boxes, give us that.  We'll sit tight for ninety days.

23       THE COURT:  Okay.  Okay, thanks.  I think they've

24   beat it to death.  Does anybody else want to say anything?

25   Any new people?

1    MR. BUTZ:  Yes.

2        THE COURT:  Go ahead.

3        MR. BUTZ:  Good afternoon, Your Honor.  Daniel Butz

4    from Morris, Nichols, Arsht & Tunnell on behalf of Bain

5    Capital Fund Seven LP.  With me in the courtroom today is

6    David Elkind.  He's an attorney with Ropes & Gray and he's an

7    attorney in good standing, admitted in the state bars of New

8    York and the Central and Eastern District of New York.  I ask

9    that he be heard today.

10        THE COURT:  Sure, of course.

11        MR. BUTZ:  Thank you, Your Honor.

12        MR. ELKIND:  Good morning -- Good afternoon, Your

13    Honor.

14        THE COURT:  Okay.

15        MR. ELKIND:  Your Honor, as I sit and listen, I've

16    tried to bide my time.  I've heard a lot of things from Mr.

17    Traub.  We've had a lot of discussions with Mr. Traub.  It's

18    very easy for arguments to be made and assertions to be made

19    to gain legitimacy because they're repeated, because they're

20    repeated by two parties who want to be plaintiffs and

21    accusations to be made.  I do want to respond to them, Your

22    Honor, and I want to address the issues before the Court

23    because there have been a lot of mischaracterizations of both

24    the facts and the issues.

25        THE COURT:  Okay, get with it.

1    MR. ELKIND:  And I will.  Your Honor, the

2  recapitalization that was done in April of 2002 was done at a

3  time when this company had overwhelming shareholder equity

4  and overwhelming net worth and overwhelming working capital.

5  And that continued to be the case after the transaction was

6  done.

7    THE COURT:  I read that in your brief.

8    MR. ELKIND:  Okay, and I want to emphasize that,

9  that the claims that are made over and over again that this

10  company was insolvent are absolute nonsense.  And you will

11  deal with them at an appropriate time in court, and I urge

12  Your Honor not to accept them, not to lend them credibility

13  simply because they've been repeated by two parties who want

14  to bring a lawsuit.  Let me now address the issues that Your

15  Honor does have before you, and those are the issues of

16  standing.  They relate to the issue of who ought to bring

17  claims or ought to have standing to bring claims.  They

18  relate to the issue of when claims ought to be brought.  When

19  standing ought to be granted and the timing and the plan

20  negotiations.  Let me address many of the issues that were

21  touched upon, Your Honor.

22    THE COURT:  Go on.

23    MR. ELKIND:  Your Honor, when KB filed for

24  bankruptcy, there was widespread reporting in the press as to

25  the reasons why it filed.  And the reasons why it filed were

1  not a  recapitalization done two years earlier.. The reasons

2  why it filed were very clear and they were a situation in

3  which Wal-Mart was able to sell product at prices below,

4  below where KB was able to buy it.  There was no way KB could

5  survive or any other company could survive in those

6  circumstances.

7       THE COURT:  I read that in your brief.

8       MR. ELKIND:  Okay, okay, Your Honor.  And that's

9  why not only KB but a number of companies were forced out of

10  this business, including Schwartz and now Toys-R-Us wants to

11  exit the business.  That's the reason why -- that's the

12  reason, and I urge Your Honor not -- Your Honor, the point --

13  there are limited resources in this estate, and the company -

14  - neither the company nor the shareholders of the company

15  would ever presume to settle a case with themselves nor could

16  they.  We can't settle claims against ourselves.  We will not

17  investigate claims against ourselves.  The company will not

18  investigate them.  The company will not settle claims.  The

19  company will not compromise claims.  That is a foregone

20  conclusion, and the arguments that to the contrary are

21  nothing more than a straw-man.  There is no doubt that any

22  settlement here has to be with the creditors of this estate,

23  with the Committee and/or with the creditors of this company,

24  period.  We accept that.  We cannot investigate.  That is not

25  the issue. That is not the issue here.  The issue here is if

1    the claims are to be pursued, by whom should they be pursued?
2    There can be no question here that the three members of the
3    Committee consisting of toy manufacturers, they have every
4    incentive and desire to use the company's resources not to
5    pursue claims against Wal-Mart which is their client, their
6    principal customer, not to pursue the claims against
7    themselves, the claims that are suggested by what was
8    reported in the press at the time these companies failed.
9    They will not do it.  They've asked for $3 million here not
10   to investigate and pursue all claims, but only to pursue
11   claims against insiders, against related recapitalization
12   transactions.  Similarly, Your Honor, there have been -- I
13   don't know what the total amount of fees have been that have
14   been billed to this estate by the Creditor Committee, but if
15   Your Honor looks at the time charges, it is clear that there
16   has not been for the hundreds and hundreds and hundreds of
17   thousands of dollars of time charges billed to this estate,
18   maybe millions, I don't know the exact number, there has not
19   been a penny, a penny spent on investigating the claims of
20   the toy manufacturers here.  Not a single --

21            THE COURT:  All right, I've read this in your
22   brief.  Go on, speed it up.

23            MR. ELKIND:  So, Your Honor, in a nutshell, if
24   there were claims to be pursued, they can and they should be
25   given to a trustee, whether it's a liquidating trustee

1  pursuant to a Chapter 11 plan or a Chapter 7 plan.  If there

2  were conversion within three months there would be a -- or

3  four months or whatever schedule Your Honor set, there would

4  be a Chapter 7 trustee, the claims would belong to him

5  including the claims that Big Lots is asserting.  Those are

6  claims of the estate.    And so, the issue is not whether

7  claims should be investigated but whether they should be

8  handled and put under the charge of a party that is free of

9  conflicts.    That's what we're saying.

10            THE COURT:    And who would you suggest?

11            MR. ELKIND:    Your Honor, what I'm suggesting here

12  is the following:    That as Mr. Polebaum said, quite

13  articulately and as Your Honor expressed, this case needs to

14  be brought to a conclusion.    This has been a -- the last

15  month, and as long as there are fights about litigation, have

16  been a complete distraction to this company particularly at a

17  time when this company is trying to make an effort to deal

18  with, negotiate with a buyer, and those negotiations are

19  between potential buyers and the Committee.    We are not doing

20  those negations and we are not settling anything.    I believe,

21  very strong, very strongly, Your Honor, that the interest of

22  moving this case forward, the interest of protecting the

23  interest of creditors as a whole, the interest in preserving

24  this company, the interest in maximizing value, the interest

25  in not chasing away employees of this company -- these guys

1  want to be suing employees of the company --

2          THE COURT:  Okay, get to it.

3          MR. ELKIND:  -- necessitate that, as Mr. Polebaum

4  pointed out, that parties cool down for three months,

5  negotiate.  Claims aren't going to go away.  We'll negotiate

6  with the Creditors Committee and that parties explore whether

7  they can work something out and within three months we should

8  know whether this is going to be a 7 or it's going to be an

9  11.

10         THE COURT:  All right, I want to tell at a 7, a

11 trustee would be good, is a very --

12         MR. ELKIND:  Absolutely right.  Absolutely right,

13 and so, within three months, if that's the schedule that Your

14 Honor sets, there would be a Chapter 7 trustee, if there

15 would either be a plan, in which case there would be a

16 liquidating trustee.  Of course it would be a liquidating

17 trustee to pursue any claims including claims against us, our

18 clients, including claims against the members of the

19 Committee, and that would be the right person to do it if

20 there were a plan.  If there's no plan, there's going to be a

21 Chapter 7 trustee as Your Honor points out.

22         THE COURT:  And that's a plan.

23         MR. ELKIND:  And a Chapter 7 trustee in that case,

24 has all the rights to sue anybody and everybody and a Chapter

25 7 trustee can sue not only us but it can also look at what

1   actually happened and sue the members of the Committee.  So

2   what we're urging, Your Honor, the counsel for the Committee

3   is very candid.  There's no need for them to commence, pursue

4   litigation for three months, and I think it highlights the

5   fact, Your Honor, that there's not a bit of prejudice being

6   suffered here by allowing the -- by leaving the situation

7   where the parties are not sitting there squabbling, hiring

8   lawyers, litigating.  Management's not being demoralized.

9   You've got potential buyers who don't know -- who don't know

10  whether the management of the company that they want to buy

11  are going to be on the butt-end of a lawsuit from a Creditor

12  Committee.  These are not things that you need when you're

13  trying to sell a company, when you're trying to restructure a

14  company, and when you're trying to get a plan done.

15            THE COURT:  Okay, I've got that, thanks.

16            MR. ELKIND:  Thank you very much.

17            THE COURT:  Anybody else want to say anything?

18  Make it short; would you?

19            MR. DUHIG:  One minor point, Your Honor.

20            THE COURT:  All right.

21            MR. DUHIG:  Good afternoon, Your Honor.  Peter

22  Duhig of Klett Rooney Lieber & Schorling.  I'd like to

23  introduce Jeffrey Ganz.

24            THE COURT:  Mr. Ganz.

25            MR. GANZ:  Your Honor, Jeffrey Ganz from Riemer &

1    Braunstein on behalf of Fleet Retail Group, the debtor in

2    possession lender here.  I think I understand the way Your

3    Honor is thinking about a Chapter 11 trustee, but I also

4    think I would --

5              THE COURT:  I'm not thinking about a Chapter --

6              MR. GANZ:  I understand --

7              THE COURT:  I'm thinking about a Chapter 7 trustee.

8              MR. GANZ:  That's what I do understand from the

9    comments you've made today about a Chapter 11 trustee, but

10   because requests have been made and that issue has been

11   discussed, I think it would be remiss of me to not mention to

12   the Court that the appointment of a Chapter 11 trustee does

13   represent a default, an event of default under the current

14   debtor-in-possession financing.  Now, I can't tell you what

15   exactly the lenders would do because we haven't considered

16   what we'd do in the event that that occurred, but I think it

17   would be remiss if I didn't mention that point to the extent

18   that the other parties are having this discussion.

19             THE COURT:  Well, you know, almost every loan

20   agreement inside and outside of bankruptcy has a clause like

21   that.

22             MR. GANZ:  I'll have a seat.

23             THE COURT:  And I think you know how they survive.

24             MR. GANZ:  I will have a seat, Your Honor, thank

25   you.

1      THE COURT:  Okay.  I mean, the people that draw the

2   documentation always put that in, and I --

3      MR. GANZ:  They asked me to make that comment.

4   Thank you, Your Honor.

5      THE COURT:  All right.  Pass on what I said to

6   them.

7      MR. BRODY:  Your Honor, Mark Brody on behalf of

8   Angelo --

9

10      THE COURT:  And that was a threat.  If it goes into

11   7 and 11, they're going to pull the chain on the financing or

12   they have the authority to pull -- you always have the

13   authority to pull the chain, I guess, I guess --

14      MR. GANZ:  Your Honor, please don't make that

15   mistake in assuming what I said was a threat, because we've

16   communicated with the parties in this room to let them know

17   our position and our position is that we have not considered

18   how it would work out.

19      THE COURT:  I'd like to get a plan in here, an

20   amicable plan, but --

21      MR. GANZ:  I think that that's essential.

22      THE COURT:  -- anyway, go on.

23      MR. BRODY:  Your Honor, Mark Brody on behalf of

24   Angelo Gordon.  As Mr. Traub indicates we do in fact support

25   the Committee's motion, but what we're primarily concerned

1    about here is exclusivity.  We share Your Honor's concerns

2    that fourteen months has come and gone and we don't seem to

3    be anywhere.  I found Mr. Elkind's remarks particularly

4    interesting in that, you know, he places the blame on this

5    bankruptcy squarely on Wal-Mart.  Wal-Mart's still there.

6    Target's still there.  The competition is still there.

7             THE COURT:  Oh, come on.  I don't want to get into

8    this.

9             MR. BRODY:  No, all I'm saying, Your Honor, is that

10   Mr. Polebaum said that they're about a million and a half

11   apart with a potential buyer.  That's a gap they should be

12   able to close in thirty days.  If we're not coming back here

13   for another sixty to ninety days, what will happen in the

14   meantime.

15            THE COURT:  Okay, who do you represent?

16            MR. BRODY:  Angelo Gordon, Your Honor.  We're owed

17   approximately $20 million.

18            THE COURT:  That's a lot of money.

19            MR. BRODY:  Yes, it is, Your Honor.  And what we

20   believe is, we believe that any extension of exclusivity

21   should be thirty days so that the parties have a chance to

22   come back here in a month, let Your Honor know what's going

23   on.  Let Your Honor know if they've made progress to a plan,

24   and if they haven't, at that point we should consider our

25   options.  If we're not coming back here for another ninety

1    days, at that time we may have no options but a Chapter 7

2    trustee as much as our view is that that is not going to be

3    the right way to go.  So, we think at the very least a

4    thirty-day extension is what will keep the parties' feet to

5    the fire and allow all of us to reevaluate the situation in

6    thirty days' time rather than in sixty or ninety.

7         THE COURT:  I might tell you I like a Chapter 7

8    trustee more than I like a Chapter 11 liquidating.  That's my

9    own biases, and I can be talked out of that, of course, and

10   I, you know, if it comes along in a plan, that's the plan,

11   but I'm just telling you Chapter 7 has its own plan and its

12   own momentum which I -- from experience, I think is not bad.

13        MR. TRAUB:  Under certain circumstances, Chapter 7

14   is a much better way to go.  In a situation like this, where

15   there's a lot of operations, if you'll give us a chance, keep

16   your mind open, I think an 11 would work.

17        THE COURT:  I would, and this is different, you're

18   right.  And I guess the major assets in this case, I think I

19   assume it's the leases and the staffing, the management --

20        MR. TRAUB:  Wholesale businesses, separate

21   businesses, people's view of skinning it down, different

22   types of things.  It's not just a everything's for sale.

23   It's not that way.

24        THE COURT:  Go ahead.

25        MR. DEHNEY:  Your Honor, I'm also going to be

1   quick.  We filed the objection where ASM -- I'm not sure if
2   Your Honor reviewed the objection on exclusivity.  Everything
3   we've heard about in the debates back and forth, we agree
4   with Angelo Gordon.  The professionals and the parties here
5   should be able to hammer out a deal in thirty days.  A lot of
6   professional fees are going to be spent if you go
7   sixty/ninety days, and if it's a million and a half dollar
8   gulf with the buyer, that should be arrived at pretty
9   quickly, and we would not like to be here in ninety days.

10          THE COURT:  Thirty days is nothing in the way
11  lawyers work.

12          MR. DEHNEY:  And, Your Honor, if it were at the
13  beginning of the case, I would agree, but you've had fourteen
14  months, and we've recited in our objection everything that's
15  gone on and everyone has agreed.  They've negotiated for
16  fourteen months, pursued different alternatives.  There's a
17  million and a half that separates a deal from no deal, and
18  thirty days, Your Honor, they should be able to get a deal
19  done.

20          THE COURT:  Okay, thanks.

21          MR. KENNEY:  Good afternoon, Your Honor.  Mark
22  Kenney for the United States Trustee.  First of all, Your
23  Honor, thirty days --

24          THE COURT:  Oh, I've been waiting for you.

25          MR. KENNEY:  I don't know if that's good or bad,

1   Your Honor.

2          THE COURT:  No, no, no, I -- You may have a client

3   that doesn't have any money involved.

4          MR. KENNEY:  That's very true, Your Honor.  I see

5   how they are on their quarterly fees.  Your Honor, I think

6   one of the biggest issues and it's funny because I hear, you

7   know, there's a lot of personalities involved here and a lot

8   of issues, but the biggest issue is going to be, can this

9   business be fixed in the first place, and it sounds like,

10  well you still have an operating debtor, and maybe there's a

11  chance of fixing it so that in that respect maybe, you know,

12  talk about putting a Chapter 7 trustee, you're basically

13  talking about the demise of the debtor which, you know,

14  according to Mark Twain, reports of his demise may be a

15  little premature, and maybe we don't want to start killing

16  the debtor now by even talking about that unless we're really

17  sure it can't be -- the business can't be fixed.  I think,

18  Your Honor, the decision whether the business can be fixed, I

19  think, has to include a decision on who's going to pursue the

20  estate's claims against insiders.  And I don't know that

21  that's something you can say, well, let's wait until we get a

22  plan in place and we're just going to appoint some neutral

23  third party, okay.  In almost every plan that I see, Your

24  Honor, you're going to have somebody selected by the

25  Creditors Committee, okay?  or the new shareholders who are

1  usually going to be the former creditors of the company

2  that's going to make the decision on who to bring in.  And if

3  that's the case, well, why not start looking to the people

4  right now, look into the creditors now to get a decision on

5  who's going to control that litigation.  It sounds to me like

6  the litigation is going to take place.

7          THE COURT:  Well, who knows?  The insiders may

8  deposit $108 million.

9          MR. KENNEY:  I think I lot of people would be happy

10  if that would happen, Your Honor, but --

11          MR. TRAUB:  Let's go home.

12          MR. KENNEY:  I'm going to be a lot older and a lot

13  grayer before that ever happens, Your Honor, and if that's

14  the case, you know, why not start focusing early on who's the

15  appropriate party to handle litigation?

16          THE COURT:  What are you suggesting?

17          MR. KENNEY:  Well, Your Honor, I think the idea of

18  having any kind of a trustee may be rather extreme, and I

19  think that perhaps that was found out there because that is

20  basically the equivalent of saying we're going to blow

21  ourselves up if we don't get our way, okay?  It's very

22  common.  I mean, in most cases that I've been involved in, it

23  is ultimately the Committee or the Committee's constituency

24  against the unsecured creditors who are going to control

25  those causes of action anyway.  Do we really need to delay

FORM FED-25  PENGAD  1-800-63'-6889

1  making a decision on that?  Maybe that becomes a major

2  element of a plan of reorganization, and dealing with it

3  today lets us know what we can get into a plan.

4          THE COURT:  Are you favoring the Committee's --

5          MR. KENNEY:  At this point we are, Your Honor.  We

6  think that that the Committee is normally the most natural

7  person to pursue it.  I understand there's some allegations

8  that there are conflicts of interest because of certain

9  members of the Committee, and that may be true.  I don't want

10  to commit whether there are or are not conflicts, but if

11  there are that kind of conflicts, do you then wall off the

12  people with the conflicts so that the remaining members of

13  the Committee can pursue that kind of -- pursue the estate's

14  causes of action?  And if we want to talk about the

15  conflicts, I understand --

16          THE COURT:  What conflicts?  Make sure I

17  understand.  You're talking about people on the Committee

18  that deal with suppliers that had a lot to do with the last

19  season of bad results.

20          MR. KENNEY:  Your Honor --

21          THE COURT:  Are you talking about -- Is that what

22  you're talking about?

23          MR. KENNEY:  Sometimes it's almost better to map it

24  out.

25          THE COURT:  I think I know what you're --

1   MR. KENNEY: And I think basically you've got --

2   THE COURT: I don't want to malign any or libel or

3   slander anybody. Let's go easy.

4   MR. KENNEY: Essentially, Your Honor, you have

5   basically certain people saying that the company's financial

6   problems are the result of predatory pricing, which I guess

7   can be antitrust violations which would include potential

8   violations by toy suppliers, and I guess that would be the

9   defense to their fraudulent conveyance action that the

10  company was solvent at all times, and it was strictly results

11  of antitrust violations by third parties, and they would

12  implicate members of the Committee who are toy suppliers.

13  But that is fifty percent of the current Committee. We do

14  have a vacancy on the Committee created by Big Lots'

15  resignation from the Committee, and we are looking -- I mean,

16  we've had a request to fill that vacancy. We are looking

17  very seriously at filling that vacancy. So that I think you

18  can still wind up with a committee that if need be is going

19  to be a sub-committee, but --

20  THE COURT: That's one solution.

21  MR. KENNEY: It's a significant and I think it's a

22  workable solution, Your Honor, but more important than that,

23  I think that to even know whether they're going to be able to

24  put together a viable plan, you really need to deal with that

25  issue up front.

1      THE COURT:  I realize that, and I -- What would you

2  suggest?  I heard thirty days, sixty/ninety days.

3      MR. KENNEY:  Your Honor, it could be that the

4  ability to put together a plan in the first place is going to

5  depend on knowing who's going to have the standing and who's

6  going to be pursuing those claims in the first place.  And I

7  don't know if Your Honor wants to say today, Look, we'll

8  decide the standing issue today and give them thirty days to

9  come up with a plan before --

10      THE COURT:  Oh, no, I'm --

11      MR. KENNEY:  -- or we'll give them thirty days, you

12  know, we'll make a decision on standing in thirty days and

13  give them sixty days to come up with a plan, okay?  But I

14  think it's very difficult to come up with a plan in this case

15  without resolving the standing issue.  Now, maybe what you

16  come up with is two separate plans.  Maybe let the debtor put

17  a plan on the table and let the Committee put a plan on the

18  table.

19      THE COURT:  Well, if I rule in favor of the motion

20  for standing by the Committee and then set some time limits,

21  would that help?

22      MR. KENNEY:  I think it would help, Your Honor.

23  And I think, obviously, just with everybody knowing who's

24  going to be dealing with those claims, even if they're not

25  pursued right away.

1    THE COURT:  And ask the Committee to -- if they're

2  going to start going to court, that they do it --

3    MR. TRAUB:  We give some notice.

4    THE COURT:  Give some notice.

5    MR. KENNEY:  I think that would be appropriate.  I

6  think -- and it's more important that -- to be able to move

7  this case off the dime because I think right now it's just --

8    THE COURT:  It's heated up.

9    MR. KENNEY:  It's spinning -- It's heated up but

10  the wheels are spinning.

11    THE COURT:  Okay.

12    MR. KENNEY:  And I think what we need to do is give

13  it a nudge, you know, it's like --

14    THE COURT:  Well, I'm going to tell you, this is

15  the last chance.  Either there's going to be a plan or there

16  isn't going to be a plan, and we're going to know that in the

17  next couple of months, and I guess what I'm going to say is

18  that I know a Chapter 7 trustee doesn't have any conflicts or

19  wouldn't have any conflicts that they're concerned about now,

20  and I think with that comment, I'll let you think about it.

21    MR. KENNEY:  I understand that, Your Honor, at the

22  same time that with a Chapter 7 trustee the company is dead,

23  and that -- I think that's antithetical to everybody's

24  purposes.

25    THE COURT:  That's very true.  A Chapter 7 trustee

can sell, and he can be an operating trustee, but maybe he --
I know maybe in the marketplace he has a disease and that
probably is --

MR. KENNEY:  Well, that's a kind way to
characterize it.

MR. FOX:  The 7 trustee, Your Honor, you have a lot
of moving parts.  I'm Michael Fox, Traub, Bonacquist.  We
just don't think that that's the way it would maximize the
value to the entire estate.  It may, Your Honor, address the
conflict issue that you're addressing, but there's so many
assets to that need to be distributed, marketed, and sold in
an orderly fashion, I don't believe a 7 trustee is just too
much of a knee-jerk reaction to cause --

THE COURT:  Okay, okay, yeah.

MR. MARWIL:  Your Honor, there is a way, I think to
solve both parts.  And remember that we've got the holding
company structured here.  Your Honor can appoint a Chapter 7
trustee for HCC, and that Chapter 7 trustee could deal with
the litigation and give direction -- or elect a new board if
it wanted to for the operating companies and it will still be
in Chapter 11 that can operating and that can try to propose
a plan.  HCC, that entity that's different than the operating
companies, and it can't be lumped in either on a standing or
on a trustee or on operations.  It's different.  And the
creditor constituency, which is us, is different.